MBTVCON1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        21 Cr. 530 (SHS)

 5   GEORGE CONSTANTINE
     ANDREW DOWD,
 6                                        Trial
                 Defendants.
 7
     ------------------------------x
 8
                                         New York, N.Y.
 9                                       November 29, 2022
                                         9:45 a.m.
10

11   Before:

12                  HON. SIDNEY H. STEIN,

13                                       District Judge
                                          -and a jury-
14
                          APPEARANCES
15
     DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   ALEXANDRA ROTHMAN
     NICHOLAS FOLLY
18   DANIELLE KUDLA
          Assistant United States Attorneys
19
     MARC C. GANN
20   AMANDA VITALE
          Attorneys for Defendant Constantine
21
     KEVIN J. KEATING
22   MATTHEW W. BRISSENDEN
     MATTHEW J. CONROY
23        Attorneys for Defendant Dowd

24   Also Present:   Joseph Carbone, Paralegal Specialist
                     Matthew Bailey, Paralegal Specialist
25
```

MBTVCON1

1          (Trial resumed; jury not present)

2          THE COURT:  Everyone is here, including the

3     defendants.

4          We have some concerns here.  It's a quarter of ten; we

5     only have 11 jurors.  I'm just letting you know that.  That's

6     not terribly troubling, but I'd rather see everyone here, all

7     16 jurors here at 9:30.

8          I think I informed the parties that Juror No. 6,

9     Mr. Boaten, B-O-A-T-E-N, told my deputy that he only gets paid

10    for when he works, and he'd be homeless if he had to sit for

11    three or four weeks in this trial.  I was going to talk with

12    him with the lawyers this morning.

13         To a certain extent he's taken that out of our hands.

14    He phoned my chambers this morning and said he woke up with a

15    sore throat and he was going to the -- oh, I'm sorry.  This

16    note says severe fever.  He woke up with a severe fever and he

17    was doing two things.  He may have COVID, so he was

18    quarantining, and he was also going to the doctor and somebody

19    should call him back.  That's Juror No. 6.

20         I told you Juror No. 10 — I think I informed you of

21    this — told my deputy that she was very nervous and anxious and

22    felt she could not sit, apparently really had no answer when my

23    deputy asked, Didn't you hear the judge ask if there was any

24    reason you couldn't sit?  And I was going to talk with her this

25    morning as well.

MBTVCON1

1             In addition to that, Ms. Conboy, Juror No. 4, is here

2     and told my deputy that her husband's cancer treatments, chemo

3     treatments for cancer, have been moved up.  She did not know

4     it.  It was on her cell phone when she left yesterday.  And she

5     wants to be able to, or she has to, I don't know what the words

6     were, attend those treatments.

7             It seems to me we should take this one by one.  I

8     thought we had enough people with four alternates.  I'm very

9     concerned, given, again, the existence of COVID and the

10    population and the upcoming Christmas season.  But let's see

11    what we can do to have this trial move forward.  I know

12    everybody wants that, including the Court.  And there's no

13    basis at this point for a mistrial since we have enough jurors.

14            I propose that I speak with Ms. Gilmer and Ms. Conboy.

15    I also propose that we do it in the robing room, which is a

16    little more -- is less anxiety-producing and more informal.

17    And I'm going to ask that there be one lawyer from each side,

18    rather than the host of lawyers we have.  I think that just

19    will be an easier conversation.  And I'll speak to Ms. Gilmer;

20    I'll speak to Ms. Conboy.

21            And what do the parties propose about Mr. Boaten?  He

22    obviously doesn't want to sit.  For some reason he wants a

23    callback, and I will call him back.  I propose to call him back

24    in the presence of the lawyers, ask what the situation is, and

25    I assume he'll say he can't come in because he has a severe

MBTVCON1

1    throat -- severe fever, severe fever, and he thinks it may be

2    COVID, so therefore he's quarantining.  I certainly am not

3    about to adjourn this jury for a couple of days while that's

4    resolved; and I don't think I can say, No, you're not; No, you

5    don't have the severe fever.

6         What's the views of the parties?  Government.

7         MS. ROTHMAN:  Your Honor, we agree with the Court's

8    approach.  We should call him and then we likely should excuse

9    him.

10         THE COURT:  What did you say, you said something

11    excuse him.

12         MS. ROTHMAN:  We should call him and then we should

13    excuse him from the jury.

14         THE COURT:  What's the position of each defendant?

15         Mr. Gann.

16         MR. GANN:  I certainly agree with calling him, Judge,

17    inquiring.  As I said yesterday, I'm sympathetic to his

18    economic position, which I am somewhat concerned is driving the

19    phone call today.

20         THE COURT:  Yes, one would think so.  Or his statement

21    of his economic situation.

22         MR. GANN:  Right.

23         THE COURT:  All right.  While you think about that,

24    sir, what's your position?

25         MR. KEATING:  Your Honor, again, the Court could call

MBTVCON1

```
 1   him, but I think he's a lost cause.  He's not going to be here

 2   today.  Clearly we can't afford to wait for him another day.

 3              THE COURT:  I agree with that.

 4              MR. KEATING:  So I think he's a lost cause.

 5              THE COURT:  Let me call him.  I'll call him in the

 6   presence of the lawyers, and then I'll talk to Ms. Conboy and

 7   Ms. Gilmer.

 8              All right.  I want one lawyer from each of the parties

 9   in my robing room.  Let's go.

10              (In the robing room)

11              JUROR:  Hello?

12              THE COURT:  Mr. Boaten, good morning.  This is Judge

13   Stein.

14              JUROR:  Hello?

15              THE COURT:  Yes, Mr. Boaten.  Can you hear me?

16              JUROR:  Hello?

17              THE COURT:  Mr. Boaten, can you hear me?  Are you

18   still there, Mr. Boaten?

19              JUROR:  I'm here.

20              THE COURT:  Okay.  Great.

21              I have you in the robing room, sir.  And you're on the

22   speakerphone because I have a couple lawyers here.  I wanted to

23   talk with you.

24              My deputy tells me that you spoke with her after

25   yesterday after this jury was impaneled, and you told her you
```

MBTVCON1

1    had some economic problems in sitting on this jury; is that

2    correct?

3                 JUROR:  Yes, I do.

4                 THE COURT:  All right.  Tell me what that is.

5                 JUROR:  Basically, other than -- other than feeling

6    sick this morning, before I would not be able to come because

7    I'll be homeless if I do.  My job would not reimburse me.  And

8    at this point I'm overleveraged in my credit cards and I'm a

9    month late in rent.  So if I'm not able to earn money and pay

10   the rent this month, I will -- I will lose my -- my job -- I

11   mean, I will lose my apartment and I'll be out on the street.

12                THE COURT:  All right.  So let me be direct, sir.

13                You saw that when people raised economic issues, like

14   the deli owner and there was somebody else who was a sole

15   practitioner, I think a psychologist, I excused them.  And I

16   asked on more than one occasion if there was any reason why,

17   apart from what people have told me, why they couldn't sit.

18   And you didn't say anything.  Why?

19                JUROR:  I did not even -- I did not even think I

20   was -- I was going to be picked, to be honest with you.  A lot

21   of people there.  I'm not -- I'm not a very extroverted person.

22   I don't particularly enjoy, you know, speaking about myself or,

23   you know, talking in front of crowds.  So, you know, I had some

24   apprehension then.

25                But in all honesty, I really did not think I was going

1   to get picked with the amount of people that were there and the

2   different -- you know, the different -- you know, the different

3   swath of lifestyles that was there.

4             THE COURT:  So, in other words, you were betting on

5   not being chosen.  And when you lost that bet, you then tell me

6   about your economic situation, am I correct?

7             JUROR:  No, it's -- my economic situation was there.

8   It's just I did not -- you know, I really did not think I was

9   going to get picked.  And I'm not one to really get up and talk

10  in front of crowds or raise my hand.  It's just not my --

11            THE COURT:  I understand.  But you heard -- I take it

12  you also heard me say, Anyone who wants a sidebar can have a

13  sidebar, and you saw people come up and talk to me privately on

14  the side; correct?

15            JUROR:  I did.  I just was out of it.  I was

16  feeling -- I really wasn't feeling well the whole day.  And,

17  you know, when I got home, even when I was sleeping, I was

18  getting into a fever, so I really wasn't trying to be around

19  people.  I've had COVID before earlier this year.  I got the

20  shot.  And it's one of those situations whereby I've had

21  adverse -- I've had medical issues because of COVID and taken

22  shots.  So I'm actually going to be going to my doctor later

23  today to hopefully make sure that it hasn't come back again.

24            THE COURT:  Tell me what your medical situation is

25  now.  I've been asking you about why you didn't tell me you had

1    an economic issue.  Now I'm asking about a medical issue.  What

2    is your medical situation this morning?

3            JUROR:  Like the whole night I was not able to sleep.

4    When I came back, I thought I was just basically tired because

5    of -- it was a long day.  And, you know, I've been -- I was out

6    the house from 6 a.m.; I did not get back home until, you know,

7    close to 9 o'clock.  So I just felt that I was just basically

8    tired.

9            But throughout the night I couldn't sleep.  I woke up

10   in sweats, you know, just sweating profusely, basically, all

11   the symptoms that happened previously before when I did

12   contract COVID.  So I just wanted to make sure I reached out.

13   And I'll be going to my doctors in the afternoon to hopefully

14   get tested and make sure that I haven't contacted it yet.  So I

15   just wanted to be safe on my end because --

16           THE COURT:  What is your -- how are you feeling now?

17   What are your symptoms, if any, now, as you talk to me?

18           JUROR:  Headache, my throat is getting scratchy, I'm

19   feeling weak within my bones, my body.  The same aches and

20   pains that I had before when I did get the COVID, I'm starting

21   to feel those type of symptoms.  So I just wanted to make sure

22   for myself that it hasn't come back again, that's another issue

23   I have to deal with.

24           THE COURT:  All right.  Thank you, sir.

25           I'll be in touch.  Thank you very much.

MBTVCON1

```
 1              JUROR:  Thank you.

 2              THE COURT:  All right.  He's off the line.

 3              I don't think we have any choice.

 4              MR. GANN:  I concur at this point, Judge.

 5              MS. ROTHMAN:  Agree.

 6              MR. KEATING:  Agree.

 7              THE COURT:  All right.  We're going to dismiss him.

 8              I am dismissing him.

 9              (Off record)

10              (Juror present)

11              THE COURT:  Hi, Ms. Gilmer.  Come on in.  Have a seat.

12    Don't worry.

13              You were chosen for this jury yesterday.  You know

14    it's -- I told you about the timing of it.  And my deputy tells

15    me that you spoke to her afterwards and you said you were

16    anxious, okay.

17              JUROR:  Yes.

18              THE COURT:  Okay.  I need to talk with you about that.

19    Because you didn't inform me about that earlier, and it's very

20    important that this case go forward.  It's important to

21    everybody; to the lawyers, to the parties, both the government

22    and each of the defendants here.  So everyone wants this case

23    to go forward with all of the jurors who are here.

24              So is that possible?

25              JUROR:  I apologize.  I didn't realize that we were
```

MBTVCON1

1  given -- I thought there was going to be another chance to

2  speak up.  And I didn't know that the timing -- all my personal

3  issues going on, were something that I could have brought up at

4  the time.  I'm sorry for that.

5          THE COURT:  No, no, take your time.

6          JUROR:  Sorry.

7          THE COURT:  Relax.  Relax.  Don't worry.

8          I have tissues.

9          MR. GANN:  We're more nervous than you are.

10          THE COURT:  You're not the first person to cry.  Don't

11  worry.

12          JUROR:  I don't want to hold everything up.  I'm

13  sorry.

14          THE COURT:  Pardon me?

15          JUROR:  I don't want to hold everything up.  I'm so

16  sorry.

17          THE COURT:  Don't worry.  Don't worry.

18          I'm going to go off the record, if that's okay with

19  the parties.

20          (Off record)

21          (Juror not present)

22          THE COURT:  Let's go on the record.

23          I've just spoken with Ms. Gilmer off the record, with

24  agreement of the three parties who are represented here.  And

25  she indicated however anxious she was in life and how this is

MBTVCON1

 1    the most important part of her time for her job in post

 2    production, and said something about the Sundance Festival,

 3    working very hard.  And she said she's a very anxious person;

 4    she suffers from anxiety.  And I excused her and we're back on

 5    the record now.

 6            It seems to me that we need to excuse her.  She said

 7    that she could not -- did not believe she could concentrate on

 8    what was happening here in the court because she's so worried

 9    about her job and her personal issues, which she did not

10    specify.  The two defense lawyers agree that she should be

11    excused and the government is now addressing the issue.

12            MS. ROTHMAN:  I'm just concerned that we are getting

13    very low in our alternates if we excuse her.

14            THE COURT:  I'm very, very concerned.  And what it's

15    starting to tell me in the future is I shouldn't pick a

16    three-week trial during Christmas season, especially when

17    there's the remains of a pandemic.  Go ahead.

18            MS. ROTHMAN:  I'd want to know from Ms. Gilmer,

19    notwithstanding her anxiety, if she thinks she could fairly

20    consider the evidence in this case.

21            THE COURT:  I thought I asked her that.

22            MS. ROTHMAN:  I don't think she --

23            THE COURT:  I said could she -- I think I asked her

24    could she focus on what was happening in the court, and she

25    said no.  She said she was concerned about overly -- she'd be

MBTVCON1

1  focusing on her personal problems and her issues at work.  I

2  think that was her phrase.

3          MS. ROTHMAN:  I understand that.  I wonder if there

4  was a way to rehabilitate her such that she --

5          THE COURT:  Tell me how.

6          MS. ROTHMAN:  I think you could ask her if she thinks

7  there are ways she can manage her work responsibilities over

8  the next two and a half weeks.

9          THE COURT:  I tried that by saying -- and she said, I

10 couldn't return all the emails.  I said, You could do it

11 beforehand, you could do it during lunch, you could do it

12 later.  I started to say during breaks, but she was then going

13 on.  She said no.

14         MS. ROTHMAN:  Okay.

15         THE COURT:  I think it's a lost cause.  I'm

16 sympathetic and very concerned.

17         MS. ROTHMAN:  Okay.  I mean, I think if it's the

18 Court's decision to excuse her, that's the Court's decision.

19         THE COURT:  Okay.  I don't think I have any choice.

20         Just so the record is clear, she started to cry here

21 and my clerk got her a tissue.  And she did say -- I'm

22 reluctant to put this on the record because it's public, but

23 she said she suffers from anxiety and depression, and I think

24 she was being genuine.

25         All right.  I'm going to excuse Ms. Gilmer, No. 10.

MBTVCON1

```
 1              (Off record)

 2              THE COURT:  We're on the record.

 3         I brought her back in and asked whether or not she

 4    could focus on the testimony.  She said no; she has too much

 5    going on.  I asked her whether she could be fair and impartial.

 6    She said no; she has too much going on.  I asked whether she

 7    could have somebody else handle her work.  She said no.  I

 8    asked whether she could handle her work before court, after

 9    court, during lunch and breaks.  She said no, she has access --

10    she needs access to a computer.

11         Mr. Keating said he thinks this is cruel and unusual

12    to be asking these additional questions.  In any event, I'm now

13    going to excuse her.

14              (Off record)

15              THE COURT:  We're on the record.

16         I spoke to Ms. Conboy off the record, with the consent

17    of the parties, as long as I summarize the conversation.

18         Basically, her husband's chemo treatments have been

19    moved up from December 20 to December 6 and 13.  And I told her

20    we were not having court on December 6.  She was quite

21    relieved.  And I asked whether or not she could pay attention,

22    decide this case on the merits, and she said yes.  And I told

23    her I very much appreciate that.  She seemed relieved that

24    there would be no court on the 6th.  And she's prepared to sit,

25    so I'm going forward with her.
```

MBTVCON1

1          Any objection?

2          MR. GANN:  No.

3          MR. KEATING:  No, Judge.

4          MS. ROTHMAN:  No, thank you.

5          THE COURT:  Okay.  So, now, counsel, where do we

6    stand?  I think it's best that I excuse Ms. Gilmer at the end

7    of the day.  I'm concerned a little.  Mr. Keating, you said

8    cruel and unusual punishment to keep her here, but I don't want

9    the jury to think all you do is come in to the judge and you're

10   off.

11         MR. KEATING:  I understand that, Judge.  The only

12   concern I have — and I don't know the answer to it, frankly,

13   legally, the Court probably does.  If it's the Court's

14   intention to excuse her, I think rightfully so, is it

15   appropriate to have her sit and listen to the testimony

16   throughout the day and excuse her at the end of the day?

17         THE COURT:  They've been told not to talk to anybody,

18   so the issue is simply whether I should be keeping her here for

19   a day.

20         MR. KEATING:  I understand that.  I would just like a

21   moment to -- and I could have my colleague research it in two

22   minutes, research that issue before I opine on that issue, your

23   Honor, whether it's appropriate to have her sit in the box.

24         THE COURT:  I don't know that it's a legal issue.  If

25   she's not talking to anybody, I think it's a human issue.

MBTVCON1

1  That's separate.

2            MR. KEATING:  Well, I think there are two issues, I

3  agree with you.  From a humanity standpoint, this woman is

4  depressed.  She was crying, she was trembling at a certain

5  level.

6            THE COURT:  All right.  I'm going to excuse her now.

7  You're quite right.  I think that the stress was genuine and

8  the government agreed.

9            MS. ROTHMAN:  Defer to the Court.

10            THE COURT:  I'm going to excuse her.  I'll have

11  Ms. Blakely call her out and excuse her.

12            Okay.  Ms. Blakely will go and get her coat.

13            So now we're down to two alternates.  And going

14  forward, let's just -- if the parties can help me, the lawyers

15  can help me or help us get to a resolution here by being as

16  efficient as they can be and as productive as they can be and

17  not wasting time.  And let's move through this trial

18  appropriately and expeditiously.

19            How long is the government's opening and who's giving

20  it?

21            MS. ROTHMAN:  Ms. Kudla is giving it.  It's about 15

22  minutes, your Honor.

23            THE COURT:  Who's going first among the defense?

24            MR. GANN:  I think I am, Judge.  And I'm expecting 20

25  to 25 minutes.  I do need -- I did want to ask for some clarity

MBTVCON1

1    based on rulings yesterday that I don't know if you want to do

2    it here or --

3            THE COURT:  I'll do it here.

4            MR. GANN:  Or in the courtroom.

5            THE COURT:  The government is represented.

6            MR. GANN:  So I don't know that we fully resolved the

7    Arce issue yesterday in terms of not only exactly what she was

8    going to testify to on the government's case --

9            THE COURT:  That's not the issue for the opening.  The

10   opening is that she's not going -- go ahead.

11           MS. ROTHMAN:  So what Ms. Kudla intends to say is

12   consistent with the Court's ruling, that an investigator from

13   an insurance company looked at Mr. Constantine's cases and will

14   describe the things she noticed.  Ms. Kudla will not say the

15   word "fraud" in connection with Ms. Arce as a witness.

16           I do think there is a proposal for what the Court

17   could do with respect to Ms. Arce's testimony.  I think the

18   Court can just instruct the jury that the question of whether

19   the defendant committed fraud is not --

20           THE COURT:  I know where I'm going on Arce.

21           MS. ROTHMAN:  Okay.

22           THE COURT:  And essentially, it's that; that is, Arce

23   can talk to what she did.  I saw -- yes, I think she has to say

24   what her job title is.  If she's a fraud investigator, she's a

25   fraud investigator.  I don't think you can get -- we can get

1    entirely away from it, her using the word "fraud."  But I want

2    that minimized.

3              MS. ROTHMAN:  Understood.

4              THE COURT:  And there will be a charge.  And the

5    parties can try to draft a charge if they wish, which I then

6    will review.  But the charge will say, in essence:  You have

7    heard from this witness, who's a fraud investigator for what,

8    and you've heard what she did.  But the issue of whether or not

9    there was fraud here and whether or not the defendants

10   committed the fraud is for you, the jury, and not for her.  She

11   was simply describing what she did.

12             In terms of the direct, we can minimize the use of

13   "fraud."

14             MS. ROTHMAN:  Yes.

15             THE COURT:  By in such ways, you or one of your

16   colleagues will be doing the questioning, but the idea is what

17   patterns did you see?  What are you looking for?  I'm making

18   this up.  I saw that for Mr. Constantine or Mr. Dowd there were

19   41 out of 86 cases where they were involved or cases where we

20   had questions about the authenticity, that sort of thing.

21             MS. ROTHMAN:  Understood.

22             THE COURT:  I think she does have to be allowed to

23   testify to what she then did.  But it's that she referred it --

24   who did she refer it to?

25             MS. ROTHMAN:  She refers it to NICB, which is the

MBTVCON1

1   National Insurance Crime Bureau, and also to the FBI.

2                THE COURT:  Okay.  Fine.  She has to be able to say

3   what she did.  But I want a minimal use of the word "fraud."

4                MS. ROTHMAN:  Understood, your Honor.

5                THE COURT:  That's my ruling an Arce.

6                MR. GANN:  So but then the question of my

7   cross-examination --

8                THE COURT:  And that goes to the testimony.  What I'm

9   focusing on now is the openings.  But go ahead, talk to me

10  about the cross.

11               MR. GANN:  So it seems, in light of that, Judge, that

12  I should be permitted to cross-examine her about those cases

13  that she reviewed and Travelers' ultimate position with regard

14  to those cases, whether that be settling them, trying them,

15  agreeing to high-lows on jury trials, which are bifurcated in

16  civil practice.  So liability is the first issue --

17               THE COURT:  What is that -- I'm sorry, what does that

18  have to do with whether or not these defendants committed

19  fraud?

20               MR. GANN:  It's not a question of whether they

21  committed fraud; it's the question ultimately of whether my

22  client would reasonably know that fraud was being committed

23  with regard to these cases.  Even after knowing, number one,

24  that an investigation had been initiated; number two, that

25  there was a group of individuals that were arrested and

MBTVCON1

1    prosecuted by the federal government --

2            THE COURT:  Wait a minute.  Does your client have any

3    idea about what Travelers was or wasn't doing in regard to

4    other cases?

5            MR. GANN:  In the sphere of the cases that are in this

6    case, Judge, the slip-and-fall cases that are in the context of

7    this case, he absolutely does.  And she, I believe, does.  And

8    I think that she should be able to be cross-examined about how

9    Travelers handled those cases even after --

10           THE COURT:  Wait.  How Travelers handled?

11           MR. GANN:  Viewed those cases; that they settled them,

12   that they tried them, that they agreed to high-low.

13           THE COURT:  What's a high-low?

14           MR. GANN:  High-low.  At a trial stage, we're agreeing

15   that plaintiff will get a minimum of X dollars, but we will cap

16   the maximum at X dollars.  So they are --

17           THE COURT:  Oh, I see.  I see.  Go ahead.  I

18   understand that.

19           What's the position of the government?

20           MS. ROTHMAN:  So I think Mr. Gann is trying to

21   backdoor in the precise testimony the Court precluded with

22   respect to Mr. Mandell yesterday.  Mr. Mandell was the lawyer

23   that took on certain of Mr. Constantine's cases which were then

24   settled by Travelers.  They are the same universe in case in

25   large part.  There are probably some other insurance companies,

MBTVCON1

1    but Travelers has a decent number of cases that Mr. Mandell

2    took on.

3            What happened after the fact, after there was an

4    indictment, Mr. Constantine got rid of the cases, is

5    irrelevant.  What Travelers decides to do with respect to civil

6    litigation is irrelevant.  The question is Mr. Constantine's

7    knowledge.  And so the whole idea of settlements that Travelers

8    did I think is a sideshow and a distraction.

9            I will say this though:  If the Court wants to go down

10   this path, which we think is impermissible, what Ms. Arce will

11   say is these were fraudulent, in my opinion; but, listen,

12   Travelers is a business.  They have to make business decisions.

13           I wish I could just tell the Court, pull this case;

14   it's fraud.  But I can't.  Because in civil litigation,

15   lawsuits are filed and there's a process.  And we as

16   investigators do our job.  We can't just pull a case and say,

17   you know, take this case off the docket.  I don't think

18   Mr. Gann wants that testimony.  It seems like a complete

19   distraction.  There is no correlation between settlement in

20   these cases and believing these cases are legitimate.

21           THE COURT:  Go ahead.

22           MR. GANN:  Judge, again, if the government's main

23   argument, as I see it with regard to my client, is that he

24   consciously avoided these patterns that --

25           THE COURT:  Right, knew or reason to know.

1              MR. GANN:  I think there's one witness who's going to

2       say he had actual knowledge.  But so the main thrust is this

3       conscious avoidance.  I think the issue of what the Travelers

4       does with these cases that they believe to be fraud is

5       completely within the realm of whether or not anyone is

6       consciously avoiding knowledge of a fraud being committed.

7              THE COURT:  I disagree.  I understand.  I disagree.

8              What happens in the civil sphere and what a business

9       decision is of an insurance company and what happens after

10      these cases are done, that is, your client is out of it, are

11      irrelevant.  I'm precluding cross-examination along those

12      lines.

13             MR. GANN:  But, Judge, shouldn't that go to the

14      weight?  They are free to make the argument that Travelers made

15      a business decision.

16             THE COURT:  Sir, no, that's irrelevant.  That's my

17      decision.

18             Now, what else did you want -- we're talking now

19      about -- I need to focus on -- I need to have you focus on the

20      opening.  What else did you want to raise, if anything?

21             MR. GANN:  Well, there is -- I don't know that this

22      has to do with the opening per se, but there is -- we did have

23      a discussion this morning about -- I had with Ms. Kudla this

24      morning about the potential redaction of the nonprosecution

25      agreements and the cooperation agreements of certain witnesses

1     that are testifying today, given the Court's ruling yesterday

2     with regard to the cross-examination with regard to prior

3     criminal conduct.  My belief was that those agreements were

4     going to be government exhibits in an unredacted form, and they

5     do include references to --

6              THE COURT:  All right.  I understand the point.

7              Government.

8              MS. ROTHMAN:  The Court has precluded

9     cross-examination.  Those provisions of the cooperation

10    agreement that relate to uncharged conduct, like old marijuana

11    use, should be precluded.  It's in practice.  I have done this

12    several times where you redact cooperation agreements for

13    content that is not going to be discussed before the jury.

14    There's simply no basis to do so because, again, the Court --

15             THE COURT:  No basis to do what?

16             MS. ROTHMAN:  To allow that information to be

17    presented to the jury where the Court has ruled that

18    cross-examination on those issues --

19             THE COURT:  Mr. Gann, it sounds like the government is

20    agreeing to what you want.  These sorts of things should not be

21    brought to my attention without the parties reaching an

22    impasse.  It sounds like you have no disagreement here.  She's

23    going to redact stuff.

24             MR. GANN:  No, no, no.  We don't think it should be

25    redacted, Judge.  They are saying they're going to redact it.

MBTVCON1

1  We don't think it should be redacted.

2          MR. KEATING:  Judge, can I be heard briefly to

3  crystallize the point?

4          THE COURT:  No.  Just wait a second, because I want to

5  think about this.

6          MR. KEATING:  Sure.

7          THE COURT:  Yes, sir.

8          MR. KEATING:  Your Honor, the government's first

9  witness is an individual who has an immunity agreement.

10         MS. ROTHMAN:  That's not correct.

11         MR. KEATING:  One of the first witnesses.

12         MR. GANN:  He has a nonprosecution --

13         THE COURT:  Wait, wait, wait.  Just a moment.  Just a

14  moment.  This witness is going to go on shortly.  Tell him who

15  the witness is.

16         MS. ROTHMAN:  Kasheem Jones testifying pursuant to a

17  nonprosecution agreement.

18         THE COURT:  Go ahead.

19         MR. KEATING:  There is a provision in the

20  nonprosecution agreement that his crimes at issue in this case

21  he will not be prosecuted for, along with a three-year span of

22  medicaid fraud.  He will not be prosecuted for that.

23         Your Honor has precluded cross-examination in terms of

24  prior bad acts for impeachment purposes on the medicaid fraud.

25  We get that.  That is an entirely separate issue than benefits

MBTVCON1

1   conferred upon a witness.

2           A benefit conferred upon a witness by the government;

3   here, that benefit is not being prosecuted for medicaid fraud,

4   is fully admissible and relevant.  They are separate issues.

5   Cross-examination for impeachment purposes, your Honor has said

6   no.  But admissibility for the benefit conferred upon this

7   witness, of course it is admissible.  So respectfully, the

8   government is wrong to redact that provision of the

9   nonprosecution.

10          THE COURT:  We're talking about nonprosecution; we're

11  not talking about cooperation.

12          MR. KEATING:  This particular witness is a

13  nonprosecution agreement.

14          THE COURT:  No, are you making the same point for

15  cooperation?

16          MR. KEATING:  I think any benefit conferred upon a

17  witness of course is fodder for cross-examination, your Honor.

18  Of course, that's, I mean, hornbook law.  If the government is

19  conferring a benefit, we have a right to go there.

20          THE COURT:  All right.  Let me hear --

21          MS. ROTHMAN:  The Court has precluded

22  cross-examination.

23          THE COURT:  Yes.  But what about this point?

24          MS. ROTHMAN:  I think it's improper for

25  cross-examination on this point.  I mean, I think it is fair to

MBTVCON1

1    cross-examine Mr. Jones on the fact that he will not be

2    prosecuted for his involvement in this fraud scheme.  That is a

3    benefit.  But if the Court allows cross-examination on medicaid

4    fraud, don't even know the years of this medicaid fraud --

5              MR. GANN:  2016 to '18 is what was represented --

6              MS. ROTHMAN:  If the Court allows cross-examination on

7    benefit from the medicaid fraud, you're essentially allowing

8    cross-examination on a topic that the Court precluded.

9              (Indiscernible crosstalk)

10             THE COURT:  Wait.

11             MS. ROTHMAN:  Moreover, just so we're clear, this is

12   in the notes, the way the government found out about the

13   medicaid fraud was because Mr. Jones told the government about

14   it.  And what the real benefit here is, which you will

15   cross-examine him extensively on, is his involvement in this

16   trip-and-fall fraud scheme.

17             And so that is a basis to cross-examine Mr. Jones.

18   It's not to talk about this medicaid fraud that he himself

19   broad to the government's attention; that he's getting coverage

20   for technically by the terms of his nonprosecution.  I don't

21   have it here with me, I'd want to look at it to make sure

22   that's accurate; but, again, the Court precluded

23   cross-examination.  These topics should not come in.

24             (Continued on next page)

25

MBTsCON2

```
 1                   (In the robing room)
 2                   THE COURT:  Just a moment.
 3                   Is this witness number eight?
 4                   MS. ROTHMAN:  Mr. Jones, I believe that's right.  I
 5      can look at it.
 6                   MR. GANN:  He testified at the prior trial, Judge, and
 7      these questions were elicited at the prior trial.
 8                   THE COURT:  My clerk's note indicates that the
 9      government did not move to preclude cross-examination on the
10      Medicaid fraud from 2016 to 2018.
11                   LAW CLERK:  It's right here in your motion.
12                   MS. ROTHMAN:  So then I don't know.
13                   THE COURT:  I did not preclude that.  I did not
14      preclude cross-examination.  The government didn't move to
15      preclude it, and I did not move to preclude it.
16                   MS. ROTHMAN:  Then in that case, the agreement should
17      not be redacted.  I think I actually don't know what your
18      conversation was with Ms. Kudla, Mr. Gann, but I think the
19      government's position is, if the court precluded
20      cross-examination, those bad acts should be redacted.  If the
21      court did not preclude cross-examination, those bad acts should
22      not be precluded.
23                   So for Mr. Gordon, a cooperating witness, where
24      cross-examination was precluded, those bad acts should be
25      precluded.  For Mr. Jones, it sounds like the court did not
```

MBTsCON2

1    preclude cross-examination.  That agreement should not be

2    redacted.

3          That seems to be the right outcome here.

4          MR. KEATING:  We disagree.  Our position is if a

5    benefit is conferred upon a witness by the government, the

6    defense has the right to cross-examine.

7          THE COURT:  Do either of you have cases for this

8    point?

9          Because my inclination is, if I've precluded

10   cross-examination, then there can't be questioning on it.

11         But it's an interesting point you're raising.  If

12   anyone has any learning on it, I would want to see it.

13         MR. KEATING:  Fair enough.

14         THE COURT:  It also seems to me that this is a bit

15   not material because for all these witnesses, anything of

16   substance, there is a lot of things that you can -- prior bad

17   acts, prior crimes that can these people can be cross-examined

18   on.  There is no question about that.

19         MR. GANN:  What do you mean?  I'm sorry.

20         THE COURT:  You've got a lot to work with.

21         MR. GANN:  You've precluded --

22         THE COURT:  Coconspirators, there are going to be

23   plenty of things that you can, in their history, that you can

24   cross-examine them on that have not been precluded.

25         MR. GANN:  I actually thought most of what their prior

MBTsCON2

1    history was, was precluded, Judge.

2              THE COURT:  No.  It was the old stuff, the misdemeanor

3    stuff, all that stuff has been precluded.

4              MR. GANN:  I think Mr. Walker may be the only one of

5    the witnesses that I'm familiar with that the court permitted

6    questioning about the case that he's currently serving.

7              THE COURT:  You have my ruling.  If I've precluded

8    cross-examination, there's not to be any questioning on it.  If

9    you want to give me some law on it, I'll listen to it.  I

10   understand the point about benefits.  I understand it full

11   well.

12             Let's get on the record here.

13             MR. KEATING:  Final 30-second point, your Honor --

14   I'll be brief -- on our say.  Yesterday the court indicated

15   that it was not permitting the government to call her a fraud

16   investigator.

17             THE COURT:  She has to say her title.

18             MR. KEATING:  Your Honor, I'm just noting my

19   opposition to that.

20             THE COURT:  OK.

21             MR. KEATING:  She can say investigate.  If she says

22   fraud investigator, it puts the stamp of fraud on all of her

23   findings she's going to opine on.  If she says that I referred

24   this to the National Insurance Crime Bureau, it's putting the

25   stamp of fraud on her findings.

MBTsCON2

1              THE COURT:  I understand, but I am going to let her

2       say what she did.  I'm going to let her say her title, whatever

3       her title is.  And the jury will get a charge that they decide

4       fraud.  This witness was there solely to say what she did.  And

5       I don't want the government's questioning for each question to

6       be about indicia of fraud, but rather what she did.

7              That's my ruling, gentlemen.  This case is going to

8       take until March unless we get some testimony before this jury.

9              MR. GANN:  Judge, this doesn't need to be on the

10      record.

11             THE COURT:  We're going to be losing more jurors

12      because of the passage of time.

13             MR. GANN:  Quick question that doesn't have to be on

14      the record, Judge.

15             THE COURT:  Off the record.

16             (Discussion off the record)

17

18

19

20

21

22

23

24

25

MBTsCON2

1          (In open court)

2          THE COURT:  We're on the record.  Please be seated.

3          I am excusing juror No. 6, Mr. Boaten, and juror

4    No. 10, Ms. Gilmer.  My deputy will so inform them.

5          Bring the remaining jurors in

6          MR. GANN:  Judge, before we do, one issue, literally

7    just came up, having nothing to do with jurors or testimony or

8    anything else.

9          THE COURT:  Sir.

10          MR. GANN:  My colleague, Ms. Vitale, last night had

11    spent the night in the emergency room with her young son who

12    was having breathing issues, and the concern was that he might

13    have RSV.  The diagnosis, she just got while we were in the

14    back, is that he has COVID.

15          THE COURT:  How old is the boy?

16          MS. VITALE:  He's two.

17          THE COURT:  Two?

18          MS. VITALE:  Yes.

19          MR. GANN:  So I bring this to the court's attention

20    because obviously she has had --

21          THE COURT:  Ms. Blakely.

22          Go ahead.

23          MR. GANN:  -- she has had very close contact with her

24    son.  Obviously I have had --

25          THE COURT:  What do you want to tell me, sir?

MBTsCON2

1          MR. GANN:  Well, I'm not sure what -- Judge, she's

2     been exposed to COVID.  I've been excused to her now.  I don't

3     know how that impacts --

4          THE COURT:  I would suggest you put your mask on.

5     That's what you can do.

6          What's the alternative, sir?  What alternative, if

7     any, are you proposing?

8          MR. GANN:  I'm asking for a postponement, Judge,

9     frankly --

10          THE COURT:  Pardon me?

11          MR. GANN:  I'm asking for an adjournment given that

12     I've just been advised of these facts.  And not only has she

13     had close contact with her son, and I need her with me during

14     this trial, but I have now had close contact with her as well.

15          THE COURT:  All right.  Wear your masks.

16          You're the same lawyer who had said your client moved

17     for a mistrial yesterday on the basis of one of the jurors

18     saying that he would be homeless.  And your point was, which I

19     had never heard before, that you had made all of your jury

20     determinations based on the fact that, you know, who was going

21     to be on the jury and the fact that one juror now is going to

22     be excused, potentially excused, was a basis for you to move

23     for a mistrial.  I indicated, were you to move for a mistrial,

24     that I would deny it.  Now you're asking for an adjournment,

25     which would essentially be fatal in terms of getting this case

1   to this jury before the Christmas season.

2            Wear your masks.  Bring this jury in.

3            Of course, I certainly hope for the best for your son.

4            MS. VITALE:  Thank you.

5            THE COURT:  The idea is to get testimony before this

6   jury.  The idea is not to make sure this jury doesn't sit.  I

7   am going to ask that, Mr. Dowd, that you don't sit facing the

8   jury.  You're the only one who would be doing so.  I think

9   that's the way to do it.  Or if it's too crowded, one of the

10  three or four lawyers there, three lawyers there can move to

11  the seat in back.

12            Thank you.  I appreciate that.  I just don't think it

13  is appropriate.

14            The lawyers can speak at the podium and move the

15  podium to where they want.  They don't have to approach the

16  podium.

17            Mr. Keating, how long is your opening?

18            MR. KEATING:  15, 20 minutes, I expect.

19            THE COURT:  Thank you.

20            Mr. Gann, do you and your colleague have masks?

21            MR. GANN:  We don't.

22            THE COURT:  We're going to get them for you.

23            Just give them to the two lawyers.  We have to get

24  them from chambers.  That follows the protocols, I believe,

25  with the court, that you remain masked.

MBTsCON2

```
 1                (Jury present)
 2                THE COURT:  Please be seated in the courtroom.
 3                Good morning, ladies and gentlemen of the jury.  I'm
 4      sorry.  I apologize for the delay.  We had legal matters.  We
 5      now are going to hear the openings of the lawyers.
 6                Remember, what the lawyers say is not evidence, they
 7      are simply going to tell you what they believe the evidence
 8      will show.  But you decide what the evidence shows when it
 9      comes in.
10                The order of opening is set by law.  The parties have
11      absolutely no say in the order of opening.  The government
12      gives the first opening because, as you know, it has the burden
13      of proof.  And then each of the defendants' lawyers will speak
14      to you.
15                Government opening by Ms. Kudla.
16                MS. KUDLA:  Thank you, your Honor.
17                This is a case about lies and greed.  These two men,
18      George Constantine and Andrew Dowd, ran a sophisticated
19      multi-million dollar fraud scheme built on fake trip-and-fall
20      accidents.
21                Constantine, a lawyer, filed hundreds of lawsuits
22      against New York City businesses based on totally bogus
23      accidents.  And Dowd, a doctor, performed hundreds of
24      unnecessary medical surgeries.  A doctor who took an oath to do
25      no harm, needlessly cut into his patients' knees and shoulders
```

1    again and again and again.

2         Now why did the defendants do all of this?  Money.

3    Constantine and Dowd made millions of dollars from this scheme.

4    How did they pull this massive scheme off?  They relied on a

5    network of accomplices.  Everyone from patient runners, patient

6    recruiters called runners, to other dirty doctors.

7         Now, the runners were paid thousands of dollars to

8    recruit some of the most vulnerable New Yorkers' fake accidents

9    and get unnecessary surgeries.  They recruited people from

10    homeless shelters, halfway houses, drug addicts, alcoholics,

11    people who were desperate for money.  These patients, they

12    faked their accidents, and then they were sent to Constantine

13    to file fraudulent lawsuits and then to Dowd for unnecessary

14    surgeries.

15         Ladies and gentlemen, that is why we are here today,

16    because the defendants, George Constantine and Andrew Dowd,

17    lied and stole on the backs of vulnerable people and collected

18    millions in dirty money.

19         Now, this opening statement is the government's

20    opportunity to explain what the evidence in this case would

21    show and how we're going to prove our case to you.  So let's

22    start with what the evidence will show.

23         Let's go through the defendants' scheme and let's do

24    it step by step.  The first step was finding and recruiting

25    people to participate in the scheme.  The defendants needed

people who were so desperate for money that they would be willing to fake an accident and get a surgery they didn't need. So they turned to a network of recruiters, the runners, and they paid them kickbacks. Thousands of dollars to find new recruits. And those runners, they targeted people who were struggling to get by, often in shelters, and often battling addictions.

The second step was fake trip-and-falls. The runners and the patients found good locations throughout New York -- cracked cement, a pothole, a grate, at a local carwash or the neighborhood Wendy's. And the patients would walk to the spot, fall on purpose, and pretend they were hurt and go to the hospital. Sometimes they didn't even bother with the fake fall and go straight to the hospital and claim that they had fallen.

And then the third step was filing the fraudulent lawsuits. For this step, the runners brought the patients to lawyers -- lawyers like Constantine -- who filed lawsuits against the businesses where they had staged the falls.

And that takes us to the fourth step: Unnecessary surgeries. As you'll learn, every patient was required to get surgery. These surgeries were unnecessary and they were designed to make the injuries look real and to increase the value of the lawsuit. Dowd performed hundreds of surgeries.

So now that you understand how the scheme worked, let's take a look at Constantine and Dowd's individual roles.

MBTsCON2

1    You're going to learn that there were two main lawyers in this

2    scheme, and George Constantine was one of them.  Constantine

3    was a personal injury lawyer based in Queens.  And for years,

4    runners brought Constantine carloads of potential clients and

5    dropped them off at his office.  Constantine overwhelmingly

6    took these cases and filed fraudulent lawsuit after lawsuit,

7    falsely claiming that the clients had then fallen, and that

8    they had seriously been injured as a result of that fall.

9         Now, you'll learn that Constantine had this operation

10   down to a science.  In order to keep track of the carloads of

11   clients that were recruited, Constantine and Dowd paid a case

12   manager to help with the dirty work.  This case manager worked

13   in Constantine's basement.  The case manager met with patients

14   briefly in the basement, jotted down a few notes, and passed

15   the patients along to Constantine.  The case manager also took

16   cash kickbacks from Constantine, actual envelopes of cash, and

17   gave that money to the runners for bringing the new recruits.

18        Now once these clients were face to face with

19   Constantine, the client meetings were almost always brief.  In

20   and out.  Just long enough to review the intake form, ask the

21   question where the supposed fall had occurred, and sign that

22   client up.  Just long enough to build a fraudulent lawsuit, and

23   then it was on to the next client.  Just like clockwork.

24        And that's where Andrew Dowd came in.  You see, the

25   defendants and their coconspirators learned that they could

make a lot more money from these lawsuits if the injuries, the

fake injuries, were made to look real.  So the defendants

filled each patients' files with records to make those files

look like the patients were really injured.  It required

medical scans known as MRIs.  It required medical treatment

like a chiropractor or a physical therapy.  And they required

the patients to get surgeries.  Surgeries patients didn't need.

Surgeries with real risks.  Dowd performed more than 200 of

these unnecessary knee and shoulder surgeries.

        And the same runners would bring carloads of patients

to appointments with Dowd.  And Dowd paid thousands of dollars

in kickbacks to get these patients.  Now, once inside Dowd's

office, each patient said the same thing:  They had fallen and

they had injured their knee or their shoulder.  These were the

same patients that had been brought from homeless shelters and

seen by Constantine and other lawyers and then dropped off in

Dowd's waiting room.

        Dowd, you're going to learn, typically met with a

patient just one time before scheduling surgery.  And during

that single appointment, Dowd never discussed any alternatives

to surgery.  He rarely even bothered to physically examine the

patients.  Instead, he rushed the patients off to the operating

room and operated on them in often less than a week.  In

exchange, Dowd got a check for nearly $10,000 for every

surgery.

 1            Now, to ensure that the patients went through with

 2   these invasive procedures that they showed up to be put under

 3   and cut open, they received $1,500 after each surgery.  So that

 4   is what the evidence will show:  Massive scheme with hundreds

 5   of fake trip-and-fall accidents, hundreds of fraudulent

 6   lawsuits, and hundreds of unnecessary surgeries, and millions

 7   of dollars going into the defendants' pockets.

 8            Now I want to talk to you about how the government

 9   will prove its case.  You are going to hear from a number of

10   witnesses at this trial, including patients who were recruited

11   into the scheme.  Now, these patients are going to tell you

12   that they faked their accidents, that their initial meetings

13   with Constantine were quick, that they would reach out to

14   Constantine's office for more money, that Constantine coached

15   them before their depositions to say the right things, to make

16   sure those fraudulent lawsuits were successful.

17            These patients will also tell you that they met with

18   Dowd.  They will explain to you that their visits with Dowd

19   were unlike other doctor's visits.  That surgery was a foregone

20   conclusion.  That Dowd generally didn't conduct physical exams.

21   That Dowd performed surgery on them when they were not injured.

22            They will also describe the other patients, the

23   runners brought with them to Constantine and Dowd's offices.

24   Poor, sometimes homeless, under the influence of drugs and

25   alcohol, and not injured.  More people who had faked accidents

did not need surgery and had no business filing personal injury lawsuits.

You are also going to hear from an insurance investigator.  She will tell you that she investigated dozens of Constantine's cases and noticed the same patterns over and over again.  Among other things, vague accident descriptions, unwitnessed accidents, the same types of injuries, the same doctors and addresses that led back to homeless shelters.

You'll also hear from an analyst who looked at the records relating to patients who saw Constantine and Dowd. You'll see the glaring patterns among these cases.  The same doctors, same lawyers, same injuries, knees, shoulders, lower back, same addresses, same accident dates, and surgeries often within one week.  Patterns that can't be explained by coincidence.

You'll hear from a medical expert who has spent decades practicing orthopedic surgery.  The same surgeries performed by Dowd.  He will explain to you the best practices in patient care.  He will explain that surgery is risky, and it shouldn't be the default, especially in trip-and-fall cases. And he'll tell you that he reviewed Dowd's medical reports, and those reports were filled with vague and repetitive descriptions, material inconsistencies, and unnecessary surgeries.

You're also going to hear from a few individuals who

MBTsCON2

1   worked right alongside the defendants in this fraud scheme.

2   These people recruited patients and managed cases.  They will

3   tell you how this scheme worked from the inside and they will

4   tell you that Constantine and Dowd were knee deep in this

5   fraud.

6          Now, these particular witnesses, the ones who are

7   going to give you the inside look into the scheme, they

8   committed crimes together with the defendant.  They have pled

9   guilty to their crimes, and they are testifying because they've

10  entered into cooperation agreements with the government.  And

11  they hope to receive leniency at the time of sentencing.

12         It is not a question of whether you like them.  It's a

13  question of whether you believe them.  And as you listen to

14  their testimony, consider whether what they tell you is

15  consistent with all the other testimony and evidence in this

16  case.  That evidence will include documents and e-mails

17  received by the defendants and other coconspirators.  For

18  example, you'll see an e-mail in which one coconspirator

19  comments that they must screen patients better because other

20  attorneys will not tolerate what Constantine tolerates.  You'll

21  see e-mails in which Dowd is told to change reports and perform

22  surgery after surgery after surgery.  And you will see the

23  records showing that he did just that.

24         You'll also see text messages.  One where Constantine

25  remarks that a client can use his small settlement to buy

bottle of liquor.  Another where Constantine and a runner

discuss that the patients live in the worst areas of the city.

You are going to see dozens of financial records in this case,

and you will learn that Constantine and Dowd made millions of

dollars.

No single witness, no single piece of evidence can

give you the whole picture.  But at the end of this trial,

you'll see how all the pieces fit together.  And when all the

evidence is before you, you will see how it proves the

defendants' guilt beyond a reasonable doubt.

Ladies and gentlemen, you will see that this was an

egregious fraud.  The defendants preyed on some of the most

vulnerable people in this city.  And with each fraudulent

lawsuit, with each bogus surgery, Constantine and Dowd chose

personal greed over their professional duties.  Duties to

protect their clients and their patients.

Now, we will have a chance to speak with you again at

the end of this trial.  But between now and then, I'm going to

ask you to do three things:  The first, pay close attention to

all of the evidence; the second, follow Judge Stein's

instructions on the law; and the third, use your common sense,

the same common sense you use in your everyday lives as New

Yorkers.  And if you do these three things, you'll reach the

only conclusion that is consistent with both the law and the

evidence, that the defendants, George Constantine and Andrew

MBTsCON2

1    Dowd, are guilty.

2              THE COURT:  Thank you, Ms. Kudla.

3              Ladies and gentlemen of the jury, we will now hear

4    from Mr. Gann on behalf of Mr. Constantine.

5              MR. GANN:  May it please the court, counsel,

6    Mr. Constantine.

7              Good morning, ladies and gentlemen.  My name is

8    Marc Gann.  My co-counsel is Amanda Vitale, and it is our duty

9    and privilege to represent George Constantine during this

10   proceeding.

11             I want to thank you in advance for the attention

12   you've given so far and the attention that I know that you will

13   give this case and the evidence presented in this case during

14   the next couple of weeks at this trial.

15             I think there is one thing that the government, and

16   certainly I, as Mr. Constantine's representative, can agree on.

17   This is a case about fraudsters and criminals.  There is no

18   question about that.  None whatsoever.  But George Constantine

19   is a victim of those fraudsters and con artists.  He, like

20   those who the government references in terms of insurance

21   companies, were defrauded by the acts of these, quote-unquote,

22   coconspirators.

23             The government is asking you to believe these

24   examiners, these grifters, and these con artists in evaluating

25   whether or not George Constantine is guilty of these charges.

MBTsCON2

Whether or not he had knowledge of the contact in which these individuals were participating or whether he consciously avoided such knowledge. And I suggest to you, when you hear all of the evidence in the case, you will find that that burden, that burden of proof beyond a reasonable doubt, has not been sustained.

The proof will show, frankly, that George Constantine had no knowledge of the acts of these patients, of these runners, and of the cooperating witnesses that they are going to present to you during the course of this trial. And he had no reason to understand or to consciously avoid that knowledge. The government is relying on 20/20 hindsight. That's what they are relying on to say that he knew or should have known the circumstances surrounding these cases. And that is insufficient, I suggest to you, to prove his guilt beyond a reasonable doubt.

The only witness that I suggest to you, you will hear from the government, who will say that George Constantine had actual knowledge of the fraud that they were committing is an individual by the name of Peter Kalkanis. The government is going to call him as a witness in this case. And I suggest to you that when you hear from him, you're going to find that he is the king of all con artists. And I'm going to ask you to evaluate his testimony in that context. I'm going to ask you to examine his testimony, and I'll discuss him a little more in

MBTsCON2

1   a moment.

2          But lawyers generally go to law school for two

3   reasons:  They want to make a living and they want to help

4   people.  Unfortunately, lawyers get a bad rap.  We've all heard

5   the jokes about lawyers, and that is particularly true in many

6   instances of personal injury lawyers.  They are referred to

7   often as ambulance chasers.

8          MS. KUDLA:  Objection.

9          THE COURT:  Proceed.

10          MR. GANN:  Thank you.

11          Nobody likes a lawyer until they need one.  And in

12   this case, individuals came to George Constantine and have come

13   to him at various stages in his career because they need help.

14   And that's what lawyers are trying to do.  They are actually

15   trying to help people to get compensated for injuries that they

16   suffer as a result of someone else's negligence.

17          And it doesn't matter, frankly, who they are in terms

18   of their background, whether they are rich or whether they are

19   poor.  They are equally as likely to be injured or hurt.

20   Whether they are employed or whether they are unemployed.

21   Whether they are black, they are white, they are Hispanic, they

22   are Asian.  It doesn't matter.  Everybody is susceptible to

23   being injured.  And if they are legitimately injured, to be

24   compensated for that.

25          And the lawyer in this case, George Constantine, had

1  every reason to believe that the people that he was

2  representing in the context, of this alleged scheme that the

3  government refers to, were legitimately injured and should be

4  legitimately compensated.  That's the background.  That's the

5  backdrop on which George Constantine took these cases.

6          He became a lawyer in 1989.  He's been a practicing

7  lawyer ever since.  The proof will show that he started as an

8  insurance defense lawyer, working for an insurance company,

9  Aetna Insurance Company, that ultimately became Travelers

10  insurance company.  That after a period of time working in

11  insurance defense, he became a plaintiff's personal injury

12  lawyer, representing people who were injured in various types

13  of accidents, whether it is slip-and-fall, trip-and-fall, car

14  accidents, work-related accidents.

15          He developed a reputation as a tough, hard-nosed,

16  and competent plaintiff's lawyer.  And it was based on that

17  reputation that he developed a practice.  A practice of

18  referrals from various sources for the business that he

19  ultimately provided to his clients.

20          You'll hear about how lawyers get cases sometimes.

21  And you know what, sometimes you may think that the way that

22  they get cases is distasteful.  But it's not illegal.  And

23  George Constantine got cases from a number of sources.  He got

24  cases from other lawyers, he got cases from doctors, he got

25  cases from friends, he got cases from his community activities,

and he also got cases from what will be described as runners.
And there is nothing illegal about the use of runners.

Runners have relationships.  They are individuals that
have relationships with people in hospitals, police officers,
ambulance drivers, EMTs, or just they know people in their
community.  And often, they bring cases to lawyers for those
lawyers to represent those individuals in personal injury
actions.

While George Constantine was working with another
lawyer who had referred a case to him, he had the great
misfortune at that time of meeting Peter Kalkanis.  Peter
Kalkanis is a man, the proof will show, that held himself out
as a pillar of the Greek community, as a wonderful
chiropractor, as a theologian, as a man who had thought about
going into the priesthood at some point, and he made this known
to people in the community.  He was an older man, and he did
have a reputation as a good doctor.  But likewise, hindsight is
20/20.

We now know who Peter Kalkanis is.  He and his
employees, quote-unquote, are criminals.  There are no ifs,
ands, or buts about that.  They are liars, they are cheats, and
they are thieves.  And these are the people that the government
is going to ask you to rely on to convict George Constantine in
this case.

I'm going to ask you to scrutinize not just their

words, not just their words, but their actions as well, because
in many ways, I suggest to you that their actions are more
telling than the words they are going to testify to from the
witness stand.  Their words in and of themselves will be
insufficient to establish proof beyond a reasonable doubt.
Their actions, I suggest to you, will actually prove that
George Constantine is innocent of these charges.

Peter Kalkanis, you'll hear, is an actual disgraced
chiropractor.  He lost his license because he had committed
insurance fraud.  Insurance fraud having nothing to do with the
allegations in this case.  It had to do with billing for
services for patients where he didn't actually perform those
services, and he was charged for that and he was convicted in
that circumstance.

And you know what else?  Even though he was charged,
even though he was convicted, he continued the exact same
conduct even after being charged and convicted.  In fact, the
government's other star witness in this case is an individual
by the name of Kerry Gordon.  And you'll hear that he came to
George Constantine through Peter Kalkanis in 2010, prior to the
allegations contained in this indictment, and that Peter
Kalkanis committed the same insurance fraud with regard to
Kerry Gordon that he did, and that that caused him to lose his
license and that he had been charged with two years prior in
2008.

1              When he realized he was going to lose his license, and

2     that moment was coming sometime in 2011, '12 or thereabouts,

3     that's when he came up with another scheme.  And he used Kerry

4     Gordon and others like him to develop and pursue this scheme.

5     He used his experience and knowledge in the personal injury

6     field, because he had been a chiropractor dealing most

7     exclusively in the personal injury field.  He used that

8     knowledge and experience to develop relationships with

9     legitimate personal injury entities, lawyers, doctors, funding

10    companies, and even runners.

11             He set up this whole scam behind a curtain.  He was, I

12    suggest that you'll find, much like the Wizard of Oz.  That

13    curtain has now been pulled back, and we see who he really is.

14    He did this for years with other lawyers.  He will say, he will

15    testify that roughly 80 percent of the cases that he referred

16    to George Constantine were fraudulent and that 20 percent of

17    them, roughly, were actually legitimate.  That's what you're

18    going to hear from him when he testifies.

19             I suggest to you that's a made-up number.  But it

20    also indicates that there were legitimate cases that he was

21    referring to Mr. Constantine, the same types of cases, the same

22    slip-and-fall cases, the same types of clients, low-income

23    clients on occasion, unemployed clients on occasion.  They went

24    through the same process in terms of who they met, when they

25    met, and where they got their treatment.

1          How would George Constantine know which cases were
2     real and which cases were fraudulent?  He wouldn't, because he
3     was never told about it.  And the actions of these people
4     didn't indicate that they were fraudulent.  Again,
5     Mr. Kalkanis' words will tell you that George -- he will tell
6     you George Constantine knew that these cases were fraudulent.
7     But his actions will say otherwise, because he and the others
8     actually hid this fraud from George Constantine.

9          Part of their plan, part of their plan and scheme was
10    to keep George and the other lawyers from knowing this.  To
11    hide it from them.  Mr. Kalkanis and his runners met with these
12    individuals prior to ever meeting with the lawyer to make sure
13    that they had their story straight, and they told it to the
14    lawyer in a way that was believable and to maintain that.  They
15    hid the truth from George Constantine.

16         As the government alluded to, all these witnesses are
17    trying to save themselves.  But the only way for a guy like
18    Peter Kalkanis to save himself, the guy who I suggest -- and
19    the proof will show -- was the head of this scheme, was to come
20    up with a sexy defendant, someone that he could cooperate
21    against.

22         Who would that be?  It would be the lawyer.  It would
23    be the lawyer.  When you cooperate, the idea is to cooperate
24    with those who are perceived to be above you.

25         MS. KUDLA:  Objection.

MBTsCON2

```
 1                THE COURT:  Sustained.  Sustained.
 2                MR. GANN:  So -- he identified a lawyer.
 3                THE COURT:  The jury will disregard that last
 4      statement.
 5                MR. GANN:  -- as the person that he wanted to
 6      cooperate against.  And the government will say, as they have,
 7      that there are other witnesses that corroborate this fraud:
 8      The patients.  The patients who lied to Mr. Constantine.  The
 9      patients who lied during their depositions.  The patients who
10      lied and continued to lie until they were caught in this
11      scheme.
12                They referred to an investigator from Travelers
13      Insurance Company.  You know, the thing about these kinds of
14      witnesses -- again, when you look at this circumstance in
15      hindsight, you may be able to see some pattern, pattern in
16      terms of type of accident, very generic, portions of the body
17      that were injured.  If somebody trips and falls, there is only
18      a few portions of the body that you're going to injure:  Your
19      knee, your back, your shoulder.  Those patterns are not ones
20      that somebody in a legal practice, who is meeting with clients
21      from all walks of life with the same type of accident, is going
22      to find to be incredible.
23                THE COURT:  Ladies and gentlemen, I want to inform
24      you, as I'm sure you know, that what these lawyers are saying
25      in their openings are what they believe the evidence is going
```

MBTsCON2

1  to show.  It's not that they as lawyers know any particular

2  thing.

3              In fact, Mr. Gann has said, if someone trips and

4  falls, there is only a few portions of the body that you're

5  going to injure:  Your knee, your back, your shoulder.  He's

6  not a doctor, and he's not saying that because he knows it.

7  But what he really is saying to you is he believes the evidence

8  will show that is only a few portions of the body that you're

9  going to injure:  Your knee, your back, your shoulder.  But you

10  decide what the evidence shows.

11              Mr. Gann, fair enough?

12              MR. GANN:  Thank you, Judge.  Yes, 100 percent.  Thank

13  you.

14              THE COURT:  All right.  Make it clear that you're not

15  speaking from direct knowledge, but you're saying what the

16  evidence is going to show.

17              MR. GANN:  That is correct, Judge.  Thank you very

18  much.

19              THE COURT:  Of course.

20              MR. GANN:  Ladies and gentlemen, what I suggest to you

21  at the conclusion of this case is that you will find the proof

22  holds sufficient to establish George Constantine's guilt beyond

23  a reasonable doubt that he had any knowledge of any fraud that

24  was being committed by these clients and these runners and

25  Mr. Kalkanis, who made every attempt to hide that from him.

MBTsCON2

1    And you will hear them testify to that during the course of

2    this trial.

3            Likewise, at the end of the case, I will come back

4    before you and I will be asking you to consider what I suggest

5    at the time will be the only verdict consistent with the

6    evidence, or the lack of evidence, and that is when you use

7    your head, your heart, and your common sense, a verdict of not

8    guilty.

9            I thank you very much for your attention.

10           THE COURT:  Thank you, Mr. Gann.

11           We now will hear from Mr. Keating on behalf of

12    Mr. Dowd.

13           MR. KEATING:  Madam forelady, Judge Stein, and members

14    of the jury.  So you've heard both sides of it, and now it's my

15    turn.

16           That was quite an opening statement that the

17    government gave about Dr. Andrew Dowd.  So that's it then.

18    Dr. Andrew Dowd knowingly participated in a staged accident

19    scheme and engaged in unnecessary surgeries.  That's it.

20           But we know that's not it.  We know that was an

21    opening statement.  We know that is what the government hopes

22    to prove by way of evidence at trial.  If you took a verdict

23    right now, your verdict, of course, will be not guilty.  You've

24    heard nothing.  Nothing.

25           So let's start over.  I want to begin with an issue.

MBTsCON2

1    I represent the man at the end of the table.  Dr. Andrew Dowd.

2    I do not represent Mr. Constantine.  I don't.  They are

3    separate people, and the court at the end of the case, of

4    course, will advise you to treat their cases separately, to

5    decide the evidence, to look at the evidence, to view the

6    evidence separately.

7         There is a whole lot of this case, a whole lot of the

8    evidence that you will hear, that has absolutely nothing to do

9    with Andrew Dowd.  Meetings in lawyers' offices, retainer

10    agreements, runners recruiting patients, personal injury cases,

11    funding agreements.  Remember this term.  Who met whom in

12    lawyers' offices.  Whether the lawsuits should move forward.

13    Is it a fake suit.  Is it not.  It has nothing to do with

14    Andrew Dowd.

15         In fact, you'll hear evidence at this trial that

16    Dr. Andrew Dowd never met that man during these events.  Never

17    met him.  Never met him.  Dr. Andrew Dowd is at the end of this

18    journey.  He's at the end of the path of these cases.  And the

19    case, all of the cases began with a man named Peter Kalkanis.

20    The most fascinating thing about the government's opening

21    statement is that you never heard that name.  They never said

22    his name, Peter Kalkanis.  Never said it.  And they didn't say

23    it for a reason.  He is the heart --

24         MS. KUDLA:  Objection.

25         MR. KEATING:  -- and soul of the case.  He's the core

MBTsCON2

1   of the case.

2           MS. KUDLA:  Objection.

3           MR. KEATING:  Ironically, he's the heart and soul of

4   the case, and he's a man, you'll conclude, without a heart and

5   without a soul.  He created the case.  He created the concept.

6   He lived a lie.  He recruited the cases.  He's all of it.  And

7   the government chose not to mention his name.

8           As this case moves forward, I'll ask you to ponder

9   that, and ponder why in the world wouldn't they bring up the

10  heart and soul of the case.  And the reason is he's a scammer,

11  he's a fraudster, he's cunning.  He's cunning, Peter Kalkanis

12  is.  He can come across as sophisticated, quite believable.

13  He's a cunning fraudster and the heart and soul of the case.

14          At one point, Peter Kalkanis will put his hand in the

15  air and take an oath, as all the witnesses will.  And I

16  respectfully submit to you, it's the most important part of

17  this process.  I submit to you nothing else matters in this

18  whole process but that.  That oath.

19          You'll learn that the government wasn't at these

20  events that are the subject of the case.  They are not there.

21  It's the oath that matters.  Can you rely on a man's or a

22  woman's oath so that you can evaluate fairly their testimony.

23          The moment Peter Kalkanis puts his hand in the air, it

24  has no meaning.  None.  He would lie for $10.  He encouraged

25  people to bring lawsuits, to testify at depositions, engage in

1   perjury.  He defrauded his own clients, and he has put in his

2   hand on the air as if that magical moment had meaning.  At the

3   same time, of course, looking for leniency.

4            So how did it all work?  I'll be brief on this,

5   because you now have a little bit of a sense of this case.

6   Mr. Gann did mention the fact that, who is Peter Kalkanis?

7   Peter Kalkanis was a chiropractor, apparently, for years.  He

8   wouldn't know Andrew Dowd if he ran into him.  You'll hear

9   evidence of that.  Andrew Dowd wouldn't know Peter Kalkanis if

10  he ran into him.  Peter Kalkanis worked in the personal injury

11  field.  And in 2008, Peter Kalkanis, not surprisingly, was

12  corrupt.  Mr. Gann mentioned it.  Fraudulent cases.  Billing

13  insurance carriers for things that never occurred.  Forgeries

14  and on and on and on.

15           Peter Kalkanis is losing his license.  He has to make

16  a living in other ways, so he pivots.  That's Peter Kalkanis.

17  And you'll hear evidence that he decides to become a broker for

18  a funding company.  I won't go deep into this.  You'll learn

19  all about it.  A funding company advances money if you have a

20  personal injury case.  They will lend you money.  They are

21  betting on the success of your case, and they lend at high

22  interest rates.

23           So Peters Kalkanis becomes a broker for a funding

24  company.  He's going to lawyers trying to attract business.

25  This is all legal.  This is all legal, and he's the liaison

MBTsCON2

<pre>
 1   between lawyers and doctors and getting the documents to the
 2   funding company.  And he is developing a book of business.
 3          But it's not enough for Peter Kalkanis.  It's not
 4   because Peter Kalkanis always gets a conniving secret end.  So
 5   Peter Kalkanis, the evidence will show, begins to take cases in
 6   from other sources.  Again, this is nothing to do with Andrew
 7   Dowd, just giving you a sense of this.  And some of his
 8   sources, some, there are legitimate cases from varying sources,
 9   including runners.  Some of his sources are runners.
10          Mr. Gann mentioned a runner.  They bring cases to
11   attorneys.  Andrew Dowd is a doctor, not an attorney.  That is
12   what runners do.  They bring them to attorneys.  They refer
13   cases.  They get them from a variety of sources.  Medical
14   facilities.  Some runners pay people in hospitals.  Give us a
15   list of your patients.  Because they want to go to the
16   patients.  Do you need a lawyer?  Do you need a personal injury
17   lawyer?  That's what runners do.
18          But Peter Kalkanis apparently begins to take on all
19   comers.  Legitimate cases.  The people with injuries and the
20   people willing to relocate their injuries.  So what does that
21   mean very briefly?  If you fall in your kitchen, you don't have
22   a personal injury case.  If you trip-and-fall at somebody's
23   pizza parlor and you are -- well, if you legitimately trip and
24   fall at somebody's pizza parlor on a defect, you have a case.
25          So Peter Kalkanis, the man the government never
</pre>

MBTsCON2

1  mentioned, the man at the center of this, developed a pattern,

2  apparently, where some people with injuries, he was perfectly

3  OK if they relocated their case.  Bring it to a different

4  location because there is a suit.

5       So what do these people do?  The real and the fakes?

6  The real people go to hospitals.  The real people tell doctors

7  about their injuries.  The real people hire a lawyer.  They go

8  to a chiropractor.  They tell about their injuries.  They work

9  their way at the end of the journey to an orthopedist.

10       What do the fakers do?  The fakers are incentivized by

11  Peter Kalkanis and coached by Peters Kalkanis to lie.  You will

12  learn this.  The man the government didn't bring up.

13  Incentivized by Peters Kalkanis for money and coached by Peters

14  Kalkanis to lie.  If you fell in your kitchen, your how, you've

15  got to say you fell at a particular location.  It goes so deep.

16  Say you fell at a location.  Call 911, have an ambulance show

17  up, go to the hospital, lie to the triage nurse, lie to the

18  doctor, lie to the chiropractor.

19       So the witnesses that the government will bring up in

20  this case lie to these folks who have no idea because it's

21  about bringing a personal injury case.  It's about coaching and

22  incentivizing people to lie.  All of this goes on before Peter

23  Kalkanis ever meets Dr. Andrew Dowd.  Ever meets him.

24       You're going to learn that in late 2013, Peter

25  Kalkanis is looking for more doctors.  He already is using

MBTsCON2

1    doctors.  Patients lie to doctors.  They go to a doctor's

2    appointment.  Doc, my knee hurts.  I was in an accident.  How

3    does it hurt?  It hurts here.  I can't do this.  I can't walk

4    upstairs.  That's an orthopedic appointment.

5        At the end of 2014, Peter Kalkanis is looking for more

6    doctors.  More doctors.  Think about it.  If the doctors are

7    corrupt, why is he looking for more doctors?  He's going to

8    expand his universe.  So he's looking for more.  Why is it he

9    goes to Andrew Dowd?  You'll hear evidence of this, at the time

10   he goes to Dr. Andrew Dowd, he has an enormous orthopedic

11   practice.  An enormous practice.

12       During the period of time that these cases start

13   coming in from Peter Kalkanis, 90 percent of Andrew Dowd's

14   cases have nothing to do with Peter Kalkanis and his cases.

15   Nothing to do with it.  The government mentioned at one point

16   in the opening statement that the defendants recruited

17   patients.  Andrew Dowd didn't recruit a patient in his life.

18   It's just false.  It's false.  It was Kalkanis.

19       So at the end of 2013 into 2014, patients come in to

20   Andrew Dowd.  There is real Kalkanis patients.  There is people

21   who have real accidents.  Real injuries.  There is people with

22   injuries from other locations who have told a lie already.

23   It's set in their head.  And these people are hardly innocent.

24   They are hardly innocent.

25       The government talked about homeless shelters.  You'll

MBTsCON2

1    see the evidence on that.  You'll see the actual evidence.  But

2    these people have lied to 911 operators, to hospitals, to EMTs,

3    people going out in an ambulance.  Lie, lie, lie.  And

4    eventually, at the end of the journey, at one point weeks,

5    months into that journey, there is a referral to an

6    orthopedist, Dr. Andrew Dowd.  And you'll hear about those

7    meetings.  What you're going to learn in those meetings is in

8    every meeting, patients complain of pain.  An orthopedic

9    consult.  Doc, I was in an accident.  Lie.  Andrew Dowd

10    wouldn't know if that person was in an accident in a kitchen,

11    in a pizza parlor.  He doesn't know that they are engaged in a

12    fraudulent lawsuit because they are trying to sue a pizza

13    parlor.  Doc, I was involved in an accident.  My knee has been

14    hurting since.  I can't bend it.  It hurts when I walk

15    upstairs.  It's this.  It's that.  In all of the cases, there

16    were MRI films.  There were MRI films.  Andrew Dowd, 90 percent

17    of his business otherwise.  Kalkanis, there is an MRI film.

18    Doc, my knee hurts.  Doc, this.  Doc, that.  Lie, lie, lie.

19    The man at the end of the journey.  The man the government said

20    in the opening statement was involved in recruiting cases.  Not

21    true.

22            You heard mention of payments.  The government

23    mentioned payments made by Dr. Dowd.  You're going to hear

24    about those payments.  Payments.  What you're going to see in

25    this case is that there was a whole lot of cash flowing around.

MBTsCON2

1    Whole lot of that.  Cash to this person.  Cash to, you know,

2    runners.  People back, not at the end of the journey, early on.

3    What you're going to find out is that Andrew Dowd wrote a

4    check.  A check on his checking account.  Andrew Dowd, the man

5    with the enormous orthopedic practice.  Enormous practice,

6    right.  The man who knowingly is participating in a fraud

7    scheme, writing a check on his checking account.  Not cash,

8    a check.

9            You're going hear a little bit about medicine.  The

10   government mentioned that, and about orthopedic examinations

11   and what they are about.  The government is going to call a

12   witness.  His name, I believe, is Dr. Roth.  You will learn

13   that he is a paid witness.  You will learn that Dr. Roth has

14   testified for the government many times before.  He's even

15   testified on behalf of the government in personal injury cases.

16           Dr. Roth has testified.  And he will offer some

17   opinions as to, undoubtedly, Dr. Dowd's practice.  He will look

18   at certain records.  He may say Dr. Dowd was sloppy.  He was

19   not.  He may say Dr. Dowd's -- he believes Dr. Dowd's level of

20   care in a given case was substandard.  He will be wrong, but he

21   may say that.  He may say he could have done work a little

22   better in a case.  He would be wrong, but he may say that.

23           He may talk about diagnostic arthroscopies.  And

24   you're going to hear a lot about diagnostic arthroscopies.

25   Diagnostic arthroscopies being a procedure designed to detect.

Diagnostic, to detect, to determine what is going on.  An

incredibly common procedure.  You'll hear evidence of this in

the United States.  An enormously safe procedure here in the

United States.  You'll hear evidence about a diagnostic

arthroscopy.

          You'll hear evidence about pain.  Pain.  How much of

an impact does a patient's complaint of pain have in making an

assessment.  You're going to determine that it's central in

making an assessment.  Andrew Dowd, at the back of the journey.

Keep your eye on the ball, ladies and gentlemen, during the

medical testimony.  Keep your eye on the ball.  And the ball is

whether Andrew Dowd knowingly participated in a slip-and-fall

accident scheme.  Andrew Dowd.

          You'll hear a 60-year-old orthopedist with an enormous

practice knowingly participated in a staged slip-and-fall

accident scheme.  You're going to conclude that Andrew Dowd did

not.  Would not.  You're going to conclude that Andrew Dowd

called balls and strikes in his medical assessment in this

case.  Please remember that phrase.  Think of baseball.  Balls

and strikes.  Andrew Dowd did.  Don't be distracted.  The guy

who wrote checks.  He knows it is a fraudulent scheme and he's

writing checks.

          Listen carefully.  I know you will.  I don't even have

to say that.  Honor your oath.  I know you will.  You have

already taken the time to be here.  Your oath to examine the

MBTsCON2

```
 1    evidence carefully, and hold the prosecutors to their burden of
 2    proof.  Hold the witnesses to their oath in this case.  Hold
 3    the witnesses to their oath.  And at the end of this, I'm
 4    confident, I'm confident you're going to determine that Andrew
 5    Dowd is not guilty.
 6              THE COURT:  All right.  Thank you, sir.
 7              Ladies and gentlemen, you have now heard the opening
 8    statements of the lawyers, where they have told you what they
 9    think the evidence will show.  Again, none of the lawyers know
10    these things as facts.  They are telling you what the evidence
11    they believe is going to show.  You haven't heard a word of
12    testimony yet.  That's about to change.
13              Government, call your first witness.
14              MR. FOLLY:  The government calls Kasheem Jones.
15              THE DEPUTY CLERK:  Stand, please, and raise your right
16    hand.
17     KASHEEM JONES,
18         called as a witness by the Government,
19         having been duly sworn, testified as follows:
20              Please state your full name and spell your name for
21    the record.
22              THE WITNESS:  Kasheem Jones.  K-a-s-h-e-e-m, last name
23    is J-o-n-e-s.
24              THE COURT:  All right.  Thank you.
25              Please be seated, sir.
```

MBTsCON2                          Jones - Direct

1            Welcome.  Good morning.  If you would, turn the

2    microphone down and point it towards your mouth, as I'm doing

3    here.  It's a directional mic and needs to be pointed towards

4    your mouth.

5            Your witness, Mr. Folly.

6            MR. FOLLY:  Thank you, your Honor.

7    DIRECT EXAMINATION

8    BY MR. FOLLY:

9    Q.  Good morning, Mr. Jones.

10   A.  Good morning.

11   Q.  How old are you?

12   A.  45 years old.

13   Q.  Where do you live?

14   A.  I live in Brooklyn.

15   Q.  How long have you lived in Brooklyn?

16   A.  For over the last 20 years.

17   Q.  What do you do for a living?

18   A.  I run a building management company.

19   Q.  Directing your attention to approximately 2014, were you

20   involved in a lawsuit at that time?

21   A.  Yes.

22   Q.  What was the nature of that lawsuit?

23   A.  It was a slip-and-fall scam.

24   Q.  Just to be clear, were you the one who brought that

25   lawsuit?

1    A.   Yes.

2    Q.   What did you claim in that lawsuit?

3    A.   That I slipped and fell in the Floridian parking lot, which

4    was a diner.

5    Q.   Did you, in fact, slip and fall at the Floridian diner

6    parking lot?

7    A.   No.

8    Q.   Why did you say you had fallen at that location when you

9    had not?

10   A.   It was part of a scam.  If you were willing to have a

11   surgery and was willing to go through with having the surgery,

12   you supposedly we were supposed to get big pay-outs, if you

13   were willing to go with the procedure and the therapy.  And it

14   would take about a year.

15   Q.   Did you have a lawyer in connection with that lawsuit?

16   A.   Yes.

17   Q.   What was the lawyer's name?

18   A.   George Constantine.

19   Q.   I'm going to ask you to look around the courtroom and

20   indicate whether you recognize him and, if so, identify an

21   article of clothing he's wearing.

22   A.   Um.

23   Q.   You can stand.

24              THE COURT:  Do you recognize him, sir?

25              Move away from the mic.

MBTsCON2                    Jones – Direct

1          THE WITNESS:  I think he's behind the screen.

2          THE COURT:  Would the people behind the screen stand

3    up.  Everybody behind the screen in the second row, is that it?

4          THE WITNESS:  Yes.

5          THE COURT:  All right.

6    BY MR. FOLLY:

7    Q.  Can you just describe a tie he is wearing or an article of

8    clothing?

9    A.  Right there.  He's right there.  Purple tie, I think.

10         THE COURT:  Purple tie, sir.  All the gentlemen with

11   ties stand up.  Of those three gentlemen who claim they have

12   ties, all four gentlemen, who are you identifying?

13         THE WITNESS:  The one to the far left.

14         THE COURT:  Sir on the far left, raise your hand.

15   That's you, sir.

16         No.  The witness's far left.  Raise your hand, sir.

17         Is that who you're identifying?

18         THE WITNESS:  Yes.

19         THE COURT:  The witness has identified

20   Mr. Constantine.  Thank you, sir.

21         MR. FOLLY:  Just show the witness what has been marked

22   as Government Exhibit 1.

23         Your Honor, there appears to be a technical issue.

24   I'll continue with the testimony and circle back on this

25   exhibit.

MBTsCON2                         Jones – Direct

1    BY MR. FOLLY:

2    Q.  In connection with that trip-and-fall scam, Mr. Jones, you

3    mentioned that you claimed you were injured, is that right?

4    A.  Yes.

5    Q.  Did you undergo surgery as part of the lawsuit?

6    A.  Yes.

7    Q.  What areas of your body did you get medical procedures on?

8    A.  My hand, on my back, and my left leg.

9    Q.  Focusing on your back and your knee, were either of those

10   areas of your body actually injured?

11   A.  No.

12           THE COURT:  I believe you said left leg, sir.

13           Was it your knee?

14           THE WITNESS:  My knee, yes.

15           THE COURT:  All right.

16   Q.  Who did your knee surgery?

17   A.  Dr. Dowd.

18   Q.  Why did you get that surgery if you were not, in fact,

19   injured?

20   A.  I was -- it was a part of the scheme, that you had to be

21   willing to have surgery, have a procedure done, and go to

22   therapy.

23   Q.  Let's start from the beginning of all of this.

24           How did you first hear about this trip-and-fall scam?

25   A.  It was a friend of mine named Craig.  He had told me about

1   it.  And he -- he pretty much said, as long as you were willing

2   to go through with having a procedure, which would include the

3   surgery, you wait about a year, you would receive a large

4   payout.

5   Q.  You indicated that the individual who told you about this

6   was named Craig.

7          What was Craig's full name?

8   A.  Craig Smith.

9   Q.  Did Mr. Smith indicate to you how he had learned about the

10  trip-and-fall scam?

11          MR. GANN:  Objection.

12          THE COURT:  Sustained.

13          MR. FOLLY:  Your Honor, it's a coconspirator statement

14  in furtherance of a conspiracy.

15          THE COURT:  I'm sorry.  Just a moment.

16          Admitted provisionally, subject to connection.

17  Provisionally.

18          Proceed.  You may answer, sir.

19  A.  Pretty much his friend, Ryan, who was a part of it.  And

20  that's who I was introduced to when I decided to go forward

21  with it.

22  Q.  We'll come to the individual named Ryan in just a moment.

23          MR. FOLLY:  Your Honor, just one moment.

24          (Pause)

25          At this time, your Honor, the government is going to

MBTsCON2                          Jones - Direct

1    introduce a stipulation regarding business records which has

2    been marked as Government Exhibit 1806.

3            If we could please publish that.  This stipulation

4    indicates that:

5            It is stipulated between the parties that turning to

6    one, the government exhibit sets forth Exhibit A to this

7    stipulation are true and correct copies of certain records

8    produced by Sunset Management, LLC, Krieger Chiropractic

9    Office, Marc Elefant PC, Weingarten Financial Funding, Fast

10   Trak Investment Company LLC, Andrew Dowd, M.D., All County LLC,

11   and Health Finance LLC.

12           Turning to paragraph two, this stipulation indicates

13   that the government exhibits set forth in Exhibit B to this

14   stipulation are true and correct copies of e-mail records that

15   were produced in response to judicially authorized search

16   warrants.

17           Turning to paragraph three, that paragraph indicates

18   Government Exhibit 803 contains the following information for

19   clients who were referred to the law practice of George

20   Constantine, the defendant, by the following individuals --

21   Peter Kalkanis, Kerry Gordon, Bryan Duncan, Reginald Dewitt,

22   Ryan Rainford, Marion Benjamin, and others -- that Constantine

23   settled, and lists some particular details pertaining to those

24   cases.

25           Paragraph four of the stipulation indicates that the

MBTsCON2                        Jones - Direct

1    government exhibits set forth in Exhibit E to this stipulation

2    are true and correct copies of bank records.

3              Your Honor, at this time the government offers

4    Government Exhibit 1806, which is the stipulation regarding

5    business records, as well as the exhibits listed on Exhibit A,

6    Exhibit B, and Exhibit E to that stipulation.

7              For purposes of efficiency, your Honor, the government

8    is providing these exhibits that are listed on those exhibits

9    to the stipulation with the understanding that the court

10   reporter will include them in the transcript of today's

11   proceeding as being admitted.

12             THE COURT:  Motion granted.

13             (Government's Exhibits GX 1806, 706A, 706B, 1001A-I,Z,

14   1056A-H, Z, 707A, 1102A-I, Z, 1003A, 1057B, 1104A-K, Z 1004A-H,

15   Z, 1058A, 1105A-I, Z, 1005A-L, Z, 1059A-F, Z, 1107Z, 1006Z,

16   1060A-I, Z 1110A-F, Z, 1007A-F, 1061A-J, Z, 1112A, Z, 1008A-B,

17   1062A, 1009A-F, Z, 1063Z, 1010Z, 1065A-J, Z, 1113A-I, Z,

18   1114A-F, Z, 1115A, 1011A, 1066A-I, Z, 1116A-M, 1012A-C, Z,

19   1067A-H, Z, 1118A-I, Z, 1013A, Z, 1068A, 1119A-C, Z, 1015Z,

20   1069A-I, Z, 1120A, Z, 1016Z, 1071A-G, Z, 1121A-G, Z, 1018A-G, Z

21   1072A, 1122A, 1019A-G, Z, 1073A-G, Z, 1122-2A, 1021A-G, Z,

22   1074A-F, Z, 1123A-G, Z, 1022A-F, 1075A-K, Z, 1124A-K, Z,

23   1023A-H, Z, 1076A-Z, AA, Z-2, 1125A, 1024A-F, Z, 1078Z,

24   1127A-H, Z, 1025Z, 1079A, D-J, Z, 1128A, Z, 1026A-I, Z,

25   1080A-G, Z, 1129A, 1027A-H, Z, 1082A-S; Z, 1130A-F, Z, 1029A-M,

MBTsCON2                    Jones - Direct

Z, 1083A-I, Z, 1131A-G, Z, 1030A-F, Z, 1084A-Y, Z, 1133A-I, Z,

1031A-J, Z, 1085A-P, Z, 1135A-H, Z, 1032A-K, Z, 1087A-K, Z,

1137A-D,  1036A-D, Z, 1088B-G, Z, 1139A-N, Z, 1037A-N, Z,

1089A-H, Z, 1140A-C, 1038A-G, Z, 1090A-F, Z, 1141A, 1041A-N, Z,

1091A-F, Z, 1142D-N, Z, 1043Z, 1092Z, 1143A-D, Z, 1044A-F, Z,

1045A-O, Z, 1093A-J, Z 1094A-H, Z, 1144A-F, Z, 1145A, 1048Z,

1096A-B, 1147A-L, 1049Z, 1097A-L, Z, 1148C, Z, 1050A-O, Z,

1098A-K, Z, 1149A-I, Z, 1051A, Z, 1099A, Z, 1150B-H, Z,

1053A-H, Z, 1100A, 1151A-H, Z, 1055A-H, Z, 1101A, Z, 1153A-H,

1154A-F, Z 1155C-H, 1207A-F, Z 1209A-J, 1265A-F, Z, 1266A-E, Z,

1156A-G, Z, 1210A-E, Z, 1267A-F, Z, 1157A-F, Z, 1211A-I, Z,

1268A-K, Z, 1158A-R, Z, 1212A-D, Z, 1270G, 1160A-I, Z, 1213A-H,

1271Z, 1161A-H, Z, 1214A-K, 1272A-I, 1163D, 1215A, 1273A-G,

1164A-F, Z, 1216A-E, Z, 1274A, 1166A-C, Z, 1218E, Z, 1275A,

1168A-E, Z, 1220A-J, Z, 1276A-G, Z, 1172A-N, Z, 1221A-N, 1278A,

1173A, Z, 1223A-G, Z, 1280Z, 1174Z 1224A-L, Z 1283A-F, Z 1175Z

1227A-H, Z 1284A-C, Z 1177A-H, Z 1228A-H, Z 1286A-F, Z 1178A-B

1229A 1287A-H, Z 1179A-E, Z 1230A-G, Z 1288A-G, Z 1180Z 1231A

1289A-F 1181A, E, Z 1233A-E, Z 1290Z 1182A 1235A-F, Z 1291A-H,

Z 1183A 1236A-F, Z 1292A-H, Z 1237A-G, Z 1293A-B, Z 1185A-I, Z

1238A-H, Z 1294A-K, Z 1186A-H, Z 1239A 1295A 1189A-E 1242Z

1296A-F, Z 1191A-I, Z, Z-2 1243Z 1298A-E, Z 1192A-F, Z 1246A-B,

Z 1300Z 1193A-D, Z 1248A-D, Z 1301A-E, Z 1194A-F, Z 1249A-F, Z

1302A-E 1195A-D 1251A-C 1303A-G, Z 1197Z 1252A-D, Z 1305A-E, Z

1198A-G, Z 1253H-J, Z 1306B, Z 1199A-F, Z 1254A-C, Z 1308A-I, Z

MBTsCON2                    Jones - Direct

```
 1   1200A-H, Z 1258A-G 1309A-G, Z 1201B-E 1260A-G, Z 1310A 1203C, Z
 2   1261A-I, Z 1311A-C, Z 1204A-I, Z 1262A-I, Z 1313A-C, Z 1205A-F,
 3   Z 1264A-J, Z 1314A-C, Z 1206A-D, Z 1315A-C, Z 1317A-F, Z
 4   1318A-I, Z 1374A-K 1375A 1427A-R, Z 1319A-F, Z 1376A-G, Z
 5   1428A-L, Z 1429A 1322A-B, Z 1378A-H, Z 1430A-Q, Z 1323A-G, Z
 6   1379A-J, Z 1432A 1325A-H, Z 1380A-J, Z 1433A-I, Z 1327Z
 7   1383A-C, Z 1434A-C 1331A-F, Z 1384A-H, Z 1435A-Q 1333A-C, Z
 8   1385M 1436A-F, Z 1334A-L 1387Q, Z 1437A-R 1335A-O, Z 1388A-M, Z
 9   1438A-H 1336G, Z 1389A-C 1440A-B 1337A-H, Z 1390A-D, Z 1441A-M
10   1338A-N, Z 1391A-B 1443A-I, Z 1339A-D 1393A-Q, Z 1445A-Q
11   1340A-J, Z 1394A-J, Z 1446A-L, Z 1341A-U, Z 1395A 1449A-J, Z
12   1342A-D 1343A-R, Z 1396F-G 1400A-O, Z 1450A-P, Z 1451A-P, Z
13   1344A-J 1401A-G 1453A 1345A-H, Z 1402A-M, Z 1455A-U 1346A-F, Z
14   1403A-P, Z 1456A-H 1349A-F, Z 1404A-D 1457A-F, Z 1352A, Z
15   1405A-I, Z 1458A-P, Z 1355A 1406A, Z 1459A-E, Z 1356A-G
16   1407A-M, Z 1460A, Z 1357C-F 1410A-F, Z 1461A-K, Z 1358Z 1412A-I
17   1463A-Y, Z 1359A, Z 1413A 1464A, Z 1360A, Z 1414A-T, Z 1465A-J,
18   Z 1363A 1415A-B 1466A-G, Z 1364A-G, Z 1416Z 1469A-M, Z 1365A
19   1419A-K, Z 1471E, Z 1366A, Z 1420A-I 1472C-E, Z 1367A-I, Z
20   1421Z 1473A-I 1368A 1422A-M, Z 1474A-K, Z 1369A-K, Z 1423A-Z,
21   AA, Z 1476A, Z 1370A 1424A-N, Z 1477A-G, Z 1372Z 1425A-B 1478A
22   1373A-G, Z 1426A-C 1480A-O, Z 1481A-B 1482A-H, Z 1483A-I, Z
23   1487A-O, Z 1488Z 1489A-J 1490A 1491A-J, Z 1492A-L, Z 1494A-I, Z
24   1495A 1496A-B 1497A-E, Z 1498A-I, Z 1499A-C, Z 1500A 1501A-D
25   1505A 901 - 910 551 - 570 Exhibit B 401 439 474 402 440 475 403
```

MBTsCON2                          Jones - Direct

```
 1   441 476 404 442 477 405 443 478 405A 444 479 406 445 480 407

 2   445A-B 480A 408 446 409 447 410 448 411 449 412 450 413 451 414

 3   452 415 453 416 454 417 455 418 456 481 481A 482 482A 483 483A

 4   484 484A 485 485A 486 419 457 487 420 458 488 421 459 488A 422

 5   460 488B 423 461 489 424 462 489A – B 425 463 490 426 464 491

 6   427 465 492 428 466 493 429 467 494 430 468 496 431 469 497 432

 7   469A 498 433 470 499 434 470A 500 435 471 501 436 471A 502 437

 8   472 438 473 1003B 1115B 1247A 1376H 10041 1122-2B 1253A – G

 9   1377A – J 1006A – H 1126A – B 1255A-C 1382A – I 1010A – F 1128C

10   1256A – I 1385A – L 1014A 1129B – M 1257A – E 1386A – I 1015A-I

11   1132A – C 1263A – B 1387A-P 1016A – G 1134A – I 1269A – J 1392A

12   – H 1017A-C 1136A – B 1270A – F 1396A – E, H 1020A – M 1138A –

13   F 1271A – B 1397A 1025A – C 1140D 1272J – P 1398A 10271 1142A –

14   C 1277A-C 1399A 1028A1146A – D 1279A – G 1408A – C 1031K – L

15   1148A – B 1280A – C 1409A – D 1033A – B 1150A 1281A – I 1415A

16   1034A – D 1152A – F 1282A – C 1417A 1035A-G 11531 – N 1285A – H

17   1418A 1040A – L 1155A – B 1290A – C 1421A 1042A – O 1162A – F

18   1297A – D 1425B – C 1043A – M 1163A-C, E 1299A – N 1431A 1046A

19   – C 1165A – C 1300A – C 1444A – E 1047A – I 1166D 1301F – G

20   1447A – B 1048A – G 1167A – B 1304A – C 1448A 1049A – F 1170A –

21   D 1306A 1452A 1052A 1171A 1310B – E 1454A – C 1054A – E 1174A –

22   I 1316A – D 1462A 1057A 1175A – B 1320A – C 1465K – L 1062B

23   1176A – K 1321A – D 1467A 1063A – F 1180A – C 1324A – C 1468A –

24   I 1064A – C 1181B – D 1326A – D 1470A 1070A 1188A 1327A 1471A –

25   D 1077A – B 1190A – J 1329A 1472A – B 1078A-H 1196A – B 1330A
```

MBTsCON2                          Jones - Direct

1    1475A – B 1079B–C 1197A–G 1332A 1479A–B 1081A 1201A 1336A – F,

2    H | 1484A – K 1086A 1203A – B 1341V 1485A – C 1088A 1208A–C

3    1347A – D 1486A – C 1092A – J 1218A – D 1348A – L 1488A 1095A –

4    D 1219A – B 1350A – D 1493A 1100B – C 1222A – E 1351A – M 1502A

5    1101B 1225A 1353A – B 1503A–B 1106A 1229B – C 1354A – D 1504A

6    1107A 1232A – E 1357A – B 1506A 1108A–B 1234A – B 1358A–D 1507A

7    1109A – M 1240A – L 1359B 1111A – B 1241A – B 1361A – B 1112B –

8    Q 1242A – I 1366B 1117A–B 1243A–E 1371A – B 1120B – X 1244A

9    1372A – B 1125B – N 1245A–G 1374L 701A 702A Exhibit E 702B 703A

10   703B 703C 703D 703E 704A 704B 704C 704D 704E 704F 704G 705A

11   705B 705C 708A 708B received in evidence)

12       Ladies and gentlemen, what you've just seen is you saw

13   testimony from a witness on the witness stand and you also

14   heard a stipulation.  What that stipulation was, that certain

15   documents are true and correct records.  So remember, that's a

16   second way that evidence comes in, by stipulation.

17       So you have to accepted the fact that these certain

18   documents are true and correct records, and I have admitted

19   those true and correct records.  So that's the third way

20   evidence comes in.  You remember, I said documents.  I admit

21   documents.

22       So you've seen now, in just ten minutes of testimony,

23   a witness testifying, the stipulation of the parties, and

24   admission of documents.  You've seen all three ways that

25   evidence comes in here.  You will have an opportunity at the

MBTsCON2                          Jones - Direct

1    end of the case in your deliberations to review any of the

2    exhibits, indeed any of the testimony that the parties will use

3    now, whatever pieces of the evidence they so choose to bring to

4    your attention.

5              Proceed.

6              (Continued on next page)

MBTVCON3                          Jones – Direct

1              MR. FOLLY:  Thank you, your Honor.

2    Q.  Mr. Jones, you indicated earlier that the lawyer who

3    represented you in connection with your trip-and-fall case was

4    George Constantine; is that correct?

5    A.  Yes.

6              MR. FOLLY:  We could show the witness what has been

7    marked as Government Exhibit 1.

8    Q.  Mr. Jones, do you recognize that?

9    A.  Yes.

10   Q.  What is it?

11   A.  That's George Constantine.

12             MR. FOLLY:  Your Honor, the government offers

13   Government Exhibit 1.

14             MR. KEATING:  No objection.

15             THE COURT:  Admitted without objection.

16             (Government's Exhibit 1 received in evidence)

17             MR. FOLLY:  We could please publish that to the jury.

18             THE COURT:  And, ladies and gentlemen, the lawyers

19   often say "publish it to the jury."  All that means is show it

20   to the jury.  The jury can actually see anything that's

21   admitted into evidence.  So feel free to show whatever you want

22   to the jury that's in evidence.  Proceed.

23             MR. FOLLY:  Thank you, your Honor.

24             Mr. Carbone, you can take that exhibit down.

25             We could please publish to everyone what is in

 1   evidence as Government Exhibit 1425B.

 2              THE COURT:  Next question.

 3              MR. FOLLY:  Thank you, your Honor.

 4              At the top it indicates this is email from Robin

 5   London to Bryan Duncan, dated May 19th, 2016.  And at the

 6   bottom there's a signature block from Robin London, legal

 7   assistant, Law Office of George A. Constantine, P.C.

 8              If we could turn now to page 3 of this email.  And if

 9   we could highlight where it says Kaheem Jones.  You can use the

10   highlighter.

11              THE COURT:  The jury can see where that cursor is;

12   correct?  The jury sees it.  Next.

13              MR. FOLLY:  If you can scroll down to the next page

14   where it says "Craig Smith."

15   Q.  Do you see that as well?

16   A.  Yes.

17              MR. FOLLY:  If you can scroll up to the top of page 3

18   where it says:  George Constantine, Weingarten Financial

19   Funding, November 2015.  It indicates Kaheem Jones.  Do you

20   recognize the name of the individual there?

21   A.  Yes.

22   Q.  And who is that?

23   A.  That's me.  My name is misspelled.

24   Q.  And then where it says "Craig Smith" on the fourth page, do

25   you recognize that as well?

MBTVCON3                          Jones - Direct

1    A.  Yes.

2    Q.  And who is that individual?

3    A.  That's Craig, the person that introduced me to this; that

4    told me about it.

5    Q.  Now, you indicated earlier that Craig Smith had told you he

6    had learned about the scam from someone named Ryan, is that

7    right?

8    A.  Yes.

9    Q.  Did you eventually meet Ryan?

10   A.  Yes.

11            MR. FOLLY:  We could show the witness what's been

12   marked as Government Exhibit 11.

13   Q.  Do you recognize that?

14   A.  Yes.

15   Q.  What is it?

16   A.  That's Ryan.

17            MR. FOLLY:  The government offers Government Exhibit

18   11.

19            MR. GANN:  No objection, your Honor.

20            THE COURT:  Admitted without objection.

21            (Government's Exhibit 11 received in evidence)

22            MR. FOLLY:  We could publish that to the jury.

23            THE COURT:  Next question.

24            MR. FOLLY:  You can take that down, Mr. Carbone.

25            THE COURT:  Next question.

MBTVCON3                    Jones - Direct

1    Q.  Did you eventually take Craig Smith up on this offer to get

2    involved in the trip-and-fall scheme?

3    A.  Yes.

4    Q.  Describe the first thing that happened in connection with

5    your participation in the trip-and-fall scam.

6    A.  I went to the hospital; I had injured my hand.  And when I

7    got to the emergency room, I told them I slipped and fell.

8    Q.  You indicated that you went to the hospital and you had

9    injured your hand?

10    A.  Yes.

11    Q.  How had you injured your hand?

12    A.  Punched the TV.

13    Q.  Describe once you got to the hospital what the first thing

14    that happened was.

15    A.  I was in the ER.  They put a cast on my hand, after they

16    took x-rays and stuff and they cast my hand.  They gave me

17    whatever medications for pain and they gave me my discharge

18    papers.

19            THE COURT:  Did you punch the TV purposely?

20            THE WITNESS:  Yes.

21            THE COURT:  In order to injure yourself?

22            THE WITNESS:  No.  I was -- I was drinking and I had

23    an argument with my ex-wife.

24            THE COURT:  I see.  All right.  Proceed.

25            MR. FOLLY:  Thank you, your Honor.

MBTVCON3                    Jones - Direct

1    BY MR. FOLLY:

2    Q.   Did you speak with anyone at the hospital?

3    A.   Yes, the nurse and the doctor.

4    Q.   Can you explain what you discussed with them.

5    A.   I told them I slipped and fell.

6    Q.   Had you, in fact, slipped and fell?

7    A.   No.

8    Q.   Did the medical staff believe you that you had actually

9    hurt your hand in a trip-and-fall?

10   A.   No.

11   Q.   How do you know that?

12   A.   Because the nurse said that -- she said that it's a boxer's

13   fracture, and she know what a boxer's fracture looks like.

14            MR. GANN:  Objection, Judge.

15            THE COURT:  Yes.  Sustained.

16            MR. GANN:  And I ask to strike that.

17            THE COURT:  I'll grant that.

18            MR. FOLLY:  Your Honor, can we have a brief sidebar?

19            THE COURT:  No.  Proceed.  This is not 801.  This is

20   not 801; correct?

21            MR. FOLLY:  Your Honor, we're not offering that

22   statement for its truth.  There's another permissible purpose,

23   if we could be heard on it.

24            THE COURT:  Move on.

25            MR. FOLLY:  We'd ask to revisit before the witness

MBTVCON3                    Jones - Direct

1    leaves the stand.

2              THE COURT:  Yes.

3              MR. FOLLY:  Thank you.

4    BY MR. FOLLY:

5    Q.  Why did you tell the doctor that you had slipped and fell?

6    A.  That's what was required to get started; you had to have

7    your discharge papers.  So I knew I already had to go to the

8    hospital for my hand, so I told them I slipped and fell.

9    Q.  Now, you mentioned you told the medical staff you had

10   injured your hand, as well as your knee and your back; is that

11   correct?

12   A.  Yes.

13   Q.  With respect to the knee and the back, had you, in fact,

14   injured those areas of your body?

15   A.  No.

16             MR. FOLLY:  Mr. Carbone, if we could publish what's in

17   evidence as Government Exhibit 1253I at 23.  And if we could

18   zoom in a little bit.

19   Q.  At the top it indicates Mt. Sinai Beth Israel Brooklyn

20   Emergency Department.

21             Mr. Jones, can you read aloud the patient name that's

22   listed in the upper right corner?

23   A.  My name, Kasheem Jones.

24   Q.  Can you also read aloud where it says today's date, what is

25   the date that's listed there?

MBTVCON3                        Jones - Direct

1    A.  August 6, 2014.

2    Q.  Now, focusing on the section towards the middle of the

3    page, where it says your diagnosis, can you read aloud what's

4    indicated there?

5    A.  It says:  Boxer metacarpal fracture, neck closed ED.  Back

6    pain, lumbuscula (ph).  Muscle strain of right knee.  Rib

7    contusion.

8    Q.  And further below it says "boxer's fracture."  You had been

9    diagnosed with a boxer's fracture.  And then it states:  A

10   boxer's fracture is a broken bone of the hand; it results from

11   punching a hard object at least harder than your hand.  That is

12   why it is often called a boxer's fracture.  And the description

13   that's provided there, is that consistent with how you had

14   actually injured your hand?

15   A.  Yes.

16             MR. FOLLY:  We can take down that exhibit.

17   Q.  Did you eventually get discharged from the hospital?

18   A.  Yes.

19   Q.  Was that the same day or a different day than when you

20   arrived at the hospital?

21   A.  It was the same day.

22   Q.  And were you provided with any paperwork when you were

23   discharged?

24   A.  The discharge papers.

25   Q.  What was the next step in this trip-and-fall scam?

1   A.  I contacted Craig.  He had set me up to meet with the guy

2   Ryan.

3   Q.  Did you eventually meet with Ryan?

4   A.  Yes.

5   Q.  Where did that meeting take place?

6   A.  We met at George Constantine's office.

7   Q.  When you say "George Constantine," is that the same

8   individual you identified here in the courtroom as the

9   defendant?

10  A.  Yes.

11  Q.  Where was George Constantine's office located?

12  A.  It was in Queens off of -- on Vernon Boulevard.

13          MR. FOLLY:  If we could show the witness only what's

14  been marked as Government Exhibit 220.

15  Q.  Mr. Jones, do you recognize that?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's George Constantine's office.

19          MR. FOLLY:  The government offers Government Exhibit

20  220.

21          MR. GANN:  No objection.

22          THE COURT:  Admitted.

23          (Government's Exhibit 220 received in evidence)

24          MR. FOLLY:  We could publish that.

25          THE COURT:  Next question.

MBTVCON3                         Jones - Direct

1    Q.  When you arrived at Constantine's office, did you speak

2    with anyone?

3    A.  Yes.

4    Q.  Who did you speak with when you arrived at his office?

5    A.  I spoke with a guy named Mel and doctor -- Dr. K.

6    Q.  Prior to arriving at George Constantine's office, had you

7    ever met Dr. K or the individual named Mel?

8    A.  No.

9            MR. FOLLY:  We can take down that exhibit.

10   Q.  I'm showing you what's been marked --

11           MR. FOLLY:  We could show the witness only what's been

12   marked as Government Exhibit 9.

13   Q.  Mr. Jones, do you recognize that?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's the guy named Mel.

17           MR. FOLLY:  The government offers Government Exhibit

18   9.

19           MR. GANN:  No objection.

20           THE COURT:  Admitted.

21           (Government's Exhibit 9 received in evidence)

22           MR. FOLLY:  If we could please publish that.

23   Q.  Mr. Jones, you indicated you spoke with a Dr. K, as well as

24   this individual from Government Exhibit 9 named Mel.  Who did

25   you speak with first at George Constantine's office?

MBTVCON3                    Jones - Direct

1    A.  I spoke with a guy Mel.

2    Q.  Focusing on your conversation with Mel, can you describe

3    what you discussed with him.

4    A.  He had a -- he had a phone with a bunch of pictures in it.

5    The pictures was of different locations.  The locations was

6    various different locations that didn't have any cameras or

7    anything like that.

8    Q.  You indicated that he had a phone that had photographs on

9    it.  What types of photographs were on his phone that he showed

10   you?

11   A.  They were pictures of different places, places that you

12   would select to say that that's where you -- you know, you

13   tripped and fell at.

14   Q.  What types of places were in the photos?

15   A.  It was various different places.  They were all commercial,

16   usually restaurants or something.  They were all, like,

17   selected because they didn't have any video cameras or stuff

18   like that.

19   Q.  And at those particular locations, what was shown in the

20   photographs?  What area of those locations?

21   A.  It was like parking lots, driveways, things like that.

22   Q.  What was your understanding of the purpose of the

23   photographs that he was showing you?

24   A.  I had to pick one.

25   Q.  What were you picking that location for?

MBTVCON3                        Jones - Direct

1    A.  Because that's -- whatever location that you pick was the

2    location that you tripped and fell at.

3    Q.  Had you had a trip-and-fall at any of the locations that

4    were in those photographs?

5    A.  No.

6    Q.  Did you eventually select one of the locations that Mel

7    showed you?

8    A.  Yes.

9    Q.  Which location did you select?

10   A.  The Floridian Diner.

11   Q.  Why did you select that particular location?

12   A.  Because it was right down the block from where I live, and

13   I used to go there all the time for breakfast.

14          MR. FOLLY:  If we could show the witness only what's

15   been marked as Government Exhibits 216 and 217.

16          THE COURT:  Mr. Folly, I don't want to take time out

17   for a sidebar, but was the point you were going to raise in

18   regard to the motion to strike that you believe it's admissible

19   under 803(4)?  Take a look.

20          MR. FOLLY:  Okay.  One moment.

21          THE COURT:  Is that the point you were going to make?

22   803(4).

23          MR. FOLLY:  Your Honor, the government believes that

24   there are two separate bases.  One of them is the provision

25   your Honor just cited; and a separate one is a nonhearsay

1    purpose.

2              THE COURT:  I'm going to admit it under 803(4).

3              Ladies and gentlemen, I'm sorry to do this code, but I

4    don't want to -- the idea was not to waste time with the

5    sidebar.  We've spent more time now than I would have on the

6    sidebar.

7              You'll remember earlier I had stricken an answer.  It

8    was the nurse's statement that this is a boxer's injury.  I am

9    going to reverse myself on that and you can -- I'm allowing

10   that statement to be part of the evidence.  What weight, if

11   any, to give it is entirely up to you.

12             Proceed.

13             MR. FOLLY:  Thank you, your Honor.

14   BY MR. FOLLY:

15   Q.  Mr. Jones, do you recognize --

16             THE COURT:  Again, the numbers here simply have to do

17   with legal matters; they are of no concern to you.

18             Go ahead.

19             MR. FOLLY:  Thank you, your Honor.

20   Q.  Mr. Jones, do you recognize Government Exhibits 216 and

21   217?

22   A.  Yes.

23   Q.  What are they?

24   A.  That's the Floridian Diner.

25             MR. FOLLY:  The government offers Government Exhibits

MBTVCON3                    Jones - Direct

1    216 and 217.

2              MR. GANN:  No objection, Judge.

3              THE COURT:  Admitted.

4              (Government's Exhibits 216, 217 received in evidence)

5              THE COURT:  And let's not waste time with "publish it

6    to the jury."  When something is admitted, the paralegal can

7    show it to the jury.

8              Next.

9              MR. FOLLY:  Thank you.

10   Q.  And focusing on 217, which is on the screen now, Mr. Jones,

11   which portion of this photograph is the Floridian Diner?

12   A.  Right in the center where the parking lot -- that's the

13   transit depot across the street.  And that's the diner.

14   Q.  Is that where the -- above where the cursor is in the

15   middle there?

16   A.  Yes.

17   Q.  That is the diner itself.

18              And that is the parking lot in front of it?

19   A.  Yes.

20   Q.  After your meeting with Mel, you indicated you had also had

21   a conversation with Dr. K; is that right?

22   A.  Yes.

23   Q.  Can you explain what you discussed during your conversation

24   with Dr. K.

25   A.  He pretty much just spoke about how much for each injury.

MBTVCON3                      Jones - Direct

1    He told me -- he told me that he would find me a doctor for my

2    hand.  We spoke about the back and the leg.  And, you know, it

3    was like a -- you know, I don't remember the details, but he

4    was, you know, just pretty much like talking numbers; what

5    injury, how much for each injury, and so on.

6    Q.  When you say "how much for each injury," can you explain

7    what you mean by that?

8    A.  Like the leg was a certain dollar amount, the back would be

9    a certain dollar amount, the hand would be a certain dollar

10   amount.

11   Q.  And were those dollar amounts connected to your lawsuit?

12   A.  Yes.

13   Q.  And the amount of money that you hoped to get through the

14   lawsuit?

15   A.  Yes.

16   Q.  Did you have an understanding at the time of that

17   conversation with Dr. K of what Dr. K's role was with respect

18   to this trip-and-fall scam?

19   A.  No, I just -- he didn't look like a doctor; he just -- he

20   just looked a little weird.  But no, I didn't know what -- what

21   part he played.

22   Q.  After that conversation with Mel and Dr. K, what happened

23   next?

24   A.  Went and sat down with Constantine.

25   Q.  Going back for just one moment to your conversations with

MBTVCON3                    Jones - Direct

1   Mel and Dr. K, did those conversations take place at George

2   Constantine's office?

3   A.  Yes.

4   Q.  Now, you indicated after you spoke with them, you also met

5   with George Constantine; is that right?

6   A.  Yes.

7   Q.  Who was present during your meeting with George

8   Constantine?

9   A.  The kid Mel.

10  Q.  What did you discuss during that meeting with George

11  Constantine?

12  A.  Mel showed the pictures of the Floridian Diner.  He asked

13  me a few questions about my background, what I do, and that was

14  pretty much it.

15  Q.  You indicated that Mel showed the pictures of the Floridian

16  Diner.  How did he do that?

17  A.  He showed them on his phone.

18  Q.  Who did he show them to?

19  A.  George Constantine.

20  Q.  Was that meeting with Constantine a short or a long

21  meeting?

22  A.  It was short.

23  Q.  Was there anyone --

24          THE COURT:  I don't know what short or long is.  How

25  short?  If you can estimate.

MBTVCON3                        Jones - Direct

1          THE WITNESS:  Fifteen minutes.

2          THE COURT:  All right.  Thank you.

3    Q.  Was there anyone else at Constantine's office that day

4    while you were there?

5    A.  There was other people just sitting in the lobby.

6    Q.  What was your understanding of who those other individuals

7    were?

8          MR. GANN:  Objection, Judge.

9          THE COURT:  Did you have an understanding as to who

10   those other individuals were?

11         THE WITNESS:  They were just -- they were, like,

12   people -- I didn't know specifically who they were.

13         THE COURT:  All right.  Next.

14   Q.  Now, did you make -- after your meeting -- how did your

15   meeting end with George Constantine?

16   A.  I think I signed whatever papers, and I -- I left.  We

17   supposed to have -- after that, I know we supposed to -- I had

18   schedule for the MRI and start therapy.

19   Q.  You mentioned earlier that you had injured your hand while

20   striking a TV; is that right?

21   A.  Yes.

22   Q.  What, if any, medical treatment did you receive for your

23   hand?

24   A.  Like a day or so after I called, and nobody got back to me.

25   So when they discharged me from the hospital, they had gave me

MBTVCON3                    Jones - Direct

1    a referral of like -- gave me a list of like three hand

2    surgeons.  And because I was in pain, I had actually called one

3    of the hand surgeons and scheduled an appointment.

4    Q.  You indicated that initially you had called someone

5    regarding your hand injury before you made the call to someone

6    on that list.  Who were you referring to?

7    A.  It was either the kid Mel or Dr. K or one of them --

8    someone I had called from there.  Because they told me that

9    they would get me a hand doctor; and I needed to see a doctor.

10   Q.  Did you hear back from anyone after you called them about

11   getting a hand doctor?

12   A.  No.

13   Q.  Why did you decide to call someone on that list before

14   hearing back from them?

15   A.  My hand was the size of like a mini basketball.  It was --

16   I was in pain.  I needed to see a doctor.  I wasn't waiting.

17   Q.  Did you use insurance for the medical treatment you

18   received for the hand?

19   A.  Yes, I did.

20   Q.  Going back to this trip-and-fall scam, what was the next

21   step in that process?

22   A.  Get the MRI and you start therapy.  Then you -- you know,

23   you saw your doctor and just start scheduling.  But the first

24   part was to get the MRI, you start therapy, that was the

25   immediate part.  Then as the process went on, you see a doctor

1    and then schedule your -- the surgery.

2    Q.  You indicated that you started to do therapy.  Who did you

3    go to for that therapy?

4    A.  Dr. Krieger.

5            MR. FOLLY:  Mr. Carbone, if we could publish what's in

6    evidence as Government Exhibit 1253J at page 3.

7    Q.  At the top it says Krieger Chiropractic Office, Charles A.

8    Krieger, DC.  Can you read aloud the patient name listed there?

9    A.  That's my name, Kasheem Jones, 74 Ross Street, 5H.

10   Q.  Do you recognize the personal information that's provided

11   throughout that document?

12   A.  Yes.  That's my -- that's my personal information.  That's

13   my social, that's my date of birth, that's my cell phone

14   number, my mom's address, and my address.

15   Q.  And the date of this appears to be August 20th, 2014, in

16   the upper left.

17   A.  Yes.

18           MR. FOLLY:  We can take that down.

19   Q.  Where was Dr. Krieger's office located?

20   A.  In Queens, in Astoria.

21           MR. FOLLY:  If we could show the witness only what's

22   been marked as Government Exhibit 207.

23   Q.  Do you recognize that?

24   A.  Yes.

25   Q.  What is it?

MBTVCON3                        Jones - Direct

1   A.  It's Dr. Krieger's office.

2            MR. FOLLY:  The government offerings Government

3   Exhibit 207.

4            MR. GANN:  No objection.

5            THE COURT:  Admitted.

6            (Government's Exhibit 207 received in evidence)

7   Q.  Typically, how long were your appointments with Dr.

8   Krieger?

9   A.  Ten, 15 minutes.

10  Q.  Do you recall how you got to your first appointment with

11  Dr. Krieger?

12  A.  Yes.

13  Q.  How did you get there?

14  A.  Ryan picked me up from my house and took me.

15           MR. FOLLY:  If we could publish Government Exhibit 11.

16  Q.  Is that the same individual you identified earlier as Ryan?

17  A.  Yes.

18           MR. FOLLY:  We can take that down.

19  Q.  And you went to that first appointment.  Were you alone

20  with Ryan or were you with anyone else?

21  A.  No, he had picked up several people on the way.

22           THE COURT:  "He" being Ryan?

23           THE WITNESS:  Yes.

24  Q.  Did you have an understanding of who those other

25  individuals were that he picked up along the way?

MBTVCON3                          Jones - Direct

1          MR. GANN:  Objection.

2          THE COURT:  Do you have an understanding, yes or no?

3          THE WITNESS:  They were just -- they were people that

4  was picked up that was going to therapy as I was.

5  Q.  Approximately how many other individuals were transported

6  with you to Dr. Krieger's office?

7  A.  Two or three.

8  Q.  Apart from the people who came with you in Ryan's car, did

9  you observe anyone else once you got to Dr. Krieger's office?

10 A.  Yes.

11 Q.  Who did you observe?

12 A.  The kid Mel had a vehicle with a bunch of people that was

13 currently inside Dr. Krieger's office.

14 Q.  Can you describe how your appointments at Dr. Krieger's

15 office worked?

16 A.  You go in, you sign the paper.  You go in the back.  He

17 snap your neck and you leave.

18 Q.  How much time would you actually have face-to-face with Dr.

19 Krieger?

20 A.  Ten minutes.  I mean the process was -- the process was

21 never more than 10, 15 minutes.  By the time you park, you go

22 in, you come right back out, you know, you don't usually put

23 more than a quarter or two in the meter, you don't.

24         THE COURT:  So you're saying from the time you arrived

25 to the time you got back to your car was 10 to 15 minutes?

MBTVCON3                         Jones - Direct

1          THE WITNESS:  Yes.

2          THE COURT:  All right.

3   Q.  Was his office similar or different to other medical

4   offices you've been to?

5   A.  It was different.

6   Q.  In what ways was it different?

7   A.  It was never no patients there.  After the first time I

8   went, I didn't want to be driven because you had to -- you

9   know, you had to pick people up and drop people off.  So I

10  always drove myself to avoid the running into them or

11  whoever -- whatever carload of people they would have.

12          So I would always go -- try to go there when, you

13  know, it was more convenient for my schedule.  And I would just

14  be in and out, so it didn't conflict with my schedule because I

15  had to go to Queens.  So I was -- never nobody in the office;

16  it was never a wait.  The goal was to just drive to Queens and

17  get in and out so I can go back to whatever I was doing.

18          THE COURT:  When you say there was never nobody in the

19  office, do you mean that there never was anybody there or do

20  you mean there always were people there?

21          THE WITNESS:  Like the receptionist and you sign, you

22  go in the back, whatever, then you leave.

23          THE COURT:  Okay.

24  Q.  So to be clear about that, on the occasions when you drove

25  yourself to Dr. Krieger's office, did you observe any other

1  patients in his office?

2  A.  For the most part, no.  The times, like, I would go and if

3  I seen that it was a car there with the people, then I would go

4  get a hot dog or something because, you know, you wanted to

5  wait for them to be -- my goal was to be in and out and not let

6  it conflict with my schedule all the time.  So usually I -- you

7  know, I always drove myself after the first time.

8  Q.  And the individuals you saw on those other occasions when

9  you went there, were those patients who were transported in the

10  cars?

11  A.  Yes.

12          MR. GANN:  Objection.

13          THE COURT:  I'll allow it.

14  Q.  Did you have any discussions with Dr. Krieger while you

15  were there in his office?

16  A.  No, not that I remember.

17  Q.  Did you make any observations about the other patients who

18  were transported by the drivers to these appointments?

19  A.  I mean, most of them are like low-income people.

20          MR. GANN:  Objection, Judge.

21          THE COURT:  Yes.  Sustained.

22  Q.  Can you describe your observations with more specificity?

23  A.  I mean, it was just, you know, like a -- you know, you --

24  most of the people that they picked up was either from housing

25  projects or something like that.

1            MR. GANN:  Objection.

2   A.   I only rode with them one time.

3            THE COURT:  I'll allow it.  You can cross.

4            Proceed.

5   A.   I only rode with them one time.  But, you know, you --

6   normally you could tell by the type of people that was there

7   that they -- you know, that you could -- you could look and

8   tell.  It was -- not to be prejudiced, but it is what it is.

9   Q.   Did you have any discussions with Ryan or Mel about any of

10  those other clients?

11  A.   Ryan.

12  Q.   What did you discuss with Ryan?

13  A.   He would complain.  He wanted -- he would say that, you

14  know, he needed more people that were working and things to

15  that nature so they wouldn't always be calling and talking

16  about money and basically pressing them.

17  Q.   And when you say pressing him, what do you mean by that?

18  A.   Because people, I guess, you know, they were -- they were

19  under the impression, like -- like I was, you know, you -- you

20  know, it's going to be -- it's going to be quick, you know, you

21  just going --

22            MR. GANN:  Objection, Judge.

23            THE COURT:  He's answering.

24            Go ahead, sir.

25  A.   You're going to have a surgery and, you know, like, you're

MBTVCON3                        Jones - Direct

1  going to get your check real soon; it was going to be instant.

2  And it didn't happen that way.

3  Q.  You mentioned earlier that you observed other individuals

4  at Constantine's office when you were there.

5  A.  Yes.

6  Q.  Were the individuals that you saw at Dr. Krieger's office

7  similar or different than the patients you saw --

8              MR. GANN:  Objection.

9              THE COURT:  I'll allow it.

10  A.  They were similar.

11  Q.  Mr. Jones, did you eventually get an MRI?

12  A.  Yes.

13  Q.  What is your understanding of what an MRI is?

14  A.  It's like a detailed x-ray of your body.

15  Q.  Where was the MRI facility located at where you got your

16  MRI?

17  A.  I don't -- it was in Queens.  Every -- every -- everywhere

18  was in Queens.  I don't remember exactly where.

19  Q.  At some point after getting the MRI and starting your

20  therapy, did you see a back doctor?

21  A.  Yes.

22  Q.  Do you recall where you saw that back doctor?

23  A.  No.  It would have been Dr. Krieger's office.  If not, I

24  don't remember.

25  Q.  Putting aside the actual building, do you recall where the

1  office was located?

2  A.  Queens.  Queens.  Everything was Queens.

3  Q.  Where were you living at the time?

4  A.  Brooklyn.

5  Q.  Did you meet with the back doctor before getting a

6  procedure on your back?

7  A.  Mm-hmm.

8  Q.  Was that one meeting or more than one meeting?

9  A.  It was one meeting.

10  Q.  Approximately was that a short meeting or a long meeting?

11  And please be as specific as you can.

12  A.  I don't remember the details, but they were all short.

13  Q.  When you say they were all short, what are you referring

14  to?

15  A.  You never really there for more than 30 minutes.

16  Q.  So, in other words, between the time you parked the car and

17  got back to the car, it wouldn't exceed 30 minutes?

18  A.  Yes.

19  Q.  And are you referring to meetings that you had with doctors

20  in the trip-and-fall scam?

21  A.  Yes.

22  Q.  Was that appointment with the back doctor similar or

23  different than other medical appointments you've had outside of

24  the trip-and-fall scam?

25  A.  They were all different than going to a regular doctor.

MBTVCON3                      Jones - Direct

1    Q.  How is it different?

2    A.  If you go to a regular doctor, it's a process.  You know,

3    if you going through just a basic exam, it's a process.  If

4    anything, it's a process; it's not -- none of that was -- was

5    compared to seeing a regular, whether it's a physician or

6    whatever.

7    Q.  Did you eventually get a back procedure?

8    A.  Yes.

9    Q.  Was your back actually injured?

10   A.  No.

11   Q.  Why did you get that procedure on your back if it wasn't

12   injured?

13   A.  It was what was required.  When you opted to do it, you

14   opted to go through with having surgery.

15   Q.  Did you have an understanding of what they did to your back

16   with that procedure?

17   A.  I don't remember.

18   Q.  Do you recall where that back procedure took place?

19   A.  In Queens.

20          MR. FOLLY:  If we could show the witness what has been

21   marked as Government Exhibits 226 through 228.

22   Q.  Mr. Jones, do you recognize those?

23   A.  Yes.

24   Q.  What are they?

25   A.  That's the place we had the surgery at.

1            MR. FOLLY:  We could publish those.

2            Your Honor, the government offers 226 through 228.

3            MR. GANN:  No objection.

4            THE COURT:  Admitted without objection.

5            Now you can show the jury.

6            (Government's Exhibits 226 to 228 received in

7       evidence)

8       Q.  You indicated that that's where your back procedure took

9       place; is that correct?

10      A.  Yes.

11           MR. FOLLY:  If you could just publish 227 for a

12      moment.

13           THE COURT:  Question.

14           MR. FOLLY:  We could now publish what's in evidence as

15      Government Exhibit 1253I at 15.

16      Q.  Mr. Jones, at the top it says "New York Surgery Center

17      Queens."  Does that appear to be the location where you had

18      your back procedure?

19      A.  Yes.

20           MR. FOLLY:  If we could zoom back out.

21      Q.  Where it says "patient name," can you read that aloud?

22      A.  Kasheem Jones.

23           THE COURT:  That's your name.

24           Next.

25      Q.  Can you also read aloud the date of the examination?

1    A.  10/28/2014.

2    Q.  Focusing towards the bottom at the surgeon name?

3    A.  Dr. Ribeiro.

4    Q.  Thank you.

5          MR. FOLLY:  You can take that down.

6    Q.  After that back procedure, did you eventually get a surgery

7    on your knee?

8    A.  Yes.

9    Q.  Who was your doctor for your knee surgery?

10   A.  That was Dr. Dowd.

11   Q.  Was your knee, in fact, injured?

12   A.  No.

13   Q.  Why did you get surgery on your knee if it wasn't hurt?

14   A.  It was a part of the process.

15   Q.  Prior to the knee surgery, did you meet with Dr. Dowd?

16   A.  Yes.

17   Q.  Was that meeting long or short?

18   A.  Short.

19   Q.  Was it consistent in length --

20         THE COURT:  Rather than say long or short, say how

21   long you think it was.

22   Q.  Was it consistent in length with your meeting with the back

23   doctor?

24   A.  Yes.

25   Q.  What do you remember about that visit with Dr. Dowd before

MBTVCON3                         Jones - Direct

1   you had the surgery?

2   A.  I don't remember too much.  I just know I was, you know,

3   pretty much in and out, that's all.  I don't remember the

4   details or the specifics of any conversation I may have had.

5   Q.  Did he indicate to you that a surgery needed to be

6   performed?

7           MR. GANN:  Object.

8           THE COURT:  No, I will allow that.  803(4).

9   A.  I don't remember.

10  Q.  Do you recall during that appointment, did Dr. Dowd conduct

11  a physical examination --

12          THE COURT:  And another provision as well.  I didn't

13  need that provision.

14          Next.

15          MR. FOLLY:  Thank you, your Honor.

16  Q.  During that appointment, did Dr. Dowd conduct a physical

17  examination of you or perform any tests on your knee?

18  A.  No, I would say no.

19          MR. FOLLY:  If we could publish what's in evidence as

20  Government Exhibit 1253Z at 4.

21  Q.  At the top it says "Andrew J. Dowd, M.D., Orthopedic and

22  Hand Surgery."

23          MR. FOLLY:  We could zoom back out.

24  Q.  Can you read aloud the date listed at the top.

25  A.  April 8th, 2015.

1    Q.  And it indicates that this is regarding Kasheem Jones;

2    correct?

3    A.  Yes.  Yes.

4    Q.  Can you read aloud just the first two sentences of the

5    history of present illness.

6    A.  The patient is a 37-year-old male who was involved in a

7    trip-and-fall on 8/16/2014.  The patient was transported via

8    ambulance to Beth Israel Hospital and was treated and released

9    the same day.

10              MR. FOLLY:  You can zoom back out.

11   Q.  Mr. Jones, did you indicate you were transported via

12   ambulance to the hospital?

13   A.  No, I didn't -- I wasn't transported in the ambulance.  I

14   went to the hospital.

15              MR. FOLLY:  And if we could blow up the physical

16   examination section of this.  It reads:  Examination of the

17   right knee revealed crepitation in the anterior aspect of the

18   knee.  I'll apologize in advance.  Patellofemoral compression

19   painful.  Drawer test was negative.  Lachman test was negative.

20   Pivot shift was negative.  McMurray's was positive.  Collateral

21   ligaments were stable.  Positive joint line tenderness.

22              We can take that down.

23   Q.  Mr. Jones, did you receive --

24              THE COURT:  When you saw Dr. Dowd, did he perform any

25   procedure -- did he do anything to your knee, sir?

1           THE WITNESS:  I don't remember.

2           THE COURT:  You don't remember whether or not he did

3   or you don't remember his doing any?

4           THE WITNESS:  I don't remember him doing any.

5           THE COURT:  Pardon me?

6           THE WITNESS:  I don't remember him doing any.

7           THE COURT:  All right.  Next question.

8           MR. FOLLY:  Your Honor, subject to connection, we'd

9   like to offer Government Exhibit 824.

10          Any objection?

11          THE COURT:  I don't see it.

12          MR. KEATING:  One moment please, your Honor.

13          (Counsel conferred)

14          MR. KEATING:  Your Honor, as long as it's subject to

15  connection, we don't have an objection.

16          THE COURT:  Admitted subject to connection.

17          (Government's Exhibit 824 received in evidence)

18          MR. FOLLY:  We can publish and play that.

19          (Video played)

20  Q.  Mr. Jones, prior to getting your surgery, did Dr. Dowd

21  conduct any test resembling the test we just watched on the

22  video?

23  A.  I don't remember.

24  Q.  And when you say you don't remember --

25          MR. KEATING:  Your Honor, I think that answer is

MBTVCON3                      Jones - Direct

1    self-explanatory.

2              THE COURT:  No, it's a little ambiguous.

3              Do you mean that you don't remember him doing the test

4    or you don't remember whether or not he did the test?

5              THE WITNESS:  I don't remember him doing the test.

6              THE COURT:  All right.

7    BY MR. FOLLY:

8    Q.  Had you had an injury --

9              THE COURT:  Yes.  I don't know whether you were

10   finished with your answer or not, sir.  Were you finished?

11             THE WITNESS:  What I remember is that the visits were

12   short and we was in and out.  I don't want to say that I -- you

13   know, something didn't or did take place that didn't.  I just

14   remember it wasn't -- it wasn't a normal examination.  I didn't

15   get undressed and lay down on a bed and stuff like that.

16             THE COURT:  All right.  Thank you.

17             Next.

18   Q.  Thank you, Mr. Jones.

19             And to make that clear, do you recall a test being

20   done on you where you laid down flat on your back on a bed, the

21   doctor lifted your knee and moved it in a manner similar to

22   what was on the video?

23   A.  Yes.

24             MR. KEATING:  Objection.

25             THE COURT:  I'm sorry, the answer is yes.

MBTVCON3                          Jones - Direct

1           Do you remember that, sir?

2           THE WITNESS:  Yes.

3           THE COURT:  Okay.  Next question.

4    Q.  I'm unclear.  Do you remember that the doctor did or did

5    not perform that test on you?

6           MR. KEATING:  Objection.

7    A.  That was an injury from 2008.

8    Q.  Okay.  So putting aside -- I think we're getting ahead of

9    ourselves.

10   A.  Yeah.

11   Q.  Putting aside your 2008 injury and focusing on your -- what

12   you have described as your one and only visit with Dr. Dowd

13   before your surgery, do you recall if Dr. Dowd placed you flat

14   on your back on a table and moved around your knee --

15   A.  No.

16   Q.  -- in the manner described on the video we saw?

17   A.  No.

18   Q.  Thank you.

19          Prior to the appointment you had with Dr. Dowd, had

20   you had an injury to your other knee before that appointment

21   with Dr. Dowd?

22   A.  Yes.

23   Q.  Approximately how long ago was that?

24   A.  That was a long time ago.  Back in 2008.

25   Q.  Did you see a doctor for that prior knee injury?

MBTVCON3                    Jones - Direct

1    A.  Yes.

2    Q.  Was your appointment with Dr. Dowd similar or different

3    than your appointment for your prior knee injury?

4    A.  They were different.

5    Q.  Can you explain what the differences were.

6    A.  It was a lot different.  You know, we went through getting

7    exams, you went through going to get x-rays, you went through

8    various follow-up appointments and more exams, and so on.

9    Q.  And the things you were just describing, were those things

10   that took place with your prior knee injury?

11   A.  Yes.

12   Q.  Did any of those things take place with your injury with

13   Dr. Dowd?

14   A.  No.

15   Q.  In connection with your prior knee surgery, did you

16   eventually get surgery for your prior knee injury?

17   A.  Yes.

18   Q.  In connection with your prior knee surgery, approximately

19   how many appointments did you have with the doctor?

20   A.  Anywhere from six to eight maybe.

21   Q.  And with Dr. Dowd, you indicated you had one appointment

22   prior to the surgery?

23   A.  Yes.

24   Q.  Did you have any appointments with Dr. Dowd after that

25   surgery?

1    A.   No.

2    Q.   Turning now to the day of your surgery with Dr. Dowd, can

3    you describe what happened that day?

4            THE COURT:   Is your testimony that there was no

5    follow-up with Dr. Dowd after he performed his procedure on

6    you?

7            THE WITNESS:   Yes.

8    Q.   Turning now to the day of your surgery, can you describe

9    what happened that day?

10   A.   I went to the surgery center.   They performed the

11   procedure.   I left.   And it was like a sponge on my leg or

12   something like that.   I took it off and I got in the car and

13   left.

14   Q.   Where did that knee surgery take place?

15   A.   In Queens at the same surgery center.

16   Q.   When you say "the same surgery center," was that the New

17   York Surgery Center where you received your --

18   A.   Yes.

19   Q.   -- back procedure?

20   A.   Yes.

21   Q.   Prior to receiving the surgery, did you receive anesthesia?

22   A.   Yes.

23   Q.   What was the effect of that anesthesia?

24   A.   I went to sleep.

25   Q.   Did you receive any payment after your surgery?

MBTVCON3                        Jones - Direct

1  A.  Yes.

2  Q.  Approximately how long after the surgery did you receive

3  the payment?

4  A.  It was right after, I think.  They brought us a few hundred

5  dollars in an envelope.

6  Q.  You indicated that someone brought you a few hundred

7  dollars in an envelope.  What form was the money in inside the

8  envelope?

9  A.  Cash.

10  Q.  Who brought that payment to you?

11  A.  It was either Ryan or Mel that brought the money.  I'm

12  not -- I don't remember exactly which one, but it was one of

13  the two.

14  Q.  Did you have an understanding before you got the surgery

15  that you were going to get paid afterwards?

16  A.  Yes.  Yes.  It was like they are going to give you money,

17  but it was never -- it was never as much as whatever they --

18  whatever they said it was.

19  Q.  Who indicated to you you were going to be paid after the

20  surgery?

21  A.  This would be Ryan.

22  Q.  In connection with your trip-and-fall case, did Constantine

23  eventually file a lawsuit on your behalf?

24  A.  Yes.

25  Q.  What was your understanding of who was sued in connection

MBTVCON3                    Jones - Direct

1    with that lawsuit?

2    A.   The Floridian Diner.

3          MR. FOLLY:  Your Honor, at this time the government

4    offers Government Exhibit 152 as self-authenticating under Rule

5    902.

6          THE COURT:  Any objection?

7          MR. GANN:  No objection, Judge.

8          THE COURT:  Admitted without objection.

9          (Government's Exhibit 152 received in evidence)

10         THE COURT:  How much longer do you have with this

11   witness, sir?

12         MR. FOLLY:  Your Honor, approximately 20 minutes.

13         THE COURT:  All right.  Ladies and gentlemen, it's 1

14   o'clock.  Let's go to lunch.  Be back here by 2:15.  I don't

15   want to keep you 20 more minutes.

16         Remember to stay away from the lawyers, the witnesses,

17   the parties.  Don't eat in the cafeteria.  You're not missing

18   anything.  And we'll see -- and don't come into the courtroom;

19   come into the jury deliberation room.  We'll see you at 2:15.

20         On my part, I'll go down to the cafeteria.

21         See you at 2:15.

22         (Jury not present)

23         THE COURT:  You may step down, sir.  Thank you.

24         (Witness not present)

25         THE COURT:  Do you have any sense of how long your

1    cross is going to be?

2              MR. GANN:  Good question, Judge.

3              THE COURT:  Mr. Keating, do you have any sense as to

4    how long the cross is going to be?

5              MR. GANN:  Maybe an hour and a half.

6              THE COURT:  Pardon me?

7              MR. GANN:  Maybe an hour and a half.

8              THE COURT:  Hour and a half with this witness.

9              MR. GANN:  It depends on how the answers go, Judge.

10             THE COURT:  I know that.  We've heard everything but

11   20 minutes.

12             Mr. Keating, any sense?

13             MR. KEATING:  An hour.

14             THE COURT:  Quite surprised.  Come back at 2:15.

15             (Luncheon recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

MBTsCON4

```
 1                          AFTERNOON SESSION

 2                             2:15 p.m.

 3              (In open court; jury not present)

 4              THE COURT:  Let's put the witness on the stand again.

 5              What's your estimate now, Mr. Folly?

 6              Still 20 minutes?

 7              MR. FOLLY:  Hopefully a little under that.

 8              THE COURT:  Mr. Jones, if you would step up, again,

 9    sir.

10              You understand, sir, you remain under oath?

11              THE WITNESS:  Yes.

12              THE COURT:  Thank you, sir.  Please have a seat.

13              Mr. Gann, are you going first in these

14    cross-examinations?

15              MR. GANN:  For this one, Judge.

16              Do you care if we decide amongst ourselves who goes

17    first and who goes second?

18              THE COURT:  I don't care, but I need to know.

19              MR. GANN:  Yes.

20              THE COURT:  I'm sure you won't be asking the same

21    questions, right?

22              MR. KEATING:  I don't intend to, your Honor.  At least

23    I will try not to.

24              THE COURT:  I say that in terms of Rule 611.  I don't

25    want there to be duplication.  At the same time, obviously, I
```

MBTsCON4

1    want each counsel to have full opportunity for cross.

2            Bring this jury in.

MBTsCON4

1              (Jury present)

2              THE COURT:  Please be seated in the courtroom.

3              Mr. Folly, you may continue with your direct

4    examination of Mr. Jones.

5              MR. FOLLY:  Thank you, your Honor.

6    BY MR. FOLLY:

7    Q.  Mr. Jones, right before we broke for lunch you had

8    indicated that in connection with your trip-and-fall case,

9    Mr. Constantine eventually filed a lawsuit, is that right?

10   A.  Yes.

11   Q.  If we could turn to what is in evidence as Government

12   Exhibit 152 at 14.  This document appears to be entitled

13   complaint and is captioned Kasheem Jones, plaintiff, against

14   Boyar Floridian LLC and M&k Real Estate Associates LLC.  At the

15   top it indicates plaintiff, Kasheem Jones, by his attorneys,

16   law office of George A. Constantine, PC, complaining of the

17   defendants, respectfully alleges as follows.

18              If we could now turn, if we can scroll down to where

19   it indicates the 23rd allegation.  It should be on this page

20   here.

21              It states:  That on or about --

22              THE COURT:  Read it, sir.

23              MR. FOLLY:  I'm waiting for it to be blown up.

24   BY MR. FOLLY:

25   Q.  On or about August 6, 2014, while plaintiff, Kasheem Jones,

MBTsCON4

1  was lawfully traversing the aforementioned area of the

2  defendant's premises, he was caused to trip and fall.

3         Mr. Jones, was that allegation true?

4  A.  No.

5  Q.  Turning now to the 24th item.  While plaintiff was on said

6  premises of the defendants, plaintiff was caused to be severely

7  injured when he was caused to fall due to the defective

8  condition of the defendant's premises, more specifically the

9  parking lot threat.

10         Mr. Jones, was that allegation true?

11  A.  No.

12  Q.  Turning now to the 29th and 30th allegations on the next

13  page which indicate:  That by reason of the foregoing,

14  plaintiff was rendered sick, sore, and disabled, and was caused

15  to suffer and still suffers great pain, physical incapacity,

16  mental anguish and loss of enjoyment of life.

17         And then in 30:  That as a result of the foregoing,

18  plaintiff, Kasheem Jones, was compelled to seek medical care

19  and attention and will, upon information and belief, continue

20  to undergo medical care and attention in the future.

21         With respect to the allegations in 29 and 30,

22  Mr. Jones, were those allegations true?

23  A.  No.

24  Q.  We can take this down.

25         Did you eventually get a deposition in connection with

MBTsCON4

1    your lawsuit?

2    A.  Yes.

3    Q.  Can you explain your understanding of what a deposition is?

4    A.  Um, when you and the attorney meet in the office where a

5    court reporter and insurance company or the insurance company's

6    attorneys.

7    Q.  When you --

8          THE COURT:  Did they ask you questions during that

9    deposition?

10          THE WITNESS:  Yes, sir.

11          THE COURT:  And are you put under oath during that

12    deposition?

13          THE WITNESS:  Yes, sir.

14    Q.  When you referred to the insurance company, what was your

15    understanding of their connection to the case?

16    A.  That was for the diner.

17    Q.  The insurance company for the diner?

18    A.  Yes.

19    Q.  Describe what happened on the day of your deposition.

20    A.  Um, I met with Constantine on -- I met with Constantine

21    at Starbucks on the corner of Court Street, and we sat in

22    Starbucks for maybe 20 minutes and we prepped for the

23    deposition.

24    Q.  What did you discuss with Constantine during that

25    discussion, during that discussion at Starbucks?

MBTsCON4

A.  Um, he told me -- he read the report from my hand surgeon
and he told me that we're going to withdraw the hand.  And then
we went over the rest of the details, and then we went
upstairs.  The deposition was right next door from Starbucks.

Q.  You indicated he read a report from the hand surgeon.

        Can you explain what you meant by that?

A.  When I went to the hand surgeon, the hand surgeon asked me
what happened.  I told the hand surgeon what happened with me
hitting the TV and everything.  So that report was different
from the report I gave at the hospital, in the emergency room.
When the hand surgeon then scheduled me for a surgery
immediately, I had to have surgery done on my hand.

        So when I met with Constantine, he pretty much -- that
report came, he had that report.  And he told me that -- he
pretty much read the report off to me, and he said we have to
withdraw the hand.

Q.  When you said that he said you had to withdraw the hand,
what did he mean by that?

A.  Basically it would be only my knee and my back.  Me saying
that I hurt my hand during the slip-and-fall, he had to, you
know, basically not say anything about the hand.

Q.  Prior to that conversation, what had you told him about how
you had injured your hand?

A.  Um, I don't remember telling him anything about my hand
injury.

MBTsCON4

1    Q.   And in your case, how were you -- what were you alleging

2    had caused the injury to all of the areas of your body?

3    A.   The slip-and-fall.

4    Q.   During your conversation with Constantine, did he indicate

5    he was angry or upset with you for lying to him about how you

6    had injured your hand?

7    A.   No.

8    Q.   Did he indicate he had any concerns about the rest of your

9    case?

10   A.   No.

11   Q.   Did he indicate he had any concerns you were telling him

12   the truth about how you had injured the other areas of your

13   body?

14   A.   No.

15   Q.   Did he decide to drop your case after learning about how

16   you had actually injured your hand?

17   A.   No.

18   Q.   You said your discussion with Constantine also focused on

19   preparing for the deposition, is that right?

20   A.   Yes.

21   Q.   Can you explain what you meant by that?

22   A.   Um, I don't remember word-for-word details, but I know it

23   was, you know, basically the story, went over the story, me

24   slipping and falling in the parking lot.  You know, being

25   briefed on what not to say and things to say.  But, you know,

MBTsCON4

1    I don't -- I don't remember the exact details of the whole

2    conversation.

3    Q.  Did you go forward with the deposition that day?

4    A.  Yes.

5    Q.  During the deposition, did you tell the truth about the

6    circumstances of your alleged accident?

7    A.  No.

8    Q.  Why not?

9    A.  Um, the purpose was to go through with the slip-and-fall

10   story, like the surgeries, you follow through to the end.

11   Q.  In other words, did you lie during the deposition?

12   A.  Yes.

13   Q.  What happened with respect to your trip-and-fall lawsuit?

14   A.  Um, eventually it settled.

15   Q.  Approximately how much money did you receive?

16   A.  Somewhere like 30, 35,000.

17   Q.  Approximately how much did the entire case settled for?

18   A.  It was close to 200,000.

19   Q.  What was your understanding of why you received less than

20   the full amount of the settlement?

21   A.  Um, it was, um, back and forth between me and Constantine.

22   We had -- um, we had exchanged a few phone calls.  First -- the

23   first call was him trying to -- um, you know, telling me that

24   it was 20,000.  And I remember saying no, you know.  Then it

25   was 25,000, and I was saying no.  Then he was saying, you know,

MBTsCON4

the money was $1,000 you took, and then the finance company --

he gave me a bunch of different stories of why the amount was

so little.

Q.   What did you say to him during those conversations when he

indicated that the settlement was going to be initially 20,000?

A.   Like, you know, it was, like, you know, trying to low ball

me like I was a crack head or something, like I would just take

anything.  He, you know, kept going into the details of the

finance companies, and he had to shave off of his fees in order

to get me the amount that we wound -- I wound up taking, which

was either 30 or 35,000.  I don't remember the exact amount.

          But it was, like, when I agreed to take it, I know he

had said that he had to, you know, um, drop some of his fees

and argue back and forth with the finance company and all of

this.  It was a bunch of back and forth with me and him, and

him explaining why it was that amount.

Q.   Were you upset with him?

A.   Um, yeah.

Q.   You indicated that you thought he was trying to low ball

you and treat you like a crack head.

          Did you express that sentiment to him?

A.   Yeah.  I mean, it was -- it was like he -- you know, you

were dealing with, um, a certain type of people.  Say you would

just figure that they would just take anything and they would

take anything and be happy --

MBTsCON4

1              MR. GANN:  Objection.

2              THE WITNESS:  -- be happy with --

3              THE COURT:  Just a moment.

4              Overruled.  Proceed.

5    A.  I felt like he had -- you know, I was categorized in this

6    group of people where I would just take whatever you threw at

7    me and be happy with it and --

8              THE COURT:  What led you to that conclusion, sir?

9              Why did you conclude that?

10             THE WITNESS:  It was a series of different things.  It

11   was just the type of people that they dealt with, the type of

12   people you saw going in and out.  You -- you know, you just --

13   you know, you developed a perception like, you know, you think

14   I'm just going to take whatever you give me and be happy with

15   it.

16             MR. FOLLY:  Thank you, your Honor.

17   Q.  You indicated you were referring to the type of people

18   going and in and out.

19             Were you referring to George Constantine's office?

20             MR. GANN:  Objection.

21   A.  The office, wherever you seen the drivers --

22             MR. GANN:  Objection.

23             THE COURT:  Objection sustained.

24   Q.  What locations were you referring to when you made that

25   reference?

MBTsCON4

1    A.  It was mainly therapy.  You know, we went -- I only went to

2    Constantine office, I think, maybe twice.  That was -- any

3    other bump-in with Constantine was either at 44 Court Street or

4    at the deposition.

5    Q.  Mr. Jones, I would like to switch topics for a moment.

6             Prior to today's testimony, did you meet with the

7    prosecutors in this case?

8    A.  Yes.

9    Q.  Did you attend meetings at the U.S. Attorney's office?

10   A.  Yes.

11   Q.  During your meetings with the prosecutors, were you

12   truthful?

13   A.  Yes.

14   Q.  Did you tell the government about other crimes you had

15   committed in addition to the trip-and-fall scam?

16   A.  Yes.

17   Q.  Did you tell the government about any crimes you had never

18   been charged with before?

19   A.  Yes.

20   Q.  What were some of those crimes?

21   A.  It was me -- I think I was getting Medicaid until 2019, I

22   believe.

23   Q.  And you indicated that you were getting Medicaid --

24   describe what you did to obtain those Medicaid benefits.

25   A.  Um, I would write a letter stating that I live with my

MBTsCON4

```
 1    mother and she provided food and shelter.  Yeah, I would do
 2    that, and so I could keep the health insurance and I wouldn't
 3    have to pay for health insurance.
 4    Q.  Was that truthful or was that untruthful?
 5    A.  That was untruthful.
 6    Q.  After telling the government about that, did you stop doing
 7    it or --
 8    A.  Yes, I did.
 9    Q.  Did you keep doing it?
10    A.  Yes, I did.
11    Q.  You stopped?
12    A.  Yes, I stopped.
13    Q.  After meeting with the government, did you eventually enter
14    into an agreement with the government?
15    A.  Yes.
16    Q.  Was that a written agreement?
17    A.  Yes.
18    Q.  If we can show the witness what's been marked as Government
19    Exhibit 806.  If we can scroll.
20            Do you recognize that?
21    A.  Yes.
22    Q.  What is it?
23    A.  It's the agreement that I signed in 2019.
24            MR. FOLLY:  The government offers Government Exhibit
25    806.
```

MBTsCON4

| 1 | MR. GANN:  No objection, Judge. |
| 2 | THE COURT:  Admitted. |
| 3 | (Government's Exhibit GX 806 received in evidence) |

BY MR. FOLLY:

Q.  What is your understanding of what you are required to do
under that agreement with the government?

A.  Tell the truth.

Q.  If you tell the truth, what is your understanding of what
you receive in return from the government?

A.  I just won't be prosecuted.

Q.  And --

THE COURT:  You won't be prosecuted for what, sir?

THE WITNESS:  Um, for the medical fraud case and --

THE COURT:  Is that the Medicaid fraud you just told
us about?

THE WITNESS:  Yes, and also the slip-and-fall scam.

THE COURT:  All right.

BY MR. FOLLY:

Q.  And under that agreement, do you have an understanding you
will also not be prosecuted for your personal use of marijuana
during a certain time period?

A.  Yes.

Q.  Now --

A.  I don't use marijuana --

Go ahead.  I'm sorry.

MBTsCON4

```
 1   Q.  What was that?

 2   A.  No, go ahead.

 3   Q.  Is the time period 2014 through 2019?

 4   A.  Yes.

 5   Q.  Do you know whether the outcome of this trial has any

 6   bearing on whether you can be prosecuted for those crimes?

 7   A.  No.

 8   Q.  It does not have any bearing, is that your understanding?

 9   A.  That is my understanding.  I believe I just have to be

10   honest and truthful.

11   Q.  As part of your cooperation, did you previously testify for

12   the government?

13   A.  Yes.

14   Q.  What is your understanding of what could happen today if

15   you do not tell the truth?

16   A.  I can be prosecuted.

17   Q.  Mr. Jones, did you ever tell anyone else about this

18   trip-and-fall scam?

19   A.  Yes.

20   Q.  Who did you tell?

21   A.  My fiance.

22   Q.  What is her name?

23   A.  Collette Ford.

24   Q.  What was her response when you told her about getting

25   involved in this scam?
```

MBTsCON4

1  A.  Um, I mean, she seen me go through it.  And I was, like,

2  you don't really have to do anything, so she -- she followed.

3  She listened.

4  Q.  Did she eventually participate in the scam?

5  A.  Yes.

6  Q.  Did she eventually file her own case?

7  A.  Yes.

8  Q.  Did she have the same lawyer or a different lawyer as you?

9  A.  A different lawyer.

10 Q.  Who was her lawyer?

11 A.  It was Marc Elefant.

12 Q.  Did she eventually get surgery in connection with her case?

13 A.  Yes.

14 Q.  What areas of her body?

15 A.  Her back and her knee.

16 Q.  Was she actually injured on those areas of her body?

17 A.  No.

18 Q.  Did she have the same or different doctors for her medical

19 procedures as you did?

20 A.  The same doctors.

21 Q.  If you could publish what is in evidence as Government

22 Exhibit 1158F.

23       Starting with the first check at the top, Mr. Jones,

24 who does that check appear to be made out to, where it says

25 paid to the order of at the top?

MBTsCON4

```
 1   A.  I don't see anything.

 2   Q.  There appears there's an issue with the screen.

 3   A.  Dr. Dowd.

 4   Q.  On the for line, who is listed there?

 5   A.  Collette Ford.

 6           MR. FOLLY:  Now this should be published to everyone.

 7   Can the jurors see this on their screens?

 8   Q.  You indicated the first check was made out to Dr. Dowd, is

 9   that right?

10           THE COURT:  Yes, that's right.

11   A.  Yes.

12           THE COURT:  Next question.

13   Q.  What was the amount of the first check?

14   A.  $9,000.

15   Q.  Can you remind the jury who Collette Ford was?

16           THE COURT:  The jury just heard that.  That's his

17   fiance.

18           Next.

19   Q.  Turn to the third check.  Can you read who the check was

20   made out to?

21   A.  Krieger Chiropractic.

22   Q.  Who was listed on the for line?

23   A.  Collette Ford.

24   Q.  Turning to the fourth check, can you read who that check

25   was made out to?
```

MBTsCON4                    Jones - Cross

1    A.  Collette Ford.

2    Q.  And on the for line, it indicates personal advance.

3           Return to the fifth check.  That check appears to be

4    made out to Peter Kalkanis.  And, once again, the for line

5    indicates Collette Ford, and it's in the amount of $2,000.

6           Mr. Carbone, can you publish what is in evidence as

7    Government Exhibit 1158I.  It appears to be entitled record of

8    operation.  If we can zoom in on the top half.

9           Under name it lists Collette Ford.  Surgeon:  Andrew

10   Dowd.  Date of surgery:  July 9, 2015.

11          Mr. Jones, based on your observations of Ms. Ford, was

12   her knee seriously injured at the time of this surgery?

13   A.  No.

14   Q.  Was it injured at all?

15   A.  No.

16          MR. FOLLY:  No further questions, your Honor.

17          THE COURT:  All right.  Thank you.

18          Mr. Gann, is there any cross-examination of this

19   witness?

20          MR. GANN:  Thank you, Judge.

21          May I inquire, Judge?

22          THE COURT:  Yes.

23   CROSS-EXAMINATION

24   BY MR. GANN:

25   Q.  Good afternoon, Mr. Jones.

MBTsCON4                      Jones - Cross

1    A.  Good afternoon.

2    Q.  Mr. Jones, you just indicated that your personal injury

3    case that you had with Mr. Constantine, I believe you said

4    settled for around $200,000, correct?

5    A.  Somewhere close to it.

6    Q.  It was actually less than that, wasn't it?

7    A.  I don't remember the exact number.

8    Q.  You don't remember that it was $150,000?

9    A.  No, I don't.

10   Q.  And you received $30,000 from that settlement, right?

11   A.  Um, something like that, yes.

12   Q.  And you indicate that Mr. Constantine cut his fee on that

13   case, right?

14   A.  That's what he told me, yes.

15   Q.  OK.  You received documentation to that effect, did you

16   not?

17   A.  I never received any documentation.

18   Q.  You didn't receive any kind of documentation --

19             THE COURT:  Let the witness finish.

20             MR. GANN:  Sorry, Judge.

21   A.  This was done over the phone.  He called me one day and

22   told me a number, and we went back and forth.  And then a few

23   days later, we spoke.  Then a few days later, we spoke after

24   that.  And then when we agreed on a number, I met him at his

25   new office in Long Island.

MBTsCON4                          Jones - Cross

1  Q.  And you took a check from him?

2  A.  Yes.

3  Q.  And he gave you some documents at that time, right?

4  A.  Possibly.

5  Q.  That explained the funds that were being taken from the

6  settlement you had received, right?

7  A.  OK.

8  Q.  Yes?

9  A.  You're saying -- I -- I'm going to say yes.  I'm assuming.

10  Q.  OK.  Now, you also indicated that there was a finance

11  company involved with your case, correct?

12  A.  That's what he said, yes.

13  Q.  Well, you knew that to be the case, right?

14  A.  We didn't know nothing until afterwards.

15  Q.  You didn't know anything about the funding company?

16  A.  We didn't know none of that stuff until it was time --

17  Q.  I'm not asking you about --

18         THE COURT:  Let the witness --

19  A.  I --

20         THE COURT:  Gentlemen.  The way this system works is

21  that there will be a question, then there will be an answer.

22  After the answer is given, there will be another question.

23  You're not to speak over each other.

24         What is the question?

25  Q.  The question is:  You knew that there was a funding company

MBTsCON4                         Jones - Cross

1    involved with your case, correct?

2    A.  At the end, I did.

3         THE COURT:  Next question.

4    Q.  And you had received advances on your personal injury case

5    through that funding company, correct?

6    A.  I picked up $1,000 from Constantine's office, I think, in

7    2015 or something like that.

8    Q.  You picked that up from Constantine's office or you got

9    that from Mel or Ryan or Dr. K?

10   A.  The advance was from Constantine's office.  It came in an

11   envelope with cash, and I picked it up from his secretary at

12   the office on Vernon Boulevard.

13   Q.  And the funding agreement, you signed the funding

14   disagreement, did you not?

15   A.  I signed a bunch of papers.  I don't...

16   Q.  I'm not asking about the papers you signed when you first

17   met with Mr. Constantine, which I think you previously

18   described as the retainer agreement or something like that,

19   right?

20   A.  Um, most likely.

21   Q.  At some point during the processing of your case you signed

22   a funding agreement in which you took loans against your

23   settlement, did you not?

24   A.  I took $1,000.  Did I sign the agreement?  I'm not -- I'm

25   not saying I didn't.  I'm not saying I didn't sign anything.  I

MBTsCON4                          Jones - Cross

1    know I took $1,000.  It was close to Christmas, I think, of

2    2015.  What I signed, I'm not saying I didn't sign it.

3    Q.  What you're saying is you only got $1,000 --

4    A.  Yes.

5    Q.  -- to your recollection, correct?

6    A.  Yes.  No, it's not to my recollection.  I know what I got.

7    Q.  Now, you said you were upset with George Constantine

8    because you felt that he was low balling, correct?

9    A.  I wasn't upset with him.  I had conversations with

10   Constantine.  It wasn't some personal, you know, vendetta had

11   against him.  He had conferences at Court Street.  His son

12   worked for Douglas Elliman.  I spoke with Constantine.

13   Q.  But you indicated on direct examination that you were upset

14   with him?

15   A.  Yeah.  I thought he was trying to low ball with me offering

16   me $20,000.

17   Q.  Because you felt he was low balling you and you felt he was

18   lumping you in with other people that you believed to be

19   involved in this scheme, right?

20   A.  Yes.

21   Q.  That you would just take whatever he offered you, correct?

22   A.  Yes.

23   Q.  And I believe you indicated that he indicated in those

24   initial calls that the settlement amount that you were being

25   offered was $20,000, right?

MBTsCON4                           Jones - Cross

1   A.  Yes.

2   Q.  And then you said it went to $25,000, correct?

3   A.  Yes.

4   Q.  And ultimately it settled at $150,000, correct?

5   A.  I didn't -- I don't remember the exact number.

6   Q.  OK.  Now, you were upset that he was low balling you for a

7   settlement that you were receiving that you had staged,

8   correct?

9   A.  I was upset because they promised us a lot more money than

10  what they offered.

11  Q.  Interesting you say that.  They promised you --

12            THE COURT:  The jury will disregard statements of the

13  lawyers.  What Mr. Gann just said is not evidence.  Anything he

14  says is not evidence, but certainly disregard the statements.

15            What's the question?

16  Q.  You said you didn't get what they promised you, correct?

17  A.  Yes.

18  Q.  They being Ryan, correct?

19  A.  They being the -- supposedly, Dr. K, the kid, Mel, with the

20  pictures, the whole description of the course for the back and

21  the knee, when I first went to Constantine's office, the high

22  numbers that they spoke.  You know -- you know, they sell --

23  they sold this dream, like --

24            MR. GANN:  This is not responsive to my question,

25  Judge.

1              THE COURT:  Ask the question again.

2              MR. FOLLY:  Your Honor, I think the testimony was

3     directly responsive to the question.

4              THE COURT:  Let me just see.

5              Not at the end.

6              Go ahead.  Ask whatever question you want.

7              MR. GANN:  Thank you.

8     BY MR. GANN:

9     Q.  They being Ryan Rainford, correct, he is one of the people

10    who told you that, right?

11    A.  Yes, it was --

12    Q.  That's all I'm asking you.  He was one of the people who

13    told you that, correct?

14    A.  It was Dr. K and the other kid and Mel.

15             THE COURT:  Listen to the question.

16    A.  Yes.

17             THE COURT:  Answer just the question that's being

18    asked.

19             Was Ryan Rainford one of the people who told you that;

20    yes or no?

21             THE WITNESS:  Yes.

22             THE COURT:  Next question.

23    Q.  Dr. K was one of the people that told you that, right?

24    A.  Yes.

25    Q.  And Mel was one of the people that told you that, correct?

MBTsCON4                      Jones - Cross

1    A.   Yes.

2    Q.   They are the ones who told you there would be a big payday

3    at the end of this thing, right?

4    A.   Yes.

5    Q.   Not George Constantine, right?

6    A.   I don't remember the conversation we had that detail.  No,

7    he never -- he never -- you know, it was never, like, a pitch

8    with Constantine, from what I remember.

9    Q.   As to how much you would make on this, correct?

10          He told you he would do the best he could and get you

11   the most money he could, correct?

12   A.   I don't remember him telling me that, but...

13   Q.   In sum and substance?

14          THE COURT:   In words or substance, did Mr. Constantine

15   tell you that he would do the best he could for you and get you

16   the most money he could?

17          Did he say that to you, in words or substance?

18          THE WITNESS:   I don't remember.

19          THE COURT:   All right.   Next.

20   BY MR. GANN:

21   Q.   And you never told him that this was all a fake injury,

22   right?

23          You never told him that?

24   A.   No.

25   Q.   You never told him it was a fake trip-and-fall that you

1    had, right?

2    A.  No.

3    Q.  Now, the trip-and-fall that you had, you said that you met

4    with -- you ran into a friend of yours, Craig Smith, several

5    weeks before your purported slip-and-fall, correct?

6    A.  I didn't run into him, but yes.  Correct.

7    Q.  You had a conversation with him?

8    A.  Yes.

9    Q.  And he told you about this scheme, correct?

10   A.  Yes.

11   Q.  And he told you about Ryan, correct?

12   A.  Um, he told me about the -- the process.  He didn't tell me

13   about any individual in specific.  He told me about the

14   process, and if I wanted to go through with it, to let him know

15   and he would make the phone calls.

16   Q.  OK.  And at some point you did tell him you wanted to go

17   through with it, correct?

18   A.  Yes.

19   Q.  And you met with the person that you identified as Ryan

20   Rainford, right?

21   A.  Yes.

22   Q.  And you met with Ryan Rainford before you ever met with

23   George Constantine, correct?

24   A.  Yes.

25   Q.  In fact, you met with Ryan Rainford maybe a week or more

MBTsCON4                    Jones - Cross

1   before you met with George Constantine, correct?

2   A.  I don't remember, but it was before.  I don't remember how

3   long, but it was -- I did meet with him before.

4   Q.  And it was longer than the day before -- excuse me.  It was

5   longer than the -- it was longer before that -- withdrawn.

6        That was prior to August 6 of 2014, correct?

7   A.  I don't remember the exact day, but I do remember I met him

8   before I met with Constantine.

9   Q.  What you said on direct examination that -- and correct me

10  if I'm wrong -- that you met Ryan and Dr. K and Mel outside of

11  or inside of George Constantine's office the day after your

12  supposed accident, correct?

13  A.  Yes.

14  Q.  But you had actually met Ryan Rainford and Mel maybe

15  even --

16  A.  No.

17  Q.  -- before that?

18  A.  No.

19  Q.  You never told the government that?

20  A.  No.  The first time I met -- the first time I met with the

21  guy Mel was when I got to Constantine's office.

22  Q.  Let me ask you this:  You described on direct examination

23  that you had met with the government on many occasions prior to

24  coming here and testifying, correct?

25  A.  Yes.

MBTsCON4                          Jones - Cross

1  Q.  And one of those occasions was fairly recently, on

2  October 28 of 2022, correct?

3  A.  Yes.

4  Q.  And when you met with the government, you were there to

5  tell them the truth, the whole truth, and nothing but the

6  truth, correct?

7  A.  Yes.

8  Q.  And you did tell them the truth, right?

9  A.  Yes.

10  Q.  And they took notes about the conversation, during the

11  conversation that they were having with you, correct?

12  A.  OK.  I don't know, but...

13  Q.  Well, you told the government that you met with Ryan before

14  you ever went to the hospital.

15          Isn't that what you told them?

16  A.  At Craig house.

17  Q.  I'm sorry?

18  A.  At Craig's house.  Craig Smith.  He lived in Queens.

19  Q.  So you spoke with Ryan at Craig's house --

20  A.  I'm not sure it was before I went to the hospital.  I know

21  that was the first time.  It was outside of where Craig live.

22  And I don't remember exactly where in Queens, but it was

23  somewhere in Queens.

24  Q.  But didn't you tell them that that -- that you met with

25  Ryan before you ever went to the hospital?

1  A.  I don't know if it was before I went to the hospital.  I

2  don't remember if it was exactly -- it was before I met with

3  Constantine, I know that.

4  Q.  All right.  So let's talk about then the conversation --

5  you indicated that you went to Constantine's office on the day

6  after you had been to the hospital, correct?

7  A.  Yes.

8  Q.  So you went to the hospital on August 6 of 2014.

9           So August 7 of 2014 would have been when you went to

10  Constantine's office, to George Constantine's office, right?

11  A.  Um, it would have been after I went to the hospital, the

12  day --

13           THE COURT:  Was it the day --

14  A.  I don't remember whether it was the 5th, 6th, or 7th.  I

15  don't want to say yes to the 6th if it was the 4th or 5th.  It

16  was right after I went to the hospital.

17  Q.  Would there be anything to refresh your recollection as to

18  the date that you went to the hospital?

19  A.  You're talking about seven, eight years ago.

20  Q.  I understand, but --

21           THE COURT:  Is there something that you think -- you

22  say you're not sure of the exact date.  Is there something that

23  you think will refresh your recollection; in other words, help

24  you remember exactly what date it was that you met with

25  Constantine; yes or no?

MBTsCON4                         Jones - Cross

1           MR. FOLLY:  Your Honor, I think the question was as to

2      when he went to the hospital.

3           MR. GANN:  That was the question, Judge.  I'm sorry.

4           THE COURT:  I'm sorry.  Whether it would refresh your

5      recollection as to exactly what date it was that you went to

6      the hospital; yes or no?

7           THE WITNESS:  On what date?  No.

8           THE COURT:  OK.  Let me ask this -- and I don't want

9      to put words in your mouth, I'm just trying to understand your

10     testimony, sir -- how long after you're going to the hospital

11     did you meet with Constantine.

12          THE WITNESS:  Maybe a day or two after.

13          THE COURT:  All right.  Thank you.

14          Next.

15     BY MR. GANN:

16     Q.  Would the hospital record itself refresh your recollection

17     as to the day you went to the hospital to report this?

18     A.  Yeah.

19     Q.  OK.  Could I have that, Defendant's B., I believe it is B1,

20     put on the screen for the witness only.

21          Can you see what's on the screen, sir?

22          THE COURT:  Nothing.  There should be nothing on the

23     juror's screens.

24          Sir, take a look at that.  Now just because it says

25     something on that doesn't mean that whatever it says is true.

MBTsCON4                          Jones - Cross

1   The question is not whether or not what's on that screen is

2   true.  The question is whether or not looking at that gives you

3   now a recollection of the day you went to the hospital.

4              Yes or no; does it refresh your recollection or not?

5              THE WITNESS:  Um, no.

6              THE COURT:  All right.

7              Next.

8              THE WITNESS:  No.

9   BY MR. GANN:

10  Q.  Now when you went to the hospital -- actually, before you

11  went to the hospital, you had indicated that you had punched

12  the television set after having an argument with your wife or

13  fiance, correct?

14  A.  My ex-wife.

15  Q.  Your ex-wife.  OK.

16             And that incident when you punched the TV took place

17  the day before you went to the hospital, correct?

18  A.  No, it was days prior.  It was -- it was -- my hand had

19  swelled up.  It had to be -- it was a few days before, maybe

20  two or three days before I went to the hospital.

21  Q.  Let me ask you about the circumstances surrounding that

22  portion.

23             You indicated you punched the TV because you had the

24  argument with your ex-wife, right?

25  A.  Yes.

MBTsCON4                    Jones - Cross

1    Q.  As a result of that, you got in your car, correct?

2    A.  Yes.

3            MR. FOLLY:  Your Honor, I'm not sure where he's going

4    with this, but I think he's getting close to stuff that was

5    precluded.

6            THE COURT:  Let's see.  You know the prior ruling,

7    sir.

8            MR. GANN:  Judge, can we have a brief sidebar?

9            THE COURT:  No.

10   BY MR. GANN:

11   Q.  You got in your car and you drove, right?

12   A.  Yes.

13   Q.  And you were angry when you were driving, right?

14   A.  Yes.

15           MR. GANN:   And one moment, please.

16           (Counsel confer)

17   Q.  So you drove, you were angry, and ultimately you went to

18   the hospital, correct?

19   A.  Yes.  Yes.

20   Q.  And when you went to the hospital, you told the hospital

21   that you had slipped and fallen on August 6 of 2014, correct?

22   A.  I told them I had slipped and fell.

23   Q.  And you told them that you had slipped and fell on the same

24   day that you arrived at the hospital, correct?

25   A.  Yes.

1  Q.  And you told them that you had certain injuries as a result

2  of that slip-and-fall, correct?

3  A.  Yes.

4  Q.  You told them that you hurt your hand, right?

5  A.  Yes.

6  Q.  And I believe you said on direct examination that you told

7  them that you hurt your left leg and your back as well,

8  correct?

9  A.  Yes.

10  Q.  And specifically the left leg you ultimately said was the

11  left knee, right?

12  A.  It was the knee, yes.

13  Q.  OK.  Now, in fact, when you went to the hospital and you

14  spoke to the people at the hospital, number one, you were

15  limping when you went in, right?

16  A.  I don't remember.

17  Q.  You told them that your pain scale was eight out of ten,

18  right?

19  A.  I don't remember.

20  Q.  You told them that you had tripped and fallen and that you

21  hurt your right hand, your left lower back, and your right

22  knee, isn't that correct?

23  A.  Yes.

24  Q.  You told them that you had tenderness in your back and pain

25  on the right side, correct?

MBTsCON4                         Jones - Cross

1    A.  I don't remember.

2    Q.  And you told them also that you had a problem with your

3    ribs as well, correct?

4    A.  I don't remember.

5    Q.  Well, when you were asked on direct examination about the

6    diagnosis that you got, you acknowledged that you had a

7    diagnosis of a boxer's fracture on your hand, correct?

8    A.  Yes.

9    Q.  A contusion on your knee, right?

10   A.  What I remember, out of all the details that I may not

11   remember, I remember my hand because it was real and I was in

12   pain.  So I remember -- if I seem to remember a little more

13   details about my hand than anything else, and I may not get the

14   right or the left right or I may I have forgotten about whether

15   I said right or left, I remember the hand because my hand was

16   swollen and it was broken and I was in pain.  I was in real

17   pain.

18         THE COURT:  Next question, sir.

19   Q.  But didn't you also -- weren't you also diagnosed with a

20   rib contusion, sir?

21   A.  I don't know.  I mean, excuse my language, half of this --

22         THE COURT:  Sir, you said you don't know.

23         Next question.

24   Q.  They put you in a knee brace, did they not?

25   A.  I don't remember.

MBTsCON4                    Jones - Cross

1  Q.  You don't remember coming to Mr. Constantine's office the

2  next day in a knee brace?

3  A.  I remember having a cast on my hand and it being swollen

4  like a mini basketball.

5  Q.  You don't remember having a knee brace the next day when

6  you went?

7  A.  No.

8  Q.  You were given certain medications when you left the

9  hospital as well, or I should say prior to leaving the

10  hospital, right?

11  A.  Yes.

12          THE COURT:  When you were in the hospital, did they

13  give you certain medications?

14          THE WITNESS:  I remember them giving me something.  I

15  don't remember what they gave me.  What they gave me to leave

16  with, I don't remember that.

17          THE COURT:  Thank you.

18          Next.

19  BY MR. GANN:

20  Q.  They gave you a muscle relaxer?

21          THE COURT:  Do you know whether or not they gave you a

22  muscle relaxer, sir?

23          THE WITNESS:  I don't remember.  I don't remember

24  exactly what they gave me.

25          THE COURT:  Next.

MBTsCON4                         Jones - Cross

1   Q.  They gave you an antiinflammatory?

2   A.  I don't remember what they gave me.

3   Q.  They gave you prescriptions for Motrin and Vicodin?

4           THE COURT:  I take it, sir, you don't remember what

5   they give you, is that correct?

6           THE WITNESS:  Yes, sir.

7           THE COURT:  OK.  Next.

8   Q.  Now, when you went to Mr. Constantine's office the first

9   time, I believe you said you were driven there by -- were you

10  driven there by Ryan and Mel?

11  A.  I was driven there by Ryan.

12  Q.  By Ryan.

13          And is it fair to say that you met outside of

14  Mr. Constantine's office and met Mel at that time?

15  A.  Yes.

16  Q.  And you had a conversation with Ryan and Mel outside of the

17  office, correct?

18  A.  No.  I had a conversation with the kid and Mel outside of

19  the office, then we went inside and we spoke with the Dr. K

20  guy.

21  Q.  The conversation that you had with Mel outside of the

22  office was a conversation about the accident, the slip-and-fall

23  and the photos, correct?

24  A.  No, it was just he showed me a bunch of pictures.

25  Q.  So you meet Mel outside of Mr. Constantine's office, and he

1  shows you some pictures on his phone of where accident sites

2  may be, right?

3  A.  Yes.

4  Q.  And asked you to pick out one of those sites, correct?

5  A.  Yes.

6  Q.  Because you made it clear to him and to them that you were

7  in on this scheme, correct?

8  A.  Yes.

9  Q.  After you broke your hand, you decided that was the time

10  that I'm going to go to the hospital and now claim that I

11  slipped and fell?

12  A.  Yes.

13  Q.  And after that conversation with -- withdrawn.

14        In that conversation with Mel outside of the office,

15  other than picking a location as to where the accident

16  happened, you also told him basically what you were claiming

17  your injuries were, right?

18        THE COURT:  Did you tell Mel what your injuries were?

19        THE WITNESS:  No, we was talking about the diner.  It

20  was -- it was, more or less, OK, that's the spot because I live

21  right around the corner and I go there all the time.

22  Q.  Didn't they say, pick a side, pick an injury, a knee, your

23  back, your shoulder; didn't they tell you that?

24  A.  Yes.

25  Q.  And they told you that in that conversation that you had

MBTsCON4                          Jones - Cross

1   outside of George Constantine's office, right?

2   A.  Um, they told me that outside.  But then when we went

3   inside, um, Dr. K, I remember –– I remember specifically when

4   he was talking about the numbers.  And the reason why I

5   remember is because he specifically said, don't do anything

6   with the shoulder unless you actually have to.

7   Q.  OK.  So Dr. K was discouraging you from saying a shoulder

8   injury?

9   A.  Don't say anything about the shoulder unless you have to.

10  I now remember that.

11  Q.  But my point is, there is a conversation outside of George

12  Constantine's office with –– and it may have been brief –– with

13  at least Mel, showing you photographs?

14  A.  Yes.

15  Q.  And telling you to pick a side of your body on which to

16  claim an injury, correct?

17  A.  Yes.

18  Q.  And you had, when you went to Constantine's office, you had

19  certain hospital records with you, correct?

20  A.  Yes.  I had my discharge papers.

21  Q.  You had your discharge papers?

22  A.  Yes.

23  Q.  And the discharge papers said what you had claimed to be

24  the injuries that you had sustained as a result of this

25  slip-and-fall, right?

1   A.   Yes.

2   Q.   And those injuries that you claimed to have sustained were

3   the hand injury, right?

4   A.   Yes.

5   Q.   Correct?

6           The right knee, correct?

7   A.   Yes.

8   Q.   And your back?

9   A.   Yes.

10  Q.   So you already knew what side of your body you were going

11  to claim to have been injured, correct?

12  A.   Yes.

13  Q.   Now you go inside the office and -- by the way, these

14  conversations that happened outside of George Constantine's

15  office, he's not there, correct?

16  A.   Yes, he's not there.

17  Q.   He's not a party to these conversations, right?

18  A.   No.

19  Q.   You go into the office, you don't see George Constantine

20  when you go into the office, right, immediately?

21  A.   No, I seen -- when we first went in, after we -- I choose

22  the location, we spoke with Dr. K.  That's when he was talking

23  about the numbers and how much, and that's when he mentioned

24  the shoulder.  And, um, and then we went -- me and the kid Mel

25  went down and sat down with Constantine.

MBTsCON4                          Jones - Cross

1   Q.  All right.  I want to drill down on that a little bit.  OK?

2   A.  Um-hmm.

3   Q.  So you come into Constantine's office, you don't meet

4   George Constantine right away, correct?

5   A.  Correct.

6   Q.  You go, you're taken downstairs by presumably Mel or Ryan

7   or both, correct?

8   A.  I don't remember who, but, you know --

9   Q.  But you're immediately taken downstairs, correct?

10  A.  I didn't stay I was taken downstairs.  We immediately went

11  to speak with Dr. K, and I don't know if that was downstairs or

12  was just in another office at the same floor.  I don't remember

13  going downstairs.  I know it was in a separate office.  I'm not

14  sure if it was downstairs or not.  It was in a separate office.

15  Same office, but separate office.

16          THE COURT:  Do you mean the same --

17          THE WITNESS:  Like, the same building.  Like, you have

18  offices next door to each other.  We was in one office.

19          THE COURT:  You don't mean another room?

20          THE WITNESS:  Another room, yes.

21          THE COURT:  I'm sorry.  I want to make sure I

22  understand.  You mean that you went into another room in

23  Constantine's office suite?

24          THE WITNESS:  Yes.

25          THE COURT:  OK.

1    BY MR. GANN:

2    Q.  OK.  And that's where you met Dr. K, correct?

3    A.  Yes.

4    Q.  And you sat in that room, wherever that was, you sat in

5    that room with Dr. K and Mel and Ryan, correct?

6    A.  It was just Dr. K and Mel.

7    Q.  OK.  But in that room you had further conversation about

8    the accident location, correct?

9    A.  Yes.

10    Q.  And by the way --

11    A.  Yes.

12    Q.  By the way, you picked the diner, the Floridian diner,

13    because it would seem more believable because you lived in the

14    area, correct?

15    A.  Yes.

16                (Continued on next page)

17

18

19

20

21

22

23

24

25

MBTVCON5                      Jones - Cross

1    BY MR. GANN:

2    Q.  That was in your mind when you were looking through those

3    photographs about a place to pick for your fake slip and fall;

4    it's going to sound more believable if I have a reason for why

5    I would be near that location, right?

6    A.  Yes.

7    Q.  And so you talked -- you're now talking to Kalkanis and to

8    Mel, and you're telling them that your trip-and-fall was staged

9    outside of the Floridian Diner, right?

10   A.  I -- I remember specifically when we went in, we shook

11   hands, he spoke about the numbers for the types of injuries and

12   telling me he'll give me a doctor for my hand.  I didn't do too

13   much talking.  They did majority of the talking.  I didn't talk

14   a lot about anything.

15   Q.  Okay.  So you said they did most of the talking, right?

16   A.  Yes.

17   Q.  But they had -- there was certainly conversation about

18   where you fell and what your claimed injuries were; correct?

19   A.  I don't remember exactly.  I know it was -- it wasn't so

20   much of a conversation; it was, you get this for this, you get

21   this for this, you get -- and we'll find you a hand doctor.

22   And I don't think I could shake his hand with my right hand

23   because my right hand was in a cast.  But it was, you know --

24   it wasn't no long, Let's sit down and have a conversation.  It

25   wasn't me doing a lot of talking.

1    Q.  But they also discussed with you what they wanted you to

2    tell the lawyer when you met the lawyer; correct?

3    A.  No.

4    Q.  They didn't tell you that?

5    A.  No, they didn't.  It wasn't no prep.  It wasn't no, Say

6    this when you go inside to sit with the attorney.  No, that

7    didn't happen.

8    Q.  They didn't tell you that you should tell the lawyer that

9    you tripped and fell at the Floridian Diner at any point prior

10   to meeting George Constantine?

11   A.  No.

12   Q.  They didn't tell you to tell the lawyer that you injured

13   your back and your knee and your hand at any time prior to

14   meeting George Constantine?

15   A.  No.

16   Q.  You went in though ultimately and met with George

17   Constantine; correct?

18   A.  Yes.

19   Q.  And it was you and George Constantine and Mel; correct?

20   A.  Yes.

21          MR. GANN:  I'm sorry, can I just have one -- back up

22   one moment, Judge?

23          THE COURT:  Go ahead.

24          MR. GANN:  If I could, with the Court's and the

25   government's --

MBTVCON5                          Jones – Cross

1          THE COURT:  Back up.

2          MR. GANN:  If I could, with the Court's and the

3   government's permission, I want to display for the witness only

4   a government exhibit, Government Exhibit 3, if I could.

5   Q.  Can you see that, Mr. Jones?

6   A.  Yes.

7   Q.  So referring to Government Exhibit 3, do you recognize the

8   person depicted in that photograph?

9          THE COURT:  Just yes or no.

10  A.  Yes.

11  Q.  Who is that?

12  A.  Dr. K.

13         MR. GANN:  I would offer that into evidence; whether

14  you want to make it my exhibit or the government's exhibit,

15  doesn't matter to me, Judge.

16         THE COURT:  Government.

17         MR. FOLLY:  Your Honor, we can keep it as a government

18  exhibit.

19         THE COURT:  Yes, I would think so.  What number?

20         MR. FOLLY:  Three.

21         THE COURT:  Three admitted.

22         (Government's Exhibit 3 received in evidence)

23         MR. GANN:  Can we now have that displayed to the jury?

24         THE COURT:  Go ahead.  Question.  What's the next

25  question?

MBTVCON5                     Jones - Cross

1           MR. GANN:  It was up?  Okay.

2     Q.  Now, when you met with Mr. Constantine, he did an intake

3     with you; correct?

4           THE COURT:  What did Constantine do when you met with

5     him, if anything?

6           THE WITNESS:  We sat down.  Mel showed him the

7     pictures.  He asked me a bunch of questions about my past, and

8     that was it.

9     Q.  Okay.  So let me ask you this:  He asked you your name,

10    right?

11          THE COURT:  Did he ask your name, if you remember?

12          THE WITNESS:  I'm going to say yes.  I don't recall

13    detail for detail what was said, what he said.

14          THE COURT:  Don't guess.  If you don't know whether or

15    not he asked your name, then say you don't know.  But, again, I

16    don't want to put words in your mouth.

17    Q.  Nor do I.

18          THE COURT:  The jury will disregard any statement of

19    the lawyer.

20          Next question.

21    Q.  Mr. Jones, did he ask your date of birth?

22    A.  I don't remember.

23    Q.  Did you tell him your date of birth was September 9th,

24    1977?

25          MR. FOLLY:  Your Honor, asked and answered.

MBTVCON5                          Jones - Cross

1          THE COURT:  No, slightly different question.

2          Did you tell him that?

3          THE WITNESS:  I don't remember.  I may have told him

4     my age.  I may not have said -- you know, I may not have said

5     September 9th, 1977.  I may have said, you know, I'm 37 or --

6     whatever how old I was at the time.

7     Q.  Did you give him your Social Security number?

8     A.  I'm sure I did.

9          THE COURT:  No, no, no.  The answer is either yes, if

10    you remember --

11         THE WITNESS:  I don't remember.

12         THE COURT:  -- no, if you remember not --

13         THE WITNESS:  I don't remember.

14         THE COURT:  Sir.

15         THE WITNESS:  I'm sorry.

16         THE COURT:  It's either yes, if you remember; or it's

17    no, if you remember that you did not give it to him; or it's "I

18    don't know" if you don't know.

19         So I think you said -- tell me, did you give him your

20    Social Security number?  Yes, no, or I don't know.

21         THE WITNESS:  I don't know.

22    BY MR. GANN:

23    Q.  Did you tell him you lived at 5401 Avenue L?

24    A.  Yes.

25    Q.  In Mill Basin, New York?

MBTVCON5                      Jones - Cross

1   A.  In Brooklyn, yes.

2   Q.  You told him Mill Basin though, right?

3   A.  I don't -- I don't remember specifically.  That's where I

4   was living at the time.

5   Q.  Did you tell him that your cell phone was 347-725-7220?

6   A.  I believe I filled this out on a form.  I don't recall

7   directly telling Constantine my name, my date of birth, and my

8   social.  This was all filled out on some -- whatever document I

9   had to fill out.

10  Q.  Did you tell him that you had UnitedHealthcare medicaid?

11  A.  I would have had -- at the time I did.

12          THE COURT:  No, the question is -- he's asking you

13  whether you told that to Mr. Constantine, not whether it was on

14  some form.  Did you tell that to Constantine?

15          THE WITNESS:  I don't remember telling him

16  specifically.

17          THE COURT:  All right.  Do you remember it being on

18  some form that you filled out?

19          THE WITNESS:  I would have -- definitely would have

20  put it all on a form.

21          MR. GANN:  I'm just going to ask something to be

22  marked for identification to see if this refreshes the

23  witness's recollection about some of this.

24          THE COURT:  All right.  Mark whatever you want.

25          MR. GANN:  I just have to -- I'm sorry, Judge.

1          THE COURT:  I trust the parties are, because this is

2     the beginning of the case, getting into the mechanics, and

3     these mechanical delays won't continue.

4          MR. GANN:  I hope not.  Thank you.

5          THE COURT:  Now, Mr. Gann is going to show you a

6     document.  And he's going to ask whether or not that refreshes

7     your recollection.  As I said before, sir, just because -- and

8     this document is not in evidence, so it's only going to be

9     shown to the lawyers and myself and you.

10          MR. FOLLY:  Your Honor, I'm not sure if there's a

11     pending question that this document is supposed to refresh the

12     witness on, but that would be helpful when he's shown the

13     document.

14          THE COURT:  As I was saying, sir, the issue is going

15     to be whether or not looking at this document refreshes your

16     recollection in regard to whatever the question is going to be.

17     It's not simply because something is on that page.

18          Do you understand the difference?

19          THE WITNESS:  Yes.

20          THE COURT:  Traditionally in the courthouse, the

21     example I gave is he could show you a banana.  And it may be

22     that that banana refreshes your recollection because you

23     remembered you were at the zoo that day or something like that.

24     But just because he shows you something, doesn't mean it's

25     true; it doesn't mean it refreshes your recollection.  But it

MBTVCON5                          Jones - Cross

1    may.  Looking at it, you say, Oh, now I remember.

2              Do you understand?

3              THE WITNESS:  Yes.

4              THE COURT:  Let's hear what the question is.

5    BY MR. GANN:

6    Q.  So, Mr. Jones, I'm showing you what's been marked

7    Defendant's Exhibit 13 for identification, and ask you just to

8    take a look at that.  And does that refresh your recollection

9    as to whether or not you told Mr. Constantine that your

10   insurance was United Health medicaid?

11   A.  No.

12             THE COURT:  Next question.

13   Q.  Is that your handwriting that is --

14   A.  No.

15   Q.  -- contained on that form?

16   A.  No, it's not.

17   Q.  Did you tell Mr. Constantine that you worked as a property

18   manager for a landlord management company?

19   A.  Yes.

20   Q.  FT Landlord Management, right?

21   A.  Say that again.

22             THE COURT:  Did you tell him that?

23             THE WITNESS:  Yes.

24   Q.  And that you were a 1099 employee; correct?

25   A.  Yes.

MBTVCON5                    Jones - Cross

1   Q.  And you told him that you had no loss of earnings claim;

2   correct?

3   A.  Yes.

4   Q.  You weren't claiming that you missed work as a result of

5   this, right?

6   A.  Yes.

7   Q.  You told him that the accident occurred on August 6 of

8   2014; correct?

9   A.  I'm not sure of specific dates, so I don't remember.

10  Q.  You told him it was about 12 noon when it happened?

11  A.  I don't remember.

12  Q.  You told him it was at the New Floridian Diner though;

13  correct?

14  A.  Yes.

15  Q.  And you told him that that was at Utica and Fillmore,

16  right?

17  A.  Yes.

18  Q.  You told him that you stepped in a parking lot pothole;

19  correct?

20  A.  Yes.

21          THE COURT:  Now, are these things that you told him or

22  things that you put on a form?  If you know.

23          THE WITNESS:  I remember telling him about --

24          THE COURT:  About these things.

25          THE WITNESS:  The fall in the parking lot.  I remember

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    him saying that if you're going to file lost wages, do you want

2    people looking into your -- into your taxes and stuff like

3    that.  I remember him saying that specifically.  That's why I'm

4    pretty sure about the employment part.  As far as the dates and

5    times, I really don't want to say yes to anything I'm not sure

6    of.

7    Q.  But you told him you stepped in the pothole with your right

8    foot; correct?

9    A.  Yes.

10   Q.  You told him that you were alone at the time, right?

11   A.  I don't remember.

12   Q.  You told him that you were wearing sneakers, right?

13   A.  I don't remember.

14   Q.  You told him that you were cutting through the parking lot?

15   A.  Yes.

16   Q.  To go home, right?

17   A.  Yes.

18   Q.  And you told him that there was a witness to the incident,

19   right?

20   A.  I don't remember.

21   Q.  Do you remember the name N. Canners or Cammers?

22   A.  No.

23   Q.  By the way, the medicaid that you indicated that you were

24   on at the time of this incident in 2014, is that the same

25   medicaid that you were on in 2018 or '19 that you referred to

MBTVCON5                    Jones - Cross

1   when you were asked on direct examination?

2   A.  Possibly.  I'm not sure.  I believe so.  Before I stopped,

3   yeah, before I stopped, I believe so.

4   Q.  Well, when you spoke to the government about your medicaid

5   fraud, you told them that that was between the years 2016 and

6   2018; correct?

7   A.  I'm not sure exactly what years.  But it was for some time.

8   Q.  Well, you had an opportunity certainly to review your

9   nonprosecution agreement with the government; correct?

10  A.  Yes.

11  Q.  And in that agreement, there's a reference to not being

12  prosecuted for medicaid fraud between 2016 and 2018; correct?

13  A.  Okay.

14  Q.  That's right, isn't it?

15  A.  If you say so.  I mean, I don't have the agreement in my

16  face.  But I know I had medicaid before 2016.  It was -- I

17  didn't -- you know, I stopped in 2019.

18          MR. GANN:  So if I can put up 806, please, for the

19  witness.  Actually, is this in evidence?

20          MS. VITALE:  Yes.

21          MR. GANN:  So we can display it to everyone.

22  Q.  Looking at Government Exhibit 806, Mr. Jones, this is your

23  nonprosecution agreement; correct?

24  A.  Yes.

25  Q.  And this is the agreement that you were shown on direct

1    examination that you signed prior to -- certainly back in 2019,

2    prior to coming here and testifying, right?

3    A.  Yes.

4    Q.  And in there, referring you specifically to the first

5    paragraph, point two, you're given a nonprosecution agreement

6    as to any false representations you made in medicaid

7    applications from 2016 through 2018, right?

8    A.  Yes.

9    Q.  But actually your medicaid fraud was a fraud that existed

10   prior to 2016; correct?

11   A.  Yes.

12   Q.  How early did you start committing medicaid fraud?

13   A.  I don't remember.  That I'm not sure.  I don't remember.

14   It was early -- I mean, 2012 or '13, somewhere around there.

15   Q.  And what you said was that you didn't -- you did that so

16   you didn't have to pay for health insurance; correct?

17   A.  Yes.

18   Q.  And you told them, whoever you made the application to,

19   that you were living with your mother, right?

20   A.  Yes.

21   Q.  Which wasn't true; that was a lie, right?

22   A.  Yes.

23   Q.  And you told them that you didn't make enough money to

24   qualify for private insurance; correct?

25   A.  Yes.

MBTVCON5                         Jones - Cross

1    Q.  And that was a lie; correct?

2    A.  At the time, yes, it was a lie.

3    Q.  And you had to fill out paperwork to submit to the

4    government for that -- for those medicaid benefits; correct?

5    A.  Yes.

6    Q.  So you submitted false documentation to the government for

7    purposes of getting those medicaid benefits, right?

8    A.  Yes.

9    Q.  Now, getting back to your intake for a moment with

10   Mr. Constantine, you told him in that intake appointment that

11   you had gone to Beth Israel Medical Center, the emergency room;

12   correct?

13   A.  Yes.

14   Q.  That you had injured your right hand, your right knee, your

15   left back, and your right ribs; correct?

16   A.  I don't remember.

17   Q.  You told him that you had an appointment with your private

18   doctor on August 13; correct?

19   A.  I don't remember.

20   Q.  You told him that -- excuse me.  Yes, you told him that

21   you'd already seen Dr. Krieger before coming to him, didn't

22   you?

23            THE COURT:  Before coming to Constantine?

24            MR. GANN:  To Mr. Constantine.  Thank you, Judge.

25   A.  No.

1    Q.  You didn't tell him that?

2    A.  No.

3    Q.  Didn't you tell --

4    A.  I don't believe so.

5    Q.  I'm sorry?

6    A.  No, no, I don't remember.

7    Q.  You told him that you had had -- he asked you about prior

8    accidents; correct?

9    A.  I remember him asking me about my background.  I don't

10   remember details from, you know, question for question of what

11   he asked.

12   Q.  Well, did you tell him you had a rear-end accident in 2003?

13   A.  I did have a rear-end accident in 2003.

14   Q.  And you told him that, right?

15   A.  I don't remember telling him that; but I'm going to say if

16   he knows because I told him, do I remember telling him that,

17   no, I don't, but I did have a rear-end accident.

18          THE COURT:  That's the question, do you remember

19   telling him?

20          THE WITNESS:  No, I don't.

21          THE COURT:  All right.  Next.

22   Q.  You told him that your insurance at the time was GEICO,

23   right?

24   A.  Yes.

25   Q.  And that you went to the emergency room and you had

1  physical therapy; correct?

2  A.  Yes.

3  Q.  Now, I believe you said that all of the conversations, all

4  of the lies that you told about the accident in this case, the

5  slip and fall, all of those lies were generated and created by

6  you and Dr. K or Mel or Ryan before you ever met with George

7  Constantine; correct?

8  A.  Repeat the question.

9  Q.  The lies that you came up with with regard to the

10  slip-and-fall case at issue here were lies that you created

11  with Dr. K and Mel and/or Ryan prior to ever meeting George

12  Constantine; correct?

13  A.  Correct.

14  Q.  And during the pendency of your case, you continued in

15  whatever conversations you had with George Constantine to

16  maintain that you had actually slipped and fell, right?

17  A.  Yes.

18  Q.  And that you actually had injured your knee and your back;

19  correct?

20  A.  We spoke as if the injury actually took place.

21  Q.  And that's what you wanted him to believe; correct?

22  A.  Trying to convince Constantine wasn't something I was

23  trying to do.

24  Q.  To pursue the lawsuit that you were pursuing, you had to

25  convince George Constantine that the accident was real and your

```
1    injuries were real; correct?

2    A.  No.

3    Q.  Now, you said you went for a deposition; correct?

4    A.  Yes.

5    Q.  And that was a statement under oath; correct?

6    A.  Yes.

7    Q.  And you took an oath much like you took here today, right?

8    A.  Yes.

9    Q.  And you were asked a lot of questions by -- presumably by

10   the insurance company lawyer; correct?

11   A.  Yes.

12   Q.  And you described during that deposition the circumstances

13   under which your accident happened, right?

14   A.  Yes.

15   Q.  You described the injuries that you sustained; correct?

16   A.  Yes.

17   Q.  You described the effects that those injuries had on you,

18   right?

19   A.  The effects it had on me, I don't recall.

20   Q.  Again, all of those were lies, right?

21   A.  Yes.

22   Q.  And I believe you said on direct examination that prior to

23   the deposition, you had a meeting with George Constantine;

24   correct?

25   A.  Yes.
```

MBTVCON5                          Jones - Cross

1    Q.  To prepare for that deposition, right?

2    A.  Yes.

3    Q.  And nothing wrong with that; you're allowed to do that,

4    right?

5    A.  Are you asking me?

6    Q.  Yes.

7    A.  I mean, I'm not an attorney.

8              THE COURT:  Next question.

9    Q.  Well, you've met with the government on a number of

10   occasions, right?

11   A.  Yes.

12   Q.  Prior to coming here and testifying?

13   A.  Yes.

14   Q.  Nothing wrong with that, right?

15   A.  Yes.

16   Q.  You discussed with them the circumstances, the facts and

17   circumstances as you understand them to be with regard to this

18   case; correct?

19   A.  Yes.

20   Q.  You have been prepared for them as to what to expect when

21   you testify here; correct?

22   A.  Prepared?

23   Q.  Yes.

24   A.  I was asked questions to try to jog my memory.  I'm not

25   sure if preparation is the right phrase, but okay.

1    Q.  What I mean is they went over with you the questions that

2    they were going to ask you; correct?

3    A.  They went over the events.  They went over a series of

4    events to try to jog my memory and remember what I could, so I

5    can remember what I could from, you know, a lot of -- a lot of

6    this stuff happened some time ago.

7    Q.  And didn't they also go over with you the questions that

8    they were going to ask you?

9    A.  They went over a series of questions.  I don't know

10   specifically if they -- you know, we didn't prepare in what

11   order or anything like that.

12   Q.  But many of the questions that they had asked you before

13   coming to testify here today, they asked you during your direct

14   examination; correct?

15   A.  Yes, they did.  Yes, they did.

16   Q.  And didn't they also tell you the kinds of questions that

17   you could be expected to get from me, as Mr. Constantine's

18   attorney?

19   A.  We didn't go over any, you know, details on with -- you

20   know, the amount of -- or the types of questions.  You know, we

21   reviewed a bunch of questions and -- that I would face and

22   things that they asked me, but, yeah.

23   Q.  So they did tell you the types of questions that you might

24   face when I'm questioning you or when Dr. Dowd's attorney is

25   questioning you; correct?

MBTVCON5                        Jones - Cross

1    A.  We went over a series of questions.  I didn't know -- yes,

2    yes, yes.

3    Q.  Okay.  And pretty much -- maybe not in as much detail, but

4    pretty much the same kind of process that you had with George

5    Constantine prior to your deposition in this case; correct?

6    A.  A little different, but, yes.  Yes.

7    Q.  Preparing you for the questions that you might be asked and

8    going over the facts of your slip-and-fall case, right?

9    A.  Yes.

10   Q.  And, in fact, if you recall, do you recall in the

11   preparation for that deposition marking a Google photograph

12   that Mr. Constantine had, asking you to identify where you had

13   actually slipped and fell?

14   A.  No, I don't remember.

15   Q.  At the deposition you were shown -- withdrawn.

16          Prior to the deposition, you showed Mr. Constantine

17   photographs of the exact location where you claimed to have

18   fallen; correct?

19   A.  I showed Mr. Constantine?

20   Q.  Yes.

21   A.  I had pictures and showed to Mr. Constantine is what you're

22   asking?

23   Q.  That's what I'm asking.

24   A.  I don't remember that.

25   Q.  Mr. Jones, I'm showing you what's been marked -- what's

1    been marked as Defendant's B2 for identification.  Do you see

2    the top photograph there?

3    A.  Mm-hmm.

4    Q.  Does that picture fairly and accurately depict the location

5    at which you indicated that you had slipped and fallen in your

6    case?

7    A.  The bottom picture does.

8    Q.  The bottom -- so you're referring to the second picture on

9    B2?

10   A.  Yes.

11            MR. GANN:  I'd like to offer that into evidence as

12   Defendant's B2, your Honor.

13            MR. FOLLY:  No objection.

14            THE COURT:  B2 admitted.

15            (Defendant's Exhibit B2 received in evidence)

16            MR. GANN:  Can we publish that photograph to the jury.

17            Just for the record, Judge, this is actually page 2 of

18   a six-page exhibit that is B2.

19            THE COURT:  All right.  You're admitting these two

20   photographs -- I mean, you're asking me to admit these two

21   photographs.

22            MR. GANN:  I'm only asking you to admit one of them at

23   this point.

24            THE COURT:  Then only show that one to the jury.

25   That's the one right now is the lower one on that page, that's

MBTVCON5                        Jones - Cross

1    the only thing that's being admitted.

2              MR. GANN:  Correct.  Are you able to see that?

3              THE COURT:  Next question.

4              MR. GANN:  Could you continue to scroll.

5    Q.  Now, if you could take a look --

6              THE COURT:  I thought that's the only photograph

7    you're admitting.

8              MR. GANN:  That's the only one he's identified at this

9    point that he can say fairly and accurately.

10             THE COURT:  What have I just admitted, sir?

11             MR. GANN:  You admitted page 2 of Defendant's B2.

12             THE COURT:  All right.  Proceed.

13             MR. GANN:  Now, I'm showing him pages --

14   Q.  Now, I'm showing you what's been marked -- and this is

15   witness only --

16             THE COURT:  Take it down from the jury.

17             MS. VITALE:  It's down.

18   Q.  I'm showing what's been marked Defendant's B2, page 2, and

19   ask you to take a look at that, sir.

20             Have you had an opportunity to look at it?

21   A.  Mm-hmm.

22   Q.  Does it fairly and accurately depict the location at which

23   you indicated that you slipped and fell or tripped and fell?

24   A.  No.

25             MR. GANN:  Can we move on to page 3 of Defendant's B2.

MBTVCON5                    Jones - Cross

1    Q.  I'm showing you what's been marked --

2              THE COURT:  Same question.

3              MR. GANN:  Same questions.

4              THE COURT:  What's the answer?

5              THE WITNESS:  The top picture.

6    Q.  The top picture on page 3 fairly and accurately depicts the

7    location of which you indicated you fell?

8    A.  Yes.

9              MR. GANN:  I'd offer that into evidence.

10             MR. FOLLY:  No objection.

11             THE COURT:  All right.  The top picture on page 3 is

12   admitted.  You may show it to the jury.

13             Next.

14             MR. GANN:  One more in this series, Judge, of

15   photographs.

16   Q.  I'm showing you now what's been marked Defendant's B2, it's

17   Exhibit, excuse me, B2, page 4, and ask you to take a look at

18   those two photographs, sir.  Do they fairly and accurately

19   depict the location of which you indicated you tripped and

20   fell?

21   A.  Yes.

22             MR. GANN:  I'd offer those two into evidence as well,

23   your Honor.

24             MR. FOLLY:  No objection.

25             THE COURT:  Those two photos on page 4 are admitted.

1    Q.  These photographs, Mr. Jones, were also part of the

2    questioning that you had at your deposition in the civil

3    matter; correct?

4              THE COURT:  Civil matter being your lawsuit against

5    the Floridian.

6    A.  You mean what are pictures there or --

7    Q.  Yes, were you shown these pictures during the course of

8    your civil deposition for your slip-and-fall case?

9    A.  Possibly.  I mean, I don't remember specifically, no, I

10   don't remember.

11   Q.  By the way, the money that you received as a result of your

12   settlement of your slip-and-fall personal injury case, have you

13   been required to pay that back?

14   A.  No.

15   Q.  Have you been asked to pay it back?

16   A.  No.

17   Q.  Now, I know you said you discussed with your girlfriend or

18   fiancé, Collette Ford, the scam that you were involved in;

19   correct?

20   A.  Yes.

21   Q.  Is it fair to say that you encouraged her to get involved

22   in the scam also?

23   A.  Yes.

24   Q.  And you told her what she needed to do and how she needed

25   to do it?

MBTVCON5                         Jones - Cross

1    A.  Yes.

2    Q.  And did you introduce her to Mel or Ryan?

3    A.  Yes.

4    Q.  And once you introduced her to Mel and/or Ryan, they then

5    kind of took over what was happening with her physically in

6    terms of where she was going and who she was seeing?

7    A.  No.  I mean --

8              THE COURT:  Next question.

9    Q.  They directed her, much like they directed you, to see

10   certain doctors; correct?

11             THE COURT:  Did they tell her what doctor to see, yes

12   or no?  If you know.

13             THE WITNESS:  No, they -- they talked to me.  They

14   told me what was different at the time.  And then I followed

15   through with it.  And then after that, we contacted Ryan and we

16   set up a meeting to meet with her and the Dr. K guy again.

17   Q.  Right.  And she met with them, right?

18   A.  Yes.

19   Q.  And they then directed her as to what doctors to see;

20   correct?

21   A.  From there, she went to the attorney and then she started

22   to see the doctor, yes.

23   Q.  Okay.  And they directed her as to what attorney to go to;

24   correct?

25   A.  Yes.

MBTVCON5                        Jones - Cross

1   Q.  You didn't direct her as to what attorney to go to, right?

2   A.  No.

3   Q.  They picked this guy Marc Elefant, you said, right?

4   A.  Yes.

5   Q.  Now, you testified on direct examination that you had a

6   conversation with George Constantine prior to the deposition,

7   and that he confronted you at that time about your hand;

8   correct?

9   A.  Yes.

10  Q.  And you're sure that was prior to your deposition?

11  A.  Yeah, I know it was prior to the deposition, because he

12  said we have to withdraw the hand.

13  Q.  He told you that you had to withdraw the hand before you

14  ever went to that deposition?

15  A.  Yes, yeah, he said we have to withdraw the hand.

16  Q.  Isn't it a fact that at that deposition you testified about

17  the injury to your hand?

18  A.  I'm going to say no, but I'm going to say I don't remember,

19  because I don't remember the details of the deposition.

20          THE COURT:  So you don't remember whether or not you

21  were asked questions about your hand at the deposition, is that

22  what you're saying?

23          THE WITNESS:  I'm saying I don't remember, yes.

24          THE COURT:  Okay.  Fine.  Next question.

25  Q.  You did see a doctor for your hand though by the name of

MBTVCON5                       Jones - Cross

1    Dr. Horowitz; correct?

2    A.   Doctor who?

3    Q.   Horowitz.

4    A.   I think that was his name.

5         THE COURT:  Next question.

6    Q.   And you told -- you told the doctor, the hand doctor,

7    that -- that you hurt your hand punching a television, right?

8    A.   Yes.

9    Q.   You told him that it happened on August 6 of 2014; correct?

10   A.   I don't remember the date.

11   Q.   You told him that it was a week later that you were having

12   some swelling and some pain and so you went to the emergency

13   room at Beth Israel Hospital; correct?

14   A.   I don't remember that.  I don't remember.

15   Q.   When George Constantine ultimately indicated to you that

16   you had to withdraw the hand from the lawsuit, he told you that

17   because you had told the doctor that you injured your hand

18   punching a TV; correct?

19   A.   Yes, I told the hand surgeon that, the hand doctor.

20   Q.   And that he didn't think you could go forward or should go

21   forward with litigation regarding your hand because you had

22   lied about the manner in which you had injured your hand;

23   correct?

24   A.   He didn't say all that.  He just said we got to withdraw

25   the hand.

MBTVCON5                    Jones - Cross

1   Q.  He didn't ask you whether the trip-and-fall actually

2   happened at that time?

3   A.  No.

4   Q.  You didn't volunteer to him that the trip-and-fall was real

5   and serious at that time?

6   A.  No.

7   Q.  When he confronted you about the issue with your hand, he

8   asked you no questions about your knee and back injury, that's

9   what you're saying?

10  A.  I'm saying no.  He just say we have to withdraw the hand.

11  Q.  Mr. Jones, it's fair to say, correct me if I'm wrong, that

12  with regard to every conversation about the lies that you

13  engaged in with regard to your slip-and-fall case and your

14  injuries in preparation for telling those lies, that George

15  Constantine was not a party to any one of those conversations?

16          THE COURT:  I'm sorry, I think there were too many

17  negatives.  Do it slightly differently.

18          MR. GANN:  I'll try again.  Thank you, Judge.

19          THE COURT:  Sure.

20  Q.  Is it fair to say, Mr. Jones, that every conversation about

21  the lies that you told about your slip-and-fall accident were

22  with either Kalkanis, Rainford, or Mel, and not George

23  Constantine?

24  A.  Yes.

25          MR. GANN:  One moment please, Judge.

MBTVCON5                      Jones - Cross

 1              (Counsel conferred)

 2              MR. GANN:  Thank you.  I have nothing further, Judge.

 3              THE COURT:  All right.  Thank you.

 4              Does the jury want a mid-afternoon break?

 5              Okay.  Let's do it.  Ten minutes, please.

 6              (Jury not present)

 7              THE COURT:  You may step down, sir.  You're on

 8    cross-examination.  Don't discuss your testimony with the

 9    government, please.

10              (Witness not present)

11              THE COURT:  Counsel, you may be seated.

12              The two gentlemen, they just left, they have been here

13    all afternoon.  One sat in the first row, the other one sat

14    behind him.  They have been talking all afternoon.

15              This is a public courtroom; people are certainly

16    entitled — in fact, encouraged — to be here to watch the

17    criminal justice system at work.  But if any of you know who

18    those two individuals were, I'd appreciate it if you'd tell

19    them just to sit and watch the trial; don't have a running

20    conversation for two hours.

21              Is anyone aware of who those two gentlemen were?  I'd

22    much rather that whoever has a relationship with them tell them

23    rather than the Court.

24              Sir.

25              MR. GANN:  I'm assuming it's the people that I've seen

MBTVCON5                    Jones - Cross

1    for the last couple days, Judge, that I don't really know.  I

2    think one is an attorney I've seen around before though.

3            THE COURT:  Mr. Keating, your client raised his hand.

4            I don't need to know who it is; but if you're

5    indicating -- if the parties are indicating they know who those

6    two people are, tell them they are more than welcome, but I

7    don't want a running conversation while they're here.

8            MR. KEATING:  Yes, your Honor.

9            THE COURT:  All right.  Thank you.

10           Ten minutes.

11           (Recess)

12           (Jury present)

13           THE COURT:  Please be seated in the courtroom.

14           We need the witness.

15           MR. KEATING:  Your Honor, there's a brief evidentiary

16   issue which just surfaced.

17           THE COURT:  Evidentiary issues.  It seems to me -- all

18   right.  Let's go to sidebar.

19           (At sidebar)

20           MR. KEATING:  The government introduced on direct of

21   this witness a portion of his hospital record.  I have been

22   provided with the full emergency room treatment record.

23           THE COURT:  The portion of the hospital record came in

24   without objection.

25           MR. KEATING:  It did.

1          THE COURT:  Okay.

2          MR. KEATING:  It did.

3          I want to introduce the full record of treatment that

4     day.  I conveyed that to the government; they advised me they

5     may object, so I felt it best to do it at sidebar.

6          MR. FOLLY:  Your Honor --

7          THE COURT:  Just the sort of thing that ought to be

8     raised without the jury here.  Let's go.

9          MR. FOLLY:  There's two separate issues.  The first is

10    this witness is not the proper witness to admit this document;

11    this witness didn't create the document.

12         THE COURT:  But apparently --

13         (Indiscernible crosstalk)

14         MR. FOLLY:  -- a side of it that this witness is not

15    going to have any personal knowledge about or any ability to

16    speak to to authenticate or anything of the sort.

17         The second issue --

18         THE COURT:  But you introduced part of it already; is

19    that right?

20         MR. FOLLY:  Yes, we did, pursuant to a stipulation and

21    with no objection.  It was something that was worked out in

22    advance of trial.

23         The separate issue is that this document also contains

24    at various points multiple levels of hearsay.  There's a lot

25    again in here that are statements of other parties that are not

MBTVCON5                          Jones - Cross

1    going to be testifying.

2              THE COURT:  Do you know what you're going to direct

3    his attention to?

4              MR. KEATING:  There's about four entries in this

5    exhibit I want to direct his attention to.

6              THE COURT:  You should tell the government that.  This

7    is not --

8              MR. KEATING:  Very brief.

9              THE COURT:  This is not trial by surprise.  This all

10   should have been worked out.

11             We're off the record.

12             (Off record)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

MBTVCON5                         Jones - Cross

```
 1              (In open court)
 2              THE COURT:  Continue.
 3              I'm sorry Mr. Gann is finished with his questioning.
 4              I take it, Mr. Keating, you have questioning of this
 5   witness on behalf of Mr. Dowd; is that correct?
 6              MR. KEATING:  That's correct, your Honor.
 7              THE COURT:  Proceed.
 8   CROSS-EXAMINATION
 9   BY MR. KEATING:
10   Q.  Mr. Jones, you provided testimony that you applied for and
11   illegally received medicaid benefits; correct?
12   A.  Yes.
13   Q.  You did that for a period of years; correct?
14   A.  Yes.
15   Q.  And that form you filled out was a sworn legal document;
16   correct.
17   A.  Yes.  What form?
18   Q.  When you applied for medicaid benefits.
19   A.  Yes.
20   Q.  And in applying for the benefits, you advised the
21   government under oath that your income was lower than it
22   actually was; correct?
23   A.  Yes.
24   Q.  You were willing to engage in perjury for money; correct?
25   A.  Perjury for money?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.   Sure.

2    A.   What do you mean?

3            THE COURT:   In other words, did you lie on that

4    form --

5            THE WITNESS:   Yes.

6            THE COURT:   -- in order to receive money in medicaid

7    benefits?

8            THE WITNESS:   Yes.

9    Q.   You're willing to perjure yourself for money; correct?

10   A.   Did I lie on a form to get medical benefits?  Yes, I did.

11   Q.   Under oath?

12   A.   Under oath?  I filled out a medicaid application.

13   Q.   And you would agree with me that that was a sworn legal

14   document?

15           THE COURT:   Do you know if that document was under

16   penalty of perjury or not?

17           THE WITNESS:   Honestly, Judge, I filled it out.

18           THE COURT:   That's why I'm asking you, to be honest.

19           THE WITNESS:   Yeah, I filled out a form.  I put my

20   name and address and that was it.

21           THE COURT:  All right.  Next question.

22           THE WITNESS:  I didn't raise my hand.

23           THE COURT:  I understand.

24   BY MR. KEATING:

25   Q.   You filled out eight of the forms; you did it for eight

MBTVCON5                        Jones - Cross

1    years in a row; correct?

2    A.  I don't know how many years.  It was a few years.

3    Q.  Suffice to say it was easy for you to do it; it didn't

4    bother you in the least, correct?

5    A.  I didn't -- at the time I did it, I wasn't making money.  I

6    wasn't making profits.  I just started my company.  And, I

7    mean, I was making shit.  I just refused to go get food stamps

8    because my pride wouldn't allow me.

9            So when I first did it, I didn't do it under fraud or

10   perjury or whatever else you're saying.  I did it because I

11   didn't have it.  As I grew, as my business did well and as I

12   did start making money, I just kept with the same story.  So I

13   didn't go and just start fraud because I was making all this

14   money and I was just going to get medicaid, no.  It wasn't like

15   that.  I was -- I wasn't making nothing.  I -- I was -- the

16   only thing that was a lie was I wasn't living at my mother's

17   house.  But I wasn't making a dollar, no, I was -- I was

18   struggling financially.  As I did better, as my company did

19   better and as we grew, I continued to do it.

20   Q.  And you continued to lie.

21   A.  Yes.

22   Q.  For money?

23   A.  For benefits.

24   Q.  Which are worth -- which is worth money; correct?

25   A.  However way you choose to put it, sorry.

MBTVCON5                        Jones - Cross

1    Q.  And when you perjured yourself -- withdrawn.

2            How many times would you say it was during your

3    deposition that you perjured yourself, rough estimate, if you

4    know?

5    A.  I don't -- I mean, I don't know.

6    Q.  North of 50?

7    A.  I'm not sure what you're getting at.

8    Q.  How many false statements under oath --

9    A.  The whole damn thing was a lie.  The whole thing was a lie.

10   Q.  And it didn't bother you in the least, did it?

11   A.  What do you mean?

12   Q.  You did it easily; correct?

13   A.  I did it as easily as -- I'm not going to speak for

14   everybody else.  I'm going to say -- I'm going to say this.

15   Q.  I'm asking about you.

16   A.  It was wrong.  I did do it -- I didn't know what I was

17   doing; I didn't know what I was doing was wrong.  But I'm no

18   more guilty than everybody else that was in on it.  The

19   ten-minute doctor visits, the five-minute -- you know, all the

20   people that set me with the attorneys.

21           I mean, you know, if you want to say that what I did,

22   I was the -- you know, this big -- you know, I didn't start

23   this.  It was wrong for what I did.  But, you know, if -- if

24   I'm going to take the label of being this big con artist and we

25   want to believe that my ten-minute doctor visits or my lawyer

MBTVCON5                    Jones - Cross

1    who sat down with the guy with the pictures was all fine and

2    dandy and nobody knew nothing, if that's what you want to

3    portray, that's fine, I'll go with it.  But it's B.S.

4            MR. KEATING:  Your Honor, I move to strike as

5    nonresponsive.

6            THE COURT:  Granted.

7            Just listen to the question, sir.  I think part of it

8    is the unclearness of your question, but I'll grant the motion

9    to strike.

10           MR. KEATING:  Thank you, your Honor.

11   BY MR. KEATING:

12   Q.  Sir, it didn't bother you, Mr. Jones, in the least to

13   perjure yourself at deposition?

14           THE COURT:  That was asked and answered and it

15   engendered this answer.  Proceed to the next question.

16   Q.  You didn't struggle with the notion of lying at your

17   deposition, fair point, sir?

18           MR. FOLLY:  Objection.  Asked and answered.

19           THE COURT:  I'll allow it.  You may answer that.

20   A.  No.

21   Q.  Now, I'll be brief on this because some of this has been

22   gone over.

23           THE COURT:  Remember, jury, disregard the statements

24   of the lawyers.  I don't care whether he thinks it's been gone

25   over or not.  Ignore the statements.  And lawyers don't make

MBTVCON5                          Jones – Cross

1  statements; just ask questions.

2  Q.  Sir, you initially heard about all of this from a guy named

3  Craig; correct?

4  A.  Yes.

5            (Continued on next page)

MBTsCON6                         Jones - Cross

1    BY MR. KEATING:

2    Q.   And Craig told you he had gone through, correct?

3            He was involved in this?

4    A.   Yes.

5    Q.   And you thought it was great, correct?

6    A.   I thought it was great?

7    Q.   Yes.

8    A.   Whatever.  I'm not sure what I was thinking.  But obviously

9    I thought it was easy enough and ignorant -- and I was ignorant

10   to actually do it.

11   Q.   You were all in, correct?

12   A.   If that's -- yes.

13   Q.   And one day you punch a TV, you get in a fight about with

14   your wife, and you break your hand, correct?

15   A.   Yes.

16   Q.   And the light bulb goes on in your head that, I've got a

17   broken hand, I'm going to use this as an opportunity to scam

18   and lie, correct?

19   A.   Yes.

20   Q.   And you go and sit down with Craig and you had a broken

21   hand at this point, correct?

22   A.   I sit down with Craig?

23   Q.   Sure.

24   A.   I don't remember that.

25   Q.   Well --

MBTsCON6                        Jones - Cross

1    A.  I don't recall.

2    Q.  Well, did you testify that before you went to the hospital,

3    you sat down with Craig and another guy and you went over the

4    story that you were going to tell at the hospital?

5    A.  There was no sitdown.  I'm not sure -- you know, we didn't

6    sit down and have lunch together, no.  I'm not sure.  What are

7    you saying, we sat down and discussed it all?  No.  It was a

8    phone call.  You know, you needed a discharge paper.  It was

9    really that simple.  It wasn't -- it wasn't a meeting like

10   that.

11   Q.  Before you went to the hospital, you spoke with Craig

12   and -- who was the other guy you spoke with?

13   A.  One, I'm not sure if that was before I went to the

14   hospital.  So it was Craig, and then I met the guy Mel.  But

15   I'm not sure what the timeline was or anything like that.  It

16   was ...

17   Q.  Then you go to the hospital and you lie, correct?

18   A.  Yes.

19   Q.  You lie to, I imagine, a triage nurse?

20   A.  Yes.

21   Q.  You lied, perhaps, to another nurse, correct?

22   A.  Whoever I spoke to at the emergency -- in the emergency

23   room.

24   Q.  You lie to a doctor?

25   A.  Whoever I spoke to in the emergency room.

1  Q.  Because you know you have to lie to the medical personnel

2  for this to work, correct?

3  A.  The story was told, yes.  Yes.

4  Q.  And you tell the medical personnel at the hospital that you

5  fell on -- you fell down, correct?

6  A.  Yes.

7  Q.  You tell the medical personnel that you've hurt your right

8  knee, correct?

9  A.  Yes.

10  Q.  Lie, correct?

11  A.  Yes.

12  Q.  You tell the medical personnel that you hurt your back,

13  correct?

14  A.  Yes.

15  Q.  Lie?

16  A.  Yes.

17  Q.  And you're doing this because you see the end game is to

18  get money, correct?

19  A.  Yes.

20  Q.  That's the goal here, lie to get money, correct?

21  A.  Yes.

22  Q.  Then you, by the way, when you leave the hospital, do you

23  recall that they put a knee immobilizer on you?

24  A.  I don't recall that.

25  Q.  Do you recall telling the hospital that your pain was a

MBTsCON6                          Jones - Cross

1  seven out of ten?

2  A.  I don't recall.  If that had to do with my hand then, I

3  mean, I don't recall what statements I made.  I -- I -- I do

4  remember the amount of pain I was in with my hand.

5  Q.  And then after you're released from the hospital, you hook

6  up with Craig again, correct?

7  A.  Yes.

8  Q.  And Craig and a guy named Ryan set up a meeting, which

9  you've testified to?

10 A.  Yes.

11 Q.  A meeting where you eventually meet with Mel and Dr. K,

12 correct?

13 A.  Yes.

14 Q.  And I think you've described at that meeting that Dr. K

15 said something about the money you were going to make at this

16 meeting -- make at the end of this journey, correct?

17 A.  Yes.

18 Q.  And he told you that the amount of settlement you can

19 expect based upon your injuries, correct?

20 A.  Yes.

21 Q.  And he told you about upfront money that you could expect

22 to get, correct?

23 A.  It wasn't a long conversation.  It was this is this amount,

24 this is this amount.  Don't do the shoulder if you don't have

25 to.  It was real -- you know, it wasn't all -- it wasn't, you

1    know, a -- a promise.  It was supposed to be quick and, you

2    know, you were told all of these high numbers.  And that's the

3    way he made it -- he laid it out to be.

4    Q.  I think, by the way, is Dr. K Peter Kalkanis?

5    A.  I'm just hearing this name from the first time and putting

6    it all together.  That must be his name because I never knew

7    his damn name.

8    Q.  Is Mel a guy named Gordon?

9    A.  I don't know.

10   Q.  You still don't know?

11   A.  I really don't know.

12   Q.  I think you described at that meeting that they sold you on

13   the dream, correct?

14   A.  I didn't tell you they sold me on the dream.

15   Q.  You didn't say that earlier today?

16   A.  I mean, it was -- they -- you know, they -- they painted

17   the picture that, you know, this is easy.  You do one, two,

18   three, and this is what happens.

19   Q.  Now, sometime thereafter you began to go to a chiropractor,

20   correct?

21   A.  Yes.

22   Q.  And who sent you to that chiropractor?

23   A.  I don't know.

24   Q.  Where did you get the name from?

25   A.  Dr. Krieger?

1    Q.   Yes.

2    A.   Where did I get the name from?

3           I used to go there all the time.  That's how I

4    remember him so well.

5    Q.   The first time you went there, how did you know to go

6    there?

7    A.   Um, they sent me there.  I'm not sure.  I'm not sure if it

8    was either start there, or was it MRI and then start there in

9    that order.  I'm not sure exactly what order it went.

10   Q.   And I think you testified that the first time you went to

11   Krieger, you were driven there, correct?

12   A.   Yes.

13   Q.   And thereafter you drove yourself?

14   A.   Yes.

15   Q.   And you ended up, is it fair to say, going to Krieger many

16   times?

17   A.   They wanted you to go three days a week.  I was working so

18   I went twice a week.

19   Q.   For a period of weeks, correct?

20   A.   Until your last surgery.  Until my last surgery.

21   Q.   And that was part of the protocol that you were told to do,

22   correct?

23   A.   Yes.

24   Q.   And that would have been from Dr. K?

25   A.   I guess it would have been from -- yeah, that was -- that

MBTsCON6                          Jones - Cross

was from -- it's from all of them, you know.  It was, like, you

know, you got to have -- you got to have the surgeries and you

got to go to therapy.

Q.  Is it fair to say that when you first started going to

Dr. Krieger, you were actually limping?

A.  Um, no.  I'm going to say I don't remember.

Q.  You don't remember in your first meetings with Dr. Krieger

faking a limp to make it appear that, indeed, this was all

real?

A.  No, I don't remember.

Q.  When you say you don't remember, is it possible that it

happened and you just don't remember as you sit here today?

A.  It's very much possible, yes.

Q.  You go to Dr. Krieger for weeks and there is treatment

being rendered to you, correct?

A.  Treatment?

Q.  That's my question.

          THE COURT:  What is Dr. Krieger -- is Dr. Krieger

doing anything to you, or with you?

          THE WITNESS:  He push my neck and then you leave.

Q.  And they also have a table there for you to lie down on?

A.  You lay down, he push your neck and you leave.

Q.  And when you first went to Dr. Krieger, is it fair to say

you were asked which injuries you had, correct?

A.  I don't remember.

MBTsCON6                          Jones - Cross

1    Q.  Do you recall advising Dr. Krieger's office that you were

2    there for treatment to your neck and your knee?

3    A.  I don't remember.  I don't remember the specifics in

4    conversations.  I remember we went and it was in and out.  It

5    was in and out, that's what I remember.  It wasn't -- I'm not

6    saying it didn't happen.  I'm not saying I didn't have a

7    conversation.  But for the duration of time, it was an

8    in-and-out process.

9    Q.  And sometime -- some weeks after going to treatment with

10   Dr. Krieger, you recall getting an MRI?

11   A.  I got an MRI.  I'm not sure -- I don't remember exactly

12   what order it happened, but just I remember going to get an

13   MRI.

14   Q.  And you got an MRI of your right knee, correct?

15   A.  What is it?  I thought it was your whole body.  They put my

16   whole body in the machine, so I don't -- I don't know.

17   Q.  You ultimately got a treatment, a diagnostic procedure on

18   your right knee, correct?

19   A.  Um, it was my knee and my back.

20   Q.  And your right knee, correct, sir?

21   A.  Um, yeah, my knee and my back.

22              THE COURT:  Now, you just said you got a diagnostic

23   treatment on your knee and your back.  As you said diagnostic

24   treatment -- you agree it was a diagnostic procedure -- I'm

25   sorry.

1          What did you receive that you consider a diagnostic

2    procedure, if anything?

3          THE WITNESS:  Um, I took the MRI, went to therapy, met

4    with the doctor, and they planned the surgery.  I remember

5    vividly, vaguely it had something to do with a disk in my back.

6    I don't -- I don't even know what -- what I even had the damn

7    surgery for, so ...

8          I just know it had something with a disk.  I don't

9    know.

10   BY MR. KEATING:

11   Q.  Sir, you provided testimony earlier today about an earlier

12   injury you had sustained to your knee.

13          Do you recall offering that testimony?

14   A.  Yes, yes.

15   Q.  And do you recall describing the fact that you went to

16   doctors in connection with that earlier event, correct?

17   A.  Yes.

18   Q.  And I think you testified that that earlier event was your

19   other leg, correct?

20   A.  It was my knee.  My right knee.

21   Q.  It was your right knee?

22   A.  It was my right knee.  I think it was my right knee.  It

23   was one of my knees.  Right or left, but I remember going to

24   the doctor.  This was back in 2008.

25   Q.  In 2008, is it fair to say that you had a serious injury to

MBTsCON6                          Jones - Cross

1   your right knee?

2   A.  I think it was my left.  I'm sorry.  I'm trying to

3   remember, sir.  I had a knee injury in 2008 that I had to go to

4   the doctor back and forth for.  It was a real injury.

5   Q.  And my question was, do you recall it being your right

6   knee, sir?

7               MR. FOLLY:  Asked and answered, your Honor.

8               THE COURT:  Well, let's see.  Do you know which knee

9   it was; yes or no?

10              THE WITNESS:  I --

11              THE COURT:  You have to speak in the mic.

12              THE WITNESS:  I don't remember.

13              THE COURT:  Next.  Next.

14  Q.  In this case, when you initially went to the hospital, you

15  chose the injury to tell them which didn't occur to be on your

16  right knee, correct?

17  A.  Yes.

18  Q.  Do you recall meeting with the government, sir, three weeks

19  ago as one of your many meetings --

20  A.  Yes.

21  Q.  -- in this case?

22              And do you recall advising the government three weeks

23  ago that in 2008 you got into a fight, you got seriously

24  injured on your right knee?

25              Do you recall telling the government that three weeks

1   ago?

2   A.  OK.

3            THE COURT:  No.  The issue is do you remember telling

4   the government that?

5            THE WITNESS:  Yes, yes.

6            THE COURT:  The answer is yes.

7            Next question.

8   Q.  And earlier today on direct examination, you testified that

9   it was your other knee.  Do you recall testifying to that, sir?

10  A.  I recall testifying today.

11           THE COURT:  No.  Do you recall testifying earlier

12  today that the 2008 injury was to your left knee?

13           THE WITNESS:  Um, OK.

14           THE COURT:  No, no.  I'm asking whether you recall;

15  yes, no, or I don't remember?

16           THE WITNESS:  Yes.  Yes, I --

17           THE COURT:  All right.  Next.

18  BY MR. KEATING:

19  Q.  And do you recall telling the government, with regard to

20  that earlier knee injury, that you were limping around a lot

21  and you were in a lot of pain?

22  A.  Yes.

23  Q.  And do you recall telling the government that you were on a

24  cane for a few weeks?

25  A.  Yes.

1          THE COURT:  This is all in regard to the 2008 injury?

2          THE WITNESS:  That's 2008.

3          THE COURT:  All right.  Next.

4   Q.  Again, that's the knee that you picked for the fake injury

5   in this case, correct?

6   A.  I'm not -- I don't want to get confused with left, right,

7   left, right, 15 years ago, eight years ago.  Because that

8   obviously what's happening, and what I remember is this.  The

9   injury in 2008 was real.  I went to the doctor a lot.  I was in

10  pain.  It was -- it was real.  That I remember.

11          Um, if I'm confusing right when I fell and lied, or

12  left when I really had an injury, um, from the fake injury

13  years ago to the real injury 15.  If I switch right and left or

14  I made a mistake, then avoid me -- you know, I don't want you

15  to think I'm sitting here making stuff up.  Because my 2008

16  injury was very real and I went to the doctor a lot for it.

17  What I didn't do was fake anything in 2008.

18  Q.  You had a real knee injury --

19  A.  I had a real knee injury.

20  Q.  -- in 2008?

21  A.  Yes.

22          THE COURT:  That's been well-established multiple

23  times.  Move on.

24  BY MR. KEATING:

25  Q.  Now, after going to Dr. Krieger for several weeks, you

1  testified there was an MRI, correct?

2  A.  I don't remember what order the MRI was in, so whether the

3  MRI was before or after.  I know I started therapy first, and

4  then the process of therapy then came.  You know, MRI, then

5  doctor, then surgery.  The first thing we started was therapy.

6  Q.  And eventually, at one point your testimony is that you

7  went to have an appointment with Dr. Dowd, correct?

8  A.  Yes.

9  Q.  And that was an appointment which was part of your personal

10  injury case, correct?

11  A.  Yes.

12  Q.  It started with the emergency room visit, correct?

13  A.  Yes.

14  Q.  And the statements you made to the doctor at the emergency

15  room visit, correct?

16  A.  Yes.

17  Q.  Now when you saw Dr. Dowd, is it fair to say, sir, that

18  that event was eight years ago?

19  A.  Yes.

20  Q.  Is it fair to say that you have little, if any,

21  recollection of that event?

22  A.  Yes.

23  Q.  Is it fair to say that at or about that time, you were

24  drinking on a daily basis throughout this entire period?

25  A.  I used to drink a lot, yes.  I wouldn't say -- well, I used

MBTsCON6                          Jones - Cross

1    to drink a lot.

2                MR. KEATING:  Your Honor, I would like to introduce

3    Defendant's Exhibit 10, please.  Defendant's Exhibit 10 is the

4    physical examination report of Dr. Dowd.  The government put in

5    the first page of that as a government exhibit.  I am putting

6    in the two pages of it.

7                MR. FOLLY:  Your Honor, we put in the entire report.

8                THE COURT:  All right.

9                MR. KEATING:  Perhaps.  This is marked as Defendant's

10   10, your Honor.

11               THE COURT:  No.  If it's in, it's in.  We don't need

12   duplicates.

13               MR. KEATING:  What is the exhibit number, please?

14               THE COURT:  Talk to each other.

15               MR. KEATING:  Thank you.

16               (Counsel confer)

17               It's coming up, your Honor.  My apologies, your Honor.

18   It's taking a minute.

19               MR. FOLLY:  We can publish it for you.

20               MR. KEATING:  I'll put it on the ELMO.  Thank you.

21               Your Honor, I'm technologically challenged.

22               THE COURT:  We can see.

23   BY MR. KEATING:

24   Q.  Sir, on the screen is Government Exhibit 1253Z.

25   Specifically, it's the first page of a two-page document that

MBTsCON6                          Jones - Cross

1  says Andrew Dowd and it's dated April 8.

2           Do you see that, sir?

3  A.  Yes.

4  Q.  And would you agree with me, sir, that you went to see --

5  you went to Dr. Dowd's office on April 8?

6           THE COURT:  2015.

7  Q.  2015?

8  A.  Um, yeah.

9  Q.  And does it say that patient is a 37-year-old male.

10          Did I read that correctly?

11 A.  Yes.

12 Q.  And at the time of this event, this examination, would you

13 have been 37 years old, sir?

14 A.  Yes.

15 Q.  It states patient was involved in a trip-and-fall on

16 August 6, 2014, correct?

17 A.  Yes.

18 Q.  Now, August 6, 2014, is the date that you went to the

19 emergency room, correct?

20 A.  Um, yes, that's what it says.

21 Q.  And is it fair to say that at that examination on April 8,

22 2015, you told Dr. Dowd that I was involved in a trip-and-fall

23 and it occurred on August 6, 2014?

24 A.  Um, yes.

25          Do I remember?  I don't remember, but it says it,

MBTsCON6                          Jones - Cross

1    so ...

2    Q.  The truth is --

3    A.  Is it fair to say?  Yes, it's fair to say.  Do I remember?

4    No, I don't.

5    Q.  Now, it says that the patient was transported via ambulance

6    to Beth Israel Hospital.  In fact, is it fair to say, sir, that

7    on August 6, 2014, you went to Beth Israel Hospital?

8    A.  Yes.

9    Q.  And is it fair to say that at that point, one of the

10   things that you told to Dr. Dowd was that, doc, I was in a

11   trip-and-fall, I had to go to the hospital, I went to Beth

12   Israel Hospital?

13   A.  I don't remember what I said to Dr. Dowd.

14            THE COURT:  Next.

15   Q.  Does it say that you complained of pain characterized as

16   seven to ten?

17   A.  It says, He presents today complaining of right knee pain

18   categorized as seven to ten.

19   Q.  Does it state down below, if you go to occupation, sir --

20   A.  Patient works as a property manager.

21   Q.  Patient works as a property manager.  And, in fact, that is

22   what you were doing at that time, correct?

23   A.  Yes.

24   Q.  And Dr. Dowd, would you agree with me, didn't know that out

25   of thin air, you told that to him; would you agree with me?

MBTsCON6                    Jones - Cross

1          THE COURT:  The question is, did you tell Dr. Dowd

2     that you worked as a property manager on or about April 8,

3     2015; yes or no or I don't remember?

4          THE WITNESS:  I don't remember, but...

5          THE COURT:  Next question.

6     Q.  There is a section there, sir, it says past medical

7     history:  None.

8          Do you see that there, sir?

9     A.  Yes.

10    Q.  And did you tell Dr. Dowd there that you didn't have any

11    past medical history?

12    A.  I don't remember.

13    Q.  Putting on the screen the second page of that document.

14    does it say we discussed right knee arthroscopy versus

15    conservative management with the patient.

16         Did you read that?

17    A.  Yes.

18    Q.  And is it the fact that you don't remember either way on

19    that also?

20         THE COURT:  Do you remember discussing right knee

21    arthroscopy --

22         THE WITNESS:  No.

23         THE COURT:  -- versus conservative management with

24    Dr. Dowd?

25         THE WITNESS:  No, I don't.

MBTsCON6                          Jones - Cross

1           THE COURT:  Next.

2   BY MR. KEATING:

3   Q.  Is it the case that you don't remember any of this?

4   A.  I mean, you know, what you say is it fair to say and what I

5   actually remember, what it's fair to say looking at what's on

6   paper and what I actually remember is two different things.

7   Q.  Does it also say on that sheet of paper that the diagnosis

8   was right knee internal derangement and meniscal tear?

9   A.  Yes, it does.

10          THE COURT:  Put that back for a moment, sir.

11          All right.  Thank you.

12          MR. KEATING:  Now, one moment, please, your Honor.

13  Q.  I want to discuss Collette Ford for a moment.  She was your

14  girlfriend at the time?

15  A.  Yes.

16  Q.  And in the middle of all of this, you decided to suggest to

17  your girlfriend that she, too, do this, correct?

18  A.  Yes.

19  Q.  Because, fair to say, you thought this was great?

20          THE COURT:  We've been over this before.  Move on.

21  Q.  And you sat with Collette Ford, I imagine, and you

22  explained how all of this would work, correct?

23  A.  Yes.

24  Q.  And you told her about going to the hospital and lying,

25  correct?

MBTsCON6                          Jones - Cross

1    A.   Yes.

2    Q.   You told her that lying, you've got to lie to make this

3    happen, correct?

4    A.   Yes.

5            THE COURT:  If you would speak more clearly into the

6    microphone.  You're leaning back.

7    A.   Yes.

8            THE WITNESS:  I'm sorry.

9            THE COURT:  That's all right.

10   Q.   At one point, is it accurate to say, sir, that you actually

11   got in a car with Ms. Ford as she went out and faked a fall at

12   a location?

13   A.   Yes.

14   Q.   And you watched her fall down on the ground and called 911?

15   A.   Yeah -- yes, yes.

16   Q.   And you watched the ambulance show up and pick her up and

17   take her to the hospital?

18   A.   Yes.

19   Q.   Where she, too, lied, correct?

20   A.   Yes.

21   Q.   And she would like to a care provider in an effort to make

22   money for herself, correct?

23   A.   Yes.

24   Q.   And it's accurate to say, am I correct, that when Collette

25   Ford, your girlfriend, fell, she actually hurt her knee?

MBTsCON6                          Jones - Cross

1    A.  No.

2    Q.  That's not the truth?

3    A.  No.

4    Q.  When you've been meeting with the government in this case,

5    sir, have you been telling them the truth at every single

6    meeting?

7    A.  Yes.

8    Q.  Do you recall meeting the government on April 29, 2019,

9    sir?

10   A.  No.

11   Q.  Do you recall in one of your meetings with the

12   government -- and these government meetings, is it accurate to

13   say you would sit at a table with prosecutors and agents, and

14   they would ask questions and you would tell them what you knew

15   about all of this?

16   A.  Yes.

17   Q.  And you were duty bound to tell the truth, correct?

18   A.  Yes.

19   Q.  And is it accurate to say -- well, withdrawn.

20           Do you recall stating to the government in one of

21   those meetings that, I drove and met her at the hospital.  She

22   hurt her knee when fell.  Wasn't supposed to really hurt

23   herself --

24           THE COURT:  I'm sorry.  Sorry, you just made air

25   quotes.  I'm not sure why did you do that.  I mean, is part of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MBTsCON6                    Jones - Cross

1   what --

2              MR. KEATING:  Yes.

3              THE COURT:  Go ahead.

4              MR. KEATING:  Let me restate it, if I may, your Honor.

5              THE COURT:  Yes.

6   BY MR. KEATING:

7   Q.  Sir, do you recall in one of your meetings with the

8   government saying, I drove and met her at the hospital.  She

9   hurt her knee when fell.  Wasn't supposed to really hurt

10  herself.

11             Do you recall saying that to the government in one of

12  your meetings --

13  A.  No, I don't.

14  Q.  -- about your girlfriend Collette Ford's fake fall?

15  A.  No, I don't.

16             MR. KEATING:  Can I show the witness a document to see

17  if it refreshes?

18             THE COURT:  Yes.

19             MR. KEATING:  Do you mind if I approach?

20             THE COURT:  Please do.  Remember the question here is

21  not what is on the document.  The question is simply whether

22  seeing that gives you a new recollection.  OK?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Just take a look at that.  Read it to

25  yourself.

MBTsCON6                          Jones - Cross

1          You can direct your attention to where you want him to

2     read.

3          And the question is:  Does looking at that document

4     refresh your recollection as to whether or not you told the

5     government she hurt her knee when she fell and she wasn't

6     supposed to really hurt herself?

7          Does that refresh your recollection; yes or no?

8          THE WITNESS:  Yes, it does.

9          THE COURT:  Was your recollection refreshed?

10         In other words, do you now recall telling the

11    government that she hurt her knee when she fell and she wasn't

12    supposed to really hurt herself?

13         THE WITNESS:  I remember -- I remember that we -- the

14    process had changed, and they told us that you couldn't just go

15    to the hospital.  You had to actually go to the location and,

16    um, call the ambulance.  And that was the reason that after she

17    got off of work, I took her there -- which was right across the

18    street from the Floridian -- at the Burger king parking lot,

19    which was across the street from the place I said I had the

20    accident.  And she laid in the pothole and called 911.  Then I

21    followed the ambulance to the hospital.

22         So I -- yeah, I remember explaining that to the

23    government.  I remember explaining it the last time I testified

24    because it was -- after I had told her about it, they had

25    said -- the guy Ryan said specifically, we don't do it like

MBTsCON6                          Jones - Cross

1    that anymore.  You have to actually go to a location and fall

2    and call an ambulance.

3              THE COURT:  Next question.

4              MR. KEATING:  Your Honor, can I retrieve the document,

5    please?

6              THE COURT:  Yes.  Please do.

7              MR. KEATING:  Thank you.

8    BY MR. KEATING:

9    Q.  Sir, Collette Ford also testified at a deposition, correct?

10   A.  Yes.

11   Q.  Collette Ford also perjured herself, correct?

12   A.  I mean, I wasn't there, but I would say yes.

13   Q.  Collette Ford, your girlfriend, also received a settlement

14   from --

15   A.  Yes.

16   Q.  -- from the insurance company?

17             Do you have any idea how much that was?

18   A.  Um, I think it was somewhere around 40,000 or 35, 40,000,

19   something like that.

20             MR. KEATING:  Can I have one moment, your Honor?

21             THE COURT:  Yes.

22             (Counsel confer)

23             Nothing further.  Thank you, sir.

24             THE COURT:  Is there any redirect?

25             MR. FOLLY:  Your Honor, briefly.

```
 1              THE COURT:  Yes.
 2    REDIRECT EXAMINATION
 3    BY MR. FOLLY:
 4    Q.  Mr. Jones, you were asked some questions about what Mel and
 5    Ryan and Dr. K, Dr. K had discussed with you prior to meeting
 6    with Constantine and prior to meeting with Dr. Dowd.
 7              Do you recall that --
 8    A.  Yes.
 9    Q.  -- those questions?
10              Mr. Jones, did anybody ever give you instructions
11    before meeting with Dr. Dowd that you needed to exaggerate
12    injuries?
13    A.  I don't recall.
14    Q.  In other words, did anyone ever indicate to you, for
15    example, when you arrived at Dr. Dowd's office, that you should
16    hobble around and pretend that you were seriously injured in
17    your knee?
18              MR. KEATING:  Objection.
19    A.  No.
20              THE COURT:  Sustained.
21    Q.  Did you, in fact, exaggerate injuries in the presence of
22    Dr. Dowd by limping around?
23              MR. KEATING:  Objection.
24              THE COURT:  I will allow that.
25    A.  I don't remember.
```

MBTsCON6                        Jones - Redirect

1   Q.  And you were asked some questions about Ms. Ford's injury

2   or lack of injury with respect to her intentional fall.

3            Do you recall those questions?

4   A.  Yes.

5   Q.  Mr. Jones, was Ms. Ford seriously injured in her knee as a

6   result of her fake trip-and-fall?

7            MR. KEATING:  Objection.

8            THE COURT:  I will allow that.

9   A.  Honestly, honestly, I don't believe so.  It was just they

10  told us it changed, you know.  The way they said you have to

11  actually go to the place and slip and fall and -- not slip and

12  fall, but you have to actually go to the place and -- and

13  pretty much lay there, and then call the ambulance.  You just

14  can't just go to the hospital anymore and say that you fell.

15  Q.  And you observed her in her everyday life, correct?

16  A.  Yeah.

17  Q.  And she was not seriously injured on her knee?

18  A.  No.

19           MR. KEATING:  Objection.

20           THE COURT:  Sustained as to leading.

21           MR. FOLLY:  Your Honor, it's redirect.

22           THE COURT:  Sustained as to leading.  Redirect.

23  Q.  Mr. Jones, was she seriously injured on her knee; yes or

24  no?

25           MR. KEATING:  Objection.

MBTsCON6                         Jones – Redirect

1    A.  No.

2              THE COURT:  Just a moment.

3              I'll allow it.

4    Q.  Was your answer no, Mr. Jones?

5    A.  No.

6    Q.  Mr. Jones, you indicated that at a certain point in time,

7    George Constantine became aware of how you had actually injured

8    your hand, correct?

9    A.  Yes.

10   Q.  And after he became aware of how you had actually injured

11   your hand, he did not get upset with you, right?

12   A.  No.

13   Q.  He didn't question you about the legitimacy of your other

14   claimed injuries, correct?

15   A.  No.

16   Q.  He did not confront you about having lied to him about how

17   you had injured your hand, right?

18   A.  No.

19   Q.  He did not drop your case, correct?

20   A.  No.

21   Q.  He continued with that lawsuit and continued representing

22   you after learning about that, right?

23   A.  Yes.

24   Q.  Mr. Jones, you entered into a nonprosecution agreement with

25   the government, right?

1    A.  Yes.

2    Q.  And is it your understanding under that agreement that

3    there could be serious consequences if you do not tell the

4    truth here on the stand?

5    A.  Yes.

6    Q.  And among those consequences, to your understanding, would

7    you be charged with serious federal crimes?

8           MR. KEATING:  Objection, your Honor.  Improper

9    redirect.

10          THE COURT:  Sustained.

11          MR. FOLLY:  Your Honor, he was asked questions about

12   the consequences of lying, or rather, he lied in certain

13   situations.

14          THE COURT:  It was about the nonprosecution agreement.

15          Let's not talk over each other.  It was in regard to

16   the nonprosecution agreement.

17          Sustained.  Next question.

18   BY MR. FOLLY:

19   Q.  Mr. Jones, what is your understanding of what will happen

20   if you do not tell the truth on the stand today?

21          MR. KEATING:  Objection.

22          THE COURT:  I'll allow that.

23   A.  I will be charged.

24          MR. FOLLY:  No further questions, your Honor.

25          THE COURT:  All right.  Thank you.

1          MR. KEATING:  Your Honor, brief.  Very briefly.

2          MR. GANN:  I have one or two questions as well, Judge.

3   Very brief.

4          THE COURT:  Go ahead.

5          MR. GANN:  Thank you.

6   RECROSS EXAMINATION

7   BY MR. GANN:

8   Q.  Mr. Jones, did George Constantine ever direct you as to any

9   procedure, medical procedures that he suggested you engage in?

10  A.  No.

11         MR. GANN:  Thank you.

12         THE COURT:  Sir.

13  RECROSS EXAMINATION

14  BY MR. KEATING:

15  Q.  Sir, you were just asked about the consequences of not

16  telling the truth, correct?

17  A.  Yes.

18  Q.  The events that you've testified about today, these people,

19  these prosecutors were not there, correct?

20  A.  No.

21         MR. KEATING:  Thank you.

22         THE COURT:  Anything?

23         MR. FOLLY:  No, your Honor.

24         THE COURT:  You're excused, sir.  You may step down.

25         (Witness excused)

1          Ladies and gentlemen, you have now seen the complete

2   testimony of one witness.  It's five of five.  Let's pick it up

3   tomorrow.  I doubt that we will have legal issues, tomorrow

4   morning at least, so be here at 9:30.  So long as all of you

5   are here at 9:30, we'll begin and get a full day of testimony

6   in tomorrow.

7          Thank you.  Enjoy the evening.  Don't discuss the

8   case.  You've heard some testimony now, but simply one witness.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Please be seated in the courtroom.

3          Government, who is your next witness and what CW

4     number, if it is a CW?

5          MS. ROTHMAN:  Your Honor, tomorrow morning we are

6     either going to start with Kerry Gordon or Erica Barton.  We

7     can let defense counsel know later this evening.

8          With respect to the CW numbers, Mr. Gordon is CW-3 and

9     Ms. Barton is –- I think she's CW-10, and the court precluded

10    cross-examination on the small items that were listed in the

11    government's motion.

12         THE COURT:  All right.  See everybody tomorrow at

13    9:30.

14         How long is your direct on Kerry Gordon?

15         MS. KUDLA:  Your Honor, it's approximately three

16    hours.

17         THE COURT:  How long on Erica Barton?

18         MS. ROTHMAN:  45 minutes, at most, your Honor.

19         THE COURT:  Thank you.

20         Tomorrow, 9:30.

21         (Adjourned to November 30, 2022, at 9:30 a.m.)

22

23

24

25

1                        INDEX OF EXAMINATION

2      Examination of:                              Page

3       KASHEEM JONES

4      Direct By Mr. Folly . . . . . . . . . . . . 120

5      Cross By Mr. Gann . . . . . . . . . . . . . 186

6      Cross By Mr. Keating . . . . . . . . . . . 241

7      Redirect By Mr. Folly . . . . . . . . . . . 270

8      Recross By Mr. Gann . . . . . . . . . . . . 274

9      Recross By Mr. Keating . . . . . . . . . . 274

10                     GOVERNMENT EXHIBITS

11     Exhibit No.                              Received

12      GX 706A, 706B, 1001A-I,Z, 1056A-H, Z, . . . . 126

13              707A, 1102A-I, Z, 1003A,

14              1057B, 1104A-K, Z 1004A-H, Z,

15              1058A, 1105A-I, Z, 1005A-L, Z,

16              1059A-F, Z, 1107Z, 1006Z,

17              1060A-I, Z 1110A-F, Z,

18              1007A-F, 1061A-J, Z, 1112A, Z,

19              1008A-B, 1062A, 1009A-F, Z,

20              1063Z, 1010Z, 1065A-J, Z,

21              1113A-I, Z, 1114A-F, Z, 1115A,

22              1011A, 1066A-I, Z, 1116A-M,

23              1012A-C, Z, 1067A-H, Z,

24              1118A-I, Z, 1013A, Z, 1068A,

25              1119A-C, Z, 1015Z, 1069A-I, Z,

```
 1                    1120A, Z, 1016Z, 1071A-G, Z,

 2                    1121A-G, Z, 1018A-G, Z 1072A,

 3                    1122A, 1019A-G, Z, 1073A-G, Z,

 4                    1122-2A, 1021A-G, Z, 1074A-F,

 5                    Z, 1123A-G, Z, 1022A-F,

 6                    1075A-K, Z, 1124A-K, Z,

 7                    1023A-H, Z, 1076A-Z, AA, Z-2,

 8                    1125A, 1024A-F, Z, 1078Z,

 9                    1127A-H, Z, 1025Z, 1079A, D-J,

10                    Z, 1128A, Z, 1026A-I, Z,

11                    1080A-G, Z, 1129A, 1027A-H, Z,

12                    1082A-S; Z, 1130A-F, Z,

13                    1029A-M, Z, 1083A-I, Z,

14                    1131A-G, Z, 1030A-F, Z,

15                    1084A-Y, Z, 1133A-I, Z,

16                    1031A-J, Z, 1085A-P, Z,

17                    1135A-H, Z, 1032A-K, Z,

18                    1087A-K, Z, 1137A-D,  1036A-D,

19                    Z, 1088B-G, Z, 1139A-N, Z,

20                    1037A-N, Z, 1089A-H, Z,

21                    1140A-C, 1038A-G, Z, 1090A-F,

22                    Z, 1141A, 1041A-N, Z, 1091A-F,

23                    Z, 1142D-N, Z, 1043Z, 1092Z,

24                    1143A-D, Z, 1044A-F, Z,

25                    1045A-O, Z, 1093A-J, Z
```

1094A-H, Z, 1144A-F, Z, 1145A,

1048Z, 1096A-B, 1147A-L,

1049Z, 1097A-L, Z, 1148C, Z,

1050A-O, Z, 1098A-K, Z,

1149A-I, Z, 1051A, Z, 1099A,

Z, 1150B-H, Z, 1053A-H, Z,

1100A, 1151A-H, Z, 1055A-H, Z,

1101A, Z, 1153A-H, 1154A-F, Z

1155C-H, 1207A-F, Z 1209A-J,

1265A-F, Z, 1266A-E, Z,

1156A-G, Z, 1210A-E, Z,

1267A-F, Z, 1157A-F, Z,

1211A-I, Z, 1268A-K, Z,

1158A-R, Z, 1212A-D, Z, 1270G,

1160A-I, Z, 1213A-H, 1271Z,

1161A-H, Z, 1214A-K, 1272A-I,

1163D, 1215A, 1273A-G,

1164A-F, Z, 1216A-E, Z, 1274A,

1166A-C, Z, 1218E, Z, 1275A,

1168A-E, Z, 1220A-J, Z,

1276A-G, Z, 1172A-N, Z,

1221A-N, 1278A, 1173A, Z,

1223A-G, Z, 1280Z, 1174Z

1224A-L, Z 1283A-F, Z 1175Z

1227A-H, Z 1284A-C, Z 1177A-H,

```
 1              Z 1228A-H, Z 1286A-F, Z

 2              1178A-B 1229A 1287A-H, Z

 3              1179A-E, Z 1230A-G, Z 1288A-G,

 4              Z 1180Z 1231A 1289A-F 1181A,

 5              E, Z 1233A-E, Z 1290Z 1182A

 6              1235A-F, Z 1291A-H, Z 1183A

 7              1236A-F, Z 1292A-H, Z 1237A-G,

 8              Z 1293A-B, Z 1185A-I, Z

 9              1238A-H, Z 1294A-K, Z 1186A-H,

10              Z 1239A 1295A 1189A-E 1242Z

11              1296A-F, Z 1191A-I, Z, Z-2

12              1243Z 1298A-E, Z 1192A-F, Z

13              1246A-B, Z 1300Z 1193A-D, Z

14              1248A-D, Z 1301A-E, Z 1194A-F,

15              Z 1249A-F, Z 1302A-E 1195A-D

16              1251A-C 1303A-G, Z 1197Z

17              1252A-D, Z 1305A-E, Z 1198A-G,

18              Z 1253H-J, Z 1306B, Z 1199A-F,

19              Z 1254A-C, Z 1308A-I, Z

20              1200A-H, Z 1258A-G 1309A-G, Z

21              1201B-E 1260A-G, Z 1310A

22              1203C, Z 1261A-I, Z 1311A-C, Z

23              1204A-I, Z 1262A-I, Z 1313A-C,

24              Z 1205A-F, Z 1264A-J, Z

25              1314A-C, Z 1206A-D, Z 1315A-C,
```

```
 1                    Z 1317A-F, Z 1318A-I, Z
 2              1374A-K 1375A 1427A-R, Z
 3              1319A-F, Z 1376A-G, Z 1428A-L,
 4              Z 1429A 1322A-B, Z 1378A-H, Z
 5              1430A-Q, Z 1323A-G, Z 1379A-J,
 6              Z 1432A 1325A-H, Z 1380A-J, Z
 7              1433A-I, Z 1327Z 1383A-C, Z
 8              1434A-C 1331A-F, Z 1384A-H, Z
 9              1435A-Q 1333A-C, Z 1385M
10              1436A-F, Z 1334A-L 1387Q, Z
11              1437A-R 1335A-O, Z 1388A-M, Z
12              1438A-H 1336G, Z 1389A-C
13              1440A-B 1337A-H, Z 1390A-D, Z
14              1441A-M 1338A-N, Z 1391A-B
15              1443A-I, Z 1339A-D 1393A-Q, Z
16              1445A-Q 1340A-J, Z 1394A-J, Z
17              1446A-L, Z 1341A-U, Z 1395A
18              1449A-J, Z 1342A-D 1343A-R, Z
19              1396F-G 1400A-O, Z 1450A-P, Z
20              1451A-P, Z 1344A-J 1401A-G
21              1453A 1345A-H, Z 1402A-M, Z
22              1455A-U 1346A-F, Z 1403A-P, Z
23              1456A-H 1349A-F, Z 1404A-D
24              1457A-F, Z 1352A, Z 1405A-I, Z
25              1458A-P, Z 1355A 1406A, Z
```

```
 1              1459A-E, Z 1356A-G 1407A-M, Z
 2              1460A, Z 1357C-F 1410A-F, Z
 3              1461A-K, Z 1358Z 1412A-I
 4              1463A-Y, Z 1359A, Z 1413A
 5              1464A, Z 1360A, Z 1414A-T, Z
 6              1465A-J, Z 1363A 1415A-B
 7              1466A-G, Z 1364A-G, Z 1416Z
 8              1469A-M, Z 1365A 1419A-K, Z
 9              1471E, Z 1366A, Z 1420A-I
10              1472C-E, Z 1367A-I, Z 1421Z
11              1473A-I 1368A 1422A-M, Z
12              1474A-K, Z 1369A-K, Z 1423A-Z,
13              AA, Z 1476A, Z 1370A 1424A-N,
14              Z 1477A-G, Z 1372Z 1425A-B
15              1478A 1373A-G, Z 1426A-C
16              1480A-O, Z 1481A-B 1482A-H, Z
17              1483A-I, Z 1487A-O, Z 1488Z
18              1489A-J 1490A 1491A-J, Z
19              1492A-L, Z 1494A-I, Z 1495A
20              1496A-B 1497A-E, Z 1498A-I, Z
21              1499A-C, Z 1500A 1501A-D 1505A
22              901 - 910 551 - 570 Exhibit B
23              401 439 474 402 440 475 403
24              441 476 404 442 477 405 443
25              478 405A 444 479 406 445 480
```

1          407 445A–B 480A 408 446 409

2          447 410 448 411 449 412 450

3          413 451 414 452 415 453 416

4          454 417 455 418 456 481 481A

5          482 482A 483 483A 484 484A 485

6          485A 486 419 457 487 420 458

7          488 421 459 488A 422 460 488B

8          423 461 489 424 462 489A – B

9          425 463 490 426 464 491 427

10         465 492 428 466 493 429 467

11         494 430 468 496 431 469 497

12         432 469A 498 433 470 499 434

13         470A 500 435 471 501 436 471A

14         502 437 472 438 473 1003B

15         1115B 1247A 1376H 10041

16         1122–2B 1253A – G 1377A – J

17         1006A – H 1126A – B 1255A-C

18         1382A – I 1010A – F 1128C

19         1256A – I 1385A – L 1014A

20         1129B – M 1257A – E 1386A – I

21         1015A-I 1132A – C 1263A – B

22         1387A-P 1016A – G 1134A – I

23         1269A – J 1392A – H 1017A-C

24         1136A – B 1270A – F 1396A – E,

25         H 1020A – M 1138A – F 1271A –

```
 1              B 1397A 1025A – C 1140D 1272J
 2              – P 1398A 10271 1142A – C
 3              1277A–C 1399A 1028A1146A – D
 4              1279A – G 1408A – C 1031K – L
 5              1148A – B 1280A – C 1409A – D
 6              1033A – B 1150A 1281A – I
 7              1415A 1034A – D 1152A – F
 8              1282A – C 1417A 1035A–G 11531
 9              – N 1285A – H 1418A 1040A – L
10              1155A – B 1290A – C 1421A
11              1042A – O 1162A – F 1297A – D
12              1425B – C 1043A – M 1163A–C, E
13              1299A – N 1431A 1046A – C
14              1165A – C 1300A – C 1444A – E
15              1047A – I 1166D 1301F – G
16              1447A – B 1048A – G 1167A – B
17              1304A – C 1448A 1049A – F
18              1170A – D 1306A 1452A 1052A
19              1171A 1310B – E 1454A – C
20              1054A – E 1174A – I 1316A – D
21              1462A 1057A 1175A – B 1320A –
22              C 1465K – L 1062B 1176A – K
23              1321A – D 1467A 1063A – F
24              1180A – C 1324A – C 1468A – I
25              1064A – C 1181B – D 1326A – D
```

```
1        1470A 1070A 1188A 1327A 1471A

2        - D 1077A - B 1190A - J 1329A

3        1472A - B 1078A-H 1196A - B

4        1330A 1475A - B 1079B-C

5        1197A-G 1332A 1479A-B 1081A

6        1201A 1336A - F, H | 1484A - K

7        1086A 1203A - B 1341V 1485A -

8        C 1088A 1208A-C 1347A - D

9        1486A - C 1092A - J 1218A - D

10       1348A - L 1488A 1095A - D

11       1219A - B 1350A - D 1493A

12       1100B - C 1222A - E 1351A - M

13       1502A 1101B 1225A 1353A - B

14       1503A-B 1106A 1229B - C 1354A

15       - D 1504A 1107A 1232A - E

16       1357A - B 1506A 1108A-B 1234A

17       - B 1358A-D 1507A 1109A - M

18       1240A - L 1359B 1111A - B

19       1241A - B 1361A - B 1112B - Q

20       1242A - I 1366B 1117A-B

21       1243A-E 1371A - B 1120B - X

22       1244A 1372A - B 1125B - N

23       1245A-G 1374L 701A 702A

24       Exhibit E 702B 703A 703B 703C

25       703D 703E 704A 704B 704C 704D
```

```
                704E 704F 704G 705A 705B 705C

                708A 708B

1    . . . . . . . . . . . . . . . . . . . 132

11   . . . . . . . . . . . . . . . . . . . 134

220  . . . . . . . . . . . . . . . . . . . 139

9    . . . . . . . . . . . . . . . . . . . 140

216, 217 . . . . . . . . . . . . . . . . . 144

207  . . . . . . . . . . . . . . . . . . . 150

226 to 228 . . . . . . . . . . . . . . . . 158

824  . . . . . . . . . . . . . . . . . . . 162

152  . . . . . . . . . . . . . . . . . . . 168

GX 806   . . . . . . . . . . . . . . . . . 182

3    . . . . . . . . . . . . . . . . . . . 212
```

                        DEFENDANT EXHIBITS

Exhibit No.                                    Received

 B2    . . . . . . . . . . . . . . . . . . . 229