MBUsCON1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

         v.                      21 Cr. 530 (SHS)

GEORGE CONSTANTINE
ANDREW DOWD,

                                  Trial

           Defendants.

------------------------------x

                              New York, N.Y.
                              November 30, 2022
                              9:45 a.m.

Before:

                  HON. SIDNEY H. STEIN,

                              District Judge
                              -and a jury-

                      APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
ALEXANDRA ROTHMAN
NICHOLAS FOLLY
DANIELLE KUDLA
     Assistant United States Attorneys

MARC C. GANN
AMANDA VITALE
     Attorneys for Defendant Constantine

KEVIN J. KEATING
MATTHEW W. BRISSENDEN
MATTHEW J. CONROY
     Attorneys for Defendant Dowd

Also Present:  Joseph Carbone, Paralegal Specialist
                 Matthew Bailey, Paralegal Specialist

MBUsCON1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MBUsCON1

| | |
|---|---|
| 1 | (Trial resumed; jury not present) |
| 2 | THE COURT:  All members of the jury are here.  Bring |
| 3 | the jury in. |
| 4 | Jury entering. |
| 5 | (Jury present) |
| 6 | THE COURT:  Please be seated in the courtroom. |
| 7 | Good morning, ladies and gentlemen. |
| 8 | Government, call your next witness. |
| 9 | MS. ROTHMAN:  The government calls Erica Barton. |
| 10 | THE DEPUTY CLERK:  Raise your right hand, please. |
| 11 | ERICA BARTON, |
| 12 | called as a witness by the Government, |
| 13 | having been duly sworn, testified as follows: |
| 14 | Please state your full name and spell your last name |
| 15 | for the record. |
| 16 | THE WITNESS:  Erica Barton, B-a-r-t-o-n. |
| 17 | THE DEPUTY CLERK:  Thank you. |
| 18 | THE COURT:  Good morning, Ms. Barton. |
| 19 | Welcome.  Please be seated.  You can bring that |
| 20 | microphone down closer to your mouth.  It is a directional |
| 21 | microphone, so when you talk, when you respond to the |
| 22 | questions, please speak directly into the mic. |
| 23 | THE WITNESS:  OK. |
| 24 | THE COURT:  Your witness, ma'am. |
| 25 | MS. ROTHMAN:  Thank you. |

MBUsCON1                          Barton – Direct

1   DIRECT EXAMINATION

2   BY MS. ROTHMAN:

3   Q.  Ms. Barton, how old are you?

4   A.  I'm 60.

5   Q.  Do you have any children?

6   A.  Yes, I have two.

7   Q.  How old are they?

8   A.  My son is 27 and my daughter is 24.

9   Q.  In February 2017, where were you living?

10  A.  Um, Roosevelt project.

11  Q.  Where are the Roosevelt projects located?

12  A.  In Brooklyn.  953 DeKalb Avenue.

13  Q.  Is that a public housing complex?

14  A.  Yes, it is.

15  Q.  Who did you live with at the time?

16  A.  I lived with my children's father and my two -- my son and

17  my daughter and myself.

18  Q.  Were you working?

19  A.  I was.

20  Q.  What were you doing for work?

21  A.  Working with the mentally disabled.

22  Q.  I want to direct your attention to February 23, 2017.

23          Did you have a trip-and-fall accident on that day?

24  A.  Yes, I did.

25  Q.  Was it real or staged?

1   A.  It was staged.

2   Q.  Ms. Barton, why did you stage a trip-and-fall accident?

3   A.  I staged a trip-and-fall accident for the money.

4   Q.  Was there any reason in particular that you needed money at

5   that time?

6   A.  Well, I did it because my daughter was, um, was going to

7   college and I needed -- I thought I needed the money to do

8   that, to help her with it.

9   Q.  Did you file a lawsuit in connection with your staged

10  accident?

11  A.  Yes, I did.

12  Q.  Do you remember the name of your lawyer?

13  A.  Um, I can't remember his name.  I'm sorry.

14          MS. ROTHMAN:  Let's pull up for Ms. Barton what is in

15  evidence as Government Exhibit 1031D, please.

16          If you can zoom in on the first paragraph.

17  A.  Yeah.  Mr. Elefant, that's his name.

18  Q.  Thank you, Ms. Barton.

19          MS. ROTHMAN:  You can take that down.  Thank you,

20  Mr. Carbone.  You can leave it up, actually.  That's OK.

21  Q.  Ms. Barton, were you injured after your staged accident?

22  A.  I was not.

23  Q.  Did you have surgery in connection with your accident?

24  A.  Yes, I did.

25  Q.  Why did you have surgery if you weren't injured?

MBUsCON1                    Barton - Direct

1   A.  That was the only way you could get money from the

2   accident.

3   Q.  On what body parts did you have surgery?

4   A.  On my right knee and on my back.

5   Q.  Do you remember the name of your knee surgeon?

6   A.  Dr. Dowd.

7           MS. ROTHMAN:  Mr. Carbone, can you please pull up for

8   the witness only what's been marked for identification as

9   Government Exhibit 2.

10  Q.  Ms. Barton, do you recognize this photograph?

11  A.  Dr. Dowd.

12  Q.  Is it a fair and accurate depiction of Dr. Dowd?

13  A.  Yes, it is.

14          MS. ROTHMAN:  Your Honor the government offers into

15  evidence Government Exhibit 2.

16          MR. KEATING:  No objection.

17          THE COURT:  Admitted.

18          (Government's Exhibit GX 2 received in evidence)

19          MS. ROTHMAN:  May we publish it on face board to the

20  front of the room?

21          THE COURT:  Where is that?

22          MS. ROTHMAN:  To the left of the witness, your Honor.

23          THE COURT:  I see.  Yes.

24          MS. ROTHMAN:  Thank you.

25  BY MS. ROTHMAN:

MBUsCON1                    Barton - Direct

1    Q.  While Ms. Kudla does that, Ms. Barton, let me ask you, how

2    did you first learn about this scheme in 2017?

3    A.  My friend Destiny.  She told me about the scheme.  She

4    asked me did I want to do it.  At first, I did not.

5    Q.  What did Destiny tell you?

6    A.  She told me that she knew of a guy that, um, could give

7    me -- you know, give me money, um, to do a slip-and-fall.

8    Q.  Did Destiny tell you how much money you could make?

9    A.  No, she did not tell me how much money I could make.

10   Q.  Did you have any reservations about participating in this?

11   A.  Yes, I did.

12   Q.  What were those reservations?

13   A.  I was just scared to do it.  I didn't think it was the

14   right thing to do, so I said no at first.

15   Q.  Did you eventually decide to go through with it?

16   A.  I did because when I found out about my taxes, I wasn't

17   getting that much money, I said -- then I said yes, I would do

18   it.

19   Q.  Ms. Barton, once you decided to participate in this fraud,

20   what happened next?

21   A.  I told Destiny that I wanted to do it.  She told the guy

22   that I would, so he gave me a call.  And then in a couple of

23   days, he picked me up to, um, to show me the store I would have

24   to fall in front of.

25   Q.  All right.  Let's break that down a little bit, Ms. Barton.

1    A.   OK.

2    Q.   When you got picked up to do your accident, how many people

3    were in the car?

4    A.   Two.

5    Q.   Do you recall their names?

6    A.   I do not know -- remember their names.

7         MS. ROTHMAN:   Mr. Carbone, can you please pull up for

8    the witness what's been marked for identification as Government

9    Exhibit 7 and 10.

10   A.   Yes.  Both of these guys picked me up.  The light-skinned

11   guy is the one that was driving and the other guy was the one

12   in the passenger seat.

13   Q.   Thank you.

14        Ms. Barton, you recognize Government Exhibit 7 and 10?

15   A.   Yes, I do.

16   Q.   Are they fair and accurate depictions of the individuals

17   who picked you up on the day that you staged your incident?

18   A.   Yes.

19        MS. ROTHMAN:   Your Honor, at this time the government

20   offers into evidence Government Exhibit 7 and 10.

21        MR. KEATING:   No objection.

22        THE COURT:   Admitted.

23        (Government's Exhibits GX 7 and 10 received in

24   evidence)

25        MS. ROTHMAN:   May we publish to the face board as

1    well?

2              THE COURT:  Yes.

3              MS. ROTHMAN:  Thank you.

4    BY MS. ROTHMAN:

5    Q.  Ms. Barton, what location did these two individuals point

6    out to you where you would do your accident?

7    A.  Um, say that again.

8    Q.  Yes.

9              What location did these two individuals point out that

10   you were supposed to do your accident?

11   A.  OK.  They drove me to the store that I was supposed to fall

12   in front of, but I didn't get out then.  They drove me to the

13   store, and then they drove me back around the corner.  And that

14   is when I got out and walked back to the store, and then I fell

15   in front of the store.

16   Q.  Did they indicate what you were supposed to have fallen

17   over?

18   A.  You know in front of a store they have the metal things

19   that they open, like, a basement.  So I fell on top of that.

20   Q.  What, if anything, were you told to do after staging your

21   fall?

22   A.  I was supposed to lay there and not get up until the

23   ambulance came.

24   Q.  What, if anything, were you supposed to get at the

25   hospital?

```
1    A.  I had to get, um, your release papers.

2    Q.  Ms. Barton, did you, in fact, stage your accident that day?

3    A.  Yes, I did.

4    Q.  Tell us what you did.

5    A.  Um, I fell in front of the store.  I laid there until the

6    ambulance came.  The ambulance took me to the hospital.  The

7    hospital, you know, took an X-ray.  They released me.  Um, I

8    took the bus home, and then I called the light-skinned guy and

9    told him I got my paperwork.  He said he will call me in a

10   couple of days to take me to the lawyer's office.

11   Q.  Let's start at the beginning, Ms. Barton.

12           There is a binder in front of where you're seated.  Do

13   you see there is a CD in the front left pocket?

14   A.  Yes, it is.

15   Q.  That's marked Goverment Exhibit 804.

16           Do you see that?

17   A.  Yes.

18   Q.  Do you recognize that CD?

19   A.  Yes.  That's the CD of me falling.  That's my CD.

20   Q.  How do you recognize that's a CD, a video of you falling?

21   A.  This is the CD that I had fallen on.  It has my initials on

22   it.

23           MS. ROTHMAN:  At this time, the government offers into

24   evidence Goverment Exhibit 804.

25           MR. KEATING:  No objection.
```

MBUsCON1                    Barton - Direct

1           THE COURT:  Admitted.

2           (Government's Exhibit GX 804 received in evidence)

3           MS. ROTHMAN:  Mr. Carbone, can you please pull up 804.

4  And before you play it, I'm going to ask Ms. Barton one

5  question.  You can push play, but pause it right away.

6           Thank you.  Pause it right there.

7           We lost it.  Try again.

8  BY MS. ROTHMAN:

9  Q.  Before we get started, Ms. Barton, do you see in the top

10 left corner there's a date?

11 A.  Yes.

12 Q.  Can you read that date?

13 A.  Um, 2/23/2017.

14 Q.  So February 23, 2017?

15 A.  Yes.

16          MS. ROTHMAN:  All right.  Let's play the first eight

17 seconds of the video.

18          (Video played)

19          Stop it right there.

20 Q.  Ms. Barton, can you identify the person in the video?

21 A.  That's me.

22 Q.  What are you doing right now?

23 A.  I'm falling in front of the store.

24          MS. ROTHMAN:  Let's actually go back to the beginning

25 and play it start to finish, Mr. Carbone.

1          (Video played)

2    Q.  Can you describe what you see on the video right now,

3    Ms. Barton?

4    A.  A guy coming out of the store asking me if he could help me

5    get up.

6    Q.  What did that individual do?

7    A.  He stayed with me until the ambulance came.

8    Q.  Were you injured from this fall, Ms. Barton?

9    A.  No, I was not.

10   Q.  Thank you.

11          After the fall, what happened when you got to the

12   emergency room?

13   A.  Um, they took an X-ray of my knee and they gave me release

14   papers, and then I went on home.

15   Q.  Did they give you any medication?

16   A.  No.

17   Q.  Did they give you any crutches?

18   A.  No.

19   Q.  Any medical equipment?

20   A.  No.

21          MS. ROTHMAN:  Let's pull up for Ms. Barton what is in

22   evidence as Government Exhibit 1031E.  At page three.  Thank

23   you.

24          Zooming in on the top third.

25   Q.  Can you read the name, Ms. Barton, patient name?

1   A.  The patient name?

2   Q.  Yes.

3   A.  Erica Barton.

4   Q.  And the date and time?

5   A.  2/23/2017.

6   Q.  And the diagnosis?

7   A.  Sprain of other specified parts of right knee.  Initial

8   encounter.

9            MS. ROTHMAN:  Thank you.  You can take that down.

10  Q.  Ms. Barton, how did you get home from the hospital?

11  A.  I took a bus.

12  Q.  What did you do once you got home from the hospital?

13  A.  Um, I probably relaxed and looked at the TV.

14  Q.  Did you call anyone?

15  A.  I did call the light-skinned guy to let him know I got my

16  paperwork, and he said he'll call me back in a couple of days

17  to go see the lawyer.

18  Q.  Did he call you a few days later?

19  A.  Yes, he did.

20  Q.  What did he tell you?

21  A.  He said we're going to make a date to go see the lawyers.

22  And we did and, like, maybe a week later.

23  Q.  Ms. Barton, how did you get to the lawyer's office?

24  A.  He came and picked me up.

25  Q.  Where did he pick you up from?

1   A.  From my home.

2   Q.  Were you alone or was there another person?

3   A.  Two other people in the car with me.

4   Q.  Thank you, Ms. Barton.

5           Can you describe what those people looked like?

6   A.  They were black like me.

7   Q.  Were you able to observe those people during your car ride

8   to the lawyer's office?

9   A.  Um, one guy, I think, was -- it was two guys.  It was me

10  and two guys, and it was the light-skinned guy driving and the

11  guy with the glasses.

12  Q.  What, if anything, did you observe or hear during your

13  drive to the lawyer's office?

14  A.  I mean, the two guys were kind of excited --

15          MR. KEATING:  Objection.

16          THE COURT:  The question was --

17          I'm sorry.  overruled.  You may proceed.

18  A.  Um, the two guys was kind of excited to be going to the

19  lawyer's office.

20  Q.  What, if anything, did those individuals say?

21          MR. KEATING:  Objection.

22          THE COURT:  Subject to connection, permitted.

23  A.  They were excited to go to the lawyer's office because they

24  knew -- well, they wanted to get some money.

25          THE COURT:  On what do you base your conclusion that

MBUsCON1                        Barton – Direct

1    they were excited?

2           THE WITNESS:  Because that's what they were saying.

3    They was excited to go to the lawyer's office.  That's what

4    they were saying.

5           THE COURT:  One of them --

6           THE WITNESS:  One.

7           THE COURT:  One of them --

8           When I ask you these questions, I certainly don't

9    intend to put words in your mouth.  I'm trying to understand

10   what your testimony is.

11          THE WITNESS:  OK.

12          THE COURT:  Is your testimony that one of them said

13   that they were excited, that he was excited to go to the

14   lawyer's office?

15          THE WITNESS:  I'm excited to get this -- get this job

16   done.

17          THE COURT:  OK.  Thank you.

18   BY MS. ROTHMAN:

19   Q.  Based upon your observations in the car, Ms. Barton, do you

20   have an opinion if those individuals had also staged their

21   accidents?

22   A.  Yes.

23   Q.  What is that opinion?

24   A.  It means that if you're going to the lawyer's office, three

25   people that had slip-and-falls going to the lawyer's office,

1   that's what I mean.

2   Q.  What do you mean by that?

3   A.  That it was staged.

4   Q.  Thank you.

5       Let's focus on your time at the lawyer's office.  Can

6   you describe what it looked like?

7   A.  OK.  When we got to the lawyer's office, there was about

8   ten other people sitting there too.

9   Q.  Can you describe what those individuals were doing.

10  A.  Some were, um, just sitting, waiting.  But some, a couple

11  of people were, like, asleep.  I smelled alcohol.

12  Q.  Can you describe what those individuals looked like?

13  A.  They were black like me.

14  Q.  And the lawyer's office, what did it look like?

15  A.  Very empty.  Like, the receptionist had a reception area,

16  just had a desk with a reception there, and then there was a

17  door in the corner with just a lawyer's office.  Not very

18  decorative.  You know, no one walking around.

19      THE COURT:  I'm sorry.  You said there were about ten

20  others in the lawyer's office, is that correct?

21      THE WITNESS:  Clients.

22      THE COURT:  But you also said the lawyer's office

23  looked empty, so I don't understand that.

24      THE WITNESS:  When I say empty, I mean, like, no other

25  lawyers.

1          THE COURT:  You need to talk into the mic.

2          THE WITNESS:  No other lawyers in the office.  Just

3    the receptionist, one lawyer.  No other lawyer's offices there.

4    Like, no other workers there.

5          THE COURT:  All right.  Thank you.

6    BY MS. ROTHMAN:

7    Q.  Just to make sure it is clear, Ms. Barton, there were about

8    ten other potential clients, correct?

9    A.  Yes.  Ten clients, one lawyer, one receptionist.

10   Q.  Thank you.

11         How long did you wait in the attorney's office before

12   you saw the attorney?

13   A.  I waited about 15 minutes.

14   Q.  While waiting in the attorney's office, did you fill out

15   any forms?

16   A.  I filled out a form, yes.

17   Q.  What form was that?

18   A.  It was a form with my name, my address.

19         MS. ROTHMAN:  Mr. Carbone, could you please pull up

20   what is in evidence as Government Exhibit 1031E.  Focusing on

21   the first page, if you can just zoom in on the full text.

22   Q.  Can you read the name, Ms. Barton?

23   A.  Erica Barton.

24   Q.  And can you read the date of accident/incident?

25   A.  3/2/2017.

MBUsCON1                    Barton - Direct

1    Q.  That was confusing.

2              Can you read today's date?

3    A.  Say that again?

4              MS. ROTHMAN:  On the top right, if we can highlight

5    that for Ms. Barton.

6    Q.  Today's date?

7    A.  3/2/2017.

8              MS. ROTHMAN:  And in looking in the middle of the page

9    where it said date of accident/incident, highlight that for

10   Ms. Barton.  Thank you.

11   A.  Oh, 2/23/2017.

12   Q.  And then the brief description of the accident, if you can

13   highlight that too and read it, Ms. Barton?

14   A.  Trip-and-fall.

15             MS. ROTHMAN:  And then injuries, if you can highlight

16   that, Mr. Carbone.

17   Q.  And read that, Ms. Barton.

18   A.  Right knee and lower back.

19             MS. ROTHMAN:  Great.  We can take that down.

20   Q.  Ms. Barton, who did you give the form to?

21   A.  I gave the form -- I got it from the receptionist, and I

22   gave the form to the lawyer.

23   Q.  And tell us about your -- withdrawn.

24             Did you then meet with the lawyer?

25   A.  Yes.

MBUsCON1                    Barton - Direct

1  Q.  How long was your meeting with the lawyer?

2  A.  About five minutes.

3  Q.  Tell us what happened during your meeting with the

4  attorney.

5  A.  When I got into the lawyer's office, um, he asked me how

6  did I fall.  I told him I fell in front of the store.  He asked

7  me what store.  I told him where I fell.  And he pulled it up

8  on the screen, the area where I fell.  And then he said, well,

9  how did you get hurt.  I told him I hurt my -- when I fell, I

10  had hit my hands, my knee, and I hurt my back.  He said you

11  can't get anything from hurting your hands, so I just said my

12  back and my knees and I left my hands out of it.

13  Q.  How did the meeting end?

14  A.  Um, he said he would be my lawyer, and I signed some papers

15  and then I left.  Well, I waited for the other two people to

16  finish.

17  Q.  Approximately how long did you wait for the other people to

18  finish their appointments?

19  A.  I think in total, about 30 minutes, everything, and then we

20  all left.

21  Q.  How did you get home that day?

22  A.  They drove us back home.

23  Q.  Ms. Barton, did anyone ever tell you that you needed to

24  trick the lawyer into believing your story?

25  A.  No.

MBUsCON1                        Barton - Direct

1    Q.  Did you believe that you were fooling the lawyer?

2    A.  No.

3    Q.  Why not?

4    A.  Because I thought he was in on the scam too.

5    Q.  Thank you.

6         Ms. Barton, let's go on to the medical procedures that

7    you had as part of this scheme.

8    A.  OK.

9    Q.  First, let me ask you, did you have any physical therapy?

10   A.  No.

11   Q.  Do you recall meeting with Dr. Dowd before you had knee

12   surgery?

13   A.  Yes.

14   Q.  How did you get to Dr. Dowd's office?

15   A.  I was driven there.

16   Q.  By whom?

17   A.  With the guy with the glasses.

18        MS. ROTHMAN:  Let's just pull up Government

19   Exhibit 10.

20   Q.  When you say the guy with the glasses, do you mean the

21   individual in Government Exhibit 10?

22   A.  Yes.

23        MS. ROTHMAN:  Thank you.  You can take that down.

24   Q.  Was anyone else in the car when you went to your first

25   meeting with Dr. Dowd?

1    A.  The other two people that, um, had drove with me.

2    Q.  How long do you recall your meeting with Dr. Dowd being?

3    A.  About five minutes, the longest.

4    Q.  Was it similar or different to other medical appointments

5    you had had?

6    A.  Um, before surgery, it was different.  I mean, it was

7    really fast.

8    Q.  How else was it different?

9    A.  I mean, usually -- I've had surgery before for real.  I

10   usually have a consultation, they talk to you, you have to have

11   blood work.  Blood work.  The doctor tells you the procedure

12   that you're going to get, and you have to come back and forth

13   to the doctor a couple of times.

14   Q.  Now, during this one meeting with Dr. Dowd, do you recall

15   him laying you down on a table and conducting a physical

16   examination of your knee?

17   A.  He did not lay me down.  I sat up on the table and he just,

18   like, put his hands above my knee to resist, to see how -- I

19   guess how strong my -- how strong my leg was against his arm --

20   sorry -- against his arm, my leg was against his arm.

21   Q.  How long did that take?

22   A.  About five minutes.  It wasn't long.

23   Q.  When you say five minutes, you mean the entire --

24   A.  The entire.

25   Q.  Right.

MBUsCON1                    Barton – Direct

1           MS. ROTHMAN:  Let's pull up what's in evidence for

2    Ms. Barton as Government Exhibit 1031Z and turn to page three.

3    If we can just zoom in on the top half.  The third page.

4           Thank you.

5    Q.  Do you see the date at the top, Ms. Barton?

6    A.  Yes.

7    Q.  Can you read that?

8    A.  March 8.

9    Q.  Thank you.

10          And if you can go to the physical examination

11   paragraph.

12   A.  Examination of the right knee revealed trepidation --

13   Q.  I'm just going to ask you one question, again.

14          Do you see where it says McMurray's was positive

15   medially?

16   A.  Say that again.

17   Q.  The bottom sentence, the bottom line, Mc Murray's was

18   positive medially?

19   A.  Yes.

20   Q.  Did Dr. Dowd lay you down on a table and manipulate your

21   knee?

22   A.  No.

23          MS. ROTHMAN:  Let's go to the second page.  Sorry, the

24   fourth page.  Second page of this report.  Thank you,

25   Mr. Carbone.  Zooming in on the plan.

MBUsCON1                    Barton - Direct

1   Q.  Do you see where it reads check MRI scan, physical therapy,

2   follow up in one to two weeks?

3   A.  No.

4   Q.  Well, you see it says that?

5   A.  It says that, yes.

6   Q.  Did you have physical therapy?

7   A.  No.

8   Q.  Did you have a followup visit in one to two weeks with

9   Dr. Dowd?

10  A.  No.

11  Q.  When is the next time you saw Dr. Dowd?

12  A.  When I had surgery.

13          MS. ROTHMAN:  We can take that down.

14  Q.  Now, how did you get home from Dr. Dowd's office?

15  A.  They drove us home.

16  Q.  Did you later have an MRI, Ms. Barton?

17  A.  I did have an MRI.

18  Q.  If we can pull up what has been marked for identification

19  as Government Exhibit 201.

20          Do you recognize this photograph?

21  A.  That's where I had my MRI.

22  Q.  Is that a fair and accurate depiction of the MRI facility?

23  A.  Yes.

24          MS. ROTHMAN:  The government offers into evidence

25  Government Exhibit 201.

MBUsCON1                    Barton - Direct

1          MR. KEATING:  No objection.

2          THE COURT:  Admitted.

3          (Government's Exhibit GX 201 received in evidence)

4          MS. ROTHMAN:  Let's publish that to the jury.

5   BY MS. ROTHMAN:

6   Q.  Ms. Barton, how did you get to the MRI facility?

7   A.  The guy with the glasses drove us there.

8   Q.  Did you go alone?

9   A.  No, the same two people that I've been driving with.

10  Q.  Now, after you had the MRI, did you learn that you would be

11  having surgery?

12  A.  Yes.

13  Q.  Who told you?

14  A.  Um, the guy -- the light-skinned guy.

15          MS. ROTHMAN:  Let's pull up Government Exhibit 7.

16  Q.  You when you say the light-skinned guy, do you mean this

17  individual?

18  A.  Um-hmm.  Yes.

19  Q.  Thank you.

20          What did this individual tell you?

21  A.  That I would be having surgery.

22  Q.  Before surgery, did you need any other tests?

23  A.  I think I had to have blood work.

24  Q.  How did you get to the blood work facility?

25  A.  Um, he took me to get my blood work.

1   Q.  Do you know why you had to have blood work?

2   A.  Because I was older than the rest of them and I had

3   hypertension.  They just wanted to make sure.

4   Q.  Let's talk about the morning of surgery.

5         What time were you picked up?

6   A.  Early.

7   Q.  Did you know, in advance of that morning, that you would be

8   having surgery that morning?

9   A.  Yes.  Yes, like, at least four to five days before, you

10  know you had surgery.

11  Q.  Were you told anything to do or not do on the morning of

12  surgery?

13  A.  Not to eat anything after 12 o'clock that night.

14        MS. ROTHMAN:  Let's pull up Government Exhibit 209 for

15  the witness.

16  Q.  Do you recognize this photograph?

17  A.  That's the place where I had surgery.

18  Q.  Is it a fair and accurate depiction of the surgery center?

19  A.  Yes.

20        MS. ROTHMAN:  Your Honor, the government offers into

21  evidence 209.

22        MR. KEATING:  No objection.

23        THE COURT:  Admitted.

24        (Government's Exhibit GX 209 received in evidence)

25        MS. ROTHMAN:  Mr. Carbone, let's publish to the jury.

MBUsCON1                    Barton - Direct

1   Thank you.

2          THE COURT:  Is this in Queens, the location of that?

3          THE WITNESS:  I'm not sure.

4          THE COURT:  All right.  Thank you.

5   BY MS. ROTHMAN:

6   Q.  We're looking at 209.  This is the location where you had

7   surgery?

8   A.  Yes, it is.

9          MS. ROTHMAN:  We can that down and pull up what's been

10  published at 226, 227, and 228.

11  Q.  Do you recognize these photographs?

12  A.  Yes.  That's the inside, that's the reception area, and

13  that's where you -- I guess that's the recovery area.

14  Q.  OK.  Ms. Barton, tell us what you remember from the morning

15  of your surgery?

16  A.  You go inside.  Um, you wait for them to call you to go

17  inside to change your clothes, I guess to take your blood, your

18  temperature before you get the surgery.

19  Q.  Do you remember having anesthesia in connection with your

20  surgery?

21  A.  Yes.

22  Q.  Was it general anesthesia or local anesthesia?

23  A.  I'm not quite sure of the difference.  I mean, I know you

24  wake up really fast, you're not out long.

25  Q.  Let me ask you this.  Were you put to sleep in advance of

1  your surgery?

2  A.  Yes.

3  Q.  And what do you remember about when you woke up from

4  surgery?

5  A.  When you wake up, they give you juice and crackers and they

6  watch you for a little bit to make sure that you're good.

7          MS. ROTHMAN:  Let's pull up what is in evidence as

8  Government Exhibit 1031G, please.  If we can zoom in on the top

9  third of the page.

10  Q.  Do you see patient name?

11  A.  Erica Barton.

12  Q.  And the date of surgery?

13  A.  3/13/2017.

14  Q.  Thank you.  That's March 13, 2017.

15          And the surgeon?

16  A.  Andrew Dowd, M.D.

17          MS. ROTHMAN:  Thank you.  We can take that down.

18  Q.  Ms. Barton, you said you had an MRI before surgery,

19  correct?

20  A.  Yes.

21          MS. ROTHMAN:  Let's pull up what is in evidence as

22  1031K.  1031K.  Seems like our zoom is not working.  We'll just

23  highlight the top half.

24  Q.  Can you read who this e-mail is from?

25  A.  Say that again?

1   Q.  Who the e-mail is from?

2   A.  From Peter Kalkanis.

3   Q.  I'll read it.  It's from Peter Kalkanis.

4   A.  OK.

5   Q.  To MSanchez, cc'ing *ADowdortho@gmail.com*.  The subject is

6   MRI reports for Erica Barton, Oshwan Hutchinson, Joseph Jones,

7   and it's sent on 3/13/2017 at 1:54 a.m.

8           Ms. Barton, is the date that this e-mail was sent the

9   same date that you had surgery?

10  A.  Yes.

11          MS. ROTHMAN:  Thank you.  We can take that down.

12  Q.  Now, Ms. Barton, did you get any money after your surgery?

13  A.  Yes.

14  Q.  Where did you get money?

15  A.  Um, the check from the back surgery?

16  Q.  Starting with the knee surgery.

17  A.  The knee surgery, I didn't get any money that day.  I got a

18  check a couple days later.

19  Q.  Who brought you that check?

20  A.  Um, I don't know the guy's name, but he had dreads.  And he

21  came to my home in a white car, and I picked up the check from

22  him downstairs.

23          MS. ROTHMAN:  If we can pull up for the witness what's

24  been marked for identification as Government Exhibit 11.

25  A.  That's him.

MBUsCON1                     Barton - Direct

1   Q.   Do you recognize this individual?

2   A.   Yes.

3   Q.   Who is this individual?

4   A.   This is the guy that brought me the $1,000 check in a white

5   car.

6          MS. ROTHMAN:  Your Honor, the government offers into

7   evidence Government Exhibit 11.

8          MR. KEATING:  No objection.

9          THE COURT:  Admitted without objection.

10          (Government's Exhibit GX 11 received in evidence)

11          MS. ROTHMAN:  May it publish to the face board?

12          THE COURT:  Yes.

13          MS. ROTHMAN:  Thank you.

14          We can take that down and pull up what is in evidence

15   as Government Exhibit 1031B.  If we can go to the second page,

16   looking at the check in the middle.  Before.  It says pay to

17   the order of Erica Barton.

18   BY MS. ROTHMAN:

19   Q.   Do you see that, Ms. Barton?

20   A.   Yes.

21   Q.   How much was the check for?

22   A.   $1,000.

23   Q.   Is this the check you received after your knee surgery?

24   A.   Yes.

25   Q.   If we can go to the first page of this exhibit.

MBUsCON1                        Barton - Direct

1          Looking at the top check, who is that check paid to?

2     A.  Dr. Dowd.

3     Q.  For how much?

4     A.  900 -- 900 -- $9,500.

5          MS. ROTHMAN:  Thank you.  We'll come back to this

6     document.  I want to take a break and look at an exhibit

7     together.

8          Your Honor, at this time, the government offers as a

9     demonstrative Government Exhibit 832, which is a calendar of

10    February and March 2017.

11         THE COURT:  Ladies and gentlemen, this is not being

12    offered into evidence.  It's what's known as a demonstrative,

13    and I'll allow it.  In other words, it's just to assist you in

14    understanding the evidence, but it's not evidence itself.

15         Proceed.

16         MS. ROTHMAN:  Thank you.

17    BY MS. ROTHMAN:

18    Q.  Ms. Barton, you have a binder at the front of your desk.

19    I'm going to ask you to turn to 1031E and go to the third page.

20    A.  I'm here.

21    Q.  What date did you go to the hospital after you staged your

22    accident?

23    A.  2/23/2017.

24    Q.  I'm going to write accident and hospital.

25         Do you see that, Ms. Barton?

MBUsCON1                          Barton – Direct

1    A.  Yes.

2    Q.  Can you turn to the first page of 1031E.

3    A.  OK.

4    Q.  What date did you go see the lawyer?

5    A.  3/2/2017.

6    Q.  That's March 2, 2017?

7    A.  Um-hmm.

8    Q.  And in the front pocket of your binder there is a document

9    that is 1031Z.  If you can take that out and go to the third

10   page.

11        And tell me the date that you first met Dr. Dowd.

12   A.  It's kind of -- it says March 8.

13   Q.  OK.  Thank you.

14        If you can now go to 1031G, which is back in the

15   binder, and tell us the date you had knee surgery?

16   A.  What's the number?

17   Q.  1031G.

18   A.  OK.  I'm sorry.

19   Q.  It's OK.  Take your time.

20   A.  I don't see it.

21        Here it go.  OK.  Now which one, 1031G?

22   Q.  1031G.

23   A.  3/13.

24   Q.  Thank you.

25        Then finally, if you can go to 1031K and just tell us

MBUsCON1                    Barton - Direct

1   the date and time that the MRI was first sent to Andrew Dowd.

2   A.  3/13/2017.  1:54 a.m.

3   Q.  What time was that, Ms. Barton?  I'm sorry.

4   A.  1:54 a.m.

5   Q.  Thank you.

6           You said your knee surgery was in the morning as well?

7   A.  Yes, but not that early.

8   Q.  Thank you.

9           All right.  So, Ms. Barton, can you count the number

10  of days between your staged accident and when you had knee

11  surgery?

12  A.  Two weeks.

13  Q.  It's about two and a half?

14  A.  Two and a half weeks.

15  Q.  Maybe three, two and a half.  Thank you.

16  A.  OK.

17  Q.  If we can pull back up what's in evidence as Government

18  Exhibit 1031B.  I want to focus on the check at the bottom of

19  the first page.

20          Who is that check paid to?

21  A.  Triborough Orthopedics.

22  Q.  Do you see your name on that check?

23  A.  At the bottom, yes.

24  Q.  Do you know what Triborough Orthopedics is, Ms. Barton?

25  A.  No.

1          MS. ROTHMAN:  Your Honor, at this time I'm going to

2    read an offer of stipulation into evidence.  It's marked as

3    Government Exhibit 1803.  If we can pull it up, as well.

4          If it's OK with the court, I will skip the preliminary

5    language and just read the substantive paragraph.

6          Let's go back up.

7          The parties have agreed that Government Exhibit 801 is

8    a true and accurate copy of a certificate of incorporation for

9    Triborough Orthopedics, PC, dated March 30, 2010.

10         Your Honor, at this time the government offers into

11   evidence Government Exhibit 1803 and also 801.

12         MR. KEATING:  No objection.

13         THE COURT:  Admitted without objection by stipulation.

14         Received.

15         (Government's Exhibits GX 1803 and 801 received in

16   evidence)

17         MS. ROTHMAN:  If we can pull up Government Exhibit 801

18   and turn to page two, and I'll read the first and the third

19   paragraphs.

20         First paragraph.  The name of the corporation is

21   Triborough Orthopedics.

22         The third paragraph.  The name, residence, profession,

23   professional license or certificate number of all original

24   stockholders, directors, and officers of the corporation are as

25   follows:

MBUsCON1                         Barton - Direct

1            Name and address:  Andrew J. Dowd, 19 Seacliff Lane,

2    Miller Place, New York 11764.  Profession:  Medicine.

3            We can take that down.

4    BY MS. ROTHMAN:

5    Q.  Now, Ms. Barton, did you receive any postop medical care

6    from Dr. Dowd?

7    A.  No.

8    Q.  Did you have stitches after your knee surgery?

9    A.  I did.

10   Q.  Did Dr. Dowd take them out?

11   A.  No.

12   Q.  How did they come out?

13   A.  I took them out.

14   Q.  How did it come to be that you removed your own stitches?

15   A.  Um, I had tried to call to find out when I could get them

16   out.  No one returned my call.  I called my friend Destiny to

17   ask her how she got her stitches out.  She said she took them

18   out herself, and that's how I did it too.

19   Q.  How did you do it?

20   A.  I used tweezers and burned them with a little, and cut them

21   out.

22   Q.  Was it painful?

23   A.  A little.

24   Q.  Ms. Barton, did you receive any medical equipment --

25           THE COURT:  Do you know how many times --

1          Let me ask it differently.  Did you call Dr. Dowd's

2    office more than once to ask when your stitches would be taken

3    out?

4          THE WITNESS:  Um, I've never called Dr. Dowd's office.

5          THE COURT:  Did you call anyone in regard to taking

6    your stitches out?

7          THE WITNESS:  I called the guy with the glasses, the

8    people that took us to get the surgeries done.

9          THE COURT:  And, again, I don't want to put words in

10   your mouth.  I think you said that your call was not returned,

11   is that correct?

12         THE WITNESS:  Say that again?

13         THE COURT:  You called somebody.  How many times did

14   you call that person?

15         THE WITNESS:  I mean, I called a couple of times, but

16   no one ever got back to me.

17         THE COURT:  All right.  Thank you.

18   BY MS. ROTHMAN:

19   Q.  Did you also receive medical equipment after your knee

20   surgery?

21   A.  Yes.

22   Q.  What did you receive?

23   A.  Um, I'm not sure what it was.  It was in a big box,

24   supposed to be for my knee, to help the leg, but I never used

25   it because no one ever showed me how to use it.

1    Q.  Did you request that equipment?

2    A.  No, I did not.

3    Q.  Do you still have that equipment?

4    A.  No, I don't have it.

5    Q.  Who picked it up?

6    A.  Dr. Dowd.

7    Q.  How was it that Dr. Dowd personally came to pick up this

8    equipment from your apartment?

9    A.  Because whoever was supposed to pick it up always kept

10   missing me, so I guess he got tired -- I don't know.  He just

11   came to pick it up.

12   Q.  How did you respond to Dr. Dowd himself coming to pick up

13   this medical equipment?

14   A.  I was a little shocked.  I was a little shocked the doctor

15   came to my project apartment to come pick up some medical

16   equipment.

17   Q.  Ms. Barton, you testified that you also had back surgery in

18   connection with your staged accident, correct?

19   A.  Yes.

20   Q.  Did you need back surgery?

21   A.  No.

22   Q.  Why did you have it?

23   A.  For the -- for the money.

24   Q.  Did you have surgery at the same surgery center as your

25   knee surgery or a different center?

1   A.  The same.

2   Q.  How did you get there?

3   A.  Um, the guy with the glasses drove us there.

4   Q.  Did you go alone or with other patients?

5   A.  With other patients.  Always with other patients.

6   Q.  Do you recall anything in particular about the drive to or

7   from the surgery center for your back surgery?

8   A.  Um, say that again.

9   Q.  Sure.  Do you remember anything that happened on the drive

10  to or from the back surgery with the people in the car?

11  A.  Oh, on the way back, a guy wasn't smelling too good.  So

12  the people got into an argument in the car about him smelling

13  bad.  Almost a fight.  So the guy got out and he -- and he

14  left.

15          THE COURT:  When you say smelling bad, do you mean

16  body odor?

17          THE WITNESS:  Body odor.  Body odor.

18  Q.  Did you receive money after your back surgery?

19  A.  On the back surgery, you got money the same day.

20  Q.  Thank you.

21          Now, Ms. Barton, did you have an understanding of how

22  all of these medical procedures were being paid for?

23  A.  Um, through your -- from the money that you get from

24  your -- um, oh, my God -- from, you know, when you get your

25  settlement.

1    Q.  Did you have Medicaid at the time?

2    A.  I did.

3    Q.  And did you have an understanding if you were going to use

4    your Medicaid for any of these procedures?

5    A.  Well, I didn't think -- I wasn't going to use my Medicaid

6    for that because it was a scam.  I was not going to use my

7    Medicaid.

8         MS. ROTHMAN:  Let's pull up what's in evidence as

9    Government Exhibit 1031D, please.  I want to focus on the

10   bottom paragraph that's bolded.  I'm just going to read it.

11        Further, I ask that the following amounts are paid:

12   $3,225 to Dr. P. Kalkanis as my case manager; $9,500 to

13   Dr. Dowd; $2,000 to Dr. Charles Nguyen; $1,000 to All County

14   LLC; $1,000 to Triborough Orthopedics PC; and $1,000 to me

15   personally.

16        If we can zoom out, and just focus on the beginning of

17   the first paragraph that begins advance.  Yes, zoom in on that.

18        I, the borrower, am requesting and accepting the total

19   sum of $18,475 (the advance) from SM, a State of New York

20   limited liability company, which constitutes SM's investment in

21   the lawsuit (defined below), which I will use for my immediate

22   medical and economic needs.

23        If we can go to 1031I, please.  If we can try to zoom

24   in on that tab.

25        What is the amount that you see in -- that is

1    highlighted advance?  Do you see that?

2              Thank you.  And highlight $18,475.

3              There.  Thank you.

4              Highlight 3.5 percent.

5    BY MS. ROTHMAN:

6    Q.  If we go all the way to the bottom of this page, next to

7    June 11, 2021, can you read that amount that would be owed

8    based upon the $18,000 that you borrowed?

9    A.  1006, $793.

10   Q.  Is that $106,793?

11   A.  Yeah.

12   Q.  Thank you.

13   A.  Yes, I'm sorry.

14             MS. ROTHMAN:  We can take that down.

15             Let's pull up what's in evidence as Government Exhibit

16   1031C.  Let's zoom in on the top which reads Fast Trak.  The

17   first paragraph as well.

18             Thank you.  Perfect.

19             Highlight Fast Trak.  And this agreement is made and

20   dated as of April 27, 2017, by and between Erica Barton and

21   Fast Trak Investment Company, with a principal place of

22   business located at 570 Piermont Road, Suite 121, Closter,

23   New Jersey.

24             If we can go down to the middle paragraph of this

25   first page right under disclosure statement.

MBUsCON1                    Barton - Direct

1              Thank you.

2              If we can read Dr. Ribeiro, $12,500.  Medical

3    management, Peter Kalkanis, $1,000.  And that first line,

4    property to be purchased from the seller under agreement,

5    $1,000.  Top right.

6              You can take that down.

7    BY MS. ROTHMAN:

8    Q.  Now, Ms. Barton, did there come a time when you started

9    meeting with the government in advance of your testimony here

10   today?

11   A.  Yes.

12   Q.  How many times have you met with the government?

13   A.  I think about four or five times.

14   Q.  Who was present for those meetings?

15   A.  You and my lawyer.

16   Q.  What happened during those meetings?

17   A.  We talked about this case.

18   Q.  Were you truthful in your meetings with the government?

19   A.  Yes.

20   Q.  Have you entered into an agreement with the government?

21   A.  Yes.

22   Q.  What does that agreement require you to do?

23   A.  To tell the truth about this case.

24   Q.  If you do that, what has the government promised you?

25   A.  That I won't go to jail.

1            MS. ROTHMAN:  Pull up for the witness what's been

2    marked for identification as Government Exhibit 820, please.

3    Just scroll to the second page.  Third page.  Thank you.

4    Q.  Ms. Barton, do you recognize this document?

5    A.  Yes, I do.

6    Q.  What is that?

7    A.  It's my signature to agree about this case.

8    Q.  Your agreement with the government?

9    A.  Yes.

10           MS. ROTHMAN:  Your Honor, the government offers into

11   evidence Government Exhibit 820.

12           MR. KEATING:  No objection.

13           THE COURT:  Admitted.

14           (Government's Exhibit GX 820 received in evidence)

15           MS. ROTHMAN:  Mr. Carbone, can we please publish to

16   the jury.

17           Please go to the first page.  Thank you.

18   Q.  Ms. Barton -- take a minute.  It's fine.

19           Other than this agreement, do you have any other

20   agreements with the government?

21   A.  No, I do not.

22   Q.  If you're not truthful today, what happens to you?

23   A.  I'll go to jail.

24           MS. ROTHMAN:  Your Honor, I have no further questions.

25           THE COURT:  All right.  Thank you.

1              Mr. Keating, is there any cross of this witness?

2              MR. KEATING:  I think my colleague is briefly going

3   before me, your Honor.

4              THE COURT:  All right.  Mr. Gann.

5              MR. GANN:  Actually, Ms. Vitale, Judge.

6              THE COURT:  Ms. Vitale.

7              MS. VITALE:  One moment, Judge.

8   CROSS-EXAMINATION

9   BY MS. VITALE:

10  Q.  Good morning, Ms. Barton.

11  A.  Good morning.

12  Q.  You had indicated that you had met with the government

13  about four or five times prior to testifying today?

14  A.  Correct.

15  Q.  When had met with the government, you had indicated that

16  you had met with a couple of attorneys, correct?

17  A.  Yes.

18  Q.  The first attorney you had met with was located in New

19  Jersey, is that correct?

20  A.  Correct.

21  Q.  You had previously described that this attorney had long

22  hair?

23  A.  The attorney had long hair?

24  Q.  Yes.

25  A.  No.  I remember saying he had brown hair.

MBUsCON1                     Barton – Cross

1   Q.  Brown hair?

2   A.  Brown hair, yes.

3   Q.  He had a beard?

4   A.  I don't remember saying he had a beard, no.

5           THE COURT:  Well, are you asking about the government

6   attorney she met with?

7           MS. VITALE:  No, I'm asking about the attorney that

8   you had met with, with respect to the trip-and-fall scheme.

9           THE COURT:  OK.  Did you understand that?

10  A.  I don't remember if he had long hair.  I know he had brown

11  hair.

12  Q.  OK.  His name was not Mr. George Constantine, correct?

13  A.  I don't remember.

14          THE COURT:  You don't remember his name?

15          THE WITNESS:  No.

16          THE COURT:  All right.

17  Q.  Ms. Barton, you had met with the government and they showed

18  you a variety of photographs, correct?

19  A.  Correct.

20          MS. VITALE:  Permission to publish to the jury what's

21  already in evidence as Government's Exhibit 1.

22          THE COURT:  Yes.

23  Q.  Ms. Barton, do you remember being shown this photograph?

24  A.  No.

25          THE COURT:  Does the jury see it?

MBUsCON1                    Barton - Cross

1          The answer is no.

2    A.   No.

3    Q.   I'm sorry.  You don't remember being shown this?

4    A.   I wasn't shown that photo, no.

5    Q.   OK.  Have you ever seen this individual before?

6          THE COURT:  The individual in that photo, is that what

7    you're asking?

8          MS. VITALE:  Yes.

9    A.   No.

10   Q.   So you've never seen the individual in this photograph

11   before?

12   A.   No.

13   Q.   And you had indicated on direct examination that you were

14   represented by an attorney that goes by the name of Marc

15   Elefant, correct?

16   A.   Yes.

17         MS. VITALE:  Permission to publish to just the witness

18   exhibit marked Government Exhibit 5.

19         THE COURT:  Yes.

20   Q.   Ms. Barton, can you see the photograph marked Government

21   Exhibit 5?

22   A.   Not yet.  It's not up yet.

23   Q.   Now are you able to?

24   A.   Not -- I see a man up there, yes.

25   Q.   Yes.

```
 1            Is this the individual, Marc Elefant, that you had
 2   indicated previously you had met about one to two times?
 3   A.  No, I don't -- no, I don't think that's the man that I said
 4   was Mr. Elefant.
 5   Q.  You had met with the government on a previous occasion,
 6   correct?
 7   A.  I have, Miss.
 8   Q.  And you were shown this photo when you met with the
 9   government?
10   A.  When I met with the government, I did not say that that was
11   Mr. Elefant.
12   Q.  Not that it was Mr. Elefant, but that you had met with this
13   individual one to two times?
14   A.  No.
15            THE COURT:  The answer is no.
16   Q.  It's your understanding today that your attorney was Marc
17   Elefant, correct?
18   A.  Correct.
19   Q.  You were never represented by an attorney that goes by the
20   name of George Constantine?
21   A.  Not that I remember, no.
22   Q.  Ms. Barton, you don't recall having any conversations or
23   involvement with a person that goes by the name of Kerry
24   Gordon, correct?
25   A.  No.
```

1           MS. VITALE:  Permission to display to the witness and

2    the jury what's already in evidence as Exhibit 9.

3           THE COURT:  Go ahead.

4    Q.  You have never met this individual depicted in Exhibit 9?

5    A.  Not that I remember, no.

6    Q.  And, Ms. Barton, you had never come into contact with an

7    individual that goes by the name of Bryan Duncan, correct?

8    A.  Not that I remember, no.

9           MS. VITALE:  Permission to publish to just the witness

10   Government Exhibit 8.

11          THE COURT:  Yes.

12   Q.  Ms. Barton, can you see Government Exhibit 8?

13   A.  Not yet.

14   Q.  You don't recall ever meeting this individual either?

15   A.  Nope.

16          MS. VITALE:  No further questions.

17          THE COURT:  All right.  Thank you.

18          Mr. Keating.

19          MR. KEATING:  Yes.

20   CROSS-EXAMINATION

21   BY MR. KEATING:

22   Q.  Ms. Barton, you were just asked about the agreement that

23   you entered into with the government, the nonprosecution

24   agreement, correct?

25   A.  Correct.

MBUsCON1                    Barton - Cross

1   Q.  And that agreement is that you're not being prosecuted for

2   the crimes you committed here, correct?

3   A.  Correct.

4   Q.  The scam that you perpetrated, you're not being prosecuted,

5   correct?

6   A.  Yes.

7   Q.  And it requires the government indicated that you tell the

8   truth, correct?

9   A.  Yes.

10  Q.  It also required, which would you agree with me, that you

11  assist the government, correct?

12  A.  Yes.

13  Q.  And today you've told of the number of events that you say

14  occurred, correct?

15          MS. ROTHMAN:  Objection.

16          THE COURT:  I'll allow that.

17          You've described certain efforts that occurred,

18  correct?

19          THE WITNESS:  That I did, yes.

20          THE COURT:  Next.

21  BY MR. KEATING:

22  Q.  And these individuals, the prosecutors on this case, they

23  weren't there?

24          MS. ROTHMAN:  Objection.

25          THE COURT:  Just let him finish the question.

MBUsCON1                         Barton - Cross

1          Go ahead.

2   Q.   They weren't there during these events, fair statement?

3          MS. ROTHMAN:   Objection.

4          THE COURT:   Sustained, given the question.

5   Q.   You would agree with me that when you went to see Dr. Dowd,

6   the prosecutors were not present there, correct?

7          MS. ROTHMAN:   Objection.

8          THE COURT:   I'll allow that.

9   A.   No, they weren't there.

10  Q.   And when you went to see Dr. Dowd, I imagine you were alone

11  in a room with Dr. Dowd during the exam that took place?

12  A.   Correct.

13  Q.   Now, you were shown a moment ago certain documents which

14  were funding agreements, one had the name of Sunset on it and

15  the other had the name of Fast Trak on it.

16          Do you remember seeing those a moment ago?

17  A.   Yes.

18  Q.   And those were documents, is it accurate to say, that you

19  executed in a lawyer's office, correct?

20          THE COURT:   That you signed in a lawyer's office.

21  A.   Those documents that I saw with my initials on it?

22          I did not see those documents with all those writings

23  on it.  Those have my initials on it, but I did not see all of

24  those numbers on there, no.

25  Q.   Understood.

1          At the time you placed your initials on those

2   documents, would that have been in the lawyer's office?

3   A.  No, because when I had got money from Fast Trak, they had,

4   um, mailed me, um, a check.  I had to get paperwork, um,

5   notarized, and then I had to mail it back to them.

6          So no, all of that, those numbers and stuff was not

7   there.  No, it was not.

8   Q.  When did you initial those documents?

9   A.  At home at a notary, and then I had to mail it back to

10  them.

11  Q.  To whom?

12  A.  To Fast Trak.

13  Q.  And who initially gave you those documents?

14  A.  Fast Trak.

15  Q.  Does the name Peter Kalkanis mean anything to you?

16  A.  No.

17  Q.  Did Mr. Elefant, a lawyer, give you these documents?

18  A.  No.

19  Q.  The first time you saw either the Sunset or the Fast Trak

20  documents were when you received those from those funding

21  companies?

22  A.  I think so.  I'm not sure.  I'm not sure, sir.

23  Q.  Now, you mentioned a moment ago the stitches, that you took

24  your stitches out yourself --

25  A.  Yes.

MBUsCON1                        Barton - Cross

1   Q.   -- correct?

2            And would you agree with me, ma'am, that when you had

3   your procedure, it was at a place called New York Surgical

4   Center Queens?

5   A.   Yes.

6   Q.   And they gave you paperwork when you left that facility,

7   correct?

8   A.   Yes, I think so.

9   Q.   And do you recall the paperwork indicated that you should

10  follow up with your doctor with regard to removal of stitches?

11  A.   They probably -- I don't know.  I don't remember.

12  Q.   You don't know?

13  A.   No.

14  Q.   You've told us that in this case, you called one of these

15  men who were driving you around about getting the stitches out,

16  correct?

17  A.   Correct.

18  Q.   And one of those men told you to do it yourself, correct?

19  A.   Correct.

20  Q.   How many stitches was it?

21  A.   It was two.

22  Q.   And by the way, Ms. Barton, before you faked your fall, you

23  had knee issues, correct?

24  A.   I did.

25  Q.   And you had issues in your knees which used to cause you

MBUsCON1                        Barton - Cross

1   pain, correct?

2   A.  Yes.

3   Q.  At the time of this event, you would have been how old,

4   ma'am, when you faked the fall?

5           What was your age, if you remember, approximately?

6   A.  I'm 60 now.  Maybe 55.

7   Q.  55 years old.

8           You indicated that you first learned of this through a

9   friend of yours named Destiny, correct?

10  A.  Yes.

11  Q.  And would that have been a face-to-face meeting or a phone

12  call?

13  A.  We were friends.  Might have been face to face.  I don't

14  remember.

15  Q.  And Destiny told you about this scam that you could

16  participate in and get money from, correct?

17  A.  Yes.

18           (Continued on next page)

19

20

21

22

23

24

25

MBUVCON2                          Barton - Cross

1    BY MR. KEATING:

2    Q.  And am I correct to say that Destiny told you what it

3    involved?

4    A.  Yes.

5    Q.  That you would fall down and blame a store or some business

6    for having a defective condition which caused your fall;

7    correct?

8    A.  Yes.

9    Q.  And that when you did that, you would have to begin to lie

10   about the injuries that you purportedly sustained?

11   A.  She didn't say all of that.

12   Q.  Did she say you have to go to the hospital?

13   A.  Well, she told me the -- she told me that I would have a

14   fall, then I talk to the guy, the light-skinned guy.

15   Q.  Got it.  So Destiny told you generally about it?

16   A.  Yes.

17   Q.  Fake a fall and make money?

18   A.  Yes.

19   Q.  I think your testimony was that you thought about it, but

20   initially you decided not to do it; correct?

21   A.  Yes.

22   Q.  And if I heard you correctly, you got your taxes back, you

23   said; it wasn't as much money as you wanted, so then you said,

24   I'm going to do this.

25   A.  Yes.

1    Q.  I'm going to fake a fall, blame a business, and move

2    forward with this to make a buck.

3    A.  That's what I did.

4    Q.  Because my tax return wasn't quite what I anticipated?

5    A.  Yes.

6    Q.  And then how did you make contact?  Did you reach back out

7    to Destiny to get the phone information of these men?

8    A.  No, he contacted me once I told Destiny that I would do it.

9    Q.  Got it.  You called Destiny you said?

10   A.  I said I would do it.

11   Q.  And did she say to you, You're going to get a call from

12   somebody?

13   A.  Yes.

14   Q.  And you did --

15   A.  Yes.

16   Q.  -- correct?

17   A.  Yes.

18   Q.  And the first contact with these individuals would have

19   been a phone conversation?

20   A.  Yes.

21   Q.  And I imagine in that conversation they told you what it

22   was all about, gave you some detail?

23   A.  No, they didn't go into all details on the phone, no, they

24   did not.  He said he would get back to me.  He told me what the

25   first thing that I would do, and that's what I did.  He would

MBUVCON2                          Barton - Cross

1  get back to me, and that's what happened.

2  Q.  Okay.  He didn't want to initially say over the phone what

3  it was all about?

4  A.  Yes.

5  Q.  Did he then get back to you again?

6  A.  Yes.

7  Q.  And what was that conversation, ma'am?

8  A.  Okay.  He said he would pick me up and we would go to the

9  store and that's what we did.  That's where I had the fall at.

10 Q.  And he picked you up at your home; correct?

11 A.  Yes.

12 Q.  And you knew at this point in time that what this would

13 involve, am I correct, would be this orchestrated fall;

14 correct?

15 A.  Yes.

16 Q.  And you'd have to go to the hospital; correct?

17 A.  Yes.

18 Q.  And you would have to tell the hospital about an injury

19 that, in fact, you did not sustain?

20 A.  Yes.

21 Q.  You'd have to lie to the medical personnel?

22 A.  I said I had a fall, yes.

23 Q.  And you would have to lie about injuring yourself in the

24 fall?

25 A.  Yes.

1    Q.  So he drives you to this location and you fall on this

2    cellar door which was depicted in the video; correcting?

3    A.  Yes.

4    Q.  You remain motionless on the ground; correct?

5    A.  Yes.

6    Q.  That was an act, am I correct?

7    A.  Yes.

8    Q.  Some man on the street walks over to see if you're all

9    right?

10   A.  The guy from inside the store came out.

11   Q.  And he came out to see how you were doing; correct?

12   A.  Yes.

13   Q.  And that would be the store that you would eventually sue;

14   correct?

15   A.  Yes.  Not proud of it, sir.  Yes.

16   Q.  And he comes out to see how you're doing.  And what did you

17   say to him in that conversation?

18   A.  I said that I fell and I hurt myself.  That's what I did.

19   Q.  You lied?

20   A.  Yes, I did.

21   Q.  And then you waited for an ambulance to arrive; correct?

22   A.  Yes, I did.

23   Q.  An EMT came out.  Did you lie to that individual also?

24   A.  Yes, I did.

25   Q.  Because you knew that an essential part of this was lying

MBUVCON2                         Barton – Cross

1   to the medical personnel?

2   A.  Yes, I did.

3   Q.  And you were willing to lie to medical personnel to see

4   this through in the hope of making money; correct?

5   A.  Yes.

6   Q.  And then the EMT transport you by ambulance to the hospital

7   and you begin to see people at that location; correct?

8   A.  Yes.

9   Q.  And I imagine at the hospital you saw a nurse and perhaps a

10  doctor also?

11  A.  Yes.

12  Q.  Knowing you had to lie to medical personnel about this to

13  make money, you lied to the nurse and then you lied to the

14  doctor; correct?

15  A.  Yes.

16  Q.  And then you were eventually released and you went home;

17  correct?

18  A.  Yes.

19  Q.  And you were able to walk; correct?

20  A.  Yes.

21  Q.  And I might have misheard you, did you take the bus home or

22  walk home?

23  A.  I took the bus home.

24  Q.  Took the bus home.  No problem walking; correct?

25  A.  No.

MBUVCON2                         Barton - Cross

1    Q.  Meaning you could walk to the bus and get on the bus?

2    A.  I walked to the bus.

3    Q.  Yes.  No crutches?

4    A.  No crutches.

5    Q.  And then once you got home, did I hear you correctly that

6    you waited for your next instruction?

7    A.  Yeah.  That's what I did.

8    Q.  And who would have that been from, ma'am?

9    A.  The light-skinned guy.

10   Q.  One of the men on the board there?

11   A.  Yes.

12   Q.  And he calls you and he says that he's going to bring you

13   to a lawyer's office, am I correct?

14   A.  Yes.

15   Q.  And then you get in a car and you're travel to the lawyer's

16   office.  And in the lawyer's office, is it accurate to say that

17   you lied there also?

18   A.  I didn't lie.  I told him what happened.

19   Q.  Well, did you tell the lawyer you had an accident at a

20   particular location?

21   A.  I think the lawyer knew what was going on, too.

22   Q.  Okay.  That's fine.  So you didn't have to lie --

23   A.  No, I didn't have to lie to the lawyer because the lawyer

24   knew.

25   Q.  He kind of knew what was going on?

1    A.  Sure.

2    Q.  Understood.

3           Then you were driven back, were you not, from the

4    lawyer's office --

5    A.  Back home.

6    Q.  -- back to your house?

7    A.  Yes.

8    Q.  And while at the house, you awaited further instruction, I

9    imagine, as to what's my next step in this process?

10    A.  Yes.

11    Q.  Did you testify that you got a call from one of these guys

12    again?

13    A.  Say that again.

14    Q.  I'll withdraw it.

15           What was the next step?

16    A.  After he went to the lawyer's office --

17    Q.  Yes.

18    A.  -- I think I went to the -- you have the MRI.

19    Q.  Okay.  At one point you got an MRI; correct?

20    A.  Yes.

21    Q.  And at one point your testimony was that you had a physical

22    examination with Dr. Dowd?

23    A.  Yes.

24    Q.  And did you also see, if you recall, a chiropractor by the

25    name of Dr. Nguyen, does that ring a bell to you?

1  A.  No, I don't remember that.

2  Q.  When you say you don't remember, is it possible that before

3  you saw Dr. Dowd you were driven by one of these men to a

4  chiropractor by the name of Dr. Nguyen?

5  A.  It's possible, but it was five years ago, so I don't

6  remember every detail.  So I don't know -- I don't remember.

7  Q.  I understand.

8  A.  Okay.

9  Q.  And if you saw doctor -- well, you don't remember one way

10 or the other whether you saw Nguyen, fair statement?

11 A.  Fair statement.

12 Q.  And at one point it's your testimony that you go to see Dr.

13 Dowd; correct?

14 A.  Yes.

15 Q.  And when you saw Dr. Dowd, is it fair to say that he asked

16 you a series of questions?

17 A.  I wouldn't say it was a series of questions.  I think he

18 asked me how painful was my knee, and I think I said between

19 the numbers of seven and eight, something like that.

20 Q.  So did Dr. Dowd, when you had an exam with him, did he ask

21 you what your level of pain was?

22 A.  Yes.

23 Q.  And did you say to him seven or eight?

24 A.  Something like -- yes.

25 Q.  And that would have been a lie to Dr. Dowd; correct?

MBUVCON2                      Barton - Cross

1   A.  Yes.

2   Q.  And did he ask you whether your knee was clicking, popping,

3   or snapping?

4   A.  Yes.

5   Q.  And this was when you're having -- alone with Dr. Dowd in

6   the exam room; correct?

7   A.  Yes.

8   Q.  And you lied to Dr. Dowd about that; correct?

9   A.  Yes.

10  Q.  And what did you say to him --

11  A.  I said my knee was popping.

12  Q.  Knee was popping.

13          Did Dr. Dowd ask you if you were having difficulty

14  walking?

15  A.  Yes.

16  Q.  And you were able to walk to the bus as you indicated;

17  correct?

18  A.  Yes.

19  Q.  And he's alone in this office with you examining you?

20          THE COURT:  You've established that.

21          What led you to say your knee was popping?  Why did

22  you say your knee was popping?

23          THE WITNESS:  For the money of -- for the scam.

24  Q.  When he asked you if you had difficulty walking, what did

25  you say in that regard?

1   A.  I said it was hard to walk up and down the stairs.

2   Q.  Do you recall Dr. Dowd then conducted an examination of

3   your knee; correct?

4   A.  Yes.

5   Q.  And in that regard, did he put his hands on your knee and

6   ask you to press and raise it to see if it hurt you at various

7   times?

8   A.  Yes.

9   Q.  And, in fact, during that exam, did you come to believe

10  that Dr. Dowd was a very nice man?

11  A.  No --

12          THE COURT:  Did you have a view one way or the other

13  as to whether Dr. Dowd was a very nice man?

14          THE WITNESS:  I thought he was all right guy.

15          THE COURT:  How long did the examination in his office

16  take?

17          THE WITNESS:  Maybe five minutes.

18  BY MR. KEATING:

19  Q.  And this was an exam of your knee; correct?

20  A.  Yes.

21  Q.  And do you recall -- you've met with the government many

22  times in this case?

23  A.  Many times?

24  Q.  A number of times.

25  A.  Yes.  A couple of times, yes.

1    Q.   And do you recall telling the government on June 3rd, 2021,

2    that you believe he was — referring to Dr. Dowd — a very nice

3    man?

4    A.   I think all doctors are pretty nice when they -- yes, he

5    was a nice man.

6    Q.   Do you recall if Dr. Dowd asked you whether you were on any

7    medications?

8    A.   Yes, I take medication.

9    Q.   And he asked that question; correct?

10   A.   Yes.

11   Q.   Do you recall Dr. Dowd asked what you did for a living;

12   correct?

13   A.   Yes.

14   Q.   And you answered that question; correct?

15   A.   Correct.

16   Q.   And you also told him that you were in an accident;

17   correct?  That's how this all started.

18   A.   Yes.

19   Q.   And that too was a falsehood that you told to Dr. Dowd;

20   correct?  You told him that you were in an accident --

21            THE COURT:  You've established that.

22            Proceed.  Next.

23   Q.   Did you tell Dr. Dowd that it was an accident you were in?

24   A.   Yes.

25   Q.   And was that a falsehood you told to Dr. Dowd?

1    A.  I think it was -- yes, it was a falsehood.

2              MR. KEATING:  If I can have one moment, please, your

3    Honor.

4              THE COURT:  Yes, of course.

5    Q.  Did you receive money after the knee procedure that was

6    done on you?

7    A.  Not the same day, but I did receive money.

8    Q.  And you were told in advance of having the knee procedure

9    that you would receive money after the knee procedure; correct?

10   A.  No.  On the same day I got the knee procedure, they told us

11   that same day, You wouldn't get any money this day; you would

12   get it a couple of days later.

13   Q.  And who told you that?

14   A.  The guy that brought us -- with the glasses that brought us

15   in for the surgery.

16   Q.  And how much money did you receive on that day?

17   A.  A couple of days later we received $1,000.

18   Q.  And did you have to give money to one of these guys?

19   A.  Not that day, no.

20   Q.  When did you have to give money to one of these guys?

21   A.  When we had the back surgery.

22   Q.  And had you been told, Ms. Barton, by the lawyer or the

23   drivers before you went to the procedure that you would be

24   getting money after the procedure?

25   A.  Say that again.

MBUVCON2                         Barton - Cross

```
 1   Q.  Sure.  Before you went to the procedure, the day of the
 2   knee procedure, had you been told some time prior to that that
 3   you would be getting money after the knee procedure?
 4   A.  No.  On the day of the surgery, that's when they told us we
 5   would get money after.
 6   Q.  After the procedure?
 7   A.  After the procedure.
 8   Q.  Were you told before the procedure that you'd be getting
 9   money after the procedure?
10   A.  Of the knee surgery?
11   Q.  Yes.
12   A.  The day of the knee surgery, that's when they told us we
13   would get money a couple of days after the -- after the knee
14   surgery.
15            THE COURT:  How much longer do you have, sir?
16            MR. KEATING:  Twenty minutes; maybe a half hour.
17   Q.  Now, ma'am, what pharmacy do you use?
18   A.  Dekalb Drugs.
19   Q.  Dekalb Drugs at 173 Marcus Garvey Boulevard, Brooklyn, New
20   York; correct?
21   A.  Yes.
22   Q.  And do you recall, ma'am, getting a telephone call from Dr.
23   Dowd's office prior to your surgery about calling in a
24   prescription to Dekalb Drugs for post-surgical medication?
25   A.  No.
```

```
 1    Q.  Do you recall receiving a call on or about March 10 from

 2    Dr. Dowd's office advising about receiving -- about --

 3    withdrawn.

 4              Do you recall giving Dr. Dowd's office the name of

 5    your pharmacy?

 6    A.  I might have given the pharmacy name.

 7              THE COURT:  No, do you recall --

 8              THE WITNESS:  No, I do not recall.

 9              THE COURT:  Next question.

10    Q.  When you say you don't recall, is it possible you did, you

11    just don't recall as you sit here today?

12    A.  Right.

13              MS. ROTHMAN:  Objection.

14              THE COURT:  Sustained.

15    Q.  I'm going to show you --

16              MR. KEATING:  If I can approach the witness, your

17    Honor.

18              THE COURT:  Yes.

19    Q.  I'd like to show you a document, ma'am.  Just look at it

20    silently.  Take a moment to look at it silently.  Then I'm

21    going to ask you a question.  Tell me when you're done, please.

22    A.  I'm done.

23    Q.  Does that refresh your recollection, yes or no --

24    A.  No, it doesn't.

25    Q.  Let me just finish the question please.
```

1            Does it refresh your recollection, yes or no, of

2    whether you received a call from Dr. Dowd's office before your

3    surgery about sending medication to your pharmacy, Dekalb

4    Pharmacy?

5    A.  No, it doesn't.

6            MR. KEATING:  If I can approach.

7            THE COURT:  Yes, of course.

8    Q.  Do you know what date you went for your MRI, ma'am?

9    A.  No, I do not remember that.

10           MR. KEATING:  If I can have a moment please, your

11   Honor.

12           (Counsel conferred)

13           MR. KEATING:  May I approach the witness please, your

14   Honor?

15           THE COURT:  Yes.

16   Q.  Ma'am, if you would look at that document silently, please.

17   Focus your attention at the top part just to save time.

18   A.  Okay.

19   Q.  And does that refresh your recollection as to when you had

20   your MRI in this case with regard to the knee?

21   A.  3/15 --

22           THE COURT:  No, no, no.

23           The issue is not what's written on a piece of paper.

24   The issue is -- the question is whether or not looking at that

25   gives you a recollection now, a new recollection, as to what

MBUVCON2                        Barton - Cross

1    day you had your MRI.  Just because something is on a document

2    by itself doesn't mean you'll have a new recollection.

3              THE WITNESS:  No.

4              THE COURT:  Okay.

5    Q.  That's fine.

6              Would you agree with me, ma'am, that, in fact, you did

7    have your MRI prior to your surgery?

8    A.  I know I had my MRI before the surgery.

9              THE COURT:  How long before, if you know?

10             THE WITNESS:  I don't know how long before, but I know

11   I had it before the surgery.

12             THE COURT:  Okay.

13   Q.  And during your -- I know you don't -- well, withdrawn.

14             During your examination with Dr. Dowd when he was

15   feeling your knee, you described that before; correct?

16   A.  Correct.

17   Q.  And do you recall him telling you that you had some sort of

18   internal derangement with your knee?

19   A.  No, I do not.

20   Q.  Do you recall Dr. Dowd telling you that your options in

21   having the internal derangement with the knee were to have an

22   arthroscopic procedure or not have an arthroscopic procedure,

23   do you recall those conversations?

24   A.  No.

25   Q.  Now, you wanted to have the procedure here, correct, ma'am?

MBUVCON2                          Barton - Cross

1   A.  Say that again.

2   Q.  Sure.  As part of this event that you were participating

3   in, you wanted to have the procedure; correct?

4   A.  Yes.

5   Q.  Because you were told, by having this procedure, it would

6   elevate the value of your case; correct?

7   A.  Yes.

8   Q.  You don't recall in that --

9           THE COURT:  Let me ask it directly.

10          You said you wanted to have this surgical procedure.

11  Why did you want to have the surgical procedure?

12          THE WITNESS:  Well, the scam was to get money.  So for

13  you to get money, you have to have the surgery.

14          THE COURT:  All right.  Next.

15  Q.  And do you recall telling Dr. Dowd in that meeting that you

16  wanted -- that was your desire, to go forward with this

17  procedure?  Do you remember that discussion?

18  A.  No, I do not remember that discussion, what you're saying,

19  no.

20  Q.  You indicated at one point after this event, equipment

21  showed up at your house; correct?

22  A.  Yes.

23  Q.  And do you remember that equipment consisting of a cold

24  pack to put on your knee?  Cold therapy pack?

25  A.  It wasn't a cold pack, it was some kind of machine.  It

MBUVCON2                         Barton - Cross

1   wasn't a cold pack.

2   Q.  Do you remember receiving both items, a machine to move

3   your knee and a cold pack for your knee?

4   A.  Okay.  I don't know what was in the box because I never

5   opened it because I never used it; so I don't know what was in

6   the box.

7   Q.  And this equipment was sent to, did you come to understand,

8   by a company called Tribar?

9   A.  Okay.  I don't know -- I don't know.  I don't know what was

10  in the box; I don't know who it came from.  He said he was

11  going to send it.  I never used it.  I never opened it.

12  Q.  Who said he was going to send it?

13  A.  Dr. Dowd.

14  Q.  Was going to send physical therapy equipment to your house?

15  A.  Right.

16  Q.  For use after the procedure; correct?

17  A.  It was way after the procedure; it wasn't like it was two

18  days after the procedure.  It was way after the procedure.

19  Q.  You didn't open the box?

20  A.  No, I did not.

21  Q.  And after -- where you live on Dekalb Avenue --

22  A.  953 Dekalb Avenue, Apartment 10C.

23  Q.  And there came a point in time after you had not used the

24  equipment that Dr. Dowd drove to your apartment to retrieve the

25  equipment; correct?

MBUVCON2                        Barton - Cross

1    A.  Yes.

2    Q.  What floor do you live on, ma'am?

3    A.  Ten.

4    Q.  Ten.  And you were home when he arrived; correct?

5    A.  Yes.

6    Q.  And do you remember having a conversation with Dr. Dowd?

7    A.  Not really.  I think he called.  I was shocked that he had

8    called.  I was like, Oh, you could come pick it up because I'm

9    home.  You could come get it, yes.

10   Q.  Do you remember Dr. Dowd asking you how you were feeling?

11   A.  He might have said that.  I probably said I'm doing good;

12   I'm doing okay.

13   Q.  And do you recall him saying to you -- withdrawn.

14            Do you recall --

15            MS. ROTHMAN:  Objection.

16            MR. KEATING:  I haven't asked the question.

17            THE COURT:  I don't think there is a question.

18            Go ahead.

19   Q.  Do you recall Dr. Dowd expressing disappointment to you

20   that you hadn't opened the equipment?

21            MS. ROTHMAN:  Objection.  Hearsay.

22            THE COURT:  Just a moment.  I'll allow it.

23            Did he say he was disappointed that you had not opened

24   the equipment?

25            THE WITNESS:  First he gave it -- it was -- I was

1    pressured into getting it.  I got it late.  It wasn't like he

2    gave it to me the next day of the surgery.  I got it like weeks

3    later.  And I was already walking on it.

4           No, I don't remember him saying he was disappointed in

5    me.  I don't remember that.  No, I'm sorry.

6           THE COURT:  Next.

7           MR. KEATING:  I have nothing further.  Thank you.

8           THE COURT:  All right.  Thank you.

9           Is there any redirect?

10          MS. ROTHMAN:  There is, your Honor.

11          THE COURT:  Approximately how long?

12          MS. ROTHMAN:  Ten, 15 minutes.

13          THE COURT:  All right.  Let's go.

14          MS. ROTHMAN:  If we can publish -- we'll come back to

15   this.

16   REDIRECT EXAMINATION

17   BY MS. ROTHMAN:

18   Q.  Ms. Barton?

19   A.  Yes.

20   Q.  You were asked some questions on cross-examination about

21   your existing knee pain, do you remember that?

22   A.  Yes.

23   Q.  Is that the reason you had surgery in this case?

24   A.  No.

25   Q.  Why did you have surgery?

 1   A.  I had surgery on my knee for the scam that I was

 2   participating in.

 3   Q.  You were also asked some questions on cross-examination

 4   about that March 8th meeting with Dr. Dowd, do you remember

 5   those questions?

 6              MS. ROTHMAN:  If we can pull up for the witness the

 7   report from that meeting, which is 1031Z at page 3.  If we can

 8   go to the -- actually, I think the fourth page.

 9   Q.  Do you see where it says "plan," Ms. Barton?

10   A.  Okay.  Wait.

11   Q.  Do you see that -- you can look at the computer,

12   Ms. Barton.  Do you see that?

13   A.  Okay.

14   Q.  See where it says "plan"?

15   A.  Mm-hmm.

16   Q.  Did you have physical therapy after your March 8th meeting

17   with Dr. Dowd?

18   A.  No.

19   Q.  Did you follow up in one to two weeks with Dr. Dowd after

20   your March 8th meeting?

21   A.  No.

22              MS. ROTHMAN:  We can go to page 3 of 1031Z.  And if we

23   can zoom in on the physical examination paragraph.  If you can

24   highlight "McMurray's was positive medially," please.

25   Q.  Now, Ms. Barton, I'm going to show you a video which is in

1   evidence as Government Exhibit 824.

2          MS. ROTHMAN:  If we can play that for the witness.

3          MR. KEATING:  Your Honor, note my objection for

4   improper redirect.

5          THE COURT:  No, given the question, overruled -- given

6   your questioning, overruled.

7   Q.  Just watch that video, Ms. Barton.

8          MS. ROTHMAN:  Thank you, Mr. Carbone.

9          (Video played)

10         MS. ROTHMAN:  Thank you.  You can take that down.

11  BY MS. ROTHMAN:

12  Q.  Ms. Barton, did Dr. Dowd do that exam on you?

13  A.  No.

14  Q.  Thank you.

15         You were also asked some questions on

16  cross-examination about the MRI that you had before surgery.

17  Do you remember those questions?

18  A.  Yes.

19         MS. ROTHMAN:  If we can pull up for the witness what's

20  in evidence as Government Exhibit 1031K.  And let's just zoom

21  in on that top half of the page.

22  Q.  And do you see where it says your name and subject, "MRI

23  reports for Erica Barton"?

24  A.  Yes.

25  Q.  And do you see where it says "sent on March 13th, 2017, at

MBUVCON2                    Barton - Redirect

1    1:54 a.m."?

2    A.  Yes.

3    Q.  Is this an email of Dr. Dowd receiving your MRI hours

4    before you had surgery on March 13th, 2017?

5    A.  Right.

6         MS. ROTHMAN:  We can take that down.  Thank you.

7    Q.  And Ms. Barton, how many days in advance of your surgery

8    did you know you were having surgery?

9    A.  I think at least about four to five days before.

10   Q.  So you understood you were having surgery on your knee

11   before Dr. Dowd even received your MRI?

12   A.  Yes.

13   Q.  Thank you.

14        Ms. Barton, you were asked some questions on

15   cross-examination if you thought Dr. Dowd was a nice guy.  Were

16   you able to observe any interactions between Dr. Dowd and any

17   of the three individuals on the face board who drove you to and

18   from your appointments?

19   A.  Like, when we first got to the -- to have surgery, yes, I

20   mean, they seemed very friendly.  They shook hands, like, Hey,

21   man, what's up?  I haven't seen you in a while, like that.  So

22   I would assume they were friends.

23   Q.  Now, Ms. Barton, you were asked on cross-examination if you

24   thought you had to lie to the lawyer and you said you didn't;

25   correct?

MBUVCON2                    Barton - Recross

1    A.  That I lied to the lawyer?

2    Q.  If you thought you had to --

3    A.  No, I don't think I had to lie to the lawyer; I didn't

4    think I had to lie to the doctor; I didn't think I had to lie

5    to anyone.

6    Q.  Why not?

7    A.  Because everyone was in on the scam.  Everyone.

8            MS. ROTHMAN:  No further questions.

9            MR. KEATING:  Just a couple, your Honor.

10           THE COURT:  Very briefly, sir.

11           MR. KEATING:  I'm addressing what was just raised,

12   your Honor.

13           THE COURT:  Very briefly, sir.

14   RECROSS EXAMINATION

15   BY MR. KEATING:

16   Q.  Ms. Barton, you were just shown an exhibit which was an

17   email.  You were just asked about it, which contained an MRI;

18   correct?

19   A.  Correct.

20   Q.  You have no knowledge, am I correct, as to when Dr. Dowd

21   received this MRI; correct?

22   A.  Correct.

23           MR. KEATING:  Nothing further.

24           THE COURT:  All right.  Thank you.

25           You may step down.  You are excused.

MBUVCON2

1           THE WITNESS:  Thank you, your Honor.

2           THE COURT:  You're very welcome.

3           (Witness excused)

4           THE COURT:  Ladies and gentlemen, let's take our

5      ten-minute mid-morning break.  Thank you.

6           (Jury not present)

7           THE COURT:  Ten minutes.

8           (Recess)

9           (Jury present)

10          MS. KUDLA:  Your Honor, the government intends to call

11     Kerry Gordon.  But do you mind if I read three stipulations

12     into the record?

13          THE COURT:  All right.  Have him take the stand.

14          MS. KUDLA:  I will.

15          THE COURT:  Proceed.

16          MS. KUDLA:  Your Honor, at this time the government

17     would like to offer three stipulations.  The first is

18     Government Exhibit 1801.  And Mr. Carbone, can we put that on

19     the screen, please.

20          The parties have agreed that:

21          1.  Venue is proper in the Southern District of New

22     York with respect to the charges in Counts One through Six of

23     the indictment in this matter.

24          No. 2.  By this stipulation, the defendants George

25     Constantine and Andrew Dowd hereby waive any argument or

MBUVCON2

1    defense that they might make with respect to venue not being

2    properly established in the Southern District of New York with

3    respect to those charges.

4            It's further stipulated and agreed that this

5    stipulation, which is Government Exhibit 1801, may be received

6    into evidence at this trial.

7            The government offers Government Exhibit 1801.

8            THE COURT:  Admitted.

9            (Government's Exhibit 1801 received in evidence)

10           MS. KUDLA:  The government now would like to read

11   Government Exhibit 1802.

12           Mr. Carbone, if we could publish that for the jury.

13           THE COURT:  Ladies and gentlemen, 1801 is about venue.

14   Venue is simply a requirement that at least one act of each of

15   the charges have taken place in the Southern District of New

16   York.  That stipulation says the parties agree that at least

17   one act alleged has taken place in the Southern District.

18           So when you're dealing with this at the end of the

19   case, you don't have to be concerned about the requirement of

20   venue.  The parties agree it's been established.

21           Proceed.

22           MS. KUDLA:  Thank you, your Honor.

23           And Government Exhibit 1802 is a stipulation and

24   agreement between the parties that from 1989 to the present,

25   George Constantine, the defendant, was and is a licensed

1    attorney in the state of New York.

2            The government offers Government Exhibit 1802.

3            THE COURT:  All right.  Admitted.

4            (Government's Exhibit 1802 received in evidence)

5            MS. KUDLA:  The next stipulation is Government Exhibit

6    1805.  Can we please publish for the jury.

7            It is stipulated by the parties and agreed to that,

8    one, on April 19, 2018, a Samsung Galaxy S7 cellular phone,

9    tagged the Duncan cell phone, was lawfully recovered by Federal

10   Bureau of Investigation, FBI agents from Bryan Duncan.

11           Subpart A.  Government Exhibit 1602-1 is a disk

12   containing the contents and data extracted from the Duncan cell

13   phone.

14           B.  Government Exhibits 1602 and its lettered

15   subparts, as set forth on Exhibit A, are true and accurate

16   reports reflecting certain contents of the Duncan cell phone.

17   The information in Government Exhibit 1602 and its lettered

18   subparts was contained on the Duncan cell phone at the time it

19   was seized on April 19, 2018.

20           No. 2.  On April 19, 2018, an Apple iPhone X cellular

21   telephone, the Gordon cell phone, was lawfully recovered by FBI

22   agents during the arrest of Kerry Gordon.

23           Part A.  The Government Exhibit 1604-1 is a disk

24   containing the contents and data extracted from the Gordon cell

25   phone.

MBUVCON2

B.  Government Exhibit 1604 and its lettered subparts, as set forth on Exhibit B, are true and accurate reports reflecting certain contents of the Gordon cell phone.  The information in Government Exhibit 1604 and its lettered subparts was contained on the Gordon cell phone at the time it was seized on April 19, 2018.

3.  On April 19, 2018, an LG cell phone, model number LG-VN251S, the Kalkanis cell phone, was lawfully recovered by FBI agents during the arrest of Peter Kalkanis.

Part A.  Government Exhibit 1301-1 is a disk containing the contents and data extracted from the Kalkanis cell phone.

B.  Government Exhibit 1603 and its lettered subparts, as set forth on Exhibit C, are true and accurate reports reflecting certain contents of the Kalkanis cell phone.  The information in Government Exhibit 1603 and its lettered subparts was contained on the Kalkanis cell phone at the time it was seized on April 19, 2018.

It's further agreed that this stipulation, which is Government Exhibit 1805, may be received into evidence at trial.

Your Honor, at this time the government offers Government Exhibit 1805.  And subject to the stipulation, the government offers Government Exhibit 1602 and its lettered subparts set forth in Exhibit A, which has already been

MBUVCON2

1   provided to the court reporter and will be added to today's

2   transcript.

3          Subject to the stipulation, the government also offers

4   Government Exhibit 1604 and its lettered subparts as set forth

5   in Exhibit B, which have also been provided to the court

6   reporter.

7          And subject to the stipulation, the government offers

8   Government Exhibit 1603 and its lettered subparts as set forth

9   in Exhibit C, which also had been provided to the court

10  reporter.

11         THE COURT:  All admitted, but without objection by

12  stipulation.

13         (Government's Exhibits 1602, 1603, 1604, 1805, 1602D,

14  1602E, 1602F, 1602G, 1602H, 1602I, 1602J, 1602K, 1602L, 1602M,

15  1602N, 1602O, 1602P, 1602Q, 1602S, 1602U, 1602V, 1602W, 1602X,

16  1602Y, 1602Z, 1602AA, 1602AD, 1602AE, 1602AF, 1602AG, 1602AH,

17  1602AI, 1602AK, 1602AL, 1602AM, 1602AN, 1602AO, 1602AQ, 1602AR,

18  1602AS, 1602AV, 1602AW, 1602AX, 1602AY, 1602AZ, 1602BA, 1602BB,

19  1602BC, 1602BD, 1602BE, 1602BF, 1602BG, 1602BH, 1602BI, 1602BJ,

20  1602BK, 1602BL, 1602BM, 1602BN, 1602BO, 1602BP, 1602BQ, 1602BR,

21  1602BS 1603A, 1603B, 1603C, 1603D, 1603E, 1604A, 1604B received

22  in evidence)

23         THE COURT:  Government, call your next witness.

24         MS. KUDLA:  Thank you.

25         The government calls Kerry Gordon.

MBUVCON2                        Gordon – Direct

1    KERRY GORDON,

2          called as a witness by the Government,

3          having been duly sworn, testified as follows:

4                THE COURT:  Good morning, sir.  Please be seated.

5                Welcome.  Speak loudly, slowly, and clearly into the

6    microphone.

7                Your witness.

8    DIRECT EXAMINATION

9    BY MS. KUDLA:

10   Q.  Mr. Gordon, how old are you?

11   A.  I'm 38 years old.

12   Q.  Where do you live?

13   A.  Queens, New York.

14   Q.  What do you do for a living?

15   A.  I work in laundry at Jamaica Hospital.

16   Q.  Are you currently studying?

17   A.  Yes.

18   Q.  What are you studying?

19   A.  Electrical.

20   Q.  I want to direct your attention to April 2018.  Did

21   something significant happen that month?

22   A.  Yes.

23   Q.  What was that?

24   A.  I got arrested on that day.

25   Q.  What were you arrested for?

1    A.  Mail, wire, and conspiracy.

2    Q.  What was the nature of those charges?

3    A.  For staging trip-and-fall accidents.

4    Q.  And when you say staging trip-and-fall accidents, in which

5    way were the accidents staged?

6    A.  Patients were faking their injuries and they faked their

7    accident.

8    Q.  Mr. Gordon, what was your role in that trip-and-fall scam?

9    A.  I was a patient, driver, recruiter, funder.

10   Q.  You've identified multiple roles.  Did you serve all of

11   those roles at the same time or did it change over time?

12   A.  It changed over time.

13   Q.  Once individuals had faked or staged an accident, what was

14   the general plan of the scam?

15   A.  Put the lawsuit and file.

16   Q.  During the course of the lawsuit, what, if anything,

17   happened to the patients?

18   A.  They did surgery.

19   Q.  And why would they do that?

20   A.  To make it look real; boost the value of the case.

21   Q.  We're going to come back to that over the course of today.

22   But approximately how many years were you involved in the scam,

23   Mr. Gordon?

24   A.  Eight years.

25   Q.  How did you first get involved?

1   A.  I was a patient.

2   Q.  Why did you agree to participate in the scam as a patient?

3   A.  I was -- I was approached a few years back when I was in

4   the emergency room and I was introduced to Peter Kalkanis.

5   Q.  Is there a reason you agreed to participate?

6   A.  I needed money at the time.

7   Q.  We're going to come back to your own case, Mr. Gordon,

8   later today.  But first, have you pled guilty for your

9   involvement in this fraud scheme?

10  A.  Yes.

11  Q.  And was that pursuant to a cooperation agreement with the

12  government?

13  A.  Yes.

14          MS. KUDLA:  Can we show for the witness what is marked

15  as Government Exhibit 811.  And can you scroll through that.

16  Q.  Mr. Gordon, do you recognize the document that's before

17  you?

18  A.  Yes.

19  Q.  What is this?

20  A.  This is my cooperation agreement with the government.

21          MS. KUDLA:  The government offers Government Exhibit

22  811.

23          THE COURT:  Admitted.

24          (Government's Exhibit 811 received in evidence)

25          MS. KUDLA:  Now, can we publish that agreement for the

1   jury?

2           THE COURT:  Yes.

3   Q.  We're going to come back to your cooperation agreement

4   later today.

5           MS. KUDLA:  Mr. Carbone, we can take that down now.

6   Q.  Mr. Gordon, let me ask you, were you working alone or with

7   others in the trip-and-fall scam?

8   A.  I was working with others.

9   Q.  Who were some of the other people that you were working

10  with?

11  A.  Bryan Duncan, Ryan Rainford, Peter Kalkanis, Adrian

12  Alexander, Dr. Dowd, George Constantine.

13  Q.  Did you work with any other doctors besides Dr. Dowd?

14  A.  Dr. Ribeiro.

15  Q.  You mentioned an individual named George Constantine.  What

16  was Mr. Constantine's role in this scam?

17  A.  He was the attorney.

18  Q.  And how many cases did Mr. Constantine handle as an

19  attorney for the trip-and-fall scheme?

20  A.  Hundreds.

21  Q.  Do you see Mr. Constantine in the courtroom here today?

22  A.  Yes.

23  Q.  Can you identify him by an article of clothing he may be

24  wearing or the color of an article of clothing he is wearing?

25  A.  I can't see him.

1          THE COURT:  I'd like everybody to -- both rows to

2   stand up please.  There are a number of computer monitors.

3          Pardon me?

4          THE WITNESS:  Gray suit.

5          THE COURT:  Which, front row or back row?

6          THE WITNESS:  Front row.

7          THE COURT:  I guess depends how you're looking at it.

8          Is it the row that people are standing up in?

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  And there are, to my eyes, a number

11   of men with gray suits.

12          THE WITNESS:  The light gray --

13          THE COURT:  Light gray.  All right.

14          Sir, would you raise -- I'll pick somebody with the

15   lightest gray suit, raise your hand, if you would.

16          Yes.  Is that the gentleman?

17          THE WITNESS:  Yes.

18          THE COURT:  All right.  The witness has identified the

19   defendant, Mr. Constantine.

20          Next.

21          MS. KUDLA:  Can we publish government -- what's in

22   evidence as Government Exhibit 1.

23   BY MS. KUDLA:

24   Q.  Do you recognize this individual?

25   A.  Yes.

MBUVCON2                          Gordon - Direct

1    Q.   And who is this?

2    A.   George Constantine.

3            MS. KUDLA:  Your Honor, the government will offer

4    Government Exhibit 1A, which is the nameplate George

5    Constantine.

6            THE COURT:  Admitted.

7            (Government's Exhibit 1A received in evidence)

8            MS. KUDLA:  May we approach also for the --

9            THE COURT:  Yes.

10           MS. KUDLA:  Thank you.

11   Q.   Mr. Gordon, you also mentioned a Dr. Dowd.  What was Dr.

12   Dowd's full name?

13   A.   Andrew Dowd.

14   Q.   And what was Mr. Dowd's role in this scheme?

15   A.   To perform surgery on knees and shoulders.

16   Q.   Mr. Gordon, approximately how many surgeries do you believe

17   Mr. Dowd performed as part of the scheme?

18   A.   Hundreds.

19   Q.   Can you identify Dr. Dowd by an article of clothing or

20   where he may be seated?

21           THE COURT:  I'd like everybody in both rows to stand

22   up please.

23   A.   He's at the end.  I'm not sure if that's dark blue.

24           THE COURT:  Which end?

25           MR. KEATING:  Your Honor, we'll stipulate that he's

1   identified my client.

2           THE COURT:  With the stipulation that the witness has

3   identified Dr. Dowd.

4           MS. KUDLA:  Can we publish what is in evidence as

5   Government Exhibit 2 please.

6   Q.  Mr. Gordon, do you recognize this individual?

7   A.  Yes.

8   Q.  And who is it?

9   A.  Dr. Andrew Dowd.

10          MS. KUDLA:  The government offers Government Exhibit

11  2A, the nameplate.

12          THE COURT:  Yes.  And you may put it on the board.

13          (Government's Exhibit 2A received in evidence)

14          MS. KUDLA:  Thank you.

15          THE COURT:  Next.

16  BY MS. KUDLA:

17  Q.  I want to start, Mr. Gordon, by understanding how the

18  trip-and-fall scam worked.  Who were the different categories

19  of people involved in the scam?

20  A.  Patient, driver, recruiter, doctor, lawyer, and funder.

21  Q.  Was there also a case manager?

22  A.  Yes, case manager.

23  Q.  So, Mr. Gordon, let's walk through one-by-one the different

24  categories.  And I want to start at the top.

25          You mentioned a funder.  Can you describe, Mr. Gordon,

1   just generally what was a funder?

2   A.  A funder is a person or a company that pays for the medical

3   expenses of a personal injury case; MRIs, physical therapy,

4   surgery.

5   Q.  And does that personal injury case relate to a lawsuit?

6   A.  Yes.

7   Q.  Why would a funder want to pay for the medical treatments

8   during the course of the lawsuit?

9            MR. GANN:  Objection.

10            THE COURT:  Sustained as phrased.

11  Q.  Mr. Gordon, first off, did you ever participate in the role

12  as a litigation funder?

13  A.  Yes.

14  Q.  Okay.  So as a litigation funder, why would a litigation

15  funder want to invest in medical procedures as part of a

16  personal injury lawsuit?

17  A.  High interest rate at the end of a settlement.

18  Q.  When does a funder make money?

19  A.  During settlement.

20  Q.  And what, if anything, do the medical procedures that the

21  funder pays for help with the settlement?

22  A.  It boosts the numbers.

23  Q.  When you say "boost the numbers," what do you mean with

24  respect to the settlement?

25  A.  It makes it look real and increases the value of the case.

MBUVCON2                         Gordon – Direct

1    Q.  Now, who was the main litigation funder that was used

2    during the course of the trip-and-fall scam?

3    A.  Health Finance.

4    Q.  Mr. Gordon, who owned Health Finance?

5    A.  Adrian Alexander.

6    Q.  I'm going to show you what's marked?

7            MS. KUDLA:  Let's show the witness what's marked for

8    identification as Government Exhibit 4.

9    Q.  Do you recognize this individual?

10   A.  Yes.

11   Q.  Who is that?

12   A.  Adrian Alexander.

13           MS. KUDLA:  The government offers Government Exhibit 4

14   and Government Exhibit 4A, the nameplate.

15           MR. GANN:  No objection.

16           THE COURT:  Admitted without objection.

17           (Government's Exhibits 4, 4A received in evidence)

18           MS. KUDLA:  May we publish to the jury?

19           THE COURT:  Yes.

20           Counsel, a couple of things to help speed things along

21   in a minor way.  Anything that's been admitted can be published

22   to the jury.

23           MS. KUDLA:  Thank you, your Honor.

24           THE COURT:  Shown to the jury.  That's one.

25           And counsel, as long as you don't abuse the privilege,

1   no counsel has to ask for permission to approach the witness.

2   Counsel may approach the witness to give that witness documents

3   or other things.  Again, just don't abuse the privilege and

4   nobody has to ask permission.

5          Proceed.

6          MS. KUDLA:  Thank you, your Honor.

7   BY MS. KUDLA:

8   Q.  Mr. Gordon, going back to Mr. Alexander.  In addition to

9   Health Finance, did he own any other funding companies?

10  A.  Yes, Cash Settlement or case settlement.

11  Q.  Cash Settlement?

12  A.  Yes.

13  Q.  Okay.  You also mentioned lawyers, Mr. Gordon.  What did

14  the lawyers have to do for a trip-and-fall case?

15  A.  Put the case in suit; file it.

16  Q.  Was there a main lawyer that was used for the trip-and-fall

17  scam?

18  A.  Yes.

19  Q.  Who was that?

20  A.  George Constantine.

21  Q.  How did Mr. Constantine make money from the lawsuits?

22  A.  33 and a third at settlement.

23  Q.  And 33 and a third of what?  What is 33 and a third?

24  A.  Of the settlement.

25  Q.  Are you referring to a percentage, Mr. Gordon?

MBUVCON2                          Gordon - Direct

1    A.  Yes, the percentage.

2             THE COURT:  Are you saying that Mr. Constantine was to

3    receive one third of the settlement amount when a lawsuit was

4    resolved by settlement?

5             THE WITNESS:  Correct.

6             THE COURT:  All right.

7    Q.  Now, Mr. Gordon, you also mentioned doctors.  What role did

8    the doctors have in the scheme?

9    A.  They performed the surgery.

10   Q.  And what type of surgeries?

11   A.  Shoulder, lower back, and knee.

12   Q.  Who was one of the main shoulder and knee surgeons you

13   drove patients to?

14   A.  Dr. Dowd.

15   Q.  And who was the main back surgeon?

16   A.  Dr. Ribeiro.

17   Q.  I'm going to show you what's marked for identification as

18   Government Exhibit 6.  Do you recognize the individual?

19   A.  Yes.

20   Q.  Who is this?

21   A.  Dr. Ribeiro.

22            MS. KUDLA:  Government offers Government Exhibit 6 and

23   6A.

24            THE COURT:  Admitted without objection.

25            (Government's Exhibits 6, 6A received in evidence)

1          THE COURT:  Next.

2          MS. KUDLA:  Mr. Carbone, please publish to the jury.

3   Q.  To your understanding, Mr. Gordon, were the patients who

4   had these surgeries injured?

5   A.  No.

6   Q.  If they weren't injured, what was your understanding of why

7   the patients got surgeries?

8   A.  They were desperate and they needed money.

9   Q.  And by then getting the surgeries, what, if anything, did

10  it do for the lawsuits?

11  A.  Increased the numbers.

12  Q.  And what numbers would those be related to?

13  A.  The number of patients that are coming in.

14  Q.  How did these surgeries affect the settlement, if at all?

15  A.  It made it look real and it boosted the numbers, the

16  settlement.

17  Q.  Now, I want to --

18          THE COURT:  There's another way of saying that.  When

19  you say it boosted the number of settlement, it boosted the

20  value of the litigation.

21          THE WITNESS:  Correct.

22          THE COURT:  Okay.

23  Q.  You mentioned a case manager, Mr. Gordon?

24  A.  Yes.

25  Q.  What is a case manager?

MBUVCON2                         Gordon – Direct

1    A.   A case manager is a person who oversees the patient

2    throughout the litigation.

3              (Continued on next page)

1    BY MS. KUDLA:

2    Q.  And have you ever heard the term broker?

3    A.  Yes.

4    Q.  What is the difference between a broker or a case manager,

5    or are they the same thing?

6    A.  They're the same thing.

7    Q.  When you started working in the trip-and-fall scam, who was

8    the main case manager that you worked with?

9    A.  Peter Kalkanis.

10            MS. KUDLA:  And I believe this has been in evidence by

11   the defense.  I'm showing you publishing Government Exhibit 3.

12            I'm going to offer Government Exhibit 3 at this time.

13            MR. GANN:  It's in.

14   BY MS. KUDLA:

15   Q.  Mr. Gordon, do you recognize the individuals shown here?

16   A.  Yes.

17   Q.  Who is this?

18   A.  Peter Kalkanis.

19            MS. KUDLA:  And the government offers Government

20   Exhibit 3A, the name plate.

21            THE COURT:  Admitted.

22            (Government's Exhibit GX 3A received in evidence)

23   Q.  Now, you also, Mr. Gordon, mentioned drivers.

24            What did drivers do?

25   A.  They drove patients to their apartments, MRIs, physical

1   therapy, surgery.

2   Q.  Mr. Gordon, who were the main drivers?

3   A.  Me, Bryan Duncan, and Ryan Rainford.

4          MS. KUDLA:  Please publish what's in evidence as

5   Government Exhibit 9.

6   Q.  Who is this, Mr. Gordon?

7   A.  Me.

8          MS. KUDLA:  The government would offer Government

9   Exhibit 9A, the name plate.

10          THE COURT:  Admitted.

11          (Government's Exhibit GX 9A received in evidence)

12          MS. KUDLA:  If we can take that down, Mr. Carbone.

13   BY MS. KUDLA:

14   Q.  Mr. Gordon, who was Bryan Duncan?

15   A.  A friend of mine.

16   Q.  How did you know Mr. Duncan?

17   A.  I used to work with him at United Healthcare.

18   Q.  I'm showing you what's marked for identification as

19   Government Exhibit 8.

20          Do you recognize this individual?

21   A.  Yes.

22   Q.  Who is it?

23   A.  Bryan Duncan.

24          MS. KUDLA:  The government offers Government Exhibit 8

25   and 8A.

1          THE COURT:  Admitted.

2          (Government's Exhibits GX 8 and 8A received in

3  evidence)

4          MS. KUDLA:  Mr. Carbone, you can publish.

5  BY MS. KUDLA:

6  Q.  When, approximately, did Mr. Duncan start driving for the

7  scam?

8  A.  2012.

9  Q.  You also mentioned Mr. Rainford.

10          Who was Mr. Rainford?

11  A.  A friend of Bryan Duncan.

12  Q.  How did Mr. Rainford get involved in the scam?

13  A.  Bryan referred him.

14          MS. KUDLA:  Now, please, publish what's in evidence as

15  Government Exhibit 11.

16  Q.  Mr. Gordon, do you recognize this individual?

17  A.  Yes.

18  Q.  Who is that?

19  A.  Ryan Rainford.

20  Q.  Did Mr. Rainford go by any other names?

21  A.  Yes.

22  Q.  Who was that?

23  A.  Ace.  Ace.

24          MS. KUDLA:  Government offers Government Exhibit 11B,

25  the name plate Ace.

1          THE COURT:  Admitted.

2          (Government's Exhibit GX 11B received in evidence)

3    Q.  OK.  Now I want to step aside from the participants for a

4    moment and just ask you, what were the typical locations that

5    the drivers would drive patients to?

6    A.  Um, physical therapy, MRI, lawyer's office and doctor's

7    office.

8    Q.  And we're going to walk through each one of those today,

9    but what was the typical sequence that a trip-and-fall patient

10   went for those locations?

11   A.  Emergency room, law office, physical therapy, physical

12   therapy, MRI, then doctor.

13   Q.  OK.  Let's take it one step at a time, Mr. Gordon.

14          Why did a patient have to go to the MRI -- or to the

15   ER, I think you said the emergency room?

16   A.  Um, we needed the discharge papers for the accident.

17   Q.  Why did the patient after that have to go to the lawyer's

18   office?

19   A.  To put the case in suit, file it.

20   Q.  And after that you had mentioned physical therapy.

21          Why did they have to go to physical therapy?

22   A.  To get a referral for an MRI.

23   Q.  And who at physical therapy could make the referral for the

24   MRI?

25   A.  Chiropractor.

1   Q.  And you then mentioned MRI.

2           Why was an MRI necessary?

3   A.  Um, for imaging to get the doctor's appointment.

4   Q.  And after the MRI, what was next?

5   A.  To see the doctor.

6   Q.  And what were they seeing the doctors for?

7   A.  To get scheduled for surgery.

8   Q.  Now, Mr. Gordon, what was a recruiter?

9   A.  Um, a person that referred patients.

10  Q.  And was there any other term that was used for recruiter?

11  A.  Runner.

12  Q.  In your experience, was there any overlap between the

13  people who were drivers and the people who were recruiters?

14  A.  Um, some did both.

15  Q.  Why did that happen?

16  A.  It was easier asking for referrals when you have the

17  patient next to you.

18  Q.  Now there is one category of participants that I want to

19  ask you about, the patients themselves.

20          What type of patient typically participated in the

21  trip-and-fall scam?

22  A.  Poor and low income.

23  Q.  And why was it typically poor and low income people who

24  participated?

25  A.  They were desperate and they didn't ask much questions.

1    Q.  Let's explore those two things.

2           If they were desperate, what, if anything, were they

3    willing to do?

4    A.  Surgery.

5    Q.  And when you say they didn't ask much questions, what were

6    they not asking questions about?

7    A.  Um, funding documents and, um, anything else.

8    Q.  Let's focus on patient recruiting for a moment.

9           Did you personally ever recruit trip-and-fall

10   patients?

11   A.  Yes.

12   Q.  Did anyone else recruit patients with you?

13   A.  Yes.

14   Q.  Who?

15   A.  Bryan Duncan and Ryan Rainford.

16          MS. KUDLA:  Mr. Carbone, can we please publish what's

17   in evidence, Government Exhibit 8 and 11.

18   Q.  Mr. Gordon, how did you recruit a patient to participate in

19   a trip-and-fall scam?

20   A.  Um, I would just ask the patient in the car if they knew

21   anyone that wanted a lawsuit, staged accident.

22   Q.  What did you mean by a staged accident?

23          What were you asking them to do?

24   A.  To fake a fall or go to therapy, to an emergency room.

25          MS. KUDLA:  Mr. Carbone, we can take down Government

MBUsCON3                      Gordon - Direct

1   Exhibit 8 and 11 now.  Thank you.

2   Q.  When you first started recruiting patients, Mr. Gordon,

3   what was the protocol for faking an accident?

4   A.  Um, just go directly to the ER.

5   Q.  And in that situation, did a patient have to fake or stage

6   a fall?

7   A.  No.

8   Q.  Why did the patient need to go to the ER if they didn't

9   have an accident, what was the purpose of that?

10  A.  The discharge papers and the report made it look real.

11  Q.  And what instructions, if any, Mr. Gordon, did you give to

12  the patients to say when they went to the ER?

13  A.  To complain about shoulder, lower back, and knee.

14  Q.  Why these particular areas?

15  A.  They were the most common for surgery.

16  Q.  Did you provide any instructions about the accident

17  locations?

18  A.  Yes.

19  Q.  And what instructions would you provide?

20  A.  Um, to find a pothole closer to their home big enough for

21  their foot to fit in it.

22  Q.  Now, did you ever personally help patients find these types

23  of locations?

24  A.  Yes.

25  Q.  And how did you do that?

1    A.  I would take them to a location closer to their home.

2    Q.  And when you say you took the patients, what were you

3    doing?

4            How were you taking them?

5    A.  Um, by car.

6    Q.  What, if anything, was the patient promised in exchange for

7    participating in this scam?

8    A.  Money at surgery and settlement.

9    Q.  What, if anything, were the patients told about the

10   surgeries early on?

11   A.  They were just told that they would be getting surgery.

12   Q.  Did a patient, I guess, in order to participate in this

13   scam, did a patient have to be willing to do surgery?

14   A.  Yes.

15   Q.  Did a patient receive anything in exchange for having

16   surgery?

17   A.  Yes.

18   Q.  What was that?

19   A.  $1,500.

20   Q.  And how was that payment made, by cash or by check?

21   A.  Either/or.

22   Q.  And when typically did a patient get this money?

23   A.  After surgery.

24   Q.  Mr. Gordon, did there come a point in time where the

25   instructions for the trip-and-fall, did they stay the same the

1    whole time, or did it change?

2    A.   It changed.

3    Q.   In what way?

4         Describe to the jury in which way they changed.

5    A.   Patients starting faking their fall, going by ambulance.

6    Q.   And what do you mean by they had to fake a fall?

7    A.   Go to a location and fall.

8    Q.   And was this on purpose or on accident?

9    A.   On purpose.

10   Q.   Why did they have to do that now?

11   A.   For the ambulance report.

12   Q.   And how did the ambulance report help?

13   A.   Um, more proof to make it look real.

14   Q.   Proof for what?

15   A.   To file the lawsuit.

16   Q.   Now, Mr. Gordon, were you ever present with patients when

17   they staged a fall?

18   A.   Yes.

19   Q.   Were you ever present with more than one patient when they

20   staged a fall?

21   A.   Yes.

22   Q.   And was that ever on the same day?

23   A.   Yes.

24   Q.   You testified that Mr. Duncan and Mr. Rainford were also

25   recruiting patients.

1          Did they follow the same procedures that you just

2    outlined to the jury?

3    A.   Yes.

4    Q.   Let's talk for a moment about referral fees, if any, for

5    recruiting patients.

6          What, if anything, did you receive for referring a new

7    patient?

8    A.   $1,000.

9    Q.   And who paid that fee?

10   A.   Peter Kalkanis.

11         MS. KUDLA:  And can we please publish Government

12   Exhibit 3.

13   Q.   Mr. Gordon, was that by cash or by check?

14   A.   By cash.

15         MS. KUDLA:  We can take down Government Exhibit 3.

16   Q.   And how was the cash presented to you, Mr. Gordon?

17   A.   In a white envelope.

18   Q.   And did the envelopes ever having anything written on them?

19   A.   Um, Chase sometimes.

20   Q.   Is that Chase Bank?

21   A.   Yes.

22         THE COURT:  You mean like the return address on the

23   envelope where it showed it was a Chase Bank envelope, is that

24   what you're saying?

25         THE WITNESS:  Yes.  It was a Chase Bank envelope.

1          THE COURT:  OK.

2    Q.  Did Mr. Duncan and Mr. Rainford also get paid the same

3    thousand dollar patient referral fee?

4    A.  Yes.

5    Q.  Now, setting aside the referral fee for the recruiters, did

6    a patient who referred another patient get a referral fee?

7    A.  Yes.

8    Q.  How much would they get?

9    A.  50 to $100.

10   Q.  And who paid that fee?

11   A.  Peter Kalkanis.

12   Q.  And was that by cash or by check?

13   A.  Cash.

14   Q.  How, if at all, did paying these referral fees to the

15   recruiters and to the patients help the recruitment process for

16   the scam?

17   A.  Um, a lot.  It boosted the numbers.

18   Q.  And boosted what numbers?

19   A.  The number of patients.

20   Q.  How important was the volume of patients to the

21   trip-and-fall scam, Mr. Gordon?

22   A.  Very important.

23   Q.  Can you explain to the jury why it was important to have a

24   lot of patients?

25   A.  Um, it increased the settlement amount.  Just in case

1   patients weren't found, there still was a lot of settlements in

2   the end within a year, a year or three.

3   Q.  Did it ever happen where patients, you just lost track of

4   patients?

5   A.  Yes.

6   Q.  Approximately how long, on average, did it take between

7   starting a lawsuit and settlement?

8   A.  Three years.

9   Q.  In addition to recruiting patients, did you ever drive

10  patients to appointments, Mr. Gordon?

11  A.  Yes.

12  Q.  And I think you already testified earlier today that you

13  could do both recruiting and driving at the same time?

14  A.  Yes.

15  Q.  Was Mr. Duncan and Mr. Rainford also driving and recruiting

16  patients at the same time?

17  A.  Yes.

18  Q.  When you were operating as a driver and a recruiter, how

19  many days a week were you working?

20  A.  Five days a week.

21  Q.  What about Mr. Duncan and Mr. Rainford?

22  A.  Five days a week.

23  Q.  Fair to say it was a full-time job?

24  A.  Yes.

25  Q.  Now, where were you picking up patients?

MBUsCON3                          Gordon - Direct

1  A.  All over the five boroughs.

2  Q.  Now, even though the locations were dispersed throughout

3  New York City, it sounds like, was there any commonalities

4  between the locations where the patients were coming from?

5  A.  Yes.

6  Q.  What was that?

7  A.  Poor, low income areas.

8  Q.  And when you say poor and low income areas, what do you

9  mean by that?

10 A.  Projects, homeless shelters.

11 Q.  Were you also recruiting patients from the same areas?

12 A.  Yes.

13 Q.  And using an example of five patients, approximately how

14 many trip-and-fall patients were recruited from homeless

15 shelters?

16 A.  Two to three.

17 Q.  And why were homeless shelters a place where many

18 trip-and-fall recruits came from?

19 A.  Um, they were desperate, they needed money, they didn't ask

20 a lot of questions.

21 Q.  I'm going to show you what's marked for identification as

22 Government Exhibit 211.

23      Mr. Gordon, do you recognize this building?

24 A.  Yes.

25 Q.  What is this?

MBUsCON3                    Gordon - Direct

 1    A.  A homeless shelter in Brooklyn.

 2    Q.  Did you ever recruit patients from this shelter?

 3    A.  Yes, yes.

 4            MS. KUDLA:  OK.  The government offers Government

 5    Exhibit 211.

 6            THE COURT:  Admitted without objection.

 7            (Government's Exhibit GX 211 received in evidence)

 8            MS. KUDLA:  Mr. Carbone, we can publish to the jury.

 9    BY MS. KUDLA:

10    Q.  Now that the jury can see this, is this the homeless

11    shelter in Brooklyn you said?

12    A.  Yes.

13    Q.  OK.  How often would you visit this shelter in a week?

14    A.  Two times.

15    Q.  And do you know if Mr. Duncan or Mr. Rainford also picked

16    up people from this location?

17    A.  Yes.

18    Q.  How do you know that, Mr. Gordon?

19    A.  Because I seen them there.

20    Q.  Did you visit other shelters in New York City?

21    A.  Yes.

22    Q.  Showing you what's marked for identification as Government

23    Exhibit 230.

24            Do you recognize this building?

25    A.  Yes.

1    Q.  And what is this?

2    A.  A homeless shelter in Brooklyn.

3    Q.  Did you ever visit this location?

4    A.  Yes.

5            MS. KUDLA:  The government offers Government Exhibit

6    230.

7            THE COURT:  Admitted without objection.

8            (Government's Exhibit GX 230 received in evidence)

9            MS. KUDLA:  Publish for the jury.

10   Q.  Now, apart from the locations of the patients where you

11   were picking them up, Mr. Gordon, were there any other signs

12   that they were poor or low income?

13   A.  Um, their appearance.

14   Q.  What about their appearance that gave that indication?

15   A.  They, um, they weren't the best dressed.

16           THE COURT:  Are you saying they would dress shabbily,

17   poorly?

18           THE WITNESS:  Yes.

19   Q.  Mr. Gordon, while you were driving the patients, did they

20   ever ask or talk to you for anything?

21   A.  Yes.

22   Q.  What would they ask you for?

23   A.  They would ask for money.  They would ask for food.

24   Q.  When you were driving patients to and from different

25   appointments, did they always get along in the car, the

1    patients?

2    A.   No.

3    Q.   Could you describe what you mean?

4    A.   Um, patients would be upset about another person's odor,

5    um, their behavior, how loud they're talking on the phone, um,

6    the smell of marijuana, alcohol.

7    Q.   Would you characterize this as an infrequent or frequent

8    occurrence where these type of disputes would come up?

9             MR. GANN:  Objection.

10            THE COURT:  I'll allow that.

11   A.   Frequent.

12            THE COURT:  When you say frequent, how often, if you

13   can estimate?

14            Are you talking about once every two weeks, once a

15   week, twice a week?

16            THE WITNESS:  Twice a week.

17   BY MS. KUDLA:

18   Q.   And, Mr. Gordon, you mentioned there would be complaints

19   about odor.

20            What type of complaints would you hear about body odor

21   in the car?

22   A.   The smell of marijuana and the smell of alcohol.

23            THE COURT:  Well, I take it -- Ms. Kudla asked you

24   about body odor.  Were these complaints about body odor?

25            THE WITNESS:  Yes.

```
 1   Q.  You described alcohol and marijuana.  Were there ever --
 2   I'll try to specify the question.
 3           Apart from alcohol and marijuana, were there ever
 4   complaints about just a personal hygiene odor?
 5   A.  Yes.
 6   Q.  And did any of the patients, based on your observations,
 7   that you were driving or recruiting have drug or alcohol
 8   problems?
 9           MR. GANN:  Objection.
10           THE COURT:  Sustained.
11   Q.  Now, Mr. Gordon, did the odors that you were just
12   describing to the jury, did any of those patients have those
13   odors when you were taking them to the sequence of appointments
14   that you've outlined?
15   A.  Yes.
16   Q.  And did that include to the lawyer's offices and the
17   doctor's offices?
18   A.  Yes.
19   Q.  Now, why were poor people essential to this scam?
20           MR. GANN:  Objection.
21           THE COURT:  Sustained.
22   Q.  Mr. Gordon, you previously testified that the typical
23   patient that was participating in the trip-and-fall scam was
24   poor.
25           Why did that variable help or hurt the scam in any
```

1  way?

2            MR. GANN:  Objection.

3            THE COURT:  I'll allow it.

4  A.  They were desperate and they needed money.  They didn't ask

5  a lot of questions.

6  Q.  And what would they do?

7  A.  They would do surgery.

8  Q.  You previously testified that patients would receive about

9  $1,500 on the day of surgery?

10  A.  Yes.

11  Q.  Based on the patients that you were driving, was that a lot

12  or a little amount of money to them?

13            MR. GANN:  Objection.

14            THE COURT:  Sustained.

15  Q.  Mr. Gordon, as part of the referral system, did anyone ever

16  recruit family members to do an accident?

17  A.  Yes.

18  Q.  And can you explain?

19  A.  Um, whenever I would get a funding contract signed, I would

20  see the same last name.

21            THE COURT:  The same last name as another?

22            THE WITNESS:  Another patient with the same last name

23  as the previous, from a contract that had been signed.

24  Q.  Now, while you were driving and recruiting patients, did

25  anyone, Mr. Gordon, ever appear seriously injured?

1  A.  No.

2  Q.  Did you ever give these patients direction to act as though

3  they were seriously injured?

4  A.  No.

5  Q.  And I want to be clear.  It sounds like you did give them

6  directions about staging an accident?

7  A.  Yes.

8  Q.  What percentage based on your participation in this scheme,

9  what percentage of the trip-and-fall cases that you were

10  driving or recruiting would you estimate were fake or staged

11  accidents?

12  A.  90 percent.

13          MR. GANN:  I'm sorry.  What was that answer?

14          THE WITNESS:  90 percent.

15  Q.  And based on your relationship with Mr. Duncan and

16  Mr. Rainford, what percentage of cases would you estimate were

17  fake or staged accidents that they were bringing in?

18  A.  90 percent.

19  Q.  So let's take a moment now and let's go through the

20  sequence that you've outlined in more detail.

21          After a patient had done his or her fake accident and

22  went to the ER, where did he go next in this operation?

23  A.  The lawyer's office.

24  Q.  Now, what attorney did you use most during this

25  trip-and-fall scam?

1          MR. GANN:  Objection.

2          THE COURT:  I'll allow that.

3   A.  George Constantine.

4          MS. KUDLA:  Please publish what's in evidence as

5   Government Exhibit 225.

6   Q.  Mr. Gordon, do you recognize the building in that exhibit?

7   A.  Yes.

8   Q.  What is that?

9   A.  George Constantine's office.

10  Q.  Now, where was Mr. Constantine's office located?

11  A.  Long Island City, Queens.

12  Q.  How frequently did you bring patients to Mr. Constantine's

13  office?

14  A.  Once a week.

15  Q.  And typically when would it occur?

16  A.  Um, either a Thursday or a Friday.

17  Q.  And do you recall what time you would be dropping people

18  off?

19  A.  Um, five, 530.

20  Q.  How many patients would you drop off each time you went?

21  A.  Two to three.

22  Q.  Were you the only driver doing this or were there others?

23  A.  There were others.

24  Q.  Who else?

25  A.  Bryan Duncan and Ryan Rainford.

1    Q.  Approximately how many patients were these driver's,

2    Mr. Rainford and Mr. Duncan, also bringing?

3    A.  One to three.

4    Q.  Is that each or together?

5    A.  Each.

6    Q.  And would you guys bring patients on the same day together

7    or different days?

8    A.  Same day.

9    Q.  In total on this intake day that you would be bringing

10   patients, approximately how many patients would come to

11   Mr. Constantine's office?

12   A.  Six to nine.

13          MS. KUDLA:  Let's publish what's in evidence as

14   Government Exhibit 220.

15   Q.  Mr. Gordon, what is this?

16   A.  The lobby area of George Constantine's office.

17          MS. KUDLA:  And let's publish 225 on the left and 220

18   on the right.

19   Q.  Just to orient the jury, where would Government Exhibit 220

20   be on 225?

21   A.  As soon as you walk through the black -- the gate door, the

22   black entrance door, that would be the lobby area you step in.

23   Q.  And where would patients typically wait for their

24   appointment was Mr. Constantine?

25   A.  The two chairs in Exhibit 220 or in the basement, the white

 1   door on the right.

 2             MS. KUDLA:  OK.  Now, can we keep those up,

 3   Mr. Carbone.  We're going to put those back up.

 4   Q.  I just want to ask you, with Government Exhibit 220, did

 5   the furniture layout, was it the same when you were dropping

 6   patients off?

 7   A.  No.

 8   Q.  How was it different?

 9   A.  There were two tables on the left and one table on the

10   right.

11   Q.  Did anybody sit at the tables that you just described?

12   A.  Yes.

13   Q.  Who?

14   A.  It was Robin and Victoria.

15   Q.  Who were Robin and Victoria?

16   A.  I believe they were two secretaries.

17   Q.  Did any of them have a part from just being a secretary, to

18   your knowledge, did any of them have a personal relationship

19   with Mr. Constantine?

20   A.  I believe it was Robin.

21   Q.  And what was the nature of her relationship with him,

22   Mr. Constantine?

23   A.  Married or divorced.

24   Q.  Now, did any of the patients that you were dropping off to

25   Mr. Constantine's office appear seriously injured?

1    A.   No.

2    Q.   What typically occurred when patients visited

3    Mr. Constantine's office?

4    A.   Um, intake in the basement.

5    Q.   We're going to get into what intake is.

6            Who would conduct the intake process?

7    A.   Peter Kalkanis.

8    Q.   And remind the jury what Mr. Kalkanis' role was in this

9    scheme?

10   A.   Case manager.

11   Q.   Where did the patients meet with Mr. Kalkanis for this

12   intake process?

13   A.   In the basement.

14           MS. KUDLA:  OK.  So can we please show the witness

15   what is marked for identification as Government Exhibit 222.

16   Q.   Mr. Gordon, do you recognize this photo?

17   A.   Yes.

18   Q.   What is this?

19   A.   The entrance going downstairs to the basement.

20           MS. KUDLA:  OK.  The government offers Government

21   Exhibit 222.

22           MR. GANN:  No objection.

23           THE COURT:  Admitted without objection.

24           (Government's Exhibit GX 222 received in evidence)

25           MS. KUDLA:  Please publish to the jury.

1           Please publish Government Exhibit 220 on the left and

2    222 on the right.

3    BY MS. KUDLA:

4    Q.   Just for orientation, Mr. Gordon, please explain how a

5    patient would go from the lobby area in 220 that you've

6    identified to the basement?

7    A.   They would enter the lobby area in 220 and make a right

8    down the white -- the white door which leads to the steps in

9    222 to the basement.

10           THE COURT:   Is that the door where the red oval has

11   just been placed?

12           THE WITNESS:   Yes.

13   Q.   And once entering that door, where would they go?

14   A.   To the basement.

15   Q.   Is that the staircase shown in 222?

16   A.   Yes.

17   Q.   Now let's focus on what happened in the basement.

18           Who, if anyone, was present with a patient meeting

19   with Mr. Kalkanis?

20   A.   Um, me, Bryan and Ryan.

21   Q.   What would occur during this meeting?

22   A.   Um, Peter Kalkanis would take in all the information on all

23   the patients, um, their discharge papers, date of accident,

24   injuries, yeah.

25   Q.   Now, what about photographs, did Mr. Kalkanis ever take

1    photographs during those meetings?

2    A.  Yes.  He would take -- if the patients had photos, he would

3    take it from them.

4    Q.  And how did the patients know to bring photographs if they

5    came with them?

6    A.  Either me or the recruiter would tell them.

7    Q.  What happened in the scenario where a patient did not bring

8    photographs?

9    A.  Um, either me or an investigator would be sent out to take

10   photos.

11   Q.  Now, what did you do when you were asked to take

12   photographs?

13   A.  To send them to Peter Kalkanis.

14   Q.  And who would ask you to take the photos?

15   A.  Peter Kalkanis.

16   Q.  Did he ever provide any instructions on what type of photo?

17   A.  Yes.

18   Q.  And what were those?

19   A.  Photos of a pothole with the storefront in the photo.

20   Q.  And why did the photographs matter?

21   A.  Um, it was the accident location to file the lawsuit.

22   Q.  Now, in front of you there's a CD and that CD contains

23   Government Exhibits 403 through 404 and 406 through 417.

24           Do you see that, Mr. Gordon?

25   A.  Yes.

1   Q.  And prior to your testimony here today, have you reviewed

2   these exhibits?

3   A.  Yes.

4   Q.  What are they?

5   A.  Photos of an accident.

6   Q.  And did you take those photographs?

7   A.  Yes.

8   Q.  And are those exhibits true and accurate photographs and

9   e-mails documented in those exhibits?

10  A.  Yes.

11          MS. KUDLA:  Government offers Government Exhibit 403

12  to 404 and 406 to 417.

13          MR. GANN:  Judge, I'm just not seeing them at the

14  moment.

15          THE COURT:  Put it on the screen.

16          MR. GANN:  Are they in pursuant to the stipulation?

17          MS. ROTHMAN:  Yes.

18          MR. GANN:  I don't see them on the screen.

19          MS. KUDLA:  Your Honor, they are in evidence.  My

20  apologies.

21          THE COURT:  All right.

22  BY MS. KUDLA:

23  Q.  Mr. Gordon, first of all, the photographs we're going to go

24  through them, were these all photographs related to the

25  trip-and-fall scam you've been describing?

1    A.  Yes.

2          MS. KUDLA:  Let's publish Government Exhibit 403.  And

3    can we highlight the earliest e-mail at the bottom.

4    Q.  Who sent this e-mail?

5    A.  Yes.

6    Q.  And who did you send it to?

7    A.  Peter Kalkanis.

8    Q.  Is that the e-mail address *drpdk@aol.com*?

9    A.  Yes.

10   Q.  And what is the date of this e-mail?

11   A.  February 8, 2014.

12   Q.  And what's the subject?

13   A.  Anthony Barton.

14         MS. KUDLA:  And we can take that down and I would like

15   it read the top portion.

16         This e-mail was forwarded to *SunsetManagementfunding@*

17   gmail.com and *g.constantinelaw@gmail.com* on February 8, 2014.

18         Mr. Carbone, could we just briefly scroll through

19   these photographs.

20         Now let's please publish Government Exhibit 407.

21   BY MS. KUDLA:

22   Q.  We'll try to run through these quickly, Mr. Gordon.

23         MS. KUDLA:  Let's focus on the top of the earliest

24   e-mail.  One down, Mr. Carbone.

25   Q.  Did you send this e-mail?

1    A.  Yes.

2    Q.  Who did you send it to?

3    A.  Peter Kalkanis.

4    Q.  And what's the date?

5    A.  February 28, 2014.

6    Q.  And what's the subject?

7    A.  This one.

8           MS. KUDLA:  And this e-mail was forwarded to

9    *sunsetmanagementfunding@.*

10   *gmail.com* and *g.constantinelaw@gmail.com* by Peter Kalkanis on

11   2/28/14.

12          Mr. Carbone, let's just scroll through.  This one

13   might just have one photograph.  That's it.  OK.

14          Let's publish Government Exhibit 408.

15   BY MS. KUDLA:

16   Q.  Looking at the earliest e-mail from *Kerry22*.  Did you send

17   this e-mail?

18   A.  Yes.

19   Q.  To whom?

20   A.  Peter Kalkanis.

21   Q.  What was the date?

22   A.  February 28, 2014.

23   Q.  And what was the subject?

24   A.  Jean Fougu.

25          MS. KUDLA:  And this e-mail was forwarded to

1   *sunsetmanagementfunding@gmail.com* and

2   *g.constantinelaw@gmail.com* on March 1, 2014.

3          Mr. Carbone, can you briefly scroll through these

4   photographs.

5          Can we now publish Government Exhibit 409.

6   Q.  Mr. Gordon, looking at the early section of this e-mail,

7   did you send this?

8   A.  Yes.

9   Q.  To whom?

10  A.  Peter Kalkanis.

11  Q.  And what was the date?

12  A.  March 9, 2014.

13  Q.  And what was the subject?

14  A.  Michael Noble.

15         MS. KUDLA:  And, Mr. Carbone, can we cull out the top

16  portion of this for each e-mail as well.

17         This e-mail was forwarded to *sunsetmanagementfunding@*

18  *gmail.com* and *g.constantinelaw@gmail.com* on March 9, 2014.

19         Mr. Carbone, can you please scroll through these

20  photographs.

21         Can you please publish now Government Exhibit 411.

22  Q.  Let's go through the same process, Mr. Gordon.

23         Did you send this e-mail?

24  A.  Yes.

25  Q.  To whom?

1    A.  Peter Kalkanis.

2    Q.  What's the date?

3    A.  March 9, 2014.

4    Q.  And the subject?

5    A.  Estefania Javier.

6         MS. KUDLA:  Let's take that down and highlight the top

7    portion.

8         This e-mail was sent from Peter Kalkanis on March 13,

9    2014, to *SunsetManagementfunding@gmail.com* and

10   *g.constantinelaw@gmail.com*.

11        Can we scroll through these photographs.

12        Can we publish Government Exhibit 412.

13   BY MS. KUDLA:

14   Q.  Mr. Gordon, did you send this e-mail?

15   A.  Yes.

16   Q.  To whom?

17   A.  Peter Kalkanis.

18   Q.  What is the date?

19   A.  April 11, 2014.

20   Q.  And what was the subject?

21   A.  Jonah Brown.

22        MS. KUDLA:  And take that down.  In the top, this

23   e-mail was forwarded to *darlene@necessityfunding.com* and

24   *g.constantinelaw@gmail.com* on 4/11/2014.

25        Mr. Carbone, please scroll through the paragraphs.

1              Please publish now Government Exhibit 413.

2  Q.  Mr. Gordon, did you send this e-mail?

3  A.  Yes.

4  Q.  To whom?

5  A.  Peter Kalkanis.

6  Q.  And what was the date?

7  A.  May 4, 2014.

8  Q.  And what was the subject?

9  A.  Alysha Joyner.

10  Q.  Bronx?

11  A.  Bronx.

12          MS. KUDLA:  And I'll look at the top.

13          This e-mail was forwarded from Peter Kalkanis to

14  *darlene@necessityfunding.com* and *g.constantinelaw@gmail.com.*

15          Darlene, see photos of site.  Address is 5687

16  Broadway, Bronx, New York.

17          Let's scroll through the photographs, please.

18          I'm going to publish now for the jury Government

19  Exhibit 404.

20  BY MS. KUDLA:

21  Q.  Mr. Gordon, did you send this e-mail?

22  A.  Yes.

23  Q.  Who did you send to?

24  A.  Peter Kalkanis.

25  Q.  And what's the date of this e-mail?

1    A.  February 8, 2014.

2    Q.  And what's the subject?

3    A.  Malik Walker.

4              MS. KUDLA:  And I'll cull out the top portion of this.

5              This e-mail was forwarded by Peter Kalkanis on

6    February 8, 2014, to *SunsetManagementfunding@gmail.com* copying

7    *g.constantinelaw@gmail.com*.

8              Let's scroll through the photographs.

9              We can take that down now, Mr. Carbone.

10   BY MS. KUDLA:

11   Q.  Who was Malik Walker?

12   A.  A patient.

13   Q.  And what do you recall about his appearances?

14   A.  Um, bald head.  Heavyset.

15   Q.  Did he have a fake accident as part of this scam?

16   A.  Yes.

17   Q.  And what was the nature of your relationship with him?

18              What do you remember?

19   A.  Um, I took him to -- to the accident site.

20   Q.  Let's go back to the intake process that you were

21   previously described in the basement.

22              You testified earlier, Mr. Gordon, that Mr. Kalkanis

23   would take down patient information, the discharge paperwork,

24   and photographs, if they were available.

25              In your presence, did Mr. Kalkanis reject any of the

MBUsCON3                        Gordon - Direct

1   trip-and-fall patients that either you or the other driver's

2   had brought in?

3   A.  Not in my presence.

4   Q.  How long did it take for a patient to complete this intake

5   process?

6   A.  Um, five minutes.

7   Q.  And is that for all the patients that were in the basement,

8   or just for one patient?

9   A.  For one patient.

10  Q.  What would happen after the forms had been completed and

11  collected, what was the next step?

12  A.  Um, Peter would walk the patients upstairs to see the

13  lawyer, George Constantine.

14  Q.  And when you say walk the patients upstairs, would he go

15  one at a time or with everyone?

16  A.  With everyone.

17  Q.  And what would you do during this time?

18  A.  Um, I would either be in the lobby area or in the front or

19  out in and about in the area.

20  Q.  When Mr. Kalkanis would bring the patients to meet with

21  Mr. Constantine, what, if any, paperwork did he take with him?

22  A.  The paperwork that he had downstairs in the basement.

23  Q.  Now, I'm going to show you what's marked for -- what's in

24  evidence as Government Exhibit 221.

25          MS. KUDLA:  We can publish.

1   Q.  Do you recognize this?

2   A.  Yes.

3   Q.  What is this?

4   A.  George Constantine's office.

5          MS. KUDLA:  And let's place 221 on the left and 220 on

6   the right, government exhibits.

7   Q.  And using Government Exhibits 220 and 221, can you explain

8   where Mr. Constantine's office was located?

9   A.  Straight down the hall to the left.

10  Q.  OK.  And looking at Government Exhibit 221, when you were

11  dropping off patients over the years, did the office look the

12  same as shown here?

13  A.  Yes.

14  Q.  And did that include also the wall?

15  A.  No.  There was no hole in 220.  There was no hole.

16  Q.  You're talking about -- let me clarify.

17         In Government Exhibit 220, is there any difference in

18  that photograph from when you were dropping patients off?

19  A.  Yes.  There was no hole on the wall in 220.

20  Q.  Now, looking at Government Exhibit 221, was there any

21  differences when you were dropping off patients to

22  Mr. Constantine's office than you see in this photograph?

23  A.  No.

24  Q.  Now, when Mr. Constantine met with the patients, to your

25  understanding, did he have those intake documents with him?

1    A.  Yes.

2    Q.  How did you know that?

3    A.  He would put -- it was in his hand and he would put it on

4    the table.

5            MS. KUDLA:  Your Honor, at this time, the government

6    offers Government Exhibit 221.

7            MR. GANN:  Judge, can I just have a moment?

8            THE COURT:  I thought 221 was admitted?

9            MR. GANN:  Could I have a moment?

10           Not just yet, but could I just have a moment on that?

11           THE COURT:  Of course.

12           (Pause)

13           MR. GANN:  Could I voir dire briefly on that, Judge?

14           THE COURT:  Yes.

15           MR. GANN:  Mr. Gordon, in what's been marked as

16   Government Exhibit 221, you're saying that is George

17   Constantine's office?

18           THE WITNESS:  Yes.

19           MR. GANN:  That's his personal office within the suite

20   that you've described?

21           THE WITNESS:  To my knowledge, yes.

22           MR. GANN:  You're sure of that?

23           THE WITNESS:  To my knowledge, yes.

24           MR. GANN:  Isn't that Dimitri -- I'm going to butcher

25   this name -- Dimitri Stephanopoulos' office?

MBUsCON3                    Gordon - Direct

1           THE WITNESS:  I don't know.

2           MR. GANN:  Dimitri Stephanopoulos.

3           THE WITNESS:  He may.

4           MR. GANN:  Also known as Jimmy?

5           MR. FOLLY:  Objection, your Honor.  Beyond the scope

6  of voir dire.

7           THE WITNESS:  I don't recall.

8           THE COURT:  I'll allow it to clear this up.

9           Do you know Jimmy?

10          THE WITNESS:  I -- I don't recall.

11          MR. GANN:  Do you know that there was another lawyer

12  that was sharing space, if you will, with Mr. Constantine?

13          MR. FOLLY:  Same objection.

14          THE COURT:  Sustained.

15          MR. GANN:  Judge, the problem that I have is --

16          THE COURT:  No.  Don't talk.  Ask questions.

17          MR. GANN:  How do you know that that's --

18          THE COURT:  Just a moment.

19          MR. GANN:  Let me withdraw for a second.  Let me

20  withdraw that.

21          THE COURT:  Sir, did you come up with the paperwork

22  from the basement?

23          THE WITNESS:  Not personally.

24          THE COURT:  Did you meet with Mr. Constantine -- did

25  you meet Mr. Constantine in the office that is represented at

1    221?

2              THE WITNESS:  Did I sit with him?

3              THE COURT:  No.  Were you there when he was there?

4              THE WITNESS:  No.  Peter sat with the patient.

5              THE COURT:  OK.  Go ahead.

6              MR. GANN:  Is it possible to zoom in on the -- on

7    portions of that Exhibit 221?

8              Could you show on the left side, on the left side of

9    the photograph as we're looking at it, could you zoom in on the

10   diplomas that are on the wall there?

11             Not those.

12             Can we see those?  We can't see them.

13             THE COURT:  It's not legible to me.

14             MR. GANN:  Mr. Gordon, I'm going to ask you to take a

15   look at what's been zoomed in on Exhibit 221.

16             There is a framed picture on the wall there, correct?

17             THE WITNESS:  Correct.

18             MR. GANN:  Can you read any portion of what is on

19   that?

20             Just read it to yourself.

21             THE WITNESS:  I can't -- I can't read that.  Sorry.

22             MR. GANN:  OK.  I'm sorry.  Can you zoom in --

23             THE COURT:  Were you ever in this office, sir?

24             THE WITNESS:  Um, I wasn't in the intake.

25             THE COURT:  No.  Did you ever physically go into that

1    office?

2              THE WITNESS:  Yeah.  I stepped in once, twice.

3              THE COURT:  And the one time you were there, was

4    Mr. Constantine there?

5              THE WITNESS:  Yes, he was there.

6              THE COURT:  OK.

7              MR. GANN:  Judge, if I could just approach Mr. Carbone

8    for a second --

9              THE COURT:  Go ahead.

10              MR. GANN:  -- try and clarify this?

11              THE COURT:  To your knowledge, did you see other

12    lawyers in Mr. Constantine's suite?

13              MS. KUDLA:  Your Honor, I can probably just shortcut

14    this and move on.  I don't have to offer Government Exhibit

15    221.

16              THE COURT:  Move on.

17    BY MS. KUDLA:

18    Q.  Mr. Gordon, just to clear up the confusion, were there ever

19    occasions you were called into Mr. Constantine's office?

20              THE COURT:  Take that photo down.

21    A.  Yes.

22    Q.  And was it your understanding you had identified -- can we

23    pull up Government Exhibit 225.

24              When you were called into Mr. Constantine's office,

25    was it located inside the building in Government Exhibit 225?

1    A.  Yes.

2    Q.  And was the basement that you identified where the intake

3    would occur, was that also in Government Exhibit 225?

4    A.  Yes.

5    Q.  OK.  Now, typically how long would Mr. Constantine meet

6    with each patient?

7    A.  Um, five minutes to ten -- less than ten minutes.

8    Q.  And how would you know that?

9         Where were you?

10   A.  I would in the lobby area, I would be in the front, I would

11   be in the area.

12   Q.  Did Mr. Constantine meet with the patients individually or

13   as a group?

14   A.  Individually.

15   Q.  And how do you know that?

16   A.  I had to drive them back.

17   Q.  Would you ever observe patients going into

18   Mr. Constantine's office?

19   A.  Yes.

20   Q.  And would they go in individually or as a group?

21   A.  Individually.

22   Q.  Now, after they had the initial meeting with

23   Mr. Constantine, when if ever did these patients see

24   Mr. Constantine again?

25        MR. GANN:  Objection.

1           THE COURT:  Yes, if you know.

2   A.  From my understanding, it would be deposition --

3           MR. GANN:  Objection.

4           THE COURT:  Sustained.

5   A.  Deposition.

6           THE COURT:  No.  The jury will disregard.

7   BY MS. KUDLA:

8   Q.  Mr. Gordon, I'll ask it another way.

9           You said you participated as a driver?

10  A.  Yes.

11  Q.  How many years did you do that?

12  A.  Eight years.

13  Q.  And did you drive patients to various appointments?

14  A.  Yes.

15  Q.  And what were the legal appointments, if any, that you

16  would drive them to?

17  A.  Depositions.

18  Q.  Did the appointments, did the patients typically have any

19  other type of legal appointment apart from the deposition that

20  you are aware of?

21          MR. GANN:  Objection.

22          THE COURT:  I'll allow it.

23          MR. GANN:  I don't know how this witness could know

24  that, Judge.

25          THE COURT:  Let him answer.

MBUsCON3                           Gordon - Direct

1   A.  Um, the deposition is all I could recall.

2   Q.  And typically would you drive patients to their

3   depositions?

4   A.  Sometimes, yes.

5   Q.  Now, do you recall any other legal appointments that you

6   would drive them to besides that?

7   A.  No.

8           MR. GANN:  Objection.

9           THE COURT:  I will allow it.

10  A.  I don't recall other legal.

11  Q.  Now, how many years did you drop off new trip-and-fall

12  patients off at Mr. Constantine's office?

13  A.  Five years.

14  Q.  Approximately how many trip-and-fall patients would you

15  estimate you and other driver's brought to Mr. Constantine's

16  office?

17  A.  Hundreds.

18  Q.  Did Mr. Constantine ever reject any patients in your

19  presence that were brought to his office?

20  A.  Not to my knowledge.

21  Q.  After meeting with Mr. Constantine, where did the patients

22  go next in this trip-and-fall scam?

23  A.  Physical therapy.

24  Q.  Who would they typically meet with at physical therapy?

25  A.  Chiropractor.

MBUsCON3                        Gordon - Direct

1    Q.  Who were the children that you frequently took

2    trip-and-fall patients to?

3    A.  Dr. Krieger, Millennium, Dr. Martin.

4    Q.  Showing you what's marked for identification as Government

5    Exhibit 213.

6            Do you recognize the building here?

7    A.  Yes.

8    Q.  And what is this?

9    A.  This is physical therapy in Queens.

10   Q.  And what was the name of this physical therapy?

11   A.  It was Millennium.

12          MS. KUDLA:  OK.  The government offers Government

13   Exhibit 213.

14          MR. GANN:  No objection.

15          THE COURT:  I'm sorry.  Was there an objection?

16          MR. GANN:  No, there wasn't from my perspective,

17   Judge.

18          MS. KUDLA:  You can publish to the jury.

19          THE COURT:  Received.

20          (Government's Exhibit GX 213 received in evidence)

21   BY MS. KUDLA:

22   Q.  Now that the jury can see the photo, what was the name of

23   this physical therapy?

24   A.  Millennium.

25          MS. KUDLA:  And showing you what's marked -- what is

1    in evidence as Government Exhibit 212.  Publish.

2              I apologize.  Take it down, Mr. Carbone.

3              Show it for the witness only, what is Government

4    Exhibit 212.

5    Q.  Mr. Gordon, do you recognize the building here?

6    A.  Yes.

7    Q.  And what is this?

8    A.  Physical therapy, chiropractor.

9    Q.  And who worked here?

10   A.  Dr. Martin.

11             MS. KUDLA:  Government offers Government Exhibit 212.

12             THE COURT:  Admitted without objection.

13             (Government's Exhibit GX 212 received in evidence)

14             MS. KUDLA:  Now we can publish for the jury.

15             Can we please publish what is in evidence as

16   Government Exhibit 207.

17   BY MS. KUDLA:

18   Q.  What is shown in this photograph here?

19   A.  Dr. Krieger's chiropractic office.

20             MS. KUDLA:  Now can we please place on the screen 207,

21   212, and 213.

22   Q.  Mr. Gordon, how many patients at a time would you take to

23   these physical therapy chiropractic offices?

24   A.  One to three.

25   Q.  And how many times per week were you taking patients here?

1    A.  Um, once a week.

2    Q.  And were other driver's, Mr. Duncan, and Mr. Rainford doing

3    the same?

4    A.  Yes.

5    Q.  And explain why physical therapy was necessary for this

6    scam?

7    A.  Um, to make it look real, and we needed the MRI report.

8    Q.  How did the physical therapy play in with the MRI report?

9    A.  It was needed to schedule -- it was needed to schedule the

10    doctor's appointment for surgery.

11    Q.  And who at physical therapy specifically to order the MRI

12    report?

13    A.  The chiropractor.

14         MS. KUDLA:  Now we can take those down, Mr. Carbone.

15    Thank you.

16    Q.  Did any of the patients that you drove to physical therapy

17    appear physically injured?

18    A.  No.

19    Q.  Did you ever coach patients about what they had to say or

20    do at physical therapy, Mr. Gordon?

21    A.  No.

22    Q.  Were there any issues getting patients to go to physical

23    therapy?

24    A.  Yes.

25    Q.  What were those issues?

1  A.  Um, patient's phone numbers was off or they just didn't

2  answer the phone at all.

3  Q.  Were patients typically paid in the same way as surgery for

4  physical therapy?

5  A.  No.

6  Q.  Now I want to focus on MRIs.  You've testified about those.

7       You previously testified that after physical therapy,

8  the patients typically went for an MRI, is that correct?

9  A.  Correct.

10  Q.  Now, where did you take patients for MRIs?

11  A.  All County AMI.

12  Q.  I'm going to show you what's marked for identification as

13  Government Exhibit 202.

14       Do you recognize that building?

15  A.  Yes.

16  Q.  What is it?

17  A.  AMI.

18       MS. KUDLA:  Government offers Government Exhibit 202.

19       THE COURT:  Admitted.

20       (Government's Exhibit GX 202 received in evidence)

21       MS. KUDLA:  Can we please publish Government Exhibit

22  201, which is in evidence on the left, and Government Exhibit

23  202 on the right.

24  BY MS. KUDLA:

25  Q.  Mr. Gordon, what is the building in Government Exhibit 201?

1    A.   All County.

2    Q.   Now, where was All County and AMI MRI Centers located, what

3    borrow?

4    A.   Queens.

5    Q.   During your entire course of participating in this scam,

6    did you ever drive patients to any other MRI facilities besides

7    these two?

8    A.   No.

9    Q.   How frequently would you take patients to either All County

10   or AMI?

11   A.   Once a week.

12   Q.   And typically how many patients were you taking at a time?

13   A.   One to three.

14   Q.   Were Mr. Duncan and Mr. Rainford doing the same thing

15   during this time period?

16   A.   Yes.

17   Q.   Why was it necessary for patients to have an MRI,

18   Mr. Gordon?

19   A.   To show positive results to get them scheduled for surgery.

20   Q.   So you mentioned positive results.

21        Mr. Gordon, do you have any medical training?

22   A.   No.

23   Q.   So in your lay person understanding, what did it mean for

24   you to -- for a patient to have positive results?

25   A.   That would show a tear, herniation, a bulge.

1  Q.  What percentage of the trip-and-fall patients that you were

2  driving had positive results, MRI results?

3  A.  95 percent, that I know of.

4  Q.  Mr. Gordon, you testified earlier that you estimated that

5  90 percent of the trip-and-fall patients had fake accidents.

6          Do you recall that?

7  A.  Yes.

8  Q.  Can you explain how all the patients who had fake accidents

9  ended up with positive MRIs?

10 A.  No.

11 Q.  On the limited occasions when there was a negative MRI

12 result, what, if anything, was done?

13 A.  Peter Kalkanis would ask for a second opinion.

14 Q.  And did you ever have to drive one of those patients who

15 was getting a second opinion?

16 A.  No.

17 Q.  As part of your participation in this trip-and-fall

18 operation, did you ever come to learn who owned AMI facility?

19 A.  Yes.

20 Q.  Who was that?

21 A.  Adrian Alexander.

22          MS. KUDLA:  Can we please publish what is in evidence

23 as Government Exhibit 4.

24 Q.  Can you remind the jury what role Mr. Alexander had in this

25 trip-and-fall operation?

1    A.  Yes.  He was the funder.

2    Q.  And what company did he own?

3    A.  Health Finance and Cash Settlement.

4            MS. KUDLA:  You can take that down now.  Thank you,

5    Mr. Carbone.

6    Q.  Now, once a trip-and-fall patient had their MRI, what was

7    the next step?

8    A.  Schedule them a doctor's appointment.

9    Q.  And what type of doctor's appointment specifically?

10   A.  Um, shoulder, knee, or back.

11   Q.  Were these doctor's appointments for surgeries or something

12   else?

13   A.  Um, for surgery.

14   Q.  Now, what was the average timeline between a patient's

15   initial intake and then the first surgery?

16   A.  Two months.

17           MR. GANN:  Objection.

18   A.  Two or three months.

19           THE COURT:  I'll allow that.

20   A.  Two to three months.

21   Q.  Who is one of the main shoulder and knee surgeons you drove

22   patients to?

23   A.  Dr. Dowd.

24   Q.  And who was one of the main back surgeons you drove

25   patients to?

1    A.  Dr. Ribeiro.

2    Q.  So we're going to talk about surgeries, but first I want to

3    ask you about the funding agreements that you've mentioned

4    today.  OK?

5    A.  Yes.

6    Q.  Prior to any surgery, were there any type of particular

7    contracts or documents that needed to be completed?

8    A.  Yes, funding agreement.

9    Q.  And are you familiar with funding agreements?

10   A.  Yes.

11   Q.  Why?

12   A.  I opened up my own funding company.

13   Q.  And apart from opening up your own funding company as a

14   driver, did you have any experience with funding contracts?

15   A.  Yes.

16   Q.  In what way?

17   A.  I had to get them signed, the patients.

18   Q.  At a high level, what is a funding agreement?

19   A.  A funding agreement is an agreement between patient and

20   funder where a patient sells a portion of his case.

21   Q.  In exchange, what does the funder agree to pay for, if

22   anything?

23   A.  All medical expenses and surgery.

24   Q.  Now, without the money from the funder, could the

25   trip-and-fall patients pay for their own medical procedures?

1           MR. GANN:  Objection.

2  A.  No.

3           THE COURT:  I'll allow it.

4  A.  No.  Not to my knowledge, no.

5  Q.  And how does the funder provide the money to the patient,

6  in what form?

7  A.  Check.

8  Q.  And would it be that check a type of loan or cash advance?

9  A.  Cash advance, correct.

10  Q.  Now, was there any interest that was on this cash advance?

11  A.  Yes.

12  Q.  For clarity, is a cash advance, Mr. Gordon, similar to a

13  loan?

14  A.  Yes.

15  Q.  Now, typically what interest rate, would it be high or low,

16  that would be on this loan?

17  A.  It would be high.

18  Q.  And when does the patient pay back the loan in the interest

19  rate, if ever?

20  A.  At settlement of the case.

21  Q.  If a patient has a second surgery in this scam, did they

22  need another funding agreement, or can they use the same one as

23  before?

24  A.  You need another funding agreement.

25  Q.  Were funding agreements in this scam optional or required?

1    A.  Required.

2            MS. KUDLA:  Let's please publish what's in evidence as

3    Government Exhibit 1253H at page two.

4            Let's cull out the first paragraph, please.

5    Q.  I think it will be helpful, Mr. Gordon, to walk through an

6    example.

7            Hold on one second.  We're going to get this up for

8    you.

9            So, first of all, what is shown on page two of 1253H?

10   A.  The patient's information.

11   Q.  What type of agreement is this?

12   A.  This is a funding agreement.

13   Q.  And let's cull this out.

14           Who is the patient here?

15   A.  Kasheem Jones.

16   Q.  And what is the funder?

17   A.  Weingarten Financial Funding.

18   Q.  And is this a similar funding company to Health Finance?

19   A.  Yes.

20   Q.  Now, in this contract, the Kasheem Jones is referred to as

21   the seller and Weingarten is the purchaser.

22           Why are those titles being used?

23   A.  Kasheem Jones is selling a portion of his case to

24   Weingarten Financial Funding.

25   Q.  I'm going to turn to the third where as clause now in this

1    contract.  I'll read this.  It says:

2              Whereas seller desires to sell and purchaser desires

3    to purchase, for the sum of $16,200 payable as follows:

4    $11,500 payable to Sady Ribeiro Pain Management PC; $500

5    payable to Krieger Chiropractic; $1,500 payable to Kasheem

6    Jones; $1,000 payable to All County LLC; and $1700 payable to

7    Peter Kalkanis, a contingent interest in the proceeds from

8    litigation with all relevant information disclosed below.

9              First of all, who is Sady Ribeiro Pain Management?

10   A.   Sady Ribeiro is the back doctor.

11   Q.   And Krieger Chiropractic, who is getting the money there?

12   A.   The chiropractor.

13   Q.   $1,500 is given to whom?

14   A.   Kasheem Jones.

15   Q.   And what is that in this contract?

16   A.   The patient.

17   Q.   And then why does All County get $1,000?

18   A.   MRI.

19   Q.   And then why does Mr. Kalkanis get $1700?

20   A.   Case broker.  Case manager.

21   Q.   Who is paying all of these amounts that are listed here?

22   A.   Weingarten Financial Group -- Financial Funding.

23   Q.   That's the litigation funder?

24   A.   Yes.

25   Q.   Typically when are these amounts that are outlined in the

1    agreement paid for?

2    A.  The day of or the day before surgery.

3    Q.  Now, you mentioned that these loans --

4            MS. KUDLA:  We can take the cull that down, but stay

5    in the document, Mr. Carbone.

6    Q.  You mentioned that these loans have an interest rate.

7            Do you see the interest rate reflected on this

8    agreement?

9    A.  Yes.

10   Q.  Where?

11   A.  Monthly usage, 4.25 percent per month, compounding.

12           THE COURT:  Blow that up, please.

13   Q.  Is this the interest rate that you just referred to in the

14   agreement?

15   A.  Yes.

16   Q.  And what is the interest method that's listed?

17   A.  Compounding.

18   Q.  Mr. Gordon, are these the terms typical to funding

19   agreements that you've seen?

20   A.  Yes.

21   Q.  And did that include agreements with Health Finance that

22   was run by Mr. Alexander?

23   A.  Yes.

24   Q.  Let's turn to page 13 of this document.

25           Mr. Gordon, what type of funding -- what type of

1    document are we looking at here?

2    A.   Second funding.

3    Q.   And who is --

4         MS. KUDLA:  Can we cull out the first paragraph,

5    please.

6    Q.   Who is the patient?

7    A.   Kasheem Jones.

8    Q.   And who is the funder here?

9    A.   Weingarten Financial Funding.

10   Q.   And remind us why a second funding agreement is needed?

11   A.   It's for a second surgery.

12        MS. KUDLA:  Can we cull out the third whereas

13   paragraph.

14   Q.   Based on the individuals listed in this paragraph, what

15   type of surgery is Mr. Jones receiving?

16   A.   Knee or shoulder.

17   Q.   How do you know?

18   A.   Dr. Dowd.

19        MS. KUDLA:  Now can we please turn to page 20 of this

20   document.

21   Q.   Mr. Gordon, does a patient typically sign these documents?

22   A.   Yes.

23        MS. KUDLA:  And let's turn to page 22.

24   Q.   What about the lawyer?

25   A.   Yes.

MBUsCON3                          Gordon - Direct

1    Q.  What, if any, way -- you had mentioned as a driver that you

2    would assist in getting patients to sign these documents, is

3    that correct?

4    A.  Correct.

5    Q.  How would you do that, Mr. Gordon?

6         Describe that.

7    A.  I would pick up the patient and take them to a notary.

8    Q.  And how many times would you estimate you did this during

9    the course of the scam?

10   A.  Um, a lot.  I couldn't put a number on it.

11   Q.  And when you would do that to get their signature, did you

12   ever explain this agreement to them?

13   A.  No.

14   Q.  And was Mr. Constantine ever present on any of those

15   occasions when you were getting the patient's signature?

16   A.  No.

17   Q.  Who, if anyone, ever explained the funding agreements to

18   the patients when they signed it?

19              MR. GANN:  Objection.

20              THE COURT:  If he knows.

21   A.  I --

22              THE COURT:  Answer if you know.

23   A.  No.  No one.

24              MS. KUDLA:  Your Honor, I think this is a decent

25   stopping point, if the court would like.

1              THE COURT:  All right.  It's time for lunch.

2              Ladies and gentlemen, let's take a lunch.  Be back at

3    ten after two.  I think it's very windy and very rainy out

4    there, so be careful.  If you're having lunch in the jury

5    deliberation room, you don't have to be -- well, you should

6    always be careful.

7              Enjoy your lunch.

8              (Jury not present)

9              THE COURT:  You may step down, sir.

10             (Witness temporarily excused)

11             Ten after 2:00.  Thank you.

12             (Luncheon recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

MBUVCON4                     Gordon - Direct

1              A F T E R N O O N   S E S S I O N

2                          2:20 P.M.

3          (Jury present)

4          THE COURT:  Please be seated in the courtroom.

5          You may continue with your direct examination of this

6   witness, Ms. Kudla.

7          MS. KUDLA:  Thank you, your Honor.

8          As a housekeeping matter, I failed to offer the

9   nameplate the witness testified to, Ryan Rainford, which is

10  Government Exhibit 11A nameplate; and Peter Kalkanis,

11  Government Exhibit Nameplate 3A.  I'd offer those at this time.

12         THE COURT:  Admitted.

13         (Government's Exhibits 3A, 11A received in evidence)

14  BY MS. KUDLA:

15  Q.  Mr. Gordon, we left off this morning talking about funding

16  agreements in that they were needed prior to surgery, do you

17  recall that?

18  A.  Yes.

19  Q.  I want to take a moment now and focus on the surgeries that

20  the trip-and-fall patients were having.

21         You previously testified that Dr. Dowd was the primary

22  knee and shoulder surgeon for this operation; is that correct?

23  A.  Yes.

24  Q.  Okay.  Where was Dr. Dowd's offices or office?

25  A.  One office was on 1975 Linden Boulevard.

MBUVCON4                        Gordon - Direct

```
 1   Q.  And did he have any other office?

 2   A.  Yes, in Valley Stream.  I don't know the address.

 3   Q.  Okay.  And where was the Valley Stream office located, like

 4   what area of New York?

 5   A.  Valley Stream, Long Island.

 6            MS. KUDLA:  Can we show for the witness what's marked

 7   for identification as Government Exhibit 231.

 8   Q.  Mr. Gordon, do you recognize this building?

 9   A.  Yes.

10   Q.  What is this?

11   A.  This is Dr. Dowd's office.

12   Q.  Which one?

13   A.  1975 Linden Boulevard.

14            MS. KUDLA:  We offer Government Exhibit 231.

15            THE COURT:  Admitted.

16            (Government's Exhibit 231 received in evidence)

17            MS. KUDLA:  And please publish, Mr. Carbone, for the

18   jury.

19   Q.  Now, did Dr. Dowd perform surgeries at either the Linden

20   Boulevard location shown here in Government Exhibit 231 or the

21   Valley Stream location?

22   A.  No.

23   Q.  Where did Dr. Dowd perform surgeries?

24   A.  New York Surgery Center.

25            MS. KUDLA:  Please publish what's in evidence as
```

1   Government Exhibit 209.

2   Q.  Do you recognize this building?

3   A.  Yes.

4   Q.  What is this?

5   A.  New York Surgery Center.

6   Q.  And Mr. Gordon, what borough was the New York Surgical

7   Center located in?

8   A.  Queens.

9   Q.  Did you drive patients to both Dr. Dowd's offices and the

10  New York Surgical Center?

11  A.  Yes.

12  Q.  Approximately how many times a week would you go to each

13  location?

14  A.  Once a week.

15          MS. KUDLA:  And Mr. Carbone, we could take down 209

16  now.  Thank you.

17  Q.  Let's focus on Dr. Dowd's offices, the Linden Boulevard and

18  the Valley Stream locations.  Why would you take patients to

19  those offices?

20  A.  For initial evaluation before surgery.

21  Q.  And by contrast, why were you taking patients to the New

22  York Surgical Center?

23  A.  For surgery.

24  Q.  How many preoperative exams would a patient have with Dr.

25  Dowd before surgery?

1    A.  One.

2    Q.  Was this the first time that a trip-and-fall patient would

3    meet with Dr. Dowd?

4    A.  Yes.

5    Q.  And on average, Mr. Gordon, how much time would elapse

6    between the preoperative exam and then surgery?

7              MR. KEATING:  Objection.

8              THE COURT:  If you know.

9    A.  One week.

10   Q.  And to be clear, Mr. Gordon, were you driving patients to

11   these appointments?

12   A.  Yes.

13   Q.  Typically, how many patients at a time would you bring to

14   Dr. Dowd's offices for the pre-op appointment?

15   A.  One to three.

16   Q.  And were Mr. Duncan and Mr. Rainford doing the same?

17   A.  Yes.

18   Q.  Did any of the patients that you drove to Dr. Dowd's office

19   appear seriously injured?

20   A.  No.

21   Q.  And did you ever coach patients, Mr. Gordon, about what to

22   say to Dr. Dowd?

23   A.  No.

24   Q.  What about how to act in the exam?

25   A.  No.

1   Q.  On average, how long did it take for Dr. Dowd to meet with

2   each patient you would drop off?

3   A.  Less than ten minutes.

4   Q.  And did you ever attend any of these pre-op appointments?

5   A.  Yes.

6   Q.  Why?  How did that happen?

7   A.  I was in the lobby area with the patient, and Dr. Dowd

8   invited me and the patient in at the same time.

9   Q.  Was Dr. Dowd aware that you were a patient driver?

10  A.  Yes.

11  Q.  And how do you know that?

12  A.  He would tell me to be on time for surgery.

13  Q.  Did Dr. Dowd ever express any concerns to you about having

14  the driver sit in on patient medical examinations?

15  A.  No.

16  Q.  Approximately how many pre-op exams would you say you

17  observed for Dr. Dowd?

18  A.  About ten.

19  Q.  What did Dr. Dowd's physical examination room look like?

20  A.  Medical bed with a sheet, about two chairs.

21  Q.  Apart from Dr. Dowd, were there any other medical

22  professionals that were in the room for these pre-op exams?

23  A.  No.

24  Q.  What paperwork, if any, did Dr. Dowd have during the pre-op

25  exam?

1  A.  The MRI report.

2  Q.  And when you say "MRI report," are you referring to a paper

3  report or a CD with images?

4  A.  A paper report.

5  Q.  Describe what would occur during a Dr. Dowd pre-op

6  appointment.

7  A.  Dr. Dowd would read the MRI results to the patient and get

8  them scheduled for the next available surgery date.

9  Q.  Typically, how long would these appointments last?

10  A.  Less than ten minutes.

11  Q.  After Dr. Dowd was scheduling the patient for surgery, did

12  any of the patients have any questions about the specific

13  surgical procedure?

14  A.  Just one that I could recall.

15  Q.  And that was out of the -- all of the pre-op exams that you

16  saw?

17  A.  Yeah.

18  Q.  In your presence, did Dr. Dowd ever ask a patient about his

19  or her prior medical history?

20  A.  I don't recall.

21  Q.  Did Dr. Dowd ever ask a patient to describe in detail how

22  they injured himself or herself?

23  A.  I don't recall.

24        THE COURT:  You mean you don't recall him ever doing

25  it or you don't recall one way or the other?

1            THE WITNESS:  One way or the other.

2            THE COURT:  All right.

3   Q.  Did you ever hear Dr. Dowd ask a patient to describe how

4   the injury was impacting his or her life in any way?

5   A.  No.

6   Q.  In your presence, did Dr. Dowd ever conduct any physical

7   exams with the patients?

8   A.  I seen it happen one time.

9   Q.  So in all of the appointments that you sat in, you only saw

10  it occur once?

11  A.  It was his back facing me, so I couldn't tell you exactly

12  what he was doing.

13  Q.  What did you observe?

14  A.  He pulled the chair up and he was in front, sitting in

15  front of the patient.  He was talking to the patient.  I

16  couldn't tell you verbatim what he was saying.  And I'm

17  assuming he touched the knee.

18  Q.  And what position was the patient in at the time that he

19  touched the knee?

20  A.  Sitting up on the medical bed.

21  Q.  Approximately how long did this interaction last for of

22  touching of the knee?

23  A.  Not long.

24  Q.  Did you ever observe Dr. Dowd asking a patient to lie down

25  on the medical bed?

1    A.  Don't recall.

2    Q.  Sitting here today, are you saying you don't recall that

3    ever happening or it never happened?

4    A.  I don't -- I don't remember it happening.

5    Q.  Did you ever hear Dr. Dowd present any alternatives to

6    surgery?

7    A.  No.

8    Q.  Did you ever hear Dr. Dowd explain any of the risks

9    associated with surgery?

10   A.  No.

11   Q.  Now, Mr. Gordon, you testified earlier about needing a

12   positive MRI result, do you recall that?

13   A.  Yes.

14   Q.  Were there ever any instances where you were present and

15   Dr. Dowd received a negative MRI report?

16   A.  Yes.

17   Q.  Can you describe what happened -- first of all, how many

18   times did that happen?

19   A.  One time I recollect.

20   Q.  Okay, Mr. Gordon.  Can you describe to the jury what

21   happened on that one time.

22   A.  Dr. Dowd received a fax from, I believe, Peter Kalkanis on

23   the MRI report.  And the results were negative.  And he told

24   the patient that there was no findings on the MRI, but he can

25   go in and explore the shoulder or I'm not sure what body part

1    it was.

2    Q.  Who was present while you were observing this?

3    A.  Me, the patient, and Dr. Dowd.

4    Q.  And to be clear, was this one of the patients that you had

5    brought in as part of the trip-and-fall scam?

6    A.  Yes.

7    Q.  What did the patient say when Dr. Dowd said he could go in

8    and explore in light of the negative result?

9    A.  Yes.

10            THE COURT:  No, the question is what, if anything, did

11    the patient say?

12            THE WITNESS:  The patient said yes, he can go in and

13    explore.

14            THE COURT:  Okay.  Thank you.

15    Q.  Now, did you ever observe any disturbances amongst the

16    trip-and-fall patients at Dr. Dowd's offices?

17    A.  Yes.

18    Q.  Did you ever receive complaints about these disturbances?

19    A.  Yes.

20    Q.  Can you provide an example of a complaint that you

21    received?

22    A.  One complaint was marijuana smoking in the parking lot.

23    Q.  And how did that come up?

24    A.  I received a call from Peter Kalkanis about it.

25    Q.  And what did he say to you about that complaint?

1   A.  He told me to see what's going on with the patients.

2   Q.  Was Mr. Kalkanis present at Dr. Dowd's offices when this

3   complaint came in?

4   A.  No.

5   Q.  Then how did he know about it?

6           MR. KEATING:  Objection.

7           THE COURT:  If you know.

8   A.  Maybe he received the call --

9           THE COURT:  No, no, no.  The jury doesn't want to hear

10  a guess.  If you don't know, you don't know.

11          THE WITNESS:  I don't know.

12  Q.  Well, Mr. Gordon, at the time that you received the call

13  about the marijuana, what was the problem?

14  A.  Patients were smoking weed in the parking lot.

15  Q.  And what, if anything, did you have to do?

16  A.  Resolve the issue.

17  Q.  And did any of the patients you ever transported to Dr.

18  Dowd have the odor of marijuana on them before going to the

19  appointment with Dr. Dowd?

20  A.  Yes.

21  Q.  What about alcohol?

22  A.  Yes.

23  Q.  Did Dr. Dowd ever ask you about this?

24  A.  No.

25  Q.  Mr. Gordon, are you familiar with the name Frank Andrews?

 1   A.  Yes.

 2   Q.  Who is Frank Andrews?

 3   A.  A patient I referred, recruited.

 4   Q.  And where did you refer him from?

 5   A.  Physical therapy location in Queens.

 6   Q.  And where was Mr. Andrews living at the time that he was

 7   recruited?

 8   A.  A shelter.

 9   Q.  Was Mr. Andrews a fake accident like the others that you've

10   described?

11   A.  Yes.

12   Q.  And did you assist with this fake accident in any way?

13   A.  Yes.

14   Q.  How?

15   A.  I took him to a location to stage a fall.

16        MS. KUDLA:  Can we please publish what's in evidence

17   as Government Exhibit 1006G.  Now, can we call out where it

18   says "application information," the middle section there.

19   Q.  Mr. Gordon, what are we looking at in Government Exhibit

20   1006G?

21   A.  Peter Kalkanis intake form.

22   Q.  And who is the patient for?

23   A.  Frank Andrews.

24   Q.  And where does it say Mr. Andrews lives?

25   A.  160-11 89th Avenue, Jamaica, New York, 11432.

```
 1    Q.  And who does it say referred Mr. Andrews?

 2    A.  It was referred by Mahadi, but he put my name in

 3    parentheses.

 4    Q.  Why would he put your name in parentheses as well?

 5    A.  Because I'm assuming he wanted me to give Mahadi the money,

 6    I'm assuming.

 7    Q.  Who was Mahadi, Mr. Gordon?

 8    A.  Mahadi was a recruiter.

 9    Q.  And who did Mahadi bring patients to?

10    A.  Peter Kalkanis.

11    Q.  And was this all part of the trip-and-fall scam?

12    A.  Yes.

13    Q.  Now --

14            MS. KUDLA:  Let's take that down, Government Exhibit

15    1006.  We can take it.  Thank you, Mr. Carbone.

16    Q.  Did Mr. Andrews ever visit Dr. Dowd's office?

17    A.  Yes.

18    Q.  Were there ever any disturbances involving Mr. Andrews at

19    Dr. Dowd's office?

20            MR. KEATING:  Your Honor, if the witness was present.

21            THE COURT:  Yes.

22    Q.  Were you ever present for any disturbances involving

23    Mr. Andrews at Dr. Dowd's office?

24    A.  Yes.

25    Q.  And where were you during that time?
```

1    A.    In the patient room with Dr. Dowd and the patient.

2    Q.    And what happened?

3    A.    There was a small commotion about patient acting rowdy in

4    the lower lobby area.

5    Q.    And what did Dr. Dowd do as a result of the commotion?

6    A.    He stepped out of the room.

7    Q.    And what did you do?

8    A.    I received a call to go fix the issue with Frank Andrews.

9    Q.    And what was the issue with Frank Andrews?

10   A.    He -- he had gotten a candy bar stuck in the vending

11   machine.

12   Q.    And what was he doing?

13   A.    Shaking the machine.

14   Q.    How did the issue get resolved?

15   A.    I gave him a dollar.

16   Q.    And were there any other issues going on at the same time?

17   A.    Patients were allowed on the phone in the lobby area, and a

18   few patients -- in the waiting area.  And a few patients were

19   smoking in the parking lot during this time.

20             THE COURT:  Smoking what?

21             THE WITNESS:  Marijuana.

22   Q.    How did you resolve these three situations?

23   A.    I gave Frank Andrews a dollar, I told the patients that

24   were allowed on the phone to talk outside, and the patients

25   smoking marijuana in the parking lot to take a walk up the

MBUVCON4                          Gordon - Direct

1    block.

2    Q.  Mr. Gordon, just to be clear, were the patients causing

3    these commotions trip-and-fall patients or some other type of

4    patients?

5    A.  Trip-and-fall patients.

6    Q.  Had you brought those patients that day?

7    A.  Yes.

8    Q.  Were there other patients in the waiting room apart from

9    the trip-and-fall patients?

10   A.  Yes.

11   Q.  And who were making the disturbances?

12   A.  The trip-and-fall patients.

13   Q.  Did Dr. Dowd ever ask you about these disturbances from the

14   trip-and-fall patients?

15   A.  No.

16   Q.  Let's turn now to the New York Surgical Center.  Can you

17   just briefly describe what the process was for the day of

18   surgery for these patients.

19   A.  Patients had to wake up early and they couldn't eat after

20   midnight.

21          MS. KUDLA:  Can we publish what is in evidence as

22   Government Exhibits 226 through 228.

23   Q.  Mr. Gordon, what is shown in these three exhibits on the

24   screen?

25   A.  226 shows the entrance to New York Surgery Center; 228

1    shows the waiting area at the New York Surgery Center; 227

2    shows the recovery room to the New York Surgery Center.

3    Q.  We'll leave these exhibits up.

4              And I want to ask you, how many patients on average

5    would you take to the New York Surgical Center on a set day for

6    Dr. Dowd's surgeries?

7    A.  One to three patients.

8    Q.  And would you be the only driver bringing patients to Dr.

9    Dowd on that day for surgeries?

10   A.  No.

11   Q.  Who else would be doing the same?

12   A.  Bryan Duncan and Ryan Rainford.

13   Q.  On an average surgical day, how many trip-and-fall patients

14   would Dr. Dowd see?

15   A.  Six to nine.

16   Q.  After the patients were dropped off, what would happen?

17   A.  The day of --

18   Q.  Yes, the day of surgery, Mr. Gordon.

19   A.  They would get surgery on that day.

20   Q.  When did the patients get picked up?

21   A.  After surgery.

22   Q.  And did the patients get paid for the surgical procedures?

23   A.  Yes.

24   Q.  And how much typically?

25   A.  $1500.

MBUVCON4                              Gordon – Direct

1   Q.  When did the patient get paid?

2   A.  After surgery.

3   Q.  And who would pay them?

4   A.  Peter Kalkanis.

5   Q.  Did the drivers ever pay them?

6   A.  Yes.

7   Q.  And did you ever pay patients?

8   A.  Yes.

9   Q.  Did any patients ever get paid while still at the surgical

10  center?

11  A.  Yes.

12  Q.  How?

13  A.  Peter would go in the recovery room.

14  Q.  Now, when did Dr. Dowd get paid for the surgeries?

15  A.  Usually the day before or the day of.

16  Q.  And when you say "the day of," are you referring to the day

17  of surgery?

18  A.  Yes, the day of surgery.

19  Q.  Did Dr. Dowd ever pay a referral fee for the trip-and-fall

20  patients that you guys were bringing to his office?

21  A.  Yes.

22         MS. KUDLA:  And Mr. Carbone, we could take down these

23  exhibits now.

24  Q.  Who did he pay?

25  A.  Peter Kalkanis.

1   Q.  And how do you know?

2   A.  Peter Kalkanis sent me to pick up -- pick up something from

3   Dr. Dowd.  It was in a white envelope.  I put it to the light

4   and it was -- I'm assuming it was $1500.

5   Q.  Well, I think you used the -- I want to be clear about

6   something.  When you put it up to the light, what did you see?

7   A.  $1500.

8   Q.  In what form, was it a check or cash?

9   A.  It was a check.

10  Q.  And who was that check made out to?

11  A.  Peter Kalkanis.

12  Q.  Following surgery, what percentage of the trip-and-fall

13  patients would return to Dr. Dowd's office for follow-up

14  appointments?

15  A.  Thirty to 40 percent.

16  Q.  Did Dr. Dowd ever raise this as an issue with you or the

17  other drivers?

18  A.  No, not to me.

19  Q.  Did patients have stitches as a result of their knee or

20  shoulder surgery?

21  A.  Yes.

22  Q.  And how did they get their stitches removed, if at all?

23  A.  I wouldn't know.

24  Q.  Did you ever hear of any occasion -- did any patients ever

25  talk to you about occasions of removing stitches?

1    A.   Yes.

2    Q.   And what did they say, if anything?

3    A.   "I removed the stitches myself."

4    Q.   I want to switch gears for a minute and talk about Dr.

5    Ribeiro.  Who was Dr. Ribeiro?

6    A.   The back surgeon for the trip-and-fall.

7    Q.   Now, how frequently did you drive patients each week to see

8    Dr. Ribeiro?

9    A.   Once a week.

10   Q.   And were other drivers doing the same, Mr. Gordon?

11   A.   Yes.

12   Q.   How many times, if any, did Dr. Ribeiro meet with patients

13   before the surgery?

14   A.   Once a week.  Once per -- once before surgery.

15   Q.   Okay.  So just so the record is clear, I'll ask you again.

16   How many times did Dr. Ribeiro meet with the patient before

17   surgery?

18   A.   One time.

19   Q.   How many patients would you typically take to meet with Dr.

20   Ribeiro each time for a pre-op appointment?

21   A.   One to three patients.

22   Q.   And did any of the patients you drove to Dr. Ribeiro appear

23   seriously injured?

24   A.   No.

25   Q.   Did you ever coach patients about what they had to say to

1    Dr. Ribeiro at the appointment?

2    A.   No.

3    Q.   Where did Dr. Ribeiro perform his back surgeries?

4    A.   New York Surgery Center.

5    Q.   And did you drop patients off for back surgery on the same

6    day -- with Dr. Ribeiro on the same day that you would do knee

7    and shoulder with Dr. Dowd or were they different days?

8    A.   Usually different days, but it happens a few times.

9    Q.   Now, can you just describe a surgical day for Dr. Ribeiro.

10   A.   Surgical day would be early in the morning; don't eat after

11   midnight.

12   Q.   Are those the instructions that would be given to the

13   patients?

14   A.   Yes.

15   Q.   When did the patients get dropped off and picked up on Dr.

16   Ribeiro's surgical days?

17   A.   When did they get picked up?

18   Q.   When would they get dropped off and when would they

19   typically get picked up?

20   A.   The morning of surgery and after surgery.

21   Q.   When did patients get paid for the back surgeries?

22   A.   After surgery.

23   Q.   And when did Dr. Ribeiro get paid?

24   A.   Usually Peter Kalkanis usually dealt with Dr. Ribeiro, but

25   I'm assuming -- well, it would be the day of or the day before

1    surgery.

2    Q.  Did Dr. Ribeiro pay for trip-and-fall patient referrals

3    like Dr. Dowd?

4    A.  I never picked up any money from Dr. Ribeiro.  But Peter

5    mentioned over the phone, I heard him mention money with Dr.

6    Ribeiro.

7    Q.  And when the conversation that you've heard with Dr.

8    Kalkanis, was there any part of the conversation that indicated

9    that it was referral fees?

10   A.  Yes.

11   Q.  And what was that?

12   A.  Peter was going to deposit a check for him, that's all I --

13   I could remember about it.

14   Q.  And when you say "him," are you referring to Dr. Ribeiro?

15   A.  Yes.

16   Q.  Would there be any reason that Mr. Kalkanis would need to

17   be depositing checks for Dr. Ribeiro, apart from patient

18   referral fees?

19   A.  Not that I know of.

20   Q.  Mr. Gordon, you testified earlier that you were picking up

21   and driving patients from all five boroughs.  Do you recall

22   that?

23   A.  Yes.

24   Q.  So in a situation where a patient lived in Brooklyn or in

25   the Bronx, would you still bring them to all of the medical

MBUVCON4                        Gordon - Direct

1   locations that you identified in Queens today?

2   A.  Yes.

3   Q.  So let's step away from the surgeries for a moment and

4   let's turn back to the lawsuits, Mr. Gordon.

5           Did there ever come a time when a trip-and-fall

6   patient needed to have a deposition?

7   A.  Yes.

8   Q.  And did this time for the deposition typically occur before

9   or after the surgical procedures?

10  A.  After.

11  Q.  How, if at all, were you involved in this portion of the

12  process?

13  A.  I would drive patients, some patients, to their deposition.

14  Q.  Did you ever have conversations with Mr. Constantine about

15  the depositions?

16  A.  A few, a few conversations, through text.

17  Q.  And what were the nature of those conversations?

18  A.  It would be whether they are doing good or bad.

19  Q.  Anything more than that?

20  A.  No, not that I know of.

21  Q.  When a case settled, what was the average amount of a

22  settlement?

23          MR. GANN:  Objection.

24          THE COURT:  Do you know what all of the case

25  settlements were?

MBUVCON4                          Gordon - Direct

1                    THE WITNESS:  Not all.

2                    THE COURT:  What percentage do you think you knew of?

3                    THE WITNESS:  I'm sorry, I can't put a number on it.

4                    THE COURT:  All right.  On those that you knew, can

5      you estimate what the average amount of the settlement was?

6                    THE WITNESS:  I would say 100,000, 150,000.

7                    MS. KUDLA:  Thank you, your Honor.

8      BY MS. KUDLA:

9      Q.  During the trip-and-fall operation, did any of these scam

10     participants mention Travelers Insurance?

11     A.  Peter Kalkanis mentioned it.  I don't remember a patient

12     mentioning it.

13     Q.  What did Mr. Kalkanis say?

14     A.  He mentioned that George had a few of Travelers' cases.

15     Q.  After that conversation, did you hear anything else about

16     Travelers?

17     A.  No.

18     Q.  So, Mr. Gordon, up until now you've testified mostly about

19     working for Mr. Kalkanis.  During this time, who was the

20     primary litigation funder that Mr. Kalkanis was working with?

21     A.  Health Finance.

22     Q.  And who owned Health Finance?

23     A.  Adrian Alexander.

24     Q.  And during this same time period, who's the primary

25     attorney that Mr. Kalkanis was working with?

MBUVCON4                          Gordon - Direct

1    A.  George Constantine.

2    Q.  Did there ever come a time when these relationships

3    changed?

4    A.  Yes.

5    Q.  And what happened?

6    A.  Adrian stopped working with Peter Kalkanis, and George

7    stopped taking cases.

8    Q.  Well, we're going to --

9            THE COURT:  When you say "George," who do you mean?

10           THE WITNESS:  George Constantine stopped taking cases.

11           THE COURT:  Who's Adrian?

12           THE WITNESS:  I'm sorry?

13           THE COURT:  When you say "Adrian," what do you mean?

14           THE WITNESS:  Adrian stopped working with Peter

15   Kalkanis as far as funding his cases.

16   BY MS. KUDLA:

17   Q.  And let's take this one step at a time.

18           First of all, did Mr. Alexander ever tell you why he

19   stopped working with Mr. Kalkanis?

20   A.  Yes.

21   Q.  And what did he say?

22   A.  He said Peter Kalkanis is forging patients' funded

23   agreements.

24   Q.  And how, if at all, is that -- what was Mr. Alexander's

25   reaction to that?

MBUVCON4                          Gordon - Direct

1   A.  His reaction was upset; and he felt that he wasn't going to

2   get paid during settlement.

3   Q.  Why would having someone forge the funding agreement affect

4   whether or not Mr. Alexander got paid at the time of

5   settlement?

6   A.  He felt that a patient can dispute it and say, I never

7   signed this document, so why am I paying you?  As far as the

8   funder, paying the funder back.

9   Q.  Now, approximately when did this split between

10  Mr. Alexander and Mr. Kalkanis occur?

11  A.  2015.

12  Q.  You also mentioned Mr. Constantine stopped taking cases.

13          First of all, did Mr. Constantine continue to work

14  with Mr. Kalkanis after this, around this time period?

15  A.  Did he continue -- no.

16  Q.  And did you continue to work for either Mr. Kalkanis or

17  Mr. Alexander at around this time period?

18  A.  Mr. Alexander.

19  Q.  Did anyone else do the same?

20  A.  Yes.

21  Q.  Who?

22  A.  Bryan Duncan.

23  Q.  How did you and Mr. Duncan start working for the funder,

24  Mr. Alexander?

25  A.  Dr. Ribeiro set up a meeting with Adrian Alexander.

MBUVCON4                          Gordon - Direct

1   Q.  Prior to this meeting getting set up, did you ever have a
2   lot of direct contact with Mr. Alexander?
3   A.  No.
4   Q.  What happened at the meeting that Mr. Ribeiro set up?
5   A.  Adrian Alexander complained about working with Peter
6   Kalkanis.
7   Q.  And what, if anything, else happened?  Did he ever ask you
8   to do anything?
9   A.  Yes, he asked me to help him sell a portion of some funding
10  agreements that Peter forged.
11  Q.  And who was the attorney on those funding agreements?
12  A.  George Constantine.
13  Q.  And did he also ask Mr. Duncan to do the same?
14  A.  Yes.
15  Q.  Did Mr. Alexander want to continue the trip-and-fall
16  funding cases?
17  A.  Yes.
18  Q.  And what role, if any, did he want you and Mr. Duncan to
19  play?
20  A.  Case manager.
21  Q.  And what would you be doing as a case manager?
22  A.  Overseeing the case throughout the litigation.
23  Q.  And to be clear, during the time period of this split, did
24  the scam continue to operate in the same way that you've
25  previously described with the fake trip and falls?

1   A.  Yes.

2   Q.  Now, how did this change in operations change how you were

3   getting paid, if at all?

4   A.  I guess me and Bryan Duncan opened up a company.

5   Q.  And what was the name of your company?

6   A.  D&G Premiere Solutions.

7   Q.  Now, did you, Mr. Alexander, and Mr. Duncan want to

8   continue working with Mr. Constantine?

9   A.  Yes.

10  Q.  And you mentioned earlier that Mr. Constantine stopped

11  taking cases.  Explain what you mean by that.

12  A.  He was no longer working with Peter and he stopped taking

13  cases.

14  Q.  And when you say "stopped taking cases," are you referring

15  to new cases or something else?

16  A.  New cases.

17  Q.  What happened to the existing cases that you had with

18  Mr. Constantine?

19  A.  We were still overseeing those cases.

20  Q.  And did Mr. Constantine remain the attorney on those cases?

21  A.  Yes.

22  Q.  And were those the same cases with the trip-and-fall

23  patients that you had recruited in the manner that you've

24  described earlier today?

25  A.  Yes.

1           MS. KUDLA:  Now, can we please publish Government

2    Exhibit 436.  This is in evidence.  And can we call up the top

3    portion of this email.

4    Q.  Mr. Gordon, did you receive this email?

5    A.  Yes.

6    Q.  Who sent it to you?

7    A.  Dr. Ribeiro.

8    Q.  And what's the date of this email?

9    A.  January 29th, 2015.

10   Q.  And who else, apart from you, did he send this to?

11   A.  Bryan Duncan.

12   Q.  And around January 29, 2015, what was going on at this

13   point in time?

14   A.  We were splitting.  They were splitting from George

15   Constantine and Adrian Alexander.

16   Q.  And what's the subject?

17   A.  "This was the message I sent Dr. Rodrigues.  Read and

18   delete."

19   Q.  Who is Dr. Rodrigues?

20   A.  A chiropractor.

21   Q.  Now, before moving on to the text of this email, did Dr.

22   Ribeiro send you other emails during the course of the scheme

23   that said "read and delete"?

24   A.  Yes.

25   Q.  And did he ever send you messages that did not have this

1  instruction to read and delete?

2  A.  Yes.

3  Q.  So typically, when did Dr. Ribeiro ask you to read and

4  delete messages?

5  A.  When it pertained to personal -- fraudulent cases.

6  Q.  When you say the fraudulent cases, are you referring to the

7  trip-and-fall cases?

8  A.  Yes.

9  Q.  Now, I'm going to read the message to doctor -- that

10  Mr. Ribeiro sent to Dr. Rodrigues.

11          We can meet Saturday morning around 10 a.m., place

12  called Point Brazil, 31 Avenue with 38 Street.  These are

13  personal injuries, (trip-and-fall injury) that it be brought to

14  you by a networking of referrals.  You take the history,

15  document areas that are painful, do an oriented physical exam.

16  Ask for an MRI.  Recommend PT.  Follow up.  If they do not get

17  better, you referral them to orthopedic shoulders knee problems

18  (with MRI) spine problems to me with MRI.  Funder will pay your

19  service and PT.  Do not worry, you will be paid.  There will be

20  some expenses with marketing.  Guys will explain to you.  I can

21  give you more details when we meet.

22          What is Dr. Ribeiro describing here?

23  A.  He's describing the trip-and-fall process.

24  Q.  And did he accurately describe it with the documenting to

25  go first to PT, then to an MRI, and off to the doctors, and

MBUVCON4                          Gordon - Direct

1   knee and shoulder, and then to spine problems?

2   A.  Yes.

3   Q.  After the split, did you continue to use Dr. Ribeiro as a

4   back surgeon for these cases?

5   A.  Yes.

6           MS. KUDLA:  We can take that down now.

7           Thank you, Mr. Carbone.

8   Q.  Did you, Mr. Alexander, and Mr. Duncan continue to use Dr.

9   Dowd?

10  A.  No.

11  Q.  Why not?

12  A.  I met with Dr. Dowd to discuss marketing, and I mentioned

13  $1500 paid in marketing fees.  He said no.  He said he'll agree

14  to pay 500, and then we never referred him patients after that.

15          THE COURT:  Are you saying that you were asking to be

16  paid $1500 per patient in order to refer a patient to Dowd?

17          THE WITNESS:  Correct.

18          THE COURT:  And your response -- his response was

19  what?

20          THE WITNESS:  His response was no, he can pay 500.

21          THE COURT:  All right.

22  BY MS. KUDLA:

23  Q.  How did you feel about the $500 offer for patient referrals

24  that Dr. Dowd made to you?

25  A.  I wasn't happy -- I wasn't happy about it.

MBUVCON4                    Gordon - Direct

1    Q.  Why not?

2    A.  Because I seen that he was paying Peter Kalkanis $1500.

3    Q.  During that discussion, did Dr. Dowd express any

4    reservations about continuing to accept trip-and-fall patients,

5    setting aside the referral fee?

6    A.  No.

7    Q.  Why did you even first feel comfortable asking Dr. Dowd

8    about these marketing referral fees?

9    A.  I knew he was paying Peter Kalkanis.

10   Q.  Now, approximately when did this conversation with Dr. Dowd

11   occur?

12   A.  2015.

13   Q.  After this conversation, did you, Mr. Duncan, or

14   Mr. Alexander send any new patients to Dr. Dowd for surgery?

15   A.  No.

16   Q.  Did Dr. Dowd continue to do surgeries on patients that had

17   already been scheduled?

18   A.  Yes.

19   Q.  And did Dr. Dowd continue to send patient information when

20   needed to you or Mr. Duncan for patients that had surgeries

21   with him?

22   A.  Yes.

23   Q.  Now, let's step away from Mr. Ribeiro and Mr. Dowd for a

24   moment.  What happened to Mr. Kalkanis after the split?

25   A.  He continued working with Ryan Rainford, with another

1    attorney.

2    Q.  Between the split in 2015 and your arrest in 2018, did you

3    continue to work with Mr. Alexander and Mr. Duncan on the

4    trip-and-fall scam?

5    A.  Yes.

6    Q.  And did you continue to work with Mr. Constantine on the

7    existing cases prior to the 2015 split?

8    A.  Yes.

9    Q.  Mr. Gordon, you testified earlier that the average length

10   of a lawsuit was about three years.  Did I get that correct?

11   A.  Correct.

12   Q.  Were there any issues managing the trip-and-fall patients

13   for this long of a period of time?

14   A.  Yes.

15   Q.  And what were some of the biggest challenges managing these

16   patients?

17   A.  Some patients, they would change phone numbers or they

18   would move.

19   Q.  And if they would change phone numbers and move, how did

20   that cause a problem for you guys?

21   A.  It caused a problem with trying to find them for

22   depositions and doctors' appointments.

23   Q.  What percentage of the trip-and-fall patients had working

24   phone numbers at the time of intake in the basement at

25   Mr. Constantine's office?

MBUVCON4                        Gordon - Direct

1   A.  Ninety-five percent.

2   Q.  What percentage of the trip-and-fall patients would have

3   their phone numbers changed or disconnected over the course of

4   the lawsuit?

5   A.  Eighty, 90 percent.

6   Q.  And would this typically happen once or more than once over

7   the course of the lawsuit?

8   A.  More than once.

9        MS. KUDLA:  Can we please publish what's in evidence

10  as Government Exhibit 1604A.  And let's call out the top

11  participants.

12  Q.  Mr. Gordon, who are these text messages between?

13  A.  It's between me and Robin.

14       MS. KUDLA:  And we can take the callout down.

15  Q.  Who and was Robin, can you remind the jury again?

16  A.  Secretary in George Constantine's office.

17  Q.  And what was her relationship to Mr. Constantine?

18  A.  From my understanding, wife or ex-wife.

19  Q.  So what I'd like to do is I'd like to read these text

20  messages.  I will read Ms. Robin's messages on the left, and

21  please read your own.  I'll call out the date of the messages.

22       I recognize, Mr. Gordon, that the text is a little bit

23  small; so if you have any trouble, let me know.

24       September 8th, 2014, Robin writes:  Hi Kerry.  Monique

25  Pearson just showed up in the office.  She says she's getting

1  the runaround from you.  What should I tell her?  Do you know

2  how long that's going to be?

3  A.  Peter is waiting for the money from the lender, which is

4  true.  I don't -- if I say Thursday, it's not Thursday, she

5  will go crazy.  She just has to wait.

6  Q.  Robin writes back:  I got rid of her.

7          September 18, 2014:  Hi.  Do you have a new number for

8  Monique Pearson?  I have 347 -- it provides a number.  And it

9  doesn't appear to be working.  She has a 50-h hearing tomorrow.

10          Robin writes, September 19, 2014:  Monique Pearson is

11  looking for money and you.  She has called twice already.

12          Please move to the next page.

13          And you respond?

14  A.  LOL.  I'll call her.

15  Q.  Robin writes back:  Okay.  Thanks.

16          September 22nd, 2014:  Monique is on the phone.  Says

17  you won't pick up.  She has no minutes left.  Can you pick up

18  your phone?  She is using someone else's phone.

19  A.  Okay.

20  Q.  September 29th, 2014, Robin writes:  Can you find out if

21  Robert Hines is available for his deposition?  I left him a

22  voicemail, but his phone was screwy.

23  A.  He's ready.

24  Q.  October 21st, 2014:  Can you find out if Terrance Erving is

25  available tomorrow for his deposition?

1    A.   Okay.

2    Q.   His phone doesn't work.  Shawque Shaw is asking for money

3    for a phone and to buy her daughter a coat.  What should I tell

4    her?

5              October 2nd, 2014:  Okay.  Laugh out loud.

6    A.   No.  Tell her to call Peter or me.

7    Q.   October 27, 2014, Robin writes:  Hey there, I left a

8    message for Tony Jenkins about his deposition tomorrow.  I've

9    not heard from him.  Do you know if he'll be available?

10   A.   Give me a minute.

11   Q.   December 1st, 2014.  Robin writes:  Good morning.  Do you

12   have a new number for Malike Walker?  Both numbers I have do

13   not work.  Or can you find out if he's available tomorrow for

14   his deposition?

15   A.   Okay.

16   Q.   Robin writes:  Thanks.  Have you heard from him?

17             December 3rd, 2014:  Hi there.  Do you have a new

18   number for Thomas Murphy?  929, provides a number, is no longer

19   in service.

20   A.   I wrote:  The number I had.  Want me to read the number?

21   Q.   No, that's okay.

22             December 15, 2014, Robin writes:  Hi Kerry.  Do you

23   have a new number for Nicole Rivera?  347, number, is not in

24   service.

25             December 17, 2014, Robin writes:  Hi there.  Eduardo

MBUVCON4                    Gordon - Direct

1    Ortiz deposition tomorrow, 880 River Avenue, Bronx.  He must be

2    there at 9 a.m., no excuses.

3    A.   Okay.

4    Q.   December 17, 2014, Robin writes:  Yeah, you have to keep

5    calling.  His voicemail doesn't work.  I've been calling, but

6    he does not pick up.  Maybe you will have some luck.  516, and

7    provides a number.

8    A.   Do you have a new number on him?

9    Q.   Robin writes on January 5th, 2015:  Hi there.  Do you have

10   a new number for Jerri Patterson?  347 is the last number we

11   have and doesn't accept calls.

12   A.   I'll see.

13   Q.   Robin writes on January 7, 2015:  Hi there.  Can you get in

14   touch with Corey Holley or give me a new number for him.  His

15   deposition was adjourned to 3/9/15.  The number I have is 917.

16   That doesn't work.  Thanks.

17   A.   Okay.  Then I provide a new number.

18   Q.   Thanks.  Do you have a number for Shakeyer Price?

19   A.   And then I provide a new number.

20   Q.   Robin writes on January 9, 2015:  A new number.  And then

21   she says he -- that's you.  I apologize, Mr. Gordon.

22         Robin writes on January 12, 2015:  Can you get in

23   touch with Jerri Patterson and tell her her deposition has been

24   adjourned.  I don't have a working number.

25   A.   Okay.

Q.  January 13, 2015:  Do you have Marion Benjamin's number?

Thanks.

A.  Then I provide a number.

Q.  Do you have a number for Nina Jenkins?  January 20, 2015.

A.  Then I provide a number.

Q.  January 20, 2015, Robin writes:  That one is no good.

A.  Then I provide a number.

Q.  Laugh out loud.  Do you have a number for Terrance Erving?
January 20, 2015.  Can you tell Nina Jenkins her deposition was
adjourned until March 31st?

A.  Okay.

Q.  On January 2nd, 2015, Robin writes:  Do you know if Damion
Stewart is out of the psych ward?  His deposition is tomorrow.

A.  Yes.  Just spoke to him.

Q.  Okay.  Is he available?  Okay.  Thanks.  I will call him.

        February 5th, 2015:  Do you have a working number for
Malike Walker?  He has a deposition tomorrow and I need to know
if he's available.

A.  Let me see.

Q.  Robin writes:  Okay.

A.  Phone off.

Q.  On February 17, 2015, Robin writes:  Do you have Gerald
Russell's money?  He is in jail.  Did you know that?

A.  Yes.  I spoke to him from jail, LOL.

Q.  Robin writes:  Oh, he wants it sent to him somehow.

MBUVCON4                         Gordon - Direct

1    A.  I know.

2    Q.  Oh, okay.  Because he just called.

3         On February 18, 2015, Robin writes:  Good morning.

4    Cromers deposition is going forward tomorrow.  He has to be

5    picked up in Staten Island and be in Brooklyn at 9 a.m.  Very

6    important that he is there at 9.  Can you do that?

7    A.  Yeah.

8    Q.  Robin writes:  He is at 75 Vanderbilt Avenue, Staten

9    Island.  It's a place called Project Hospitality.  Deposition

10   is at 16 Court Street, Diamond Reporting, ninth floor.  The

11   phone number of the place is, and provides.

12   A.  Phone number.

13   Q.  I'm not sure -- Robin writes:  I'm not sure his phone is

14   working, but he is calling me in an hour.

15   A.  Okay.

16   Q.  He is going to call you.  The caller ID says Project

17   Hospitality.  Can you take Tony Jenkins tomorrow to his

18   deposition?  He has to be there at 9 a.m.  Vitale Reporting

19   8900 Sutphin Boulevard, Suite 302.  I only have his girlfriends

20   number.  Do you want that?

21   A.  Yeah.

22   Q.  Do you have a new number for Damion Stewart?

23   A.  I provide the number.

24   Q.  That's the one I have.  It just rings and then goes busy.

25   A.  Text him.

MBUVCON4                        Gordon - Direct

1    Q.  Do you have a number for Shada Dupree?

2    A.  No, but I can reach her.

3    Q.  Is Jesse Leger in jail?

4    A.  I'll find out.

5    Q.  Okay.

6           MS. KUDLA:  We can take that down.

7    Q.  Were messages like those that we just read from Robin

8    common or uncommon, in your experience, to you?

9    A.  Common.

10   Q.  What, if anything, Mr. Gordon, was done to minimize the

11   risk of these patients disappearing?

12   A.  Peter Kalkanis would use incentives; he would provide a

13   patient money at the deposition.

14   Q.  And would money be provided at other points in time?

15   A.  Yes.

16   Q.  Was Mr. Kalkanis the only one to use this technique?

17   A.  No.

18   Q.  Did Mr. Alexander ever communicate with Mr. Constantine

19   about these issues?

20   A.  Yes.

21   Q.  I'm showing you what's in evidence as Government Exhibit

22   455.

23           MS. KUDLA:  And can we call out the email.

24   Q.  Who sent this message?

25   A.  Adrian Alexander.

1   Q.  And who did he send it to?

2   A.  Me, Bryan Duncan, Jamie, Susi Belli, and George

3   Constantine.

4   Q.  And what's the date of this email?

5   A.  May 20, 2015.

6   Q.  What's the subject?

7   A.  Assistance to our clients.

8   Q.  Mr. Gordon, who is Jamie?

9   A.  Adrian Alexander's assistant.

10  Q.  And in the email, do you know who Susi Belli is?

11  A.  No.

12  Q.  Who is conlaw@optonline.com?

13  A.  George Constantine.

14  Q.  Now, the email says:  Dear all:  One of our concerns is to

15  keep our clients financially stable throughout the litigation

16  period one to three years.  I'm considering to give every

17  client a monthly payment of $200 while waiting for settlement.

18  I'm still working out the mechanics of it, but would like to

19  get your opinions.

20          What was the idea Mr. Alexander was proposing?

21  A.  He was proposing to use money as an incentive to make

22  patients go to their appointments.

23  Q.  Now, to your knowledge, did Mr. Constantine ever reply to

24  this email?

25  A.  No.

1    Q.  Even if Mr. Constantine did not respond, did Mr. Alexander

2    and others continue to communicate with him about these issues?

3    A.  Yes.

4            MS. KUDLA:  Can we please show what's in evidence as

5    Government Exhibit 456.

6    Q.  And who sent this email?

7    A.  Adrian Alexander.

8    Q.  And who did he send it to?

9    A.  Jamie, George Constantine, Bryan Duncan, and me.

10   Q.  And identify again the email address associated with

11   Mr. Constantine?

12   A.  Conlaw@optonline.com.

13   Q.  And what's the subject?

14   A.  "New plan."

15   Q.  And the date of this is May 28, 2015.  It says:  250 per

16   month first four months, then four times 250 every four months.

17           What was Mr. Alexander describing here?

18   A.  He changed the money amount for the incentive for the

19   clients to go to their appointments.

20   Q.  But is this the same incentive program as outlined in

21   Government Exhibit 455?

22   A.  Yes.

23           MS. KUDLA:  We can take that down, Mr. Carbone.

24           Thank you.

25   Q.  You testified that Mr. Constantine had two secretaries,

MBUVCON4                          Gordon - Direct

1    Victoria and Robin?

2    A.   Yes.

3    Q.   Did they ever have direct communications with the

4    trip-and-fall patients?

5    A.   Yes.

6    Q.   And how would they have communications with them?

7    A.   By phone.

8    Q.   And why would they -- why would they be communicating with

9    the trip-and-fall patients?

10                MR. GANN:   Objection, Judge.

11                THE COURT:   I'll allow that.

12   A.   To get them scheduled for their appointments.

13   Q.   Did Robin or Victoria ever complain about issues, apart

14   from the scheduling issues we just looked at with Robin about

15   issues with the trip-and-fall patients?

16   A.   Yes.

17   Q.   And what would they complain about?

18   A.   One particular patient was threatening Victoria.

19   Q.   And who was that patient?

20   A.   Eduardo Ortiz.

21   Q.   And who was Mr. Ortiz?

22   A.   A client that was referred, trip-and-fall client.

23   Q.   Trip-and-fall client?

24   A.   Yes.

25   Q.   Did Mr. Ortiz have any -- any issues that you were aware

MBUVCON4                          Gordon - Direct

1   of?

2   A.  Yes, he had an alcohol addiction.

3   Q.  And did you ever pick up Mr. Ortiz?

4   A.  Yes.

5   Q.  And on those occasions when you picked him up, did you

6   notice anything about his behavior or his odor?

7   A.  Yes.  Aggressive and he smelled of alcohol.

8   Q.  Now, how did Victoria sound when she told you that

9   Mr. Ortiz was threatening her?

10  A.  She sounded nervous.

11  Q.  And what was he threatening her about?

12  A.  He threatened her for money.

13  Q.  Despite these incidents, to your knowledge, did you --

14  well, did you continue to drive Mr. Ortiz to appointments?

15  A.  Yes.

16  Q.  And to your knowledge, did his lawsuit continue?

17  A.  Yes.

18  Q.  Do you ever recall a patient named Clifford Novallo?

19  A.  Yes.

20  Q.  And what do you recall about him?

21  A.  He was an older gentleman that drunk a lot of alcohol.

22  Q.  Was he ever under the influence at his appointments that

23  you would drive him to?

24  A.  Yes.

25  Q.  Despite all of the issues that you have just described with

MBUVCON4                      Gordon - Direct

1    getting people to show up, were the trip-and-fall cases

2    profitable?

3    A.  Yes.

4    Q.  How much money did you and Mr. Duncan make in the first

5    year of operation with D&G Premiere Solutions?

6    A.  300,000.

7    Q.  What about in the second year?

8    A.  700,000.

9    Q.  Are you familiar with the company Fast Trak?

10   A.  Yes.

11   Q.  What is Fast Trak?

12   A.  The funding company that Adrian Alexander sold his

13   contracts to.

14   Q.  And those were the contracts that Mr. Kalkanis had forged?

15   A.  Yes.

16   Q.  And who was the attorney on those contracts?

17   A.  George Constantine.

18   Q.  Now, where was Fast Trak located?

19   A.  New Jersey.

20   Q.  Who, if anyone at Fast Trak, did you work with?

21   A.  Jason Krantz.

22   Q.  And did Mr. Krantz work at the New Jersey office?

23   A.  Yes.

24   Q.  And how were you introduced to Mr. Krantz?

25   A.  Me and Bryan called him after looking him up under the

1    contract.

2    Q.  Now, was Mr. Krantz ever involved in selling these

3    contracts with Mr. Alexander?

4    A.  Yes.

5    Q.  For the cases that Mr. Alexander was sending, had Dr. Dowd

6    performed any of the surgeries on those cases?

7    A.  Yes.

8    Q.  Did you ever meet with Mr. Krantz in person?

9    A.  Yes.

10   Q.  And where was that meeting?

11   A.  Fast Trak office in New Jersey.

12   Q.  Did you ever communicate with Mr. Krantz by email or phone?

13   A.  Yes.

14   Q.  And typically, in what state were you located for these

15   communications?

16   A.  New York.

17   Q.  Over the course of your multiple years participating in

18   this scheme, did you ever send or receive a document in the

19   mail?

20   A.  Yes.

21   Q.  And were those documents related to the trip-and-fall scam?

22   A.  Yes.

23   Q.  Can you give just one example of this?

24   A.  A check.

25   Q.  And where would the check be from?

1   A.  Fast Trak.

2   Q.  Mr. Gordon, have you heard the name Apex?

3   A.  Yes.

4   Q.  What is Apex?

5   A.  The funding company that me and Bryan Duncan created.

6   Q.  About how many cases did Apex fund?

7   A.  About five.

8   Q.  Prior to your arrest in 2018, did Apex settle any cases?

9   A.  No.

10  Q.  I want to switch gears for a moment and go back to

11  something you mentioned at the very beginning of your

12  testimony.  You testified that you got involved in this

13  trip-and-fall scam through your own case as a patient.  Do you

14  remember that?

15  A.  Yes.

16  Q.  Let's talk about that now.

17          Mr. Gordon, explain how your own case began.

18  A.  I had an accident in Brooklyn.  I hurt my ankle.  And as I

19  was leaving the hospital, I was approached and referred to

20  Peter Kalkanis.

21          (Continued on next page)

22

23

24

25

1   BY MS. KUDLA:

2   Q.  And was any aspect -- once you were referred to Peter

3   Kalkanis, what happened?

4   A.  I met with Peter Kalkanis and he told me I had a good case

5   and, um, he took down my information, intake.

6   Q.  At the intake, was there any discussion about what injuries

7   you would be claiming?

8   A.  Yes.

9   Q.  And what was that?

10  A.  Um, my back.

11  Q.  And had you hurt your back as part of the accident?

12  A.  No.

13  Q.  Why did you agree to participate at that time with

14  Mr. Kalkanis in going along about that your back had been

15  injured?

16  A.  He told me that I could win a lot of money in my settlement

17  and I needed the money at the time.

18  Q.  Who would be your lawyer for the case?

19  A.  George Constantine.

20  Q.  With respect to your own case, Mr. Gordon, how many times

21  did you meet with Mr. Constantine?

22  A.  About three times.

23  Q.  When was the first time?

24  A.  A week or two after I met with Peter Kalkanis, I met with

25  George Constantine by my job.

1  Q.  And you said by your job.

2          Where exactly did this meeting with Mr. Constantine

3  take place?

4  A.  It was in the parking lot in Long Island.

5  Q.  Was it outdoors or indoors?

6  A.  Outdoors.

7  Q.  And what did Mr. Constantine say at this parking lot

8  meeting?

9  A.  Um, I recall him introducing himself, giving me his card,

10  and I signed a retainer.

11  Q.  Where, if anywhere, did you sign the retainer agreement if

12  you were in a parking lot?

13  A.  On the hood of his car.

14  Q.  How long did this meeting take with Mr. Constantine?

15  A.  Under ten minutes, five minutes or so.

16  Q.  During that meeting, did Constantine ever describe how he

17  was getting paid for your lawsuit?

18  A.  Um, I don't recall.

19  Q.  Did you look injured at the time of this meeting?

20  A.  No.

21          MR. GANN:  Objection.

22          THE COURT:  I'll allow it.

23  A.  No.

24  Q.  When was the next time you met with Mr. Constantine for

25  your case?

1   A.  My deposition.

2   Q.  And how much time approximately do you think had elapsed

3   between the two?

4   A.  About three years.

5   Q.  On the day of your deposition, did you ever meet with

6   Mr. Constantine before the deposition began?

7   A.  Yes.

8   Q.  And where did that meeting occur?

9   A.  Across the hall.

10          THE COURT:  Wait.  Across the hall from what?

11          THE WITNESS:  Across the hall from the deposition

12  room.

13          THE COURT:  Where was the deposition?

14          THE WITNESS:  Um, it was in Queens.

15  BY MS. KUDLA:

16  Q.  And in that room, who, if anyone, was present with you?

17  A.  Um, me and George Constantine.

18  Q.  Did Mr. Constantine have any materials with him in that

19  meeting?

20  A.  Yes.

21  Q.  What?

22  A.  He had, um, my -- my photos, discharge papers, he had a

23  bunch of stuff.  I couldn't tell you.  A bunch of stuff in a

24  folder.

25  Q.  And what did you guys do with this paperwork during the

MBUsCON5                    Gordon - Direct

1    meeting?

2    A.  We went over the, um, my accident and then we went over a

3    brief description -- a brief of how he gets paid and I have to

4    payback a funder.

5    Q.  Now, was the paperwork that Mr. Constantine had with him at

6    the time similar or different from the paperwork that you

7    eventually collected during the trip-and-fall cases?

8    A.  Similar.

9    Q.  You said Mr. Constantine went over the details with you.

10           Can you describe how that occurred?

11   A.  Yes.  He asked me, um, how I was affected by the accident

12   and, um, what couldn't I do anymore due to the accident, what

13   was the weather like, stuff like that.

14   Q.  Mr. Gordon, based on your interaction with Mr. Constantine

15   at that meeting, did you have any doubt as to how you should

16   respond to the questions during the deposition?

17           MR. GANN:  Objection.

18           THE COURT:  Sustained as to form.

19   Q.  Mr. Gordon, with respect to the questions that

20   Mr. Constantine was going over with you, can you describe for

21   the jury how Mr. Constantine was asking you the questions or

22   describing the events?

23   A.  He would say --

24           MR. GANN:  Objection.

25           THE COURT:  I'll allow it.

1  A.  He would say, um, what can't you do anymore since your

2  accident.  Um, I don't remember if I brought up basketball or

3  not, but he would say, um, you -- you can't play basketball

4  anymore, correct?

5        Um, then he would say, um, sorry, um what was the

6  weather like?  You weren't on your phone, correct?  Um, did you

7  fall forward or backwards?

8  Q.  Based on the questions that you're just going over, were

9  you ever asked some of these questions during your deposition?

10 A.  Yes.

11 Q.  How, in any way, did Mr. Constantine's meeting with you

12 help prior to the deposition?

13        MR. GANN:  Objection.

14        THE COURT:  Did the meeting with you assist you --

15 sir, did the meeting with Constantine assist you in your

16 responses in the deposition?

17        THE WITNESS:  Yes.

18 Q.  In what way, Mr. Gordon?

19 A.  Um, like I already knew the answers.

20 Q.  Now, after the deposition, did you ever hear from

21 Mr. Constantine again with respect to your own case?

22 A.  Um, yes, for the, um, the settlement.

23 Q.  And did your case ultimately settle or not?

24 A.  Yes.

25 Q.  And do you recall approximately how much it settled for?

1  A.  I believe it was 100,000.

2  Q.  And how much of that settlement did you receive?

3  A.  30,000.

4  Q.  As part of your case, Mr. Gordon, did you have any

5  surgeries?

6  A.  Yes.

7  Q.  What surgery did you have?

8  A.  I had back surgery.

9  Q.  And did you get paid for that procedure?

10 A.  Yes.

11 Q.  To be clear, was your back injured?

12 A.  No.

13 Q.  During your deposition, did you lie?

14 A.  Yes.

15 Q.  And why did you agree to participate in this scam years

16 ago?

17 A.  Um, I lost my job and I -- I needed money at the time.

18 Q.  Now, Mr. Gordon, you testified earlier that you were

19 arrested in April 2018, is that correct?

20 A.  Correct.

21 Q.  After you were arrested, did you decide to start

22 cooperating with the government right away?

23 A.  No.

24 Q.  When did you start cooperating with the government?

25 A.  The day of trial.

1  Q.  And what happened on the morning of your trial?

2  A.  I -- I pled guilty.

3  Q.  And why did you plead guilty and decide to cooperate with

4  the government?

5  A.  Um, I was discussing it with my attorney.

6  Q.  To be clear, I don't want to hear the discussions with your

7  attorney, but continue?

8  A.  It was something I was considering for a while and to

9  correct the things that I did wrong.

10  Q.  Were you also hoping that it would help you at the time of

11  sentencing?

12  A.  Yes.

13  Q.  When did you first meet with the government?

14  A.  About two weeks after.

15  Q.  After pleading guilty?

16  A.  Yes.

17  Q.  Around how many times have you met with the government

18  since that occasion?

19  A.  Several times.

20  Q.  Were you truthful in the meetings with the government

21  during those meetings?

22  A.  Yes.

23  Q.  Was every one of those meetings to prepare for this trial,

24  or were some of those meetings with the government to gather

25  information?

1   A.  To gather information.

2   Q.  Did you provide the government with information during

3   those meetings?

4   A.  Yes.

5   Q.  And what type of information did you provide?

6   A.  Prior crimes.

7   Q.  Did you talk about the trip-and-fall scam?

8   A.  Yes.

9   Q.  And what information would you provide on that?

10  A.  Um, my involvement in it.

11  Q.  Did you talk about the involvement of other people as well?

12  A.  Yes.

13  Q.  And when you provided that information, were you truthful?

14  A.  Yes.

15  Q.  As part of your cooperation, were you required to disclose

16  to the government all of the crimes that you've committed?

17  A.  Yes.

18  Q.  And did you do that?

19  A.  Yes.

20  Q.  On the subject of prior crimes, did you plead guilty to

21  committing bank fraud in 2017?

22  A.  Yes.

23  Q.  What did you do to make you guilty of that offense?

24  A.  I deposited, um, a check that wasn't in my name.

25  Q.  How much was the check for?

1    A.  Um, about eight grand.

2    Q.  Now, Mr. Gordon, did you pay taxes on the cash income you

3    earned while working for Mr. Kalkanis?

4    A.  No.

5    Q.  Was there also a period of time where you claimed

6    unemployment benefits while working full-time as a driver for

7    Mr. Kalkanis?

8    A.  Yes.

9    Q.  And approximately how long was that for?

10   A.  About three months.

11   Q.  Mr. Gordon, while you were working for Mr. Kalkanis, did he

12   ever contact you for assistance to intimidate two recruited

13   patients?

14   A.  Yes.

15   Q.  And briefly describe what occurred.

16   A.  Um, Peter was afraid of two clients going to his house.  He

17   asked me for assistance.  Um, I told him I would handle it, and

18   I told one of my friends to just intimidate the two guys that

19   went to Peter's house.

20   Q.  And did you understand that the friend would use physical

21   violence to intimidate the patients?

22   A.  Yes.

23   Q.  Did any actual harm come to these two patients?

24   A.  No.

25   Q.  Even though no harm occurred, Mr. Gordon, how do you feel

1   about your actions volunteering to assist today?

2           MR. GANN:  Objection.

3           THE COURT:  Rephrase.

4   Q.  Mr. Gordon, how do you feel about your participation in

5   that event?

6           MR. GANN:  Objection.

7           THE COURT:  In what event?

8           MS. KUDLA:  In agreeing to assist Mr. Kalkanis with

9   the intimidation of two recruited patients.

10          THE COURT:  I'll allow it.

11  A.  I felt bad about it.

12  Q.  Now, I want to focus back on the trip-and-fall scam here.

13          Have you pled guilty to the charges in that case?

14  A.  Yes.

15  Q.  What crimes did you plead guilty to?

16  A.  Mail -- mail, wire, and conspiracy.

17  Q.  What made you --

18          THE COURT:  When you say mail, what do you mean, mail?

19          THE WITNESS:  Mail fraud, wire fraud, and conspiracy.

20          THE COURT:  Thank you.

21  Q.  And conspiracy to commit mail fraud and wire fraud?

22  A.  Yes.

23  Q.  Now, what made you guilty of those offenses, Mr. Gordon?

24  A.  For staging trip-and-fall accidents.

25  Q.  What's the maximum sentence the judge can give you as a

1   result of your guilty plea for the trip-and-fall scam and the

2   bank fraud in 2017?

3   A.  150 years.

4   Q.  You testified earlier today that when you pled guilty, you

5   did so through a cooperation agreement, is that correct?

6   A.  Correct.

7   Q.  And, Mr. Gordon, what are your obligations under this

8   cooperation agreement?

9   A.  To be truthful.

10  Q.  And if you meet your obligations under this agreement, what

11  is your understanding of what the government will do?

12  A.  They will write a 5K letter -- 5K letter to the judge.

13  Q.  And when you say the judge, is that the judge who will

14  sentence you?

15  A.  Correct.

16  Q.  What's your understanding of what information will go into

17  the letter from the government?

18  A.  Um, my truthfulness and cooperation.

19  Q.  Will the letter also include information about any bad acts

20  you may have committed?

21  A.  Yes.

22  Q.  Sitting here today, Mr. Gordon, have you been promised any

23  particular sentence that you will receive?

24  A.  No.

25  Q.  Have you been promised that letter as you sit here today?

1    A.  No.

2    Q.  Apart from your cooperation agreement with the government,

3    do you have any other agreement with the government?

4    A.  No.

5    Q.  What is your understanding, Mr. Gordon, of what happens if

6    you do not tell the truth today?

7    A.  I will not get the letter.

8    Q.  And could you be prosecuted for other crimes if you lied

9    today?

10   A.  Yes.

11   Q.  To your understanding, Mr. Gordon, does the outcome of this

12   trial affect in any way whether or not you get that letter?

13   A.  No.

14   Q.  To your understanding, what do you have to do to get that

15   letter?

16   A.  Be truthful.

17   Q.  Mr. Gordon, I want to turn back very briefly to the

18   trip-and-fall scam after the split.

19          You testified earlier that between 2015 and 2018,

20   you continued to work with Mr. Duncan, Mr. Alexander, and

21   Mr. Constantine on trip-and-fall cases, is that correct?

22   A.  Yes.

23   Q.  With respect to Mr. Constantine, this was for the

24   trip-and-fall cases that you guys had originated prior to the

25   split?

MBUsCON5                     Gordon - Direct

1   A.  Yes.

2           MS. KUDLA:  OK.  I'm going to show you what is in

3   evidence as Government Exhibit 469 first and then we'll look at

4   the attachment.

5           Can we cull out the e-mail.

6   Q.  Who sent this e-mail?

7   A.  Adrian Alexander.

8   Q.  And who did he send it to?

9   A.  Bryan Duncan, me, and Jamie and George Constantine.

10  Q.  What is the date of the e-mail?

11  A.  August 27, 2015.

12  Q.  And what's the subject of the e-mail?

13  A.  George outstanding -- George outstanding cases.

14  Q.  And the e-mail has George HF and CS outstanding on

15  7.26.1025.xlsx.  The subject says:

16          Dear Kerry/Bryan:  Attached are the 61 cases with

17  comments I have outstanding with George as of now.  Please:

18          Bullet point, follow up on the eight highlighted cases

19  that need info to proceed;

20          Second, indicate which ones are candidates for open

21  surgery so we can plan for it.

22          Were these 61 cases referenced here patients that you

23  had recruited through either you, Mr. Duncan or Mr. Rainford?

24  A.  Yes.

25  Q.  And what was Mr. Alexander asking you and Mr. Duncan to do?

 1   A.  Help him with the 61 cases to get surgery done.

 2   Q.  And how did he want you to help him?

 3   A.  To find the patients.

 4   Q.  And you testified earlier that approximately 90 percent of

 5   the trip-and-fall patients were fake accidents.

 6        Does that include these patients?

 7   A.  Yes.

 8   Q.  On here it says open surgery.

 9        Can you explain what open surgery is?

10   A.  A fusion case.

11   Q.  What is a fusion case?

12   A.  A bigger -- a bigger procedure on the back.

13   Q.  And what's your understanding of what that procedure

14   entails?

15   A.  It entailed placing a rod in the patient's back.

16   Q.  Can we go to the attachment to this, which is in evidence

17   as Government Exhibit 469A.

18        Let's scroll to the top.  First, let's orient the

19   jury.  In column B there is the letters HF.

20        What did that stand for?

21   A.  Health Finance.

22   Q.  And then in column I, there is the letters CS.

23        What did that stand for?

24   A.  Case settlement.

25   Q.  And who owned these two companies?

1   A.   Adrian Alexander.

2   Q.   And who is the attorney on these cases?

3   A.   George Constantine.

4   Q.   Let's walk through a few of the comments first on the

5   left-hand side, number four, Ken DePass.  It says no insurance,

6   disappeared, writeoff.

7        What did that notation mean?

8   A.   It meant that the patient who he is suing, there is no

9   insurance, so there is no purpose with moving forward with the

10  case.

11  Q.   What did disappear refer to?

12  A.   The client can't be found.

13  Q.   Now, did the client just not being able to be found happen

14  inferentially or frequently?

15  A.   Frequently.

16  Q.   Now let's go to number five.  Kaira Johnson does not go to

17  physical exams.  Kerry, please help OK now.

18        What's being said to you here?

19  A.   The patient Kaira Johnson is not going to therapy.  Adrian

20  Alexander is asking if we can get her to therapy.

21  Q.   And did that happen inferentially or frequently?

22  A.   Frequently.

23  Q.   And why would that be a problem for the funder?

24  A.   Um, surgery wouldn't be -- um, wouldn't be scheduled.

25  Q.   Now let's go to number eight, Shakeyer Price.

1              What's the comment here?

2    A.   No issues, might do open.  This patient might do a fusion.

3              THE COURT:  Who is writing this?

4              THE WITNESS:  Adrian Alexander.

5              THE COURT:  All right.

6    BY MS. KUDLA:

7    Q.   Let's go through some of the names on this chart.

8              Starting on the top left, we'll work our way down and

9    go to the right.  Jacqueline Chen, is that name familiar to

10   you?

11   A.   Yes.

12   Q.   Who is that?

13   A.   Bryan Duncan's mother.

14   Q.   Let's go to Jamal Belton.

15             Do you recognize that name?

16   A.   Yes.

17   Q.   Who is that?

18   A.   Um, a trip-and-fall patient.

19   Q.   Do you recall where he was recruited, if at all?

20   A.   Um, I don't remember.

21   Q.   OK.  What about Anthony Acevedo?

22   A.   Yes.

23   Q.   Why is that name familiar?

24   A.   Um, I used to work with him at United Healthcare.  I didn't

25   know him well, but Bryan Duncan did.

1   Q.  And did Mr. Acevedo have any other family members

2   participate in this scam?

3   A.  Yes.  He had a sister.

4   Q.  Do you recall his sister's name?

5   A.  Um, I just know the last name is Acevedo.

6   Q.  Let's go down to Quentin Bridgeforth.

7           Who is that?

8   A.  Um, a shelter patient.

9   Q.  What about number 22, Reginald Dewitt?

10  A.  Yes.

11  Q.  Who is that?

12  A.  A patient that, um, started working with Peter Kalkanis.

13  Q.  When he was working with Mr. Kalkanis, was he ever at

14  Mr. Constantine's office?

15  A.  Yeah.  Yes.

16  Q.  In what way, do you know, if he was working for

17  Mr. Kalkanis in Mr. Constantine's office?

18  A.  I just seen him there.

19  Q.  Let's move to the next section top, Eunice Chrischlow.

20          Do you recall that name?

21  A.  Yes, a shelter patient.  Um, she doesn't have any photos.

22  Q.  What about Robert Rosario at number 14?

23  A.  Yes.  He was a patient that referred other patients.

24  Q.  Did he refer one patient or more than one patient?

25  A.  More than one.

1    Q.  Do you recall what borough he lived in?

2    A.  I believe it was Brooklyn.

3    Q.  Let's go to Victor Rodriguez.

4            Does that name ring a bell?

5    A.  Yes.

6    Q.  Who do you recall that being?

7    A.  Um, he lived not too far from Dwayne Dozier.

8    Q.  Was he a trip-and-fall patient?

9    A.  Yes.

10   Q.  Staged accident like the rest?

11   A.  Yes.

12   Q.  You mentioned Dwayne Dozier.

13           Who is that?

14   A.  Yes.  Yes.

15   Q.  Does that name sound familiar?

16   A.  Yes.

17   Q.  Why?

18   A.  He -- he lived not too far from Victor Rodriguez.

19   Q.  And then do you see Frank Andrews name on this list?

20   A.  Yes.

21   Q.  We've discussed him today.

22           What about let's go to the name Shanice Golding.  Does

23   that name ring a bell?

24   A.  Yes.

25   Q.  Why?

1   A.  She was the only Far Rockaway client we had.

2   Q.  How, if she lived in Far Rockaway, did she get recruited to

3   this scheme?

4   A.  Her boyfriend referred her.

5   Q.  Based on your participation in this scam, was it your

6   understanding that the patient names that you just identified

7   were fake or staged accidents?

8   A.  Yes.

9           MS. KUDLA:  Your Honor, can I have one moment to ask

10  my colleagues?

11          THE COURT:  Yes.

12          (Counsel confer)

13  Q.  Mr. Gordon, just to clarify the last question, that was my

14  fault.

15          Based on your participation in the scheme, was it your

16  understanding that the patient names that you just identified

17  for the jury, were they real or fake accidents?

18  A.  Fake accidents.

19          MS. KUDLA:  Thank you.

20          No further questions, your Honor.

21          THE COURT:  All right.  Thank you.

22          Is there any cross-examination here?

23          MR. GANN:  Yes, Judge.  Could I just --

24          THE COURT:  Mr. Gann.

25          MR. GANN:  Judge, I'm sorry.  I just needed to step

1    out for a minute.

2              THE COURT:  Go ahead.

3              MR. GANN:  Thank you.  Judge, a bathroom break is what

4    I'm talking about.

5              THE COURT:  Sure.

6              Ladies and gentlemen, let's take ten minutes.

7              MR. GANN:  Thank you.  Sorry.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Jury not present)

2            THE COURT:  You may step down, sir.  Ten minutes.

3            (Recess)

4            What is was your estimate, Mr. Gann?

5            MR. GANN:  Not before the end of the day, certainly,

6    Judge.  I probably have two to three hours, I would think.  I

7    would say a minimum of two.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MBUsCON5                          Gordon – Cross

1            (Jury present)

2            THE COURT:  Bring the witness in, please.

3            Take the stand, sir.  Please be seated in the

4    courtroom.

5            You may start your cross-examination, sir.

6            MR. GANN:  Thank you, Judge.

7    CROSS-EXAMINATION

8    BY MR. GANN:

9    Q.  Mr. Gordon, I'm going to pick up where we left off just a

10   minute ago with the Government's Exhibit 469A.

11           MR. GANN:  If we could put that up, please, for

12   Mr. Gordon.

13   Q.  If you recall, Mr. Gordon, that Exhibit 469A was the list

14   of the 61 patients that you indicated that Adrian Alexander had

15   written to you about wondering about certain issues with regard

16   to each of those patients, correct?

17   A.  Correct.

18   Q.  OK.  And you indicated, correct me if I'm wrong, that all

19   61 of those patients were part of the trip-and-fall scheme,

20   right?

21           MS. KUDLA:  Objection.

22           THE COURT:  I'll allow it.

23   A.  To my knowledge.

24   Q.  OK.  And all 61 of them had faked accidents or faked

25   injuries?

1          MS. KUDLA:  Objection, misstates the record.

2          THE COURT:  I'm sorry.  The question is what his

3    belief is.

4          Is it your belief that all 61 faked their accidents?

5          THE WITNESS:  I didn't deal with all 61 patients, so I

6    wouldn't know about all 61.

7    Q.   OK.  Didn't you state on direct examination that you

8    believed all 61 of those patients were part of the scheme and

9    fake?

10   A.   I said 90 percent, so...

11   Q.   90 percent of them?

12   A.   90 percent of the cases.

13   Q.   There were several patients --

14         THE COURT:  I'm sorry.  I just want to -- again, I

15   have no interest in putting words in your mouth -- I'm just

16   trying to understand your testimony.

17         Is your testimony that about 90 percent of cases

18   overall are faked, is that it?

19         THE WITNESS:  Correct.

20         THE COURT:  Is your testimony also that 90 percent of

21   these 61 cases were fake?

22         THE WITNESS:  These 61 are a part of the 90 percent.

23   I don't know where to categorize these 61 cases --

24         THE COURT:  All right.

25         THE WITNESS:  -- separate from the 90 percent.

1          THE COURT:  OK.  Fine.

2    BY MR. GANN:

3    Q.  Well, you reviewed Government Exhibit 469A with the

4    government before you came and testified here, correct?

5    A.  Correct.

6    Q.  And you looked at the list of those 61 people, correct?

7    A.  Correct.

8    Q.  And are you saying now that not all of them are fake,

9    either accident or injuries?

10          MS. KUDLA:  Objection.

11          THE COURT:  It's cross.  I'll allow it.

12   A.  I don't know the details of all 61 cases exactly.

13   Q.  Some of those people aren't even part of the

14   Kalkanis-Duncan-Gordon scheme, correct?

15   A.  Correct.

16   Q.  Some of them are patients -- excuse me -- are clients of

17   George Constantine's outside of anything having to do with this

18   case, right?

19   A.  I don't know where they're from.

20   Q.  Well, let me refer specifically to three of them.  You're

21   looking at that exhibit.  Look at number three, please.

22          Sophia Constant, was she one of your patients?

23          It's not up?  I'm sorry.

24          MR. GANN:  Sorry about that.

25          MS. KUDLA:  It's OK.

1              THE COURT:  Did the jury see that chart?

2              THE JURY:  Yes.

3              MR. GANN:  Sorry, Judge.

4    BY MR. GANN:

5    Q.  Looking at number three, Sophia Constant, she's not one of

6    these Kalkanis-Gordon-Duncan people, is she?

7    A.  I don't know who she is.

8    Q.  You don't know.

9              Look at number seven as another example, Ryan O'Neil.

10   He's not one of the Kalkanis-Gordon-Duncan scheme participants,

11   is he?

12   A.  I don't know who referred him.  I don't know who he is.

13   Q.  You don't even know who he is, right?

14   A.  I didn't refer him, but that's doesn't mean that Bryan or

15   Ryan didn't refer him.

16   Q.  Let's look at number nine on that list for a minute, Jose

17   Roman.

18             Another one, you don't know who he is, do you?

19   A.  No.

20   Q.  You don't know where he came from, right?

21   A.  I don't know who he is.

22   Q.  You don't know if it was a trip-and-fall?

23             THE COURT:  Sir.

24             MS. KUDLA:  Objection.

25             THE COURT:  Just ask questions.  Watch the tone.

1            MR. GANN:  Sorry, Judge.

2            THE COURT:  Just ask questions.  That's all.

3  Q.  You don't know whether it was a trip-and-fall, correct?

4  A.  I don't remember the details of every case.

5  Q.  But I'm talking about the three that we've just identified,

6  you don't know the details of any one of those three, correct?

7            MS. KUDLA:  Objection, asked and answered.

8            THE COURT:  I'll allow it.

9  A.  I don't remember those three, the details of those three

10  cases.

11  Q.  When you say you don't remember, a minute ago you said you

12  didn't know them, right?

13  A.  No, I don't know them.

14  Q.  So you wouldn't know the details of their cases, correct?

15  A.  Correct.

16  Q.  Now, you referred on your direct examination also to the

17  problems you were having with some of these client patients,

18  correct; do you remember that?

19  A.  Yes.

20  Q.  And you talked about how some of them had to be

21  incentivized by paying them in order to make them want to

22  follow through, if you will, with this scheme, correct?

23  A.  Correct.

24  Q.  And the government showed you various e-mails between you

25  and, I believe, Adrian Alexander, correct?

1    A.  Correct.

2    Q.  For which those were e-mails addressed from you, excuse me,

3    from Adrian Alexander to you directly, correct?

4    A.  Correct.

5    Q.  And you indicated that on a number of those e-mails, George

6    Constantine was cc'd on them, correct?

7    A.  Correct.

8    Q.  And I believe you indicated, correct me if I'm wrong, that

9    George Constantine never responded to any of those e-mails,

10   correct?

11   A.  He received the e-mail, but never responded.

12   Q.  I understand he was listed on the e-mail, but he never

13   responded to those e-mails?

14           THE COURT:  Just answer that.  Move on.

15   A.  No.

16   Q.  Now in a number of those e-mails, there is a reference to

17   paying the various patients, clients $200 or $250 a month or

18   $250 four times a year or something along those lines, correct?

19   A.  Correct.

20   Q.  That never actually happened, though, did it?

21   A.  Not to my knowledge.

22   Q.  They were never paid that?

23   A.  No.

24   Q.  They weren't incentivized that way to continue with their

25   cases, correct?

1    A.   They were incentivized.

2    Q.   But the plan that you referred to as the basis to get them

3    to continue to go to therapy, to continue to go to the

4    doctor's, to pay them the $200 a month or $250 a quarter, that

5    never happened, right?

6    A.   Correct.

7    Q.   Now, you were asked questions about your plea, when you

8    took your plea, right?

9    A.   Yes.

10   Q.   And you took your plea, as you said, on the date that you

11   were scheduled to start your trial, right?

12   A.   Correct.

13   Q.   And you said, I believe, that you took that plea because

14   you felt bad about what you had done?

15   A.   Yes.

16   Q.   Right?

17   A.   Yes.

18   Q.   And you wanted to take responsibility for it, correct?

19   A.   Correct.

20   Q.   It had nothing to do with the fact that if you were

21   convicted, you were facing up to 150 years in jail?

22   A.   Yes, that too.

23   Q.   That's what influenced you to take that plea, isn't it?

24   A.   Part of it.

25   Q.   A big part of it, right?

1    A.  A part of it.

2    Q.  And the government asked you questions about what happens

3    if you lie, right?

4    A.  Yes.

5    Q.  Pursuant to your cooperation agreement?

6    A.  Correct.

7    Q.  And what you indicated was that if you lie, the deal is

8    off?

9    A.  Correct.

10   Q.  You can get whatever up to the maximum sentence you could

11   receive, correct?

12   A.  Correct.

13   Q.  And who makes the determination as to whether or not you've

14   lied?

15   A.  The government, I'm assumed.

16   Q.  The government does, right?

17          You know that; yes?

18   A.  Yes.

19   Q.  You know that because all the conversations you've had with

20   the government about this, correct?

21   A.  Correct.

22   Q.  You've said you met with them several times, right?

23   A.  Yes.

24   Q.  Can you put a number on that?

25   A.  I'm sorry.  It was -- it was a lot of times.  I couldn't

1   put a number on it.

2   Q.  Upwards of 40?

3   A.  No, I don't think it was 40.

4   Q.  20?

5   A.  I'm sorry.  I just really couldn't put a solid number on

6   it.

7   Q.  You can't even estimate?

8   A.  A lot.  A lot of times.  Several times.

9   Q.  And in each one of those times that you spoke to the

10  government, you told them the truth, right?

11  A.  To the best of my knowledge.

12  Q.  And you were accurate, correct?

13  A.  To the best of my knowledge, yes.

14  Q.  Now, one of the things that you said about your case was

15  that you met George Constantine through, you believe, Peter

16  Kalkanis, correct?

17  A.  Correct.

18  Q.  And I believe you said that you met him in a parking lot

19  outside of your work, right?

20  A.  Yes.

21  Q.  And so he decided to come to your office -- excuse me, to

22  the location of which you worked -- which was where at the

23  time?

24  A.  A sneaker store in Hempstead, Long Island.

25  Q.  So he met you in the parking loft of the sneaker store in

1  Hempstead, Long Island, correct?

2  A.  Correct.

3  Q.  And he signed you up as a client at that time, right?

4  A.  Yes.

5  Q.  After meeting with you and discussing at least generally

6  the circumstances of your case, right?

7  A.  I -- I don't know the -- the full details.  I don't

8  remember the full details of the conversation.

9  Q.  OK.  But you certainly had a conversation, right?

10  A.  A brief conversation, yes.

11  Q.  You said it lasted less than ten minutes?

12  A.  About, yes.

13  Q.  OK.  And you said that the reason -- it was at that time --

14  withdrawn.

15        It was at or about that time, prior to that meeting

16  with George Constantine, that you decided to get involved with

17  this scheme, correct?

18  A.  Correct.

19  Q.  After meeting with Peter Kalkanis, correct?

20  A.  Correct.

21  Q.  And I believe you said on direct examination that the

22  reason that you agreed to participate in this scheme was

23  because you had lost your job, right?

24  A.  Correct.  Correct.

25  Q.  But yet you met George Constantine at work, right?

MBUsCON5                         Gordon - Cross

1    A.  Yes.

2    Q.  Now, the government also asked you questions about some of

3    the criminal activity that you've been involved in, and one of

4    the things that they asked you about was this circumstance

5    where you tried to help Peter Kalkanis out by getting a friend

6    to get involved with patients that were intimidating him,

7    right?

8    A.  Yes.

9    Q.  What was that friend's name?

10   A.  I'm sorry.  I don't remember his name.

11   Q.  What was his nickname?

12   A.  It's been a long time.

13   Q.  What was his nickname?

14   A.  I'm sorry.  I don't recall.

15   Q.  You don't recall the name Killa?

16   A.  OK, yes.

17   Q.  Excuse me?

18   A.  I remember the name now, yes.

19   Q.  OK.  So Killa is the one that you decided to go to to help

20   Peter Kalkanis out, correct?

21   A.  Correct.

22   Q.  George Constantine never asked you to do that, did he?

23   A.  No.  He wasn't present.

24   Q.  George Constantine never asked you to get involved with any

25   of his clients other than to manage them in terms of where they

1    were and getting them to appointments, correct?

2    A.  It was -- it was -- I was just playing my part, so I don't

3    know how to answer that question.

4    Q.  What I'm asking you is, did George Constantine ever suggest

5    to you in any way, shape, or form that you should intimidate or

6    threaten any of his clients?

7    A.  No.

8    Q.  Did Robin from George Constantine's office ever ask you to

9    do anything like that?

10   A.  No.

11   Q.  Did Victoria from George Constantine's office ever ask you

12   to do anything like that?

13   A.  No.

14   Q.  Now, you said on direct examination that you were

15   prepared -- you had a conversation with George Constantine

16   prior to the deposition in your case, right?

17   A.  Yes.

18   Q.  And that conversation, I believe you said, took place

19   across the hall from where the actual deposition was conducted,

20   right?

21   A.  Correct.

22   Q.  And it happened before the deposition, correct?

23   A.  Correct.

24   Q.  One moment, please.

25           (Pause)

1          I believe what you intimated, at least to the jury,

2    was that you felt that George Constantine was telling you what

3    to say in that deposition, correct?

4    A.  He was leading the conversation.

5    Q.  I'm not asking you whether he was leading the conversation.

6          Your impression of the meeting that you had with

7    George Constantine prior to that deposition was that he was

8    trying to tell you what to say in that deposition, correct?

9    A.  In a sense.

10   Q.  Because I believe you said some of the questions he asked

11   you were leading questions, right?

12   A.  Right.

13   Q.  Do you know what a leading question is?

14   A.  Yes.

15   Q.  So some of the questions he was asking you was leading

16   questions, right?

17   A.  Yes.

18   Q.  Isn't it a fact that he was just trying to prepare you for

19   the questions that you were going to be asked during the course

20   of the deposition?

21          MS. KUDLA:  Objection.

22          THE COURT:  Sustained.

23   Q.  Isn't it a fact that the purpose of that meeting prior to

24   the deposition was to prepare for the deposition?

25          MS. KUDLA:  Objection.

```
 1              THE COURT:  I'll allow it.

 2              From your standpoint, sir, do you know what the

 3    purpose of the meeting was supposed to be?

 4              THE WITNESS:  Yes.

 5              THE COURT:  What was it?

 6              THE WITNESS:  Um, prepare me for the deposition.

 7              THE COURT:  Next question.

 8    BY MR. GANN:

 9    Q.  OK.  And he was going over with you all of the things that

10    you had previously told him about the circumstances of your

11    accident, correct?

12    A.  Yes.

13    Q.  Where it happened, right?

14    A.  Yes.

15    Q.  When it happened, correct?

16    A.  Yes.

17    Q.  You have to answer yes or no for the record.

18    A.  Yes.

19    Q.  OK.  The pothole, to identify the pothole that you say you

20    fell in, right?

21    A.  Yes.

22    Q.  All of those details he was discussing with you in

23    preparation for your deposition, correct?

24    A.  Yes.

25    Q.  And then he also asked you if there were activities that
```

MBUsCON5                         Gordon - Cross

1   you can't engage in anymore because of the accident that you

2   had, correct?

3   A.  Um, yes, yes, yes.

4   Q.  And these are actually questions --

5           THE COURT:  Did he ask you what you could not engage

6   in?

7           THE WITNESS:  Yes.  He asked me what I can't, um,

8   engage in on daily activities.  I -- I don't know how he

9   phrased it verbatim.  It's been a long time.  But um, he

10  phrased it as, um -- um, you can't play basketball anymore,

11  correct?

12  BY MR. GANN:

13  Q.  But he told you, you were going to be asked during the

14  deposition about activities that you may not be able to engage

15  in anymore because of the injury that you sustained, correct?

16  A.  Um, he -- he phrased it in a way.  In a way.

17  Q.  Am I right?

18  A.  Yes, yes, yes.

19  Q.  OK.  And everything that you had told him about your

20  accident and your injury prior to that deposition was a lie,

21  correct?

22  A.  I exaggerated my back injuries.

23  Q.  You exaggerated your back injuries, but that was a back

24  injury that occurred on the date that you claimed to have

25  fallen, right?

1    A.  Correct.

2    Q.  But you told George Constantine that you had the back

3    injury because of the fall that you took on the date of your

4    accident, right?

5    A.  I don't recall discussing it in detail.

6    Q.  At any time prior to your deposition, you don't recall

7    having a discussion with George Constantine about what injury

8    you suffered as a result of your trip-and-fall?

9    A.  In detail, I don't recall going into detail about it.

10   Q.  Even telling that you hurt your back?

11   A.  Um --

12   Q.  You told him that, didn't you?

13   A.  I may have.  I don't remember.

14   Q.  OK.  What about your ankle, did you tell him about an

15   injury to your ankle?

16   A.  Um, I believe it was in my discharge papers.

17   Q.  OK.  From the hospital?

18   A.  Correct.

19   Q.  And you believe you had a discussion with George

20   Constantine about the ankle injury as well?

21   A.  Um, yeah.  When he asked me if I -- um, if I put my foot --

22   what foot went in the hole, I believe.

23   Q.  In fact, the first time you met him, you came with

24   photographs, didn't you?

25   A.  Um, I believe Peter had photographs.

1    Q.  But you didn't meet him with Peter, did you?

2    A.  No.

3    Q.  You met him just you and him, right?

4    A.  Yes.

5    Q.  And didn't you bring photographs to him in that first

6    meeting?

7    A.  No, I didn't have photographs with me.

8    Q.  You didn't?

9    A.  No, I don't.

10            THE COURT:  He just said no, sir.

11    A.  I don't recall having photos.

12    Q.  Do you recall at any point in time having photos that you

13    show to George Constantine as to the specific location of your

14    fall outside of the Super Clean?

15    A.  I believe Peter Kalkanis had my photos.  I don't recall me

16    having photos.

17    Q.  That wasn't my question.

18            My question was, at any point in time, do you recall

19    having photographs that you showed to George Constantine and

20    marked as to where your fall actually took place?

21    A.  I -- I don't recall.  I don't recall.

22            MS. KUDLA:  Objection.

23            MR. GANN:  Judge, I'm going to ask now to approach the

24    witness with these, if I could.

25            (Counsel confer)

MBUsCON5                         Gordon - Cross

1    BY MR. GANN:

2    Q.  Mr. Gordon, I'm going to show you three photographs.  I'll

3    ask you to take a look at them.

4           Does looking at those photographs refresh your

5    recollection as to whether you ever showed and marked those

6    photographs for George Constantine?

7    A.  I didn't circle these.

8    Q.  I'll take them back.  Well, before I take them back, does

9    that depict the location of where you say the accident took

10   place?

11   A.  Yes.

12   Q.  And what you're indicating is that you didn't put any

13   markings on those?

14   A.  No.

15   Q.  I'll take them back.

16          In all of your conversations with George Constantine

17   about your case, did you ever tell him that you were lying

18   about the circumstances of your accident?

19   A.  I only met George three times.

20   Q.  That's not what I asked you.

21          THE COURT:  Did you tell Mr. Constantine that you were

22   lying about the circumstances of your accident?

23          THE WITNESS:  No.

24   Q.  Never told him that, correct?

25          THE COURT:  He just said that.  Next.

1           Did you ever tell him you were making up the

2      circumstances of your accident?

3           THE WITNESS:  No.

4      BY MR. GANN:

5      Q.   Now, in terms -- back to just briefly the preparation for

6      your deposition that we were just referring to.

7           Mr. Constantine, if you recall, showed you pictures of

8      where you had claimed your accident was, correct?

9      A.   Yes.

10     Q.   And he did that in preparation of the deposition, right?

11     A.   Yes.

12     Q.   And prior to coming and testifying here today, the

13     government showed you various pictures, correct?

14     A.   Yes.

15     Q.   And one of the pictures we referred to before, if I could

16     just have this shown to the witness only at this point, is

17     Government Exhibit, what is it, 221.

18          That's the photograph that you identified as George

19     Constantine's office, correct?

20     A.   Yes.

21          MR. GANN:  Now, can we zoom in.

22     Q.   That's actually not George Constantine's office, though,

23     correct?

24     A.   It looks like George Constantine's office.

25          MR. GANN:  Zoom in on the one below that.  No, no, no.

1    Can you make it any clearer?

2                MS. VITALE:  No.

3                MR. GANN:  Zoom out, please.

4    Q.  Looking at the photograph, what we zoomed in on now, can

5    you see a name or a portion of a name on one of the items that

6    is on the wall there?

7    A.  It's blurry.  I can't see anything.

8    Q.  Can you see the first letter?

9    A.  Yes.

10   Q.  Is it a D?

11   A.  I don't know if it's a D or a G, but it's -- I can't see

12   the loop around.

13               MR. GANN:  Can you zoom back out a minute.

14   Q.  That appears to be a diploma though, correct?

15   A.  Yes.

16   Q.  Are you indicating that this photograph, Government 221,

17   Government Exhibit 221, in your opinion, fairly and accurately

18   depicts the way that George Constantine's office looked during

19   the period of time that you were dealing with him?

20   A.  It's similar.

21   Q.  But it appears to be his office, correct, to you?

22   A.  It looks like George Constantine's office.

23               MR. GANN:  I'll offer it into evidence, your Honor.

24               THE COURT:  Government.

25               MS. KUDLA:  No objection.

1              THE COURT:  Admitted.

2              (Government's Exhibit GX 221 received in evidence)

3   Q.  In preparation for this trial testimony, the government

4   showed you that photograph, correct?

5   A.  Yes.

6   Q.  And asked you whether that was George Constantine's office,

7   right?

8   A.  Yes.

9   Q.  And you told him that that was George Constantine's office?

10             THE COURT:  Sir, that's his.  He said it several

11  times.  Move on.  His testimony is that's George Constantine's

12  office.  Move on.

13             If you want to show him other blurry letters, don't.

14             Move on.

15  BY MR. GANN:

16  Q.  Now, you indicated, I believe, on direct examination that

17  you were arrested on April 19 of 2018, correct?

18  A.  Correct.

19  Q.  And --

20             MS. KUDLA:  Objection.

21  A.  18th?

22             THE COURT:  I'm sorry.

23  A.  It was the 18th, I believe.  I could be wrong.  I think she

24  said the 18th.  You said the 19th.

25             THE COURT:  Sir, ask your question again.

1    A.  2018.  I'm sorry.  She said 2018.

2    Q.  2018.  April 19 of 2018 was the date of your arrest,

3    correct?

4    A.  Yes.

5    Q.  And you indicated that you were arrested, that the charges

6    were mail fraud and wire fraud and so on, right?

7    A.  Correct.

8    Q.  And that was based on the fact that you had been involved

9    in a scheme that involved fake injuries, correct?

10   A.  Yes.

11   Q.  Sometimes real accidents, but fake injuries, correct?

12   A.  Yes.

13   Q.  And also fake accidents, correct?

14   A.  Yes.

15   Q.  Maybe real injury, but that the injury occurred at a

16   different time or a different location, correct?

17   A.  Or, like, are you referring to previous injuries?  I'm not

18   sure what you mean by that.

19   Q.  I'm referring to the fact that somebody actually came --

20   you recruited somebody or you drove somebody who actually had

21   an injury, but it didn't occur at the time or place that they

22   ultimately said that it did?

23   A.  I received a lot of patients recruited -- um, that may have

24   happened, that scenario, but I don't recall that one.

25   Q.  Some of them may have tripped and fallen at home and gotten

1    hurt, and you or somebody on your behalf met them at a hospital

2    and recruited them as a patient, correct?

3    A.  Um, we received a lot of referrals as well, recruited a lot

4    of patients.  So, again, I can't pinpoint what accident you're

5    talking about.

6    Q.  I'm not asking about a particular accident.

7          I'm asking during the course of the scheme, were there

8    occasions in which you recruited or drove individuals who had

9    real injuries but they faked the location of the injury, the

10   location that it occurred?

11   A.  That may have happened.

12   Q.  Now, I believe you described yourself as patient, a driver,

13   a recruiter, and a funder, correct?

14   A.  Correct.

15   Q.  And in your experience, taking out the question of this

16   scheme, there was nothing illegal about being a patient, right?

17              MS. KUDLA:  Objection.

18              THE COURT:  Sustained.

19   Q.  Well, there is nothing improper about being a patient in an

20   accident, a trip-and-fall accident, correct?

21   A.  Correct.

22   Q.  There's nothing improper about driving, being a driver for

23   somebody to their appointments --

24              MS. KUDLA:  Objection.

25              THE COURT:  Let him ask the question.

MBUsCON5                        Gordon - Cross

1    Q.  -- in the context of a trip-and-fall accident, correct?

2              THE COURT:  I'll allow it.

3              MS. KUDLA:  Objection.

4    A.  Correct.

5    Q.  There is nothing wrong with being a recruiter of patients

6    who have tripped and fallen, correct?

7              MS. KUDLA:  Objection.

8              THE COURT:  I'll allow it.

9    A.  Correct.

10   Q.  And there is nothing wrong with funding those patients who

11   have tripped and fallen, correct?

12   A.  Correct.

13   Q.  Now, you said you were involved in this scam for

14   eight years, right?

15   A.  Yes.

16   Q.  And I'm assuming you're saying you were involved in the

17   scam for eight years because that is from the time of your fake

18   accident, correct?

19   A.  Yes.

20   Q.  Until the time that you got arrested, right?

21   A.  Yes.

22   Q.  But for the first, if you will, three years or two years,

23   you were merely a client/patient of George Constantine as a

24   client and maybe Peter Kalkanis as a patient, correct?

25   A.  Yes.

1    Q.  And so you didn't actually start working in this scheme

2    until 2012 or 2013, right?

3    A.  Yes, 2012.

4    Q.  At or about the time of your deposition, right?

5    A.  Yes.

6    Q.  That's when you decided to go to work for Peter Kalkanis,

7    correct?

8    A.  Um, and other people.

9    Q.  OK.  But I'm saying it was Peter Kalkanis that recruited

10   you into this scheme, correct?

11   A.  Yes.

12   Q.  You didn't tell George Constantine that you were going to

13   be working for Peter Kalkanis at that point, correct?

14   A.  Um, directly, no.

15   Q.  Yeah.  It was a decision you made on your own, right?

16   A.  Yes.

17   Q.  OK.  Now, when you were dealing with Peter Kalkanis prior

18   to 2012, 2013, he was your treating chiropractor, correct?

19   A.  Yes.

20   Q.  And he was treating you for, what, your back injury?

21   A.  Yes.

22   Q.  And you came to understand, correct me if I'm wrong, that

23   Peter Kalkanis was charging for appointments with you that he

24   didn't actually have with you, correct?

25   A.  Correct.

MBUsCON5                         Gordon - Cross

1   Q.  He was committing insurance fraud, right?

2            MS. KUDLA:  Objection.

3            THE COURT:  Yes, sustained.

4   Q.  Well, he was involved in a scheme to -- withdrawn.

5            You understood that he was billing for appointments

6   with you that you didn't have with him, right?

7   A.  During -- no.

8   Q.  You came to find that out later?

9   A.  Yes.

10  Q.  And that's separate and apart from the scheme that you

11  became involved with, with the trip-and-fall accidents,

12  correct?

13           MS. KUDLA:  Objection.

14  A.  I can't --

15           THE COURT:  I'll allow it.

16  A.  I can't speak on what Peter Kalkanis was doing.

17  Q.  Well, you found out that Peter Kalkanis lost his license to

18  practice as a chiropractor, right?

19  A.  Um, I overheard stuff.

20  Q.  Yeah, that he lost his license because --

21           MS. KUDLA:  Objection.

22  Q.  -- of this fraud with patients, correct?

23           THE COURT:  Sustained.

24  Q.  You overheard stuff from where --

25           MS. KUDLA:  Objection.

1          THE COURT:  Sustained.

2    BY MR. GANN:

3    Q.  Fair to say -- withdrawn.

4          Now, I believe that you had indicated that this scam

5    would only work if there were certain players involved in the

6    scam, correct?

7    A.  Correct.

8    Q.  Initially, it had to be people like you who were willing to

9    be a patient in the first place, right?

10   A.  Yes.

11   Q.  And then you needed some kind of person to take a person, a

12   patient, to a doctor, correct, or excuse me, to a lawyer,

13   correct?

14   A.  Yes.

15   Q.  So that there could be a personal injury case started,

16   right?

17   A.  Yes.

18   Q.  And that personal injury case was to be started on the

19   basis of faked either accidents, injuries, or both, correct?

20   A.  Correct.

21   Q.  And the idea was that those individuals who were willing to

22   lie about the circumstances of their purported accident would

23   tell that same lie to the lawyer when they met the lawyer,

24   right?

25   A.  Um, I mean, yes.  They lied to a few people.

1    Q.  Again, I'm just taking this step by step for a minute.

2           Each one of the patients, clients, however you want to

3    describe them, that you took to George Constantine went in to

4    meet with George Constantine and told him a lie, correct?

5           MS. KUDLA:  Objection.

6           THE COURT:  Sustained.

7           If you know.

8    A.  I wasn't in the room, so I couldn't tell you what was

9    discussed.

10   Q.  Well, OK.  So you're saying Peter Kalkanis was in the room,

11   correct?

12   A.  Correct.

13   Q.  Prior to Peter Kalkanis being in the room with George

14   Constantine and the patient/client, you were in a room with

15   them somewhere downstairs or in another location with those

16   individuals, correct?

17   A.  I was in the building.  I wasn't downstairs.

18   Q.  Weren't you in -- weren't you sitting in on the intakes

19   that Peter Kalkanis had with the individuals that you brought

20   into this scheme as patients?

21   A.  Yes.

22   Q.  And when you sat in on those meetings with Peter Kalkanis,

23   weren't those patients encouraged to develop the lie about the

24   circumstances surrounding their accident and/or injury?

25   A.  Peter did the intake.  He took in the information that the

MBUsCON5                        Gordon - Cross

1    patients told him.

2    Q.  That's not my question, sir.

3           My question is, during those meetings, isn't it a fact

4    that Peter Kalkanis and you discussed with the clients the lies

5    that they were going to tell the lawyer about the circumstances

6    of their accident and/or injury?

7    A.  George wasn't present, but --

8    Q.  I know he wasn't.  I'm asking you about --

9           THE COURT:  Sir.

10          MR. GANN:  Sorry.

11   A.  Can you repeat the question?

12   Q.  During those meetings where it was just you, Kalkanis, and

13   the patient/client --

14          THE COURT:  When you sat in on the intake meetings,

15   did you or Kalkanis tell people to lie?

16          THE WITNESS:  Peter never told the patient the exact

17   words to say upstairs to George.

18   Q.  I'm not asking about the exact words.

19          Each one of those patients/clients was told to come up

20   with a story, correct?

21          MS. KUDLA:  Objection, asked and answered.

22          THE COURT:  Was each one of those clients told to make

23   up a story during the intake?

24          THE WITNESS:  No, they were never told to make up a

25   story.

MBUsCON5                          Gordon - Cross

1    Q.  Had you told any of them where they should -- where they

2    should say they had fallen?

3    A.  Yes.

4    Q.  You had actually driven people to locations to stage the

5    fall, correct?

6    A.  Correct.

7    Q.  And then sometime after brought them over to

8    Mr. Constantine's office, correct?

9    A.  Correct.

10   Q.  Mr. Constantine wasn't present during those circumstances

11   in which you drove people to stage an accident, correct?

12   A.  No, it was just me and the patient --

13   Q.  And you told these people, you told these people go over

14   there and find that pothole, that grate, whatever it may be,

15   trip over it and pretend you're injured, correct?

16   A.  Um, the instructions was given from Peter Kalkanis.

17   Q.  The instructions came from Peter Kalkanis, right?

18   A.  Yes.

19   Q.  All of the instructions about how these accidents were

20   supposed to take place came from Peter Kalkanis, correct?

21   A.  Um, I spoke with him, um, most of the time.

22            (Continued on next page)

23

24

25

MBUVCON6                          Gordon - Cross

1    BY MR. GANN:

2    Q.  Right.  And he told you, you got to get people to locations

3    where there's a pothole or some kind of defect that they can

4    claim to have tripped over, right?

5    A.  He gave me instructions, but I don't know where his

6    instructions came from.

7    Q.  I'm not asking you that.  He's the one who gave you

8    instructions as to find places for people to fall; correct?

9    A.  He's the one I spoke to, but --

10   Q.  He gave you those instructions, right?

11   A.  Yes.

12   Q.  He's the one who gave you the instructions to tell people

13   to say they injured their knee or their back or their shoulder;

14   correct?

15   A.  I met with him a few times to discuss it, but as I said, I

16   don't know -- I mean, Peter got his information from other --

17   from probably --

18   Q.  I'm not asking you --

19          THE COURT:  Let him finish, unless you were finished.

20   A.  Yeah, well, he could have gotten his instruction from an

21   attorney.

22          MR. GANN:  Judge, I'm going to ask to strike that.

23   That's not responsive.

24          THE COURT:  I'm going to strike that last phrase.

25          MR. GANN:  Thank you.

MBUVCON6                          Gordon - Cross

1    Q.  My question, Mr. Gordon, is all of the instructions you

2    gave to the patient clients about what their injuries were,

3    where they fell, all of the details of their accident, came

4    from a direction of Peter Kalkanis to you; correct?

5    A.  Correct.

6    Q.  I'm not asking you to speculate where Peter Kalkanis came

7    up with it.  George Constantine never told you to take anyone

8    to a site and have them fake a trip-and-fall there, right?

9              THE COURT:  Watch the tone, sir.

10             MR. GANN:  I'm sorry.

11             THE COURT:  Just ask a question.

12             MR. GANN:  I apologize.

13             THE COURT:  Ratchet it down.

14             MR. GANN:  I apologize.  I'm loud in general, Judge.

15   I apologize.

16             THE COURT:  I'm concerned about being loud in

17   specifics --

18             MR. GANN:  I'm sorry?

19             THE COURT:  I'm concerned about being loud in

20   specifics, not in general.

21             MR. GANN:  Point well taken.

22   BY MR. GANN:

23   Q.  George Constantine never told you to take individuals to a

24   location to have them stage a trip-and-fall; correct?

25   A.  Never directly.

1   Q.  He never told you that, right?  Words never came out of his

2   mouth?

3           THE COURT:  To you.  Is that correct?

4           THE WITNESS:  That's correct.

5           THE COURT:  Okay.

6   Q.  George Constantine -- the words never came out of George

7   Constantine's mouth to tell people to have -- to fake a knee

8   injury or to fake a shoulder injury or to fake a back injury,

9   right?

10  A.  Correct.

11  Q.  Yes?

12  A.  Correct.

13  Q.  George Constantine never gave you a location at which

14  somebody should stage a fake trip-and-fall; correct?

15  A.  We -- like it was -- it was indirect.

16  Q.  Sir, that's not what I'm asking you.

17          The words never came out of George Constantine's mouth

18  telling you, This is where you should stage a trip-and-fall,

19  right?

20  A.  Correct.

21  Q.  George Constantine never told you what medical providers to

22  use, did he?

23  A.  I wasn't in a meeting to --

24  Q.  Sir, that's not what I'm asking.  Please, just listen to

25  the question.  George Constantine never told you to use any

MBUVCON6                          Gordon - Cross

1     specific or particular medical provider; correct?

2     A.  Correct.

3     Q.  And there were a number of medical providers that were used

4     in the context of this scheme; correct?

5     A.  Yes.

6     Q.  Not just the ones you've referred to during the course of

7     your direct testimony, right?

8     A.  Correct.

9              MR. GANN:  Judge, I don't know if you want me to

10    continue now.

11             THE COURT:  Yes, I do.

12             MR. GANN:  Okay.

13             THE COURT:  Make progress.

14             MR. GANN:  Okay.

15    Q.  By the way, do you know who Dimitri Stephanopoulos is?

16    A.  I don't recall.

17    Q.  Big Jimmy, does that ring a bell?

18    A.  It's been a long time.  I don't recall.

19    Q.  Big Jimmy the taxi guy?

20             MS. KUDLA:  Objection.

21             THE COURT:  He can ask, do you recall the name --

22    person big Jimmy, the taxi guy.

23             THE WITNESS:  I don't.  I don't recall.

24    Q.  George Constantine's office was not -- did not just house

25    George Constantine and his staff; correct?

1   A.  Correct.

2   Q.  There were two other lawyers in there as well, right?

3   A.  I don't know the -- if they were lawyers.  I don't know who

4   was who.  I didn't ask.

5   Q.  Dimitri Bolfos, does that name ring a bell?

6   A.  Sorry, I.

7   Q.  Little Jimmy?

8   A.  I don't recall.

9   Q.  You don't recall little Jimmy?

10          MS. KUDLA:  Objection.

11          THE COURT:  Come on, let's move on.  He doesn't know

12  big Jimmy, he doesn't know little Jimmy, he doesn't know medium

13  Jimmy.  Move on.

14  Q.  Let me ask about three cases that -- withdrawn.

15          Did you refer in the context of this scheme an

16  individual by the name of Nelson Doherty?

17  A.  It sounds familiar.  I don't recall the details of the

18  case.

19  Q.  A fall off of a ramp on the way into a building?

20  A.  Sorry, I don't recall.

21  Q.  How about Yvette Carcana?

22  A.  I am not the only one referring cases.  Bryan Duncan --

23  Q.  I understand that.

24          THE COURT:  Sir, does that mean anything to you?

25          THE WITNESS:  No.

1           THE COURT:  Next question.

2    Q.  How about Chantelle Gaffney?

3    A.  I knew a Chantelle, but I don't know the last name.

4    Q.  It was a trip-and-fall case?

5    A.  It was a trip-and-fall case.

6    Q.  Trip-and-fall case that was referred to George Constantine?

7    A.  I recall a Chantelle case, yes.

8    Q.  Young woman, right?

9    A.  There were a lot of young women in the case.

10   Q.  I'm talking about this Chantelle that you're recalling.

11   A.  If I could remember, yes.

12   Q.  Trip-and-fall case where she -- which was a legitimate

13   case, right?

14   A.  I don't remember the details of the case.

15   Q.  Now, you were asked on direct examination about whether

16   these patients that you were driving around appeared to be

17   seriously injured.  Do you recall that?

18   A.  Yes.

19   Q.  And you said they didn't appear to be seriously injured;

20   correct?

21   A.  Correct.

22   Q.  Would you agree with me that injuries aren't always visible

23   to the naked eye?

24   A.  Correct.

25   Q.  And sometimes people can be in pain and you don't see it,

1  right?

2  A.  Correct.

3  Q.  They don't complain about it, right?

4  A.  Correct.

5  Q.  To you.  They may complain to a doctor, but not necessarily

6  to you, right?

7  A.  Correct.

8  Q.  Right?

9  A.  Correct.

10  Q.  So people can be injured without you having seen it;

11  correct?

12  A.  They didn't seem injured to me.

13  Q.  I understand that.  But I'm saying to you, you understand

14  that people can be actually injured without you actually

15  observing the injury?

16          MS. KUDLA:  Objection.

17          THE COURT:  I'll allow it.

18          Is that right?

19          THE WITNESS:  People didn't seem injured to me; most

20  people didn't seem injured to me.

21          THE COURT:  Move on.

22  Q.  Now, you indicated, I believe, on direct examination, that

23  during the period of time -- and I believe you said it was five

24  years that you were referring to when you were referring

25  patients or bringing -- excuse me, referring clients or

1    bringing clients to George Constantine's office, right?

2    A.  Yes.

3    Q.  And I believe what you said was that between you and Ryan

4    Rainford and Bryan Duncan, that you brought anywhere between

5    six to nine patients per week to his office, right?

6    A.  Correct.

7    Q.  And it was -- it was always one of two days that you

8    brought those patients to his office; correct?

9    A.  Yes, Thursday or Friday.

10   Q.  And you would bring anywhere from, I think you said, two to

11   three, and they would bring anything from two to three or one

12   to three or something like that; correct?

13   A.  Correct.

14   Q.  But the average was somewhere between six and nine?

15   A.  Correct.

16   Q.  And you said that George Constantine took every one of the

17   cases that you referred to him; correct?

18   A.  To my knowledge.

19   Q.  You don't recall him rejecting anything?

20   A.  I don't recall.

21   Q.  You don't recall conversations with him and/or Robin in

22   which they said they weren't going to take these cases or

23   certain cases?

24   A.  I don't recall.

25   Q.  Over the course of that period of time that you were

MBUVCON6                          Gordon - Cross

1    dealing with George Constantine, how many cases would you say

2    you and Peter Kalkanis referred to him?

3    A.   In the five years?

4    Q.   In the period of time that you were dealing with him.

5    A.   Hundreds.

6    Q.   Meaning what?

7    A.   Hundreds of cases.

8    Q.   One hundred, 200, 300?

9    A.   Over 200.  Over two, 300 cases.

10   Q.   Okay.  Is that a fair number, two to 300 cases?

11   A.   Yes.

12   Q.   Now, just by my math alone, if you guys are referring six

13   to nine patients a week, and you said you worked five days a

14   week, correct --

15   A.   Yes.

16   Q.   -- doing this?  And you worked 52 weeks a year; correct?

17   A.   Correct.

18   Q.   So if you take six to nine patients, let's be conservative,

19   that's about 1500 client patients over the course of five

20   years; correct?

21   A.   Correct.

22   Q.   But George Constantine -- of those 1500 patients, George

23   Constantine took roughly two, three, maybe 400?  Is that fair?

24          MS. KUDLA:  Objection.

25   A.   I don't know.

1           THE COURT:  The jury -- Mr. Gordon, the jury does not

2    want a guess.  Give a fair estimate.  If you can estimate the

3    number, then do so; but certainly don't just guess.

4           Next question.

5           THE WITNESS:  I'm estimating the number of patients I

6    brought and what I seen in Bryan Duncan and Ryan Rainford's

7    car.

8           THE COURT:  And that estimate is what?

9           THE WITNESS:  One to three patients from Bryan Duncan

10   and Ryan Rainford, and about one to three patients or two to

11   three patients from me.

12          THE COURT:  For every week for five years?

13          THE WITNESS:  About.

14          THE COURT:  All right.  Move on.

15   BY MR. GANN:

16   Q.  So isn't it fair that you -- don't you know that George

17   Constantine actually rejected quite a number of patients?

18          MS. KUDLA:  Objection.

19          THE COURT:  Do you know whether or not he rejected

20   quite a number of patients?

21          THE WITNESS:  I don't know.  To my knowledge, he took

22   all the cases.

23   Q.  Was Erica Barton one of your cases?

24   A.  I don't remember the name.

25   Q.  Now, during the period of time that you were actually --

1    that you were acting as a runner, recruiter, however you want

2    to describe it, you were getting cases from a number of

3    different sources, were you not?

4    A.  Yes.

5    Q.  And I know on direct examination, I believe one of the

6    references was to Mahadi; correct?

7    A.  Yes.

8    Q.  Mahadi was somebody that he referred clients/patients to

9    you; correct?

10   A.  Not to me directly.

11   Q.  To who?

12   A.  To Peter Kalkanis.

13   Q.  Okay.  And did Mahadi work at Priority Medical?

14   A.  I don't know what his job was, but he was in the area.

15   Q.  In the area of Priority Medical?

16   A.  Yes.

17   Q.  And some of these referrals to the lawyers came out of

18   Priority Medical; correct?

19   A.  Correct.

20   Q.  These were people that prior to their involvement in the

21   scam, were getting treatment of some kind at Priority Medical;

22   correct?

23            MS. KUDLA:  Objection.

24            THE COURT:  Sustained.

25   Q.  To your knowledge, Mr. Gordon, were some of these people

1    getting treatment at Priority Medical?

2    A.  I don't know the previous treatments.  I don't know.

3    Q.  Was Priority Medical the only medical provider that you are

4    familiar with who -- from whom clients/patients were obtained

5    from?

6    A.  To my knowledge.

7    Q.  What about hospitals?

8    A.  Yes.

9    Q.  So you do know that clients were obtained by connections

10   within the hospitals; correct?

11   A.  Yes.

12   Q.  In fact, you paid for a list of patients; correct?

13   A.  Correct.

14   Q.  And some of those patients were patients that were referred

15   to George Constantine, right?

16   A.  Correct.

17   Q.  So they had already been complaining of injury or pain

18   prior to yours and Kalkanis's involvement with them; correct?

19           MS. KUDLA:  Objection.

20           THE COURT:  If you know.

21           THE WITNESS:  I don't know.

22   Q.  Who at the hospital was referring these patients to you?

23   A.  I don't remember his name.

24   Q.  Who did you buy the list from?

25   A.  I don't remember his name.

1          THE COURT:  Same person?

2          THE WITNESS:  Same person.

3   Q.  You paid like $500 for the list; correct?

4   A.  I don't -- something around there.  I don't know.

5   Q.  And you did that more than once, right?

6   A.  Yes.

7   Q.  And you bought -- you bought lists from various hospitals

8   around the five-borough area; correct?

9   A.  I don't know where he got his list from.

10  Q.  Not what I'm asking you.  You bought lists from various

11  hospitals within New York City, Queens, Brooklyn, and the

12  Bronx?

13         THE COURT:  Those are all part of New York City.

14         MR. GANN:  I'm sorry.  Manhattan I should have said.

15  I apologize.  I'm a Long Islander, Judge.  I apologize.

16  A.  They were all over the place.

17  Q.  And again, these are people that have already been to the

18  hospital; correct?

19  A.  Correct.

20  Q.  You haven't had any conversation with them prior to them

21  going to the hospital, right?

22  A.  Correct.

23  Q.  And these would be people that would be within the group of

24  referrals that you were making to George Constantine and others

25  in the context of this scam, right?

MBUVCON6                        Gordon - Cross

1    A.  I got referrals in many different ways.  So I couldn't tell

2    you one source of referrals.

3    Q.  So when you estimate at this point that 90 percent of the

4    cases were illegitimate, that's a made-up number, isn't it?

5    A.  No.

6              MS. KUDLA:  Objection.

7              THE COURT:  I'll allow it.  The answer is no.

8    Q.  How many of the referrals came from the referral source

9    that you had or the referral sources that you had at the

10   various hospitals around the city?

11   A.  I'm not sure.  I couldn't tell you.

12   Q.  You can't put any percentage on that?

13   A.  No.

14   Q.  How many of the patients that you recruited into this

15   scheme came from places like Priority Medical?

16   A.  Again, Peter had a referral there as well, so I can't

17   pinpoint a number on that.

18   Q.  Can't estimate it at all?

19   A.  No, I'm sorry.

20   Q.  Can't put a percentage on it?

21   A.  No.

22             MS. KUDLA:  Objection.

23   Q.  Now, fair to say that you knew, in your knowledge of and

24   dealings with George Constantine, that he was a sole

25   practitioner, right?  Meaning he was a one-man law -- let me

```
 1   withdraw that.
 2             George was an attorney working by himself within his
 3   practice, right?
 4   A.  I didn't know much details in the beginning.
 5   Q.  Well, okay.  He had staff; correct?
 6   A.  Yes.
 7   Q.  And he was the lawyer supervising that staff to the best of
 8   your knowledge, right?
 9   A.  Correct.
10   Q.  He didn't have a partner or anything like that?
11             THE COURT:  Do you know whether he had any legal law
12   partners?
13             THE WITNESS:  Not to my knowledge.
14   Q.  And his office was a busy place, right?
15   A.  To my knowledge.
16   Q.  Was a busy place before you ever got involved in this scam.
17   When you had your case and you went to his office, there were
18   other people, clients there; correct?
19   A.  I don't remember.  I didn't go to his office to get signed
20   up.
21   Q.  In the course of your dealings with George Constantine --
22             THE COURT:  Are you saying that in regard to the
23   actual accident you had, you never went to his office,
24   Constantine's office?
25             THE WITNESS:  Correct.
```

MBUVCON6                          Gordon - Cross

1              THE COURT:  Okay.

2     Q.  In the course of your involvement in this scam, you did go

3     to his office on many occasions, correct?

4     A.  Yes.

5     Q.  And during the times that you went to his office, there

6     were other clients there that had nothing to do with you or

7     Bryan or Ryan; correct?

8     A.  There were other drivers there.

9     Q.  I know there were other drivers there.  You referred to --

10    you referred to Ryan Rainford; correct?  He brought patients?

11    A.  Yes.

12    Q.  Bryan Duncan, you said, brought patients, right?

13    A.  Yes.

14    Q.  And you brought patients, right?

15    A.  Yes.

16    Q.  But I'm asking you at the times that you were at George

17    Constantine's office, there were many occasions where you saw

18    clients there that had nothing to do with the three of you?

19    A.  I don't know all the patients there.  I don't -- I couldn't

20    tell you the details of every patient.  But there were patients

21    there.

22    Q.  And again, patients/clients, that had nothing to do with

23    you three; correct?

24    A.  I don't know.

25    Q.  You knew that George Constantine was a guy who was in court

MBUVCON6                          Gordon - Cross

1   every day, right?

2   A.  To my understanding.

3   Q.  You knew that he was a guy that was sometimes very tough to

4   reach, yes?

5   A.  Supposably.

6   Q.  Well, you got complaints from people that he wasn't -- they

7   weren't able to reach him, right?

8   A.  Yes.

9   Q.  Is it fair to say he seemed to be a busy guy with a busy

10  practice?

11  A.  I wouldn't know.

12  Q.  I'm sorry?

13  A.  I wouldn't know.

14  Q.  Now, did Peter Kalkanis pay you for the clients that you

15  brought into this scheme?

16  A.  Yes.

17  Q.  He paid you what, $1500?

18  A.  Paid me $1,000.

19  Q.  Paid you $1,000 for each client?

20          THE COURT:  Per person?

21          THE WITNESS:  Per person.

22  Q.  And is that from roughly 2012 until you broke up with him

23  at some point in 2015?

24  A.  In 2012, I was only getting paid for just driving.

25  Q.  And how much were you being paid for driving?

MBUVCON6                          Gordon - Cross

1    A.  I think it was around $500.

2    Q.  And that was $500 a week?

3    A.  Yes.

4    Q.  And at what point did it change to where you got $1,000 for

5    every patient you brought in?

6    A.  When he asked for referrals.

7    Q.  And approximately when was that?

8    A.  I'm sorry, I can't pinpoint a date, a year on it.

9    Q.  Peter Kalkanis didn't always pay you the money that he

10   promised you, did he?

11   A.  We had issues, but he paid me.

12   Q.  When you say you had issues, there were times where you got

13   angry with him because he wasn't paying you what you thought

14   you were entitled to, right?

15   A.  Yes.

16   Q.  And ultimately, that's part of the reason that you split up

17   with him; correct?

18   A.  Correct.

19   Q.  You found out that Peter Kalkanis was actually pocketing

20   money that was for you or Bryan or Ryan and keeping it for

21   himself, right?

22           MS. KUDLA:  Objection.

23   A.  I don't remember that part --

24           THE COURT:  Just a moment.

25   A.  I don't remember --

1          THE COURT:  I'll allow it.

2    A.   -- pocketing money that he was supposed to give me, but

3    there were money issues sometimes.

4    Q.   What I mean is took money that you were entitled to and

5    kept it himself.

6    A.   Yeah.

7    Q.   And fair to say also that you were aware that Peter

8    Kalkanis also wasn't paying the patients the money that they

9    were entitled to?

10          MS. KUDLA:  Objection.

11          THE COURT:  Do you know that, sir?

12          THE WITNESS:  I don't know that.  I didn't --

13          THE COURT:  All right.  Thank you.  Next question.

14   Q.   But you do know that Peter Kalkanis was forging patients --

15   forging signatures on these funding agreements; correct?

16   A.   Yes, that's what I was told.

17   Q.   But you don't have any idea how many he forged?

18   A.   No.

19   Q.   Or whose signatures he forged?

20   A.   The patients, no, I don't know the exact names of patients.

21   Q.   Do you know he forged George Constantine's signature on

22   funding agreements?

23   A.   No.

24   Q.   You're not aware of that?

25   A.   No, I didn't know.

MBUVCON6                         Gordon - Cross

1          THE COURT:  Well, you don't know -- you simply don't
2     know anything about that; correct?
3          THE WITNESS:  Right.
4          THE COURT:  All right.
5          Is this a logical time to break, sir?
6          MR. GANN:  Makes sense to me, Judge.
7          THE COURT:  All right.
8          Ladies and gentlemen, I have another matter tomorrow
9     at 9:30, so why don't you -- it probably will be only about 15
10    minutes long; but to be on the safe side, be here at 10, all
11    right.  I don't want you to have to come in at 9:45 and wait.
12    So be here by 10 tomorrow morning.
13          We have to end tomorrow at 4:30; so that's what
14    tomorrow's schedule will be, 10 a.m. to 4:30.
15          Thank you.  Enjoy the evening.
16          (Jury not present)
17          THE COURT:  You may step down, sir.  Thank you.
18          Don't talk to the government because you're on
19    cross-examination.  You can talk to whoever about scheduling,
20    but don't talk any substance.  Thank you.
21          (Witness not present)
22          THE COURT:  All right.  Ten a.m. tomorrow.
23          (Adjourned to December 1, 2022 at 10 a.m.)
24
25

```
 1                          INDEX OF EXAMINATION

 2   Examination of:                              Page

 3    ERICA BARTON

 4   Direct By Ms. Rothman  . . . . . . . . . . . 290

 5   Cross By Ms. Vitale  . . . . . . . . . . . . 328

 6   Cross By Mr. Keating                 332{S .

 7   Redirect By Ms. Rothman  . . . . . . . . . . 357

 8   Recross By Mr. Keating . . . . . . . . . . . 361

 9    KERRY GORDON

10   Direct By Ms. Kudla  . . . . . . . . . . . . 367

11   Cross By Mr. Gann  . . . . . . . . . . . . . 502

12                        GOVERNMENT EXHIBITS

13   Exhibit No.                             Received

14    GX 2   . . . . . . . . . . . . . . . . . . 292

15    GX 7 and 10  . . . . . . . . . . . . . . . 294

16    GX 804   . . . . . . . . . . . . . . . . . 297

17    GX 201   . . . . . . . . . . . . . . . . . 310

18    GX 209   . . . . . . . . . . . . . . . . . 311

19    GX 11  . . . . . . . . . . . . . . . . . . 315

20    GX 1803 and 801  . . . . . . . . . . . . . 319

21    GX 820   . . . . . . . . . . . . . . . . . 327

22    1801   . . . . . . . . . . . . . . . . . . 363

23    1802   . . . . . . . . . . . . . . . . . . 364

24    1602, 1603, 1604, 1805, 1602D, 1602E, . . . . 366

25           1602F, 1602G, 1602H, 1602I,
```

1                    1602J, 1602K, 1602L, 1602M,

2                    1602N, 1602O, 1602P, 1602Q,

3                    1602S, 1602U, 1602V, 1602W,

4                    1602X, 1602Y, 1602Z, 1602AA,

5                    1602AD, 1602AE, 1602AF,

6                    1602AG, 1602AH, 1602AI,

7                    1602AK, 1602AL, 1602AM,

8                    1602AN, 1602AO, 1602AQ,

9                    1602AR, 1602AS, 1602AV,

10                   1602AW, 1602AX, 1602AY,

11                   1602AZ, 1602BA, 1602BB,

12                   1602BC, 1602BD, 1602BE,

13                   1602BF, 1602BG, 1602BH,

14                   1602BI, 1602BJ, 1602BK,

15                   1602BL, 1602BM, 1602BN,

16                   1602BO, 1602BP, 1602BQ,

17                   1602BR, 1602BS 1603A, 1603B,

18                   1603C, 1603D, 1603E, 1604A,

19                   1604B

20    811    . . . . . . . . . . . . . . . . . . 369

21    1A     . . . . . . . . . . . . . . . . . . 372

22    2A     . . . . . . . . . . . . . . . . . . 373

23    4, 4A  . . . . . . . . . . . . . . . . . . 375

24    6, 6A  . . . . . . . . . . . . . . . . . . 377

25    GX 3A  . . . . . . . . . . . . . . . . . . 380

GX 9A     . . . . . . . . . . . . . . . . . 381

GX 8 and 8A   . . . . . . . . . . . . . . . 382

GX 11B    . . . . . . . . . . . . . . . . . 383

GX 211    . . . . . . . . . . . . . . . . . 393

GX 230    . . . . . . . . . . . . . . . . . 394

GX 222    . . . . . . . . . . . . . . . . . 402

GX 213    . . . . . . . . . . . . . . . . . 421

GX 212    . . . . . . . . . . . . . . . . . 422

GX 202    . . . . . . . . . . . . . . . . . 424

3A, 11A   . . . . . . . . . . . . . . . . . 436

231   . . . . . . . . . . . . . . . . . . . 437

GX 221    . . . . . . . . . . . . . . . . . 522